**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| TAKEOFF TECHNOLOGIES, INC., *et al.*,[1] | ) | Case No. 24-11106 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION FOR
ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING
POSTPETITION FINANCING; (II) GRANTING LIENS
AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS; (III) MODIFYING THE AUTOMATIC STAY;
(IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"),

hereby submit this motion (this "Motion"), under sections 105, 361, 362(d), 363(b), 363(c),

364(c)(1), 364(c)(2), 503(b), and 507 of title 11 of the United States Code

(the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and rule 4001-2 of the Local Rules of Bankruptcy

Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the

"Local Rules"), for entry of interim and final orders, (a) authorizing the Debtors to obtain

postpetition financing pursuant to a superpriority, senior secured, debtor-in-possession multiple

draw term loan facility in an aggregate principal amount of up to $9.566 million; (b) granting liens

and providing superpriority administration expense claims; (c) modifying the automatic stay; (d)

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of the Debtors federal tax identification numbers, as applicable, are:  Takeoff Technologies, Inc. (0552); Takeoff Technologies Canada, Inc.; Takeoff Technologies Australia Pty Ltd. (ACN 639 288 958); Takeoff Technologies FZE; Takeoff International Subco India Private Limited; and Takeoff International Subco, LLC.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 203 Crescent Street, Suite 203, Waltham, Massachusetts 02453.

scheduling a final hearing on the Motion; and (e) granting related relief.  In support of this Motion, the Debtors submit the *Declaration of Brett Anderson in Support of the Debtors' Chapter 11 Petition and First Day Pleadings* (the "First Day Declaration"), which has been filed contemporaneously herewith and incorporated herein by reference.  In further support of this Motion, the Debtors respectfully state as follows:

## Preliminary Statement[2]

1.      The Debtors commenced these chapter 11 cases to implement a value-maximizing restructuring through a sale of some or all of their assets (the "Sale Transaction(s)").  In furtherance of these efforts, the Debtors, with the assistance of their advisors, have negotiated the terms of a postpetition delayed-draw financing facility, whereby the DIP Lenders will provide up to $9.566 million of new money financing to the Debtors, with $1.954 million available during the interim period.

2.      The Debtors believe the amounts available under the DIP Facility will be sufficient to allow them to move efficiently through these cases to maximize recovery to all stakeholders through one or more Sale Transactions.  As set forth in more detail in the First Day Declaration, the Debtors intend to capitalize on a marketing and sale process culminating in an auction and free-and-clear sale anticipated to occur less than three months post-filing.  The DIP Facility will provide sufficient liquidity to achieve this anticipated timeline, along with any runway necessary to distribute proceeds to stakeholders and exit these chapter 11 cases.  While the Debtors sought financing from traditional financing sources, none was available.  Rather, the Debtors are fortunate that three of their existing customers have committed to extend financing through these chapter 11

---

[2]    Capitalized terms used but not defined in this preliminary statement have the meaning given to them below.

cases pursuant to the DIP Facility on the terms proposed herein.  In light of the facts and circumstances, the proposed DIP Facility provides the best financing available to the Debtors, and the Debtors respectfully request that the Court grant this Motion.

## Jurisdiction

3.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (Sleet, C.J.).  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules, to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      The statutory and other bases for the relief requested in this Motion are sections 105, 361, 362(d), 363(c), 364(c)(1), 364(c)(2), 503(b), and 507 of the Bankruptcy Code Rules 2002, 4001, 6003, 6004, and 9014 of the Bankruptcy Rules and Local Rule 4001-2.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

6.      By this Motion, the Debtors seek entry of an interim order, substantially in the form attached hereto at Exhibit A (the "Interim Order") and a final order (the "Final Order" and, together with the Interim Order, collectively, the "DIP Orders"),[3] granting, among other things, the following relief:

---

[3]     The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

a.  Authorizing Takeoff Technologies, Inc. (the "DIP Borrower") to obtain postpetition financing (the "DIP Financing") pursuant to a senior secured, superpriority, debtor-in-possession, multiple-draw term loan facility (the "DIP Facility") in an aggregate principal amount of up to $9.566 million, of which $1.954 million will be available to be drawn over a weekly basis or as otherwise provided in the Approved Budget during the period from entry of the Interim Order until entry of the Final Order (the "Initial Commitment Period"), $5.75 million will be available upon the entry of the Final Order and the satisfaction of other applicable conditions precedent, and a weekly draw of $207,000 (for a total aggregate amount of $1.862 million) or as otherwise provided in the Approved Budget during the period after entry of the Final Order, subject to the terms and conditions set forth in that certain *Debtor-in-Possession Credit Agreement* attached hereto in substantially final form as **Exhibit 1** to the Interim Order (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"), by and among the DIP Borrower, the Guarantors (as defined in the DIP Credit Agreement), Woolworths Group, Albertsons Companies Inc., Village Super Market, Inc., ShopRite of Hunterdon County, Inc. and Inserra Supermarkets, Inc. (collectively, the "DIP Lenders"), and GLAS Americas, LLC, as collateral agent (in such capacity, together with its successors and permitted assigns, the "DIP Agent" and, together with the DIP Lenders, the "DIP Secured Parties");

b.  authorizing the Debtors to execute, deliver, and perform under the DIP Credit Agreement and the other DIP Documents (defined below), the DIP Orders, and all other related agreements and documents creating, evidencing, or securing indebtedness or obligations of any of the Debtors to the DIP Secured Parties on account of the DIP Facility or granting or perfecting liens or security interests by any of the Debtors in favor of and for the benefit of the DIP Agent, for itself and for and on behalf of the DIP Lenders, on account of the DIP Facility, as the same now exists or may hereafter be amended, restated, amended and restated, supplemented or otherwise modified from time to time (any and all of the agreements and documents currently executed or to be executed in connection therewith or related thereto, by and among any of the Debtors, the DIP Agent, and the DIP Lenders, and, in accordance with the DIP Credit Agreement, collectively, the "DIP Documents");

c.  authorizing the Debtors to pay fees and reimburse expenses under the DIP Documents, and perform such other and further acts as required in connection with the DIP Documents;

d.  granting to the DIP Agent, for itself and for and on behalf of the DIP Lenders, and authorizing the Debtors to incur valid, binding, enforceable, non-avoidable, and automatically and properly and fully perfected DIP Liens (defined below) in all DIP Collateral (defined below) pursuant to sections 364(c)(2), (c)(3), and (d), to secure the loans under the DIP Facility (the "DIP Loans") and all

obligations and indebtedness of any of the Debtors to the DIP Agent and the DIP Lenders under the DIP Documents, including all interest accrued and accruing thereon, and all other amounts owing by the respective Debtors in respect thereof (collectively, the "<u>DIP Obligations</u>"), which DIP Obligations shall be subject and subordinate only to the Carve Out (defined below);

e.  granting to the DIP Agent, for itself and for and on behalf of the DIP Lenders, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code against each of the Debtors in respect of all DIP Obligations, with recourse to all prepetition and postpetition property of the Debtors;

f.  vacating and modifying the automatic stay of section 362 of the Bankruptcy Code to the extent provided herein to permit the Debtors and the DIP Secured Parties to implement and effectuate the terms and provisions of the DIP Orders and the DIP Documents and to deliver any notices of termination described herein;

g.  scheduling a Final Hearing (defined below) within twenty-eight (28) days of the entry of the Interim Order and approving notice with respect thereto in accordance with Bankruptcy Rule 4001(c)(2); and

h.  waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the DIP Orders and providing for the immediate effectiveness of the DIP Orders.

## **Background of the Debtors**

7.  Founded in 2016 by a group of former grocery executives, the Debtors operate one of the leading eGrocery, micro fulfillment solution companies in the world.  The Debtors' business model centers around the sale, subsequent maintenance, and support of the equipment and software needed to operate micro-fulfillment centers—i.e., small, automated, robotic warehouses called micro-fulfillment centers, either placed in grocery stores or near the end-shoppers.

8.  Headquartered in Waltham, Massachusetts with international subsidiaries organized in Canada, Australia, India, and the United Arab Emirates, the Debtors' business is global.  At their peak, the Debtors had over 300 employees working on dozens of sites across eight countries and four continents.  However, despite generating strong revenue, the Debtors failed to

make material progress towards achieving profitability and suffered significant operating losses in 2022 and 2023 due to the cost pressures associated with an early-stage software company.

9.     On the date hereof (the "<u>Petition Date</u>"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases (these "<u>Chapter 11 Cases</u>").

10.     Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of this chapter 11 case is set forth in the First Day Declaration, incorporated herein by reference.

**Summary Terms of the DIP Documents**

11.     In accordance with Rules 4001(c)–(d) of the Bankruptcy Rules and Rule 4001-2(a) of the Local Rules, the chart below summarizes material terms of the DIP Facility.[4]

| Provision | Summary | Location |
|---|---|---|
| **DIP Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Takeoff Technologies, Inc., a Delaware corporation | DIP Credit Agreement, Preamble |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | The obligations of the DIP Borrower under the DIP Facility will be guaranteed, jointly and severally, by each of the following debtors and debtors in possession: (a) Takeoff Technologies Canada, Inc; (b) Takeoff Technologies Australia Pty Ltd; (c) Takeoff Technologies FZE; (d) Takeoff International Subco India Private Limited | DIP Credit Agreement, Preamble |

---

[4]   The following summary of the terms of the DIP Facility is qualified entirely by the express terms of the referenced documents, including the DIP Credit Agreement and DIP Orders.  If there are any inconsistencies between the summary below and such documents, the terms of such documents shall control. Capitalized terms used but not otherwise defined in this summary chart shall have the meanings ascribed to them in the DIP Credit Agreement or the DIP Orders, as applicable.

| Provision | Summary | Location |
|---|---|---|
| **DIP Agent**<br><br>Bankruptcy Rule 4001(c)(1)(B) | GLAS Americas, LLC | DIP Credit Agreement, Preamble |
| **DIP Lenders**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Woolworths Group, Albertsons Companies Inc., Village Super Market, Inc., ShopRite of Hunterdon County, Inc., and Inserra Supermarkets, Inc., along with any subsequent successor or assignee. | DIP Credit Agreement, Preamble |
| **Facility Type and Amount**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(A) | The DIP Facility is a superpriority, senior secured, debtor-in-possession multiple-draw term loan facility in an aggregate principal amount of up to $9.566 million consisting of: (a) weekly draws of not to exceed $391,000 per Borrowing and $1,954,000 in the aggregate during the Initial Commitment Period, (b) a draw of up to $5,750,000 upon entry of the Final Order, and (c) a weekly draw of $207,000 per Borrowing and $1,862,000 in the aggregate following entry of the Final Order. | DIP Credit Agreement, Section 1.1(a) |
| **Use of Proceeds/Purpose**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(A) | The proceeds of the DIP Facility shall be used solely (a) to pay reasonable fees, costs, and expenses of the Lenders up to the Lender Expense Cap and (b) to fund the operational, employee, and other costs of the Debtors, including, without limitation, payments authorized to be made under "first day" or "second day" orders, and payments related to the working capital and other general corporate purposes of the Debtors, including the payment of allowed professional fees and expenses, in each case solely as provided for in the Approved Budget. | DIP Credit Agreement, Section 4.4<br><br>Interim Order ¶ 1 |

| Provision | Summary | Location |
|---|---|---|
| **Maturity Date/Pricing**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B) | The DIP Facility shall mature on the earliest of (a) the date that is 14 weeks after the Petition Date (unless otherwise agreed by the Lenders, acting unanimously, in writing), or (b) entry by the Bankruptcy Court of an order dismissing the Chapter 11 Cases or converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code (collectively, the "<u>Maturity Date</u>").<br><br>The DIP Facility does not contain any commitment fees, unused line fees, or letter of credit fees. The DIP Facility does require the Debtors to provide an interim royalty free license to use Specified IP (but not to commercialize for sale or distribution to third parties) during the interim financing period. Upon final approval, the Debtors shall grant the DIP Lenders a royalty free perpetual license to use the Specified IP (but not to commercialize for sale or distribution to third parties). The DIP Facility also requires the delivery of the Specified IP to the DIP Lenders, which shall be subject to the applicable license. | DIP Credit Agreement, Section 11.1 |
| **DIP Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(iii) | As soon as available and in any event by 5:00 p.m. beginning on the Friday following the Petition Date and every Friday thereafter, the Borrower shall deliver to the Lenders a proposed 14-week budget for approval by the Required Lenders (the "<u>Proposed Approved Budget</u>"). As soon as practicable the Lenders (acting unanimously) shall notify the Borrower in writing whether or not such Proposed Approved Budget has been approved by the Lenders. Upon approval thereof by the Lenders (acting unanimously), such 14-Week Budget shall become the "Approved Budget"; provided that (i) if such Proposed Approved Budget is not satisfactory to each Lender in its reasonable discretion and not approved by each Lender in writing (an email being sufficient), the Approved Budget that is then in effect shall remain in place and (ii) subject to the preceding clause (i), the Initial Approved Budget shall be the only Approved Budget. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, or after the Closing Date, the proceeds received hereunder, all cash of the Debtors and proceeds of Collateral shall be used by the Debtors solely in accordance with the Approved Budget.<br><br>The Debtors believe that the Approved Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Approved Budget. | DIP Credit Agreement, Section 4.2 |

| Provision | Summary | Location |
|---|---|---|
| **Variance Covenant**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(E) | The Borrower shall provide to the Lenders on a weekly basis (commencing on the first Friday after the Closing Date), a report of (i) the Debtors' cash position and (ii) a summary reconciliation of the actual use of proceeds of any previous Borrowing as compared to the anticipated use of proceeds of such Borrowings as set forth in the Approved Budget (together with an explanation for any material variances), in each case for the week period which ended on the immediately preceding Friday. | DIP Credit Agreement, Section 4.2 |
| **Interest Rate**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B) | Except as otherwise set forth in the DIP Credit Agreement, the DIP Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) at the rate of 13% per annum, due monthly and payable in kind; provided that the outstanding unpaid principal balance and all accrued and unpaid interest shall be paid in full in cash on the Maturity Date. | DIP Credit Agreement, Section 1.3(a) |
| **Default Rate**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B) | The "Default Rate" shall be equal to the otherwise applicable rate per annum plus 2.00%. | DIP Credit Agreement, Section 1.3(c) |
| **Priority**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vii)<br><br>Local Rule 4001-2(a)(i)(G), (J) | The DIP Obligations shall, subject to the Carve- Out, at all times be secured by:<br><br>(a)    first priority liens pursuant to section 364(c)(2) of the Bankruptcy Code on all DIP Collateral and to the extent any DIP Collateral is subject to any liens perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code ("Permitted Senior Liens"), senior liens, pursuant to section 364(d) of the Bankruptcy Code, on such DIP Collateral subject and subordinate only to Permitted Senior Liens;<br><br>(b)    junior liens pursuant to section 364(c)(3) of the Bankruptcy Code on all DIP Collateral that is subject to any valid and perfected liens existing on the Petition Date;<br><br>The DIP Liens shall be effective immediately upon the entry of the Interim Order and shall not at any time be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or the Debtors' estate under section 551 of the Bankruptcy Code, | Interim Order ¶ 3 |

| Provision | Summary | Location |
|---|---|---|
| | (B) except to the extent the DIP Loan Documents expressly allow a postpetition lien to have priority over the DIP Liens, any postpetition liens granted by the Debtors to other persons or entities or otherwise arising after the Petition Date, including any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit, commission, board, or court for any liability of the Debtors, or (C) any intercompany or affiliate liens or security interests against the Debtors; (ii) subordinated to or made *pari passu* with any other lien or security interest on the DIP Collateral under section 363 or 364 of the Bankruptcy Code; or (iii) subject to sections 510(c), 549, or 550 of the Bankruptcy Code. In no event shall any person or entity who pays (or, through the extension of credit to the Debtors, causes to be paid) any of the DIP Obligations be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens, or priorities granted to or in favor of, or conferred upon, any DIP Secured Party by the terms of any DIP Loan Documents or this Interim Order unless such person or entity contemporaneously causes payment in full of all of the DIP Obligations. | |
| **Parties with an Interest in Cash Collateral** Bankruptcy Rule 4001(b)(1)(B) | There is no prepetition cash and/or cash equivalents collected and held for the benefit of creditors. | N/A |
| **Conditions Precedent to Effectiveness / Credit Extensions** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(i)(E) | Conditions precedent to initial credit extension will be customary and appropriate for similar debtor-in-possession financings of this type, including as follows:<br><br>(a) <u>Approved Budget</u>.  Delivery to DIP Agent of Approved Budget.<br><br>(b) <u>Credit Agreement</u>. The DIP Lenders and the DIP Agent shall have received a counterpart of this Agreement executed by each Loan Party.<br><br>(c) <u>Collateral Matters</u>. The DIP Agent and the DIP Lenders, shall have (i) received fully executed copies of each Collateral Document, and (ii) valid and perfected Liens on the Collateral and each UCC and any other financing statement and each document required by any Collateral Document or any applicable Requirements of Law to be filed, registered, or recorded in order to create in favor of the DIP Agent for the benefit of the Lenders, a valid | DIP Credit Agreement, Sections 2.1 and 2.2 |

| Provision | Summary | Location |
|---|---|---|
| | and perfected Lien on the Collateral required to be delivered pursuant to each Collateral Document, shall be in proper form for filing, registration, or recording. | |
| | (d)    <u>Interim Order</u>. The Court shall have entered the Interim Order in form and substance satisfactory to the DIP Agent in its reasonable discretion. | |
| | (e)    <u>Intellectual Property.</u> Each applicable Loan Party shall have (A) granted to the applicable Lender its Interim IP License and delivered to the applicable Lender its Specified IP, provided, that in connection with the delivery of the Specified IP the Debtors' Chief Technology Officer or other employee with similar responsibilities (the "<u>CTO</u>") shall assist each Lender's technical representative to verify the contents and functionality, if applicable, of the Specified IP to the reasonable satisfaction of each Lender, (B) provided access to each Lender to the "Fixx" and "Looker" instances relevant to that Lender's automated micro fulfilment center ("<u>MFC</u>") existing and future sites, together with any and all related materials, documentation, data, and information (including usernames, logins, passwords, and access keys and credentials to associated software, middleware and hardware). | |
| | (f)    <u>Sublicense</u>. Each Loan Party shall have provided to each Lender a customer sublicense as provided for under the Amended and Restated Master System Purchase Agreement with Knapp, dated October 29, 2020. | |
| | (g)    <u>No Default</u>. No Default or Event of Default shall have occurred or shall be continuing or would result after giving effect to this Agreement and the other Loan Documents. | |
| | (h)    <u>Lien Searches</u>. The DIP Agent shall have received copies of Uniform Commercial Code, mortgage search results, or their local equivalents, for each Loan Party in its jurisdiction of organization and any other jurisdiction reasonably requested by the Lenders. | |
| | (i)    Insurance. The DIP Agent shall have received evidence of insurance coverage in form, scope and substance reasonably acceptable to the DIP Agent | |

| Provision | Summary | Location |
|---|---|---|
| | which such insurance coverage shall name the DIP Agent as an additional insured.<br><br>Conditions precedent to each subsequent credit extension are as follows:<br><br>(a) <u>Borrowing Notice</u>. Each Lender shall have received a Notice of Borrowing in accordance with Section 1.4(a) (Procedure for Borrowing) of the DIP Credit Agreement.<br><br>(b) <u>DIP Order</u>. (x) With respect to any Borrowing during the Initial Commitment Period, the Interim DIP Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, and shall not have been reversed, modified, amended, stayed, or vacated, and (y) with respect to any Borrowing following the expiration of the Initial Commitment Period, the Final DIP Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, and shall not have been reversed, modified, amended, stayed, or vacated.<br><br>(c) <u>Representations and Warranties</u>. All representations and warranties by the Loan Parties contained herein or in any other Loan Document shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of the date of such Borrowing, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representation or warranty shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date).<br><br>(d) <u>No Default or Event of Default</u>. No Default or Event of Default under the DIP Facility shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof. | |
| **Affirmative Covenants**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Affirmative covenants will be customary and appropriate for similar debtor-in-possession financings of this type, including as follows:<br><br>(a) <u>Notices; Other Information</u>.<br><br>    a. The applicable Loan Party shall notify promptly the DIP Agent and each Lender following (and in no event later than three Business Days after a Responsible Officer becomes aware thereof) the occurrence or | DIP Credit Agreement, Article 4. |

| Provision | Summary | Location |
|-----------|---------|----------|
| | existence of any Default or Event of Default. | |
| | b. Each Loan Party shall promptly forward or make available to the DIP Agent and the DIP Lenders any such business, financial, corporate affairs and other information regarding each Loan Party, its subsidiaries, and the Collateral as the DIP Agent or any DIP Lender may from time to time reasonably request. | |
| | c. The applicable Loan Party shall notify promptly the Agent and each Lender (i) following any loss, damage or destruction to the Collateral in the amount of $50,000 or more, whether or not covered by insurance; and (ii) any dispute, litigation, investigation or proceeding between any Loan Party and Governmental Authority | |
| | (b) Compliance with Laws; Maintenance of Existence. | |
| | a. Each Loan Party (a) shall comply with all Requirements of Law of any Governmental Authority having jurisdiction over it or its business, except where the failure to comply would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, (b) shall preserve, renew, and keep in full force and effect its organizational existence, and (c) shall take all reasonable action to maintain all necessary governmental licenses, authorizations, Permits, consents, and approvals to own its assets and carry on its business. | |
| | (c) Further Assurances. | |
| | a. Without any further order of the Bankruptcy Court, promptly upon request by the DIP Agent (and the DIP Agent shall make such request upon the direction of the Required Lenders), each Loan Party shall take such additional actions and execute such documents as the DIP Agent or the Lenders may reasonably require from time to time in order (a) to carry out more effectively the purposes of the DIP Credit Agreement or any other Loan Document, (b) to subject to the Liens created by any of the Collateral | |

| Provision | Summary | Location |
|---|---|---|
| | Documents all of the Collateral, (c) to perfect and maintain the validity, effectiveness, and priority of any of the Collateral Documents and the Liens created thereby, and (d) to better assure, convey, grant, assign, transfer, preserve, protect, and confirm to the DIP Agent and the DIP Lenders the rights granted or now or hereafter intended to be granted to the DIP Agent or the DIP Lenders under any Loan Document. | |
| | (d) <u>Performance of MTPSA Obligations</u>. Each Loan Party shall perform all material obligations under each MTPSA. | |
| | (e) <u>Further Assurances in Respect of Specified IP</u>. Without any further order of the Bankruptcy Court, promptly upon request by any Lender, the applicable Loan Party shall take such additional actions, provide additional information, data, assistance and execute such documents as the Lender may reasonably require from time to time in order to ensure that the Specified IP is fully functioning, integrated and operational at the Lender's sites in all material respects and to the Lender's reasonable satisfaction. | |
| | (f) <u>OFAC; Anti-Money Laundering</u>. Each Loan Party shall comply with the laws, regulations, and executive orders referred to in <u>Sections 3.10</u> (*Foreign Assets Control Regulations, and Anti-Money Laundering*) and <u>3.11</u> (*Foreign Assets Control Regulations*) of the DIP Credit Agreement. | |
| | (g) <u>Undertakings with respect to Collateral</u>. Each Loan Party shall maintain, use, and operate the Collateral in accordance with the applicable Collateral Documents (if any). | |
| | (i) <u>Books and Records</u>. Each Loan Party shall maintain proper books of record and account (a) in which entries that are full, true and correct in all material respects shall be made of all material financial transactions and matters involving the assets and business of the Loan Parties, as the case may be, and (b) that permit financial statements in conformity with GAAP to be derived therefrom. | |

| Provision | Summary | Location |
|---|---|---|
| **Negative Covenants**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(C) | Negative covenants will be customary and appropriate for similar debtor-in-possession financings of this type and will include exceptions set forth in the DIP Facility, including as follows:<br><br>(a)   limitation on indebtedness;<br>(b)   limitation on liens;<br>(c)   limitation on margin stock;<br>(d)   limitation on disposal of assets;<br>(e)   limitations on modifications to material contracts and organizational documents;<br>(f)   limitation on transactions with affiliates;<br>(g)   limitation on use of proceeds of the DIP Facility;<br>(h)   limitation on seeking modifications to the DIP Orders;<br>(i)   limitations on proposing or supporting any plan of reorganization;<br>(j)   limitations on acquisitions, loans or investments;<br>(k)   limitations on paying other indebtedness; and<br>(l)   limitations on distributions and redemptions of any equity interests. | DIP Credit Agreement, Section 5.1–5.4 |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi)<br>Local Rule 4001-2(a)(i)(H) | The Debtors shall be subject to the following milestones in these Chapter 11 Cases (the "<u>Milestones</u>"):<br>(a)   No later than four (4) days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order;<br><br>(b)   No later than five (5) days after the Petition Date, the Debtors shall file a motion to approve the sale of their assets or business (a "<u>Sale Motion</u>") reasonably acceptable to the DIP Lenders;<br><br>(c)   No later than thirty (30) days after the Petition Date, the Bankruptcy Court shall have entered the Final Order;<br><br>(d)   No later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have approved bidding procedures;<br><br>(e)   No later than seventy (70) days after the Petition Date, an auction (the "<u>Auction</u>") of the Debtor's assets or business shall have occurred if a Sale | DIP Credit Agreement, Section 4.6 |

| Provision | Summary | Location |
|---|---|---|
| | Motion is filed.<br><br>(f)   No later than seventy-five (75) days after the Petition Date, the Bankruptcy Court shall enter an order granting the Sale Motion. | |
| **Postpetition Default**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(M) | "Event of Defaults" under the DIP Credit Agreement include:<br><br>(a)   failure to pay to pay when and as required to be paid under the DP Credit Agreement, any DIP Obligations that have become due;<br><br>(b)   Any representation, warranty or certification by or on behalf of a Loan Party made or deemed made herein, in any other Loan Document, or which is contained in any certificate, document, or financial or other statement by any such Person, or their respective Responsible Officers, furnished at any time under this Agreement, or in or under any other Loan Document, shall prove to have been incorrect in any material respect (without duplication of other materiality qualifiers contained therein) on or as of the date made or deemed made.<br><br>(c)   Any Loan Party shall default in the observance or performance of any its Bankruptcy Covenants contained in Section 4.6 or Negative Covenants Article V of the DIP Credit Agreement.<br><br>(d)   Any Loan Party shall default in the observance or performance of any agreement related to the performance of MTPSA Obligations or further Assurances in Respect of Specified IP and such default remains unremedied for a period of five (5) calendar days after the earlier to occur of (x) the date upon which a Responsible Officer of a Loan Party becomes aware of such default and (y) the date upon which written notice thereof is given to a Loan Party by the adversely affected Lender.<br><br>(e)   Any Loan Party fails to perform or observe any term, covenant or agreement contained in the DIP Credit Agreement or any other Loan Document, and such default shall continue unremedied for a period of five (5) Business Days after the earlier to occur of (x) the date upon which a Responsible Officer of a Loan Party becomes aware of such default and (y) the date upon which written notice thereof is given | DIP Credit Agreement, Section 7.1<br>Interim Order ¶ 16 |

| Provision | Summary | Location |
|---|---|---|
| | to a Loan Party by the Required Lenders; | |
| | (f)    the failure to meet any of the Milestones; | |
| | (g)    other than in connection with the payment in full or other satisfaction or refinancing of the Obligations, the filing of any motion, taking of any action or the filing of any reorganization or liquidation plan or disclosure statement in the Chapter 11 Cases by a Loan Party (A) to obtain financing under section 364(c) or (d) of the Bankruptcy Code that is senior to or *pari passu* with the financing provided under this Agreement, (B) to grant any Lien upon or affecting any Collateral that is senior to or *pari passu* with the Liens granted under the Collateral Documents, (C) to obtain administrative expense priority that is senior to or *pari passu* with the Obligations, except as expressly permitted in the DIP Order, or (D) that is otherwise materially adverse to the rights and remedies granted to the DIP Agent or the Lenders hereunder or under the DIP Order; | |
| | (h)    this Agreement, any of the other Loan Documents or the DIP Order for any reason ceases to be in full force and effect or is declared to be null and void by a court of competent jurisdiction, or a Loan Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of a Loan Party or such Person) any other Person's motion to, disallow in whole or in part the DIP Agent's or the Lenders' claims in respect of the Obligations or to challenge the validity of any portion of the Loan Documents, the Loans or the Obligations, or enforceability of the same, or which seeks to void, limit, subordinate or otherwise adversely affect any payment pursuant to the Loan Documents or the DIP Orders; | |
| | (i)    the filing by a Loan Party of a motion or other pleading seeking entry of an order, or the Bankruptcy Court shall enter any order, revoking, reversing, staying, vacating, rescinding, or materially modifying, supplementing, or amending the DIP Order currently in effect without the unanimous prior written consent of the Lenders; | |

| Provision | Summary | Location |
|---|---|---|
| | (j) the Bankruptcy Court shall enter any order (which has not been reversed or vacated within five days) (A) appointing a chapter 11 trustee under section 1104 of the Bankruptcy Code in the Chapter 11 Case or (B) appointing an examiner with enlarged powers (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code in the Chapter 11 Case or otherwise; | |
| | (k) the filing by a Loan Party or any controlled subsidiary thereof of a motion or other pleading seeking entry of an order dismissing the Chapter 11 Case or converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; or | |
| | (l) an order is entered dismissing the Chapter 11 Cases, or converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code; | |
| | (m) the entry of a final non-appealable order in the Chapter 11 Cases (A) charging any of the Collateral under section 506(c) of the Bankruptcy Code against the DIP Agent or the Lenders; or (B) avoiding, limiting, modifying, subordinating, or recharacterizing any of the Obligations or requiring disgorgement by the Lenders of any amounts received in respect of the Obligations; | |
| | (n) payment by a Loan Party of prepetition debt (other than as approved by the Bankruptcy Court and as otherwise contemplated by this Agreement, the DIP Order or with the prior written consent of the Required Lenders (which may be evidenced by an email from the Required Lenders' counsel); | |
| | (o) any motion for any of the orders described in clauses (ii) through (ix) above shall be made by a Person other than a Loan Party, the DIP Agent, or any Lender, and such application is not being diligently contested by the applicable Loan Party in good faith. | |
| | (p) Any material provision of any Collateral Document shall for any reason cease to be valid and binding on or enforceable against a Loan Party or a Loan Party shall so state in writing or shall bring an action to limit its obligations or liabilities thereunder; or any Collateral Document (together with the DIP Order) | |

| Provision | Summary | Location |
|---|---|---|
| | shall for any reason (other than pursuant to the terms thereof) cease to create a valid Lien on the Collateral purported to be covered thereby; or the DIP Liens shall for any reason cease to be perfected and first priority Liens, subject only to the Carve-Out and Permitted Liens. | |
| **Remedies; Waiver or Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv), (vii)<br><br>Local Rule 4001-2(a)(i)(S), (T) | When an Event of Default exists, the DIP Agent may do any one or more of the following, in each case subject, as set forth in the DIP Orders:<br><br>(a) Declare, on a pro rata basis, all or any portion of the Term Loan Commitments to be suspended or terminated, whereupon such Term Loan Commitments shall forthwith be suspended or terminated;<br><br>(b) The Debtors shall have no right to request any extension of credit under the DIP Facility or to use DIP Loan Proceeds or any DIP Collateral or proceeds of DIP Collateral other than towards the satisfaction of the DIP Obligations, and the Carve Out;<br><br>(c) Declare all or any portion of the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Documents to be immediately due and payable (such event being referred to as an "<u>Acceleration</u>") without presentment, demand, protest or (except as provided above) other notice of any kind, all of which are hereby expressly waived by each Loan Party; and/or<br><br>(d) Exercise all rights and remedies available under the Loan Documents, the DIP Order or applicable law, in each case, without further order of or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code.<br><br>Subject to the terms of the DIP Credit Agreement, the DIP Agent may in its discretion serve upon counsel for the Debtors, counsel for any Committee, and the United States Trustee a written notice (a "<u>Default Notice</u>") setting forth the Events of Default, in which event (unless the Court determines that no Event of Default exists or continues to exist, after notice and a hearing) effective five (5) business days after the Default Notice is filed (the "<u>Remedies Notice Period</u>"), the DIP Agent and the DIP | DIP Credit Agreement, Section 7.2<br><br>Interim Order ¶ 16(a) |

| Provision | Summary | Location |
|---|---|---|
| | Lenders shall be deemed to have received complete relief from the automatic stay imposed by section 362(a) of the Bankruptcy Code (and any other stay then in effect) and shall be authorized to the extent of the rights provided in the DIP Loan Documents, without further notice to the Debtors or any other interested party or any further order of this Court, to (A) declare all or any portion of the unpaid principal amount of all outstanding DIP Loans, as applicable, all interest accrued and unpaid thereon, and all other amounts owing or payable under any of the DIP Loan Documents, as applicable, to be immediately due and payable, (B) demand payment and enforce collection of all DIP Obligations, and (C) otherwise exercise all rights and remedies available to them under the DIP Loan Documents, as applicable.  During the Remedies Notice Period, the Debtors and any Committee shall be entitled to seek an emergency hearing with the Court (such hearing, a "<u>Remedies Hearing</u>").  In any Remedies Hearing, subject to entry of the Final Order, the Debtors shall waive their rights to and shall not be entitled to seek relief, including under section 105 of the Bankruptcy Code, to the extent that such relief would impair or restrict the rights and remedies of the DIP Agent as set forth in the Interim Order or in any of the other DIP Loan Documents, as applicable, and the only issue that may be raised by the Debtors is whether, in fact, an Event of Default has occurred.  Prior to the adjudication of the Remedies Hearing, the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of an Event of Default) solely to fund essential operations in accordance with past practice, the DIP Loan Documents, and the Approved Budget.  Upon the effectiveness of any relief from the automatic stay granted or deemed to have been granted, the DIP Agent may, in its discretion, take all actions and exercise all other rights and remedies under the Interim Order, the other DIP Loan Documents and applicable law that may be necessary or deemed appropriate to collect any of the DIP Obligations, as applicable, and otherwise enforce any of the provisions of the Interim Order.  The DIP Collateral Agent's failure to exercise rights and remedies under any DIP Loan Documents, the  Interim Order, or applicable law shall not constitute a waiver of any of its rights and remedies hereunder, thereunder, or otherwise, unless any such waiver is pursuant to a written instrument executed by the DIP Collateral Agent, as applicable. | |

| Provision | Summary | Location |
|---|---|---|
| **Prepayments**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(I) | The Borrower shall not have the right to voluntarily prepay any amount of the Loans. | DIP Credit Agreement, Section 1.6 |
| **Fees and Expenses; Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix)<br><br>Local Rule 4001-2(a)(i)(B), (K) | The DIP Borrowers will reimburse the DIP Secured Parties for certain expenses in connection with the DIP Facility, including reasonable and documented in connection with:<br><br>(a)  the preparation, negotiation, and execution of the Interim DIP Order and the Final DIP Order;<br><br>(b)  the preparation, negotiation, execution, and administration of the Loan Documents, the Interim IP Sublicenses, Perpetual IP Licenses, the Customer Sublicenses, and any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein, including any amendment, consent, waiver, assignment, restatement, or supplement thereto;<br><br>(c)  the funding of the Loans;<br><br>(d)  the creation, perfection, or protection of the DIP Liens (including all search, filing, and recording fees);<br><br>(e)  internal audit reviews and field examinations;<br><br>(f)  the enforcement or preservation of any right or remedy under any Loan Document, any Obligation, or with respect to the Collateral;<br><br>(g)  the commencement, defense, conduct of, intervention in, or the taking of any other action (including preparation for and/or response to any subpoena or request for document production relating thereto) with respect to, any proceeding related to a Loan Party, any Loan Document, or Obligation;<br><br>(h)  the review of pleadings and other filings made with the Bankruptcy Court;<br><br>(i)  the Chapter 11 Cases, including, but not limited to, attendance at hearings in respect of the Chapter 11 Cases;<br><br>(j)  any refinancing or restructuring of the Loans in the nature of a "work-out"; and<br><br>(k)  defending and prosecuting any actions or | DIP Credit Agreement, Section 9.4<br><br>Interim Order ¶ 14 |

| Provision | Summary | Location |
|---|---|---|
| | proceedings arising out of or relating to the Obligations or any transactions related to arising in connection with the Loan Documents.<br><br>The Loan Parties' obligations hereunder shall not be limited by the Lender Expense Cap.<br><br>The Debtors will indemnify the DIP Agent, the DIP Lenders and their Related Persons for liabilities usual and customary for a facility of this type, subject to certain exceptions, including to the extent any liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence, bad faith or willful misconduct of such indemnified person. | |
| **Carve Out**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(F) | "Carve Out" means the following expenses: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a Trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000 (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all (A) unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors) (the "Allowed Debtor Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals") and (B) unpaid fees and expenses (the "Allowed Committee Professional Fees" and together with the Allowed Debtor Professional Fees, collectively, the "Allowed Professional Fees") incurred by persons or firms retained by any statutory committees appointed in the Chapter 11 Cases (each, a "Committee") pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first day following delivery by the DIP Lenders of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (these clauses (i) through (iii), the "Pre-Carve Out Trigger Amounts"), *provided*, *however*, that the Pre-Carve Out Trigger Amounts shall not exceed the amounts for such Professional Persons included in an Approved Budget; and (iv) Allowed Professional Fees not to exceed $150,000, incurred after the first day following delivery by the DIP Lenders of the Carve Out Trigger Notice, to the extent | Interim Order ¶¶ 10(a)-(c) |

| Provision | Summary | Location |
|---|---|---|
| | allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>," and together with the Pre-Carve Out Trigger Amounts, the "<u>Carve Out Amount</u>").   For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Lenders to the Debtors, their lead restructuring counsel, the United States Trustee, and counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.<br><br><u>Carve Out Funded Reserve</u>.   For the period prior to the delivery of the Carve Out Trigger Notice, on a weekly basis, the Debtors shall fund from the DIP Facility or cash on hand into a segregated account (the "<u>Funded Reserve Account</u>") held by Citibank, N.A. in trust for the benefit of Professional Persons the amounts set forth in the Approved Budget for Professional Persons. The Debtors shall use funds held in the Funded Reserve Account exclusively to pay Allowed Professional Fees and other obligations included within the Carve Out in accordance with an Approved Budget as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any interim or final orders of the Bankruptcy Court; provided that when all Allowed Professional Fees provided for in an Approved Budget that have funded into the Funded Reserve Account have been paid, any unused funds remaining in the Funded Reserve Account for those periods shall revert to the DIP Collateral Agent for the benefit of the DIP Lenders. Funds transferred to the Funded Reserve Account shall be subject to the DIP Liens and DIP Superpriority Claims granted hereunder solely to the extent of such reversionary interest; provided, that, for the avoidance of doubt, such liens and claims shall be subject in all respects to the Carve Out. For avoidance of doubt, the Carve Out shall be limited to the Funded Reserve Account and shall not attach to or otherwise encumber the DIP Collateral or any proceeds from the sale of any DIP Collateral until such time as the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated.<br><br><u>Carve Out Funding</u>.   Notwithstanding anything in the DIP Credit Agreement to the contrary, on the day on which a Carve Out Trigger Notice is validly delivered (the | |

| Provision | Summary | Location |
|---|---|---|
| | "Carve Out Trigger Notice Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to first pay all DIP fees and DIP Lender expenses, then to fund to the Funded Reserve Account an amount equal to the then-unpaid amounts of the Allowed Professional Fees in an Approved Budget for the reasonably estimated fees for the period prior to the Carve Out Trigger Notice Date. All funds in the Funded Reserve Account shall be used to pay the Pre-Carve Out Trigger Amounts, but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to pay the obligations set forth in the Post-Carve Out Trigger Notice Cap, and then, to the extent the Funded Reserve Account has not been reduced to zero, to pay the DIP Collateral Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Debtors. Further, notwithstanding anything to the contrary in the Interim Order, (i) disbursements by the Debtors from the Funded Reserve Account shall not constitute DIP Loans or increase or reduce the DIP Obligations and (ii) the failure of the Funded Reserve Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, which shall be senior to all DIP Superpriority Claims.<br><br>The failure of the Funded Reserve Account to satisfy Professional Fees in full shall not affect the priority of the Carve Out; *provided* that, to the extent that the Funded Reserve Account is actually funded, the Carve Out shall be reduced by such funded amount dollar-for-dollar. In no way shall the Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Funded Reserve Account, or any of the terms of the Interim Order be construed as a cap or limitation on the amount of the Allowed Debtor Professional Fees due and payable by the Debtors or that may be allowed by the Bankruptcy Court at any time (whether by interim order, final order, or otherwise), but rather only a cap on the amount of Allowed Professional Fees that is entitled to the priority of the Carve Out. Any payment or reimbursement made prior to the occurrence of the Carve Out Trigger Notice Date in respect of any Allowed Professional Fees shall not reduce the Post-Carve Out Trigger Notice Cap. | |
| **DIP Collateral / Liens on Avoidance Actions** | "Collateral" means all assets of the DIP Borrower and the Guarantors, including collectively, (a) all real property and all tangible and intangible personal property of each Loan | DIP Credit Agreement, Section 11.1 |

| Provision | Summary | Location |
|---|---|---|
| Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(U) | Party, in each case wherever located and whether now owned or hereafter acquired, including, but not limited to, all accounts, contracts rights, chattel paper, cash, general intangibles, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments, commercial tort claims, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, trade names and other intellectual property, all Equity Interests (to be limited to the extent of any adverse tax consequences, as reasonably determined by the Agent and the Borrower, and limitations imposed by applicable law), all books and records relating to the foregoing, all other personal and real property of the Borrower and Guarantors, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of New York (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof)); and (b) subject to entry of the Final Order, proceeds of any actions under sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code. | Interim Order ¶ 4(b) |
| **Section 552(b) Waiver**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(W) | The DIP Documents and Final DIP Order seek to waive any "equities of the case" exception under section 552(b) of the Bankruptcy Code. | DIP Credit Agreement Section 6.6<br><br>Interim Order ¶ 6. |
| **Section 506(c) Waiver**<br><br>Bankruptcy Rule 4001(c)(1)(B)(x)<br><br>Local Rule 4001-2(a)(i)(V) | The DIP Documents and Final DIP Order seek a waiver under section 506(c) of the Bankruptcy Code. | DIP Credit Agreement Section 6.6<br><br>Interim Order ¶ 6. |
| **Marshalling**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(X) | The DIP Documents and Final DIP Order seek a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral. | DIP Credit Agreement Section 6.6<br><br>Interim Order ¶ 12(f) |

| Provision | Summary | Location |
|---|---|---|
| **Other Typical Provisions** <br><br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-2(a)(i)(D), (L), (N), (O), (P), (Q) | There is no prepetition secured debt, so the DIP Facility does not seek to prime existing debt, limit the use of estate funds to investigate prior liens, cross-collateralize or "roll up" prepetition debt, or otherwise bind the estate with respect to any prepetition debt. Additionally, the DIP Facility shall not be used to fund any non-debtor affiliates. | DIP Credit Agreement Section 6.6 |

12.     The Debtors respectfully submit that the foregoing material terms are appropriate as necessary components of the consensual agreement with the DIP Lenders regarding the DIP Facility and use of the proceeds thereof.  Granting the relief requested herein is critical to the continued operation of the Debtors' businesses and will maximize the value of the Debtors' estates for all stakeholders by permitting an orderly and efficient sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.  Accordingly, the material provisions in the DIP Orders should be approved.

## Debtors' Prepetition Capital Structure

13.     As of the Petition Date, based on their books and records, the Debtors estimate they owe approximately $12.9 million in trade debt and other accounts payable, which figure excludes potentially substantial amounts of other contingent or unliquidated unsecured claims.  *See* First Day Decl. ¶ 24.  The Debtors do not have any secured or funded debt obligations.  *Id.*

## The Debtors' Urgent and Immediate
## Liquidity Needs and the Negotiation of the DIP Facility

14.     As set forth in the First Day Declaration, the Debtors have a critical need to use the DIP Facility proceeds to operate their business and preserve their going-concern value.  *Id.* ¶ 44. Indeed, the Debtors' business requires cash to satisfy obligations to vendors and employees incurred in the ordinary course of business.  *Id.*  The DIP Facility will provide the Debtors with immediate access to necessary liquidity, which will permit the Debtors to:  (a) continue to serve

their customers and generate revenue during these Chapter 11 Cases; (b) provide working capital for their business; (c) fund payments to their workforce; (d) fund other general corporate purposes; (e) fund the payments authorized by the Court pursuant to the First Day Pleadings filed contemporaneously herewith; (f) operate the Cash Management System[5]; and (g) satisfy administrative costs and expenses of the Debtors incurred in these Chapter 11 Cases. *Id.* Additionally, as demonstrated by the Approved Budget, the need for access to the DIP Facility is further underscored by the fact that it would be imprudent, indeed impossible, to administer these Chapter 11 Cases solely on the Debtors' existing and anticipated cash receipts with no access to additional capital. *Id.*

15.     The DIP Facility will provide the Debtors with the necessary liquidity to administer these Chapter 11 Cases and conduct the contemplated sale process, without which the Debtors' ability to successfully prosecute these Chapter 11 Cases will be jeopardized, to the detriment of all of the Debtors' stakeholders. *Id.* ¶ 43.

## Debtors' Efforts to Obtain Postpetition Financing

16.     To enable the Debtors to fund the administration of these Chapter 11 Cases and the sale, the Debtors solicited post-petition financing proposals from certain parties. *Id.* ¶ 36. Numerous parties executed non-disclosure agreements but no traditional financing sources expressed interest. Ultimately, the Debtors obtained only one actionable financing proposal, which led to the negotiation of the DIP Facility. *Id.* Upon Court approval, the DIP Facility will be secured by a lien on substantially all of the Debtors' assets. *Id.*

---

[5]     *See Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors' to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, (D) Continue Intercompany Transactions; (II) Confirming Administrative Expense Priority for Postpetition Intercompany Claims; and (III) Granting Related Relief* filed contemporaneously herewith.

17.    The Debtors sought, but were unable to obtain, postpetition financing from any other source, including a facility that would be on an unsecured, administrative expense basis. *Id.* ¶ 41.  Under the circumstances, obtaining the financing needed by the Debtors as unsecured debt was simply not a realistic option. *Id.*  No other lender that the Debtors contacted was willing to provide the financing necessary to fund the Debtors' business and the contemplated sale process on terms more favorable than those provided in the DIP Facility. *Id.*

18.    The DIP Facility and its terms are fair and reasonable to the Debtors, and appropriate under the circumstances, and good and sufficient cause exists to grant the relief requested in the DIP Motion. *Id.* ¶ 42.  The DIP Facility contains milestones for the Debtors to conduct a thorough sale process, which are reasonable under the circumstances of these Chapter 11 Cases.  Additionally, the terms of the DIP Facility are comparable to other debtor in possession financings and generally consistent with market terms for companies facing similar circumstances as the Debtors. *Id.*

**DIP Facility Was Negotiated in Good Faith and at Arms' Length**

19.    The DIP Facility was the product of extensive, good faith, arms' length negotiations among the Debtors and the DIP Lenders. *Id.* ¶ 40.  The Debtors and the Debtors' advisors actively negotiated the terms and provisions of the DIP Facility leading up to the Petition Date, including on material terms of the proposed financing, such as the economics and covenants, ultimately resulting in the deal embodied in the DIP Credit Agreement. *Id.*

20.    Based on extensive negotiations among the parties, the Debtors respectfully submit that the DIP Facility represents the best financing option reasonably available to the Debtors under the current circumstances. *Id.* ¶ 41.  In addition, to the extent any party wishes to propose better terms, the Debtors have the ability to obtain better financing during the period between entry of

the Interim Order and Final Order, subject to the consent of the DIP Lenders. *Id.* The DIP Facility does not have any prepayment penalties or premiums. Accordingly, based on the facts and circumstances of these chapter 11 cases, such terms should be approved.

**Basis for Relief Requested**

I.    **The Debtors Should be Authorized to Obtain Postpetition Financing Through the DIP Documents**

21.    The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances. As set out above, the Debtors were unable to procure sufficient financing in the form of unsecured credit, which would be allowable under section 503(b)(1) or as an administrative expense, in accordance with sections 364(a) or (b) of the Bankruptcy Code. *See* 11 U.S.C. §§ 364(a)–(b). The Debtors also negotiated vigorously, and at arms' length with the DIP Lenders to secure the DIP Facility on the terms described herein. For these reasons, as discussed further below, the Debtors satisfy the necessary conditions under section 364 for authority to enter into the DIP Facility.

A.    **Entering into the DIP Facility Is a Sound Exercise of the Debtors' Business Judgment**

22.    The Court should authorize the Debtors, in an exercise of their sound business judgment, to enter into the DIP Documents and obtain access to the DIP Facility. If an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts give debtors considerable deference in acting in accordance with their sound business judgment in obtaining postpetition credit. *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A.*

-29-

*Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender.").

23.     To determine whether the business judgment test is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re AbitiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second-guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code"). In considering whether the terms of postpetition financings are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.,* 294 B.R. 855, 880 (Bankr. W.D. Mo. 2003). The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. *In re Ion Media Networks, Inc.*, No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

24.     As more fully set forth above and in the First Day Declaration, the DIP Facility represents a proper exercise of the Debtors' business judgment. The DIP Facility and the accompanying economic terms were the product of extensive, good faith, arms' length negotiations among the Debtors, and the DIP Lenders. First Day Decl. ¶ 40. The claim priority, liens, and other protections (including the granting of liens on the proceeds of avoidance actions), were essential features of the facility without which the DIP Lenders would not have committed to provide funding for the Debtors. *Id.* ¶ 41. These protections are comparable to other debtor in possession financings and generally consistent with market terms for companies facing similar

circumstances as the Debtors.  *Id.* ¶ 42.  Accordingly, the Debtors have exercised sound business judgment in negotiating these protections

25.     The Debtors' decision to agree to the terms of the DIP Facility is reasonable under the circumstances, where no viable alternative financing is available, let alone on superior terms, and where the Debtors' need for liquidity is immediate in order to avoid an immediate shutdown of operations and resulting loss of employee jobs.  As the Approved Budget reflects, use of available cash alone will be insufficient to fund these chapter 11 cases or otherwise allow the Debtors to continue operations.  *See id.* ¶ 44.  Because the DIP Facility will preserve the Debtors as a going concern through the entirety of the proposed sale process, thus maximizing value for the Debtors' estates for the benefit of all creditors and other parties in interest, it represents the best course for the Debtors' stakeholders.  *Id.* ¶¶ 47-48  Thus, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' sound business judgment.

> **B.      The Debtors Should Be Authorized to Obtain DIP Facility on a Secured and Superpriority Basis**

26.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security.  *See* 11 U.S.C. § 364. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to section 364(b) of the Bankruptcy Code, a court may authorize a debtor to obtain credit or to incur debt, the repayment of which is entitled to superpriority administrative expense status, or is secured

by a senior lien on unencumbered property, or a junior lien on encumbered property, or a combination of the foregoing.  *See* 11 U.S.C. § 364.

27.    The Debtors propose to grant the DIP Lenders (a) first priority liens on all of the DIP Collateral; and (b) junior liens on any DIP Collateral that is subject to valid, perfected, and nonavoidable liens (collectively, clauses (a) and (b), the "DIP Liens"); and (c) superpriority administrative expense claim status with recourse to all prepetition and postpetition property of the Debtors (the "DIP Superpriority Claims").  Therefore, the approval of the DIP Facility is governed by section 364(c) of the Bankruptcy Code.

### *i.    The Debtors Satisfy the Condition Under Section 364(c) to Obtain Financing on a Senior Secured and Superpriority Basis*

28.    In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court:

> may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

29.    In determining whether to authorize financing under 364(c) of the Bankruptcy Code, courts will consider whether (i) the debtor's efforts to obtain unsecured credit under sections 364(a) and 364(b) of the Bankruptcy Code, (ii) the credit transaction benefits the debtor and is necessary to preserve estate assets, and (iii) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender.  *In re Republic Airways Holdings Inc*., No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016); *In re Ames Dep't Stores, Inc*., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)

("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised").

30.     *First*, to show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code.  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating section 364 "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").  The Debtors have not been able to obtain unsecured credit or an alternative debtor-in-possession financing on better terms than those reflected in the DIP Credit Agreement, and there are no better offers available to the Debtors or before the Court at this time.  First Day Decl. ¶ 41.

31.     *Second*, the DIP Facility is necessary to preserve the Debtors' estates.  As noted, the DIP Facility should provide the Debtors with liquidity to, without limitation, (a) continue the operation of their business, maintain relationships with vendors, suppliers and customers, satisfy wage and salary obligations, and continue to satisfy other working capital and operational needs during the chapter 11 cases; and (b) implement one or more value maximizing sale transactions. *Id.* ¶¶ 44-45.  In particular, the DIP Facility should allow the Debtors to preserve the going concern value of their operations through these chapter 11 cases, which maximizes value for all stakeholders. *Id.*

32.     *Third*, the terms of the DIP Facility are fair, reasonable, and adequate under the circumstances.  The DIP Facility is the best financing available to the Debtors and will allow the Debtors to continue the marketing process commenced prepetition to maximize the value of the Debtors' estate for the benefit of all parties in interest. *Id.* ¶ 42.

33.     In light of the foregoing, the Court should authorize the Debtors to provide the DIP Lenders with the DIP Liens and the DIP Superpriority Claims, each in accordance with the DIP Credit Agreement and as provided for in section 364(c) of the Bankruptcy Code.

### C.     The Scope of the Carve Out Is Appropriate

34.     The DIP Liens and the DIP Superpriority Claims are subject to the Carve Out. Without the Carve Out, the Debtors' estates or other parties in interest could be harmed because the services that professionals might otherwise provide in these chapter 11 cases could be restricted.  *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve Out protects against administrative insolvency during the pendency of the chapter 11 cases by ensuring that funds are available to pay U.S. Trustee's fees and professional fees of the Debtors and any statutory Committee.  Accordingly, the scope of the Carve Out is appropriate and should be approved.

### D.     Debtors Should Be Authorized to Pay Fees Required by the DIP Documents.

35.     The DIP Facility does not require the payment of commitment fees, unused line fees, or letter of credit fees in cash.  Rather, the DIP Lenders have agreed to waive these customary fees in exchange for an interim royalty free license to use Specified IP (but not to commercialize for sale or distribution to third parties) during the interim financing period.  Upon final approval, the Debtors shall grant the DIP Lenders a royalty free perpetual license to use the Specified IP (but not to commercialize for sale or distribution to third parties).  The DIP Facility also requires the delivery of the Specified IP to the DIP Lenders, which shall be subject to the applicable license.

36.     Such relief is authorized under section 363 of the Bankruptcy Code and appropriate under the circumstances.  Indeed, section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  In general, a debtor may engage in transactions outside the ordinary course of its business where the transaction represents an exercise of the debtor's sound business judgment.  *See, e.g.*, *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business purpose" test).  In determining whether to approve a transaction, the Court should consider the following:  (a) whether a sound business justification exists for the transaction; (b) whether accurate and reasonable notice of the transaction was given to interested parties; (c) whether the transaction will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith.  *See, e.g.*, *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991).

37.     The Debtors have sound business justifications and are receiving fair value in exchange for delivering the Specified IP.  As existing customers, the DIP Lenders already enjoy the benefits of the Specified IP through the operation of their respective micro-fulfillment centers.  And, because each DIP Lender has their own unique source code and software, the Specified IP it is not immediately valuable to any party aside from the DIP Lenders, as other parties would not be able to utilize it in operations since the source code and software was developed specifically for its intended recipient.  First Day Decl. ¶ 39.  At the same time, the Interim IP License and Perpetual IP License of the Specified IP do not devalue the estates' assets since the proposed licenses do not permit the commercialization of the Debtors' technology to third parties,

which means that the Debtors retain the going concern value of these assets.  Further, the DIP

Facility provides the Debtors with the liquidity necessary to operate their businesses, preserve jobs,

and maximize value through these Chapter 11 Cases while they pursue a value-maximizing sale

transaction for the benefit of all stakeholders in these Chapter 11 Cases.  Accordingly, because the

DIP Lenders are the only parties that can benefit from the use of the Specified IP, providing them

with the Specified IP in exchange for the waiver of certain customary fees is a sound exercise of

the Debtors' business judgment for which they are receiving fair value.

38.     Additionally, by making the making the perpetual license subject to entry of the

Final Order, the Debtors are providing creditors and other parties and interest reasonable notice

and an opportunity to be heard at the Final Hearing.  The Debtors submit that the notice is

reasonable under the circumstances.

39.     Finally, the DIP Facility, including the fees and other economic terms of the DIP

Facility, were all negotiated in good faith and at arms' length.  First Day Decl. ¶ 40.  Under the

circumstances, the terms of the DIP Facility, which include the fees payable in connection

therewith, are the most favorable terms the Debtors could obtain.  *Id.* ¶ 41.  Indeed, the interest

and fees have been structured to minimize the impact on the Debtors' cash flows and to maximize

the period for the Debtors to conduct a sale process.  The interest payable under the  DIP Facility

is payable in kind and added to the principal amount rather than paid in cash.  The DIP Lenders

have capped the amount of their fees and expenses that are reimbursed directly from the proceeds

of the DIP Facility with any excess amounts being added to the principal balance of the DIP

Facility.

40.     As such, the Debtors submit that the interest payments and fees required by the DIP

Facility are reasonable, comparable to other debtor in possession financings, and generally

consistent with market terms for companies facing similar circumstances as the Debtors. *Id.* ¶ 42. Accordingly, the Debtors believe that under the circumstances, authorization to pay the fees is and granting of the Interim IP License is warranted.

**E.     The DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e).**

41.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its rights with respect to liens securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

42.     As explained herein and in the First Day Declaration, negotiations of the DIP Facility were conducted in good faith and at arms' length. *Id.* ¶ 40. Each DIP Lender was represented by separate counsel and the terms of the DIP Facility reflect significant changes over the course of discussions. The proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code and approved in the Approved Budget. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and therefore, entitled to all of the protections afforded by that section.

II.     **Modification of the Automatic Stay Is Warranted**

43.     The relief requested herein contemplates a modification of the automatic stay to the extent necessary to permit the DIP Secured Parties to exercise all rights and remedies, and to take certain actions without further order of or application to the Court, upon the occurrence and during the continuance of any Event of Default.  Upon any Event of Default, the DIP Agent may:  (a) grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (b) upon the occurrence of an Event of Default (as defined in the DIP Credit Agreement), subject to any applicable notice periods set forth in the Interim and Final Orders, for the Lender to exercise any remedies available to it; and (c) implement the terms of the proposed Interim and Final Orders, including payment of all amounts referred to in the DIP Credit Agreement

44.     Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of the Chapter 11 Cases.

III.    **Immediate Access to DIP Facility Should Be Approved**

45.     The Court may grant interim relief in respect of a motion filed pursuant to section 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(c)(2).  In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions.  *See In re Ames Dep't Stores*, 115 B.R. at 40.

46.     Here, the Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein is not granted promptly.  As set forth in the First Day Declaration, the Debtors have an immediate need for additional liquidity through the DIP Facility

in order to continue the operation of their business, maintain relationships with vendors, suppliers and customers, satisfy wage and salary obligations, and continue to satisfy other working capital and operational needs during the chapter 11 cases. First Day Decl. ¶44. Without immediate access to the DIP Facility, the Debtors will be forced to shutter operations and terminate employees, thus destroying the value of the business as a going concern in any subsequent sale. *See id*. Accordingly, approval of the DIP Facility will not only provide essential funding, but will allow the Debtors to preserve the value of their estates for the benefit of all creditors and other stakeholders. *See id.* ¶¶ 43-45. As such, the Debtors request the Court grant the interim relief requested herein to be effective immediately.

## IV.    Request for Final Hearing

47.    Pursuant to Bankruptcy Rules 4001c)(2), the Debtors request that the Court set a date for consideration of entry of the Final Order (the "<u>Final Hearing</u>"). The Debtors request that they be authorized serve a copy of the signed Interim Order, which fixes the time and date for the filing of any objections, by first class mail and e-mail upon the notice parties listed below. The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

<u>The Requirements of Bankruptcy Rule 6003 Are Satisfied</u>

48.    The Debtors assert that immediate relief is necessary to avoid immediate and irreparable harm. Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one (21) days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, entry of the proposed interim order is integral to the Debtors' ability to successfully transition into chapter 11 and conduct an orderly sale process. Specifically, the relief requested is necessary to avoid a severe

disruption of the Debtors' sale process and operations at this critical juncture and, in turn, to preserve and maximize the value of the Debtors' estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion.

## Request for Bankruptcy Rule 6004 Waivers

49.    The Debtors request a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h).    As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors' sale process and to preserve and maximize the value of the Debtors' estates for all stakeholders.    Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## Reservation of Rights

50.    Nothing contained herein or any action taken pursuant to relief requested is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim or interest under applicable law or nonbankruptcy law; (c) a promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; or (e) a request for or granting of approval for assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.    Likewise, if the Court grants the relief sought herein, any

payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such claim.

### **Notice**

51.     The Debtors will provide notice of this Motion to:  (a) the United States Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Department of Justice; (g) the Banks; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors will serve copies of this Motion and any order entered with respect to this Motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requests, no other or further notice need be given.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request entry of the Interim Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other relief as is just and proper.

Dated: May 30, 2024
Wilmington, Delaware

/s/ Joseph M. Mulvihill
**YOUNG, CONAWAY, STARGATT & TAYLOR LLP**
Joseph M. Mulvihill (Del. Bar No. 6061)
Shella Borovinskaya (Del. Bar No. 6758)
Kristin L. McElroy (Del. Bar No. 6871)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone:      (302) 571-6600
Facsimile:      (302) 571-1253
Email:          jmulvihill@ycst.com
                sborovinskaya@ycst.com
                kmcelroy@ycst.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
Justin Bernbrock (*pro hac vice* pending)
Robert B. McLellarn (*pro hac vice* pending)
321 North Clark Street, 32nd Floor
Chicago, Illinois 60654
Telephone:      (312) 499-6300
Facsimile:      (312) 499-6301
Email:          jbernbrock@sheppardmullin.com
                rmclellarn@sheppardmullin.com

-and-

Alexandria G. Lattner (*pro hac vice* pending)
650 Town Center Drive, 10th Floor
Costa Mesa, California 92626
Telephone:      (714) 513-5100
Facsimile:      (714) 513-5130
Email:          alattner@sheppardmullin.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**<u>Exhibit 1</u>**

**Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TAKEOFF TECHNOLOGIES, INC., *et al.*[1] | Case No. 24-11106 (___) |
| Debtors. | (Jointly Administered) |
| | Re: Docket No. [●] |

### INTERIM ORDER
### (A) AUTHORIZING THE DEBTORS
### TO OBTAIN POSTPETITION FINANCING;
### (B) GRANTING LIENS AND SUPERPRIORITY
### ADMINISTRATIVE EXPENSE CLAIMS; (C) MODIFYING
### THE AUTOMATIC STAY; (D) SCHEDULING FINAL HEARING PURSUANT
### TO BANKRUPTCY RULE 4001(C); AND (E) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**")[2] of the above-referenced debtors (collectively, the "**Debtors**"), as debtors in possession in the above-captioned cases (each a "**Case**"), requesting entry of an interim order (this "**Interim Order**") and a Final Order (as defined below) pursuant to sections 105, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(e), 364(d), 503, 507 and 552 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and 2002-1, 4001-2, and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"):

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of the Debtors federal tax identification numbers, as applicable, are:  Takeoff Technologies, Inc. (0552); Takeoff Technologies Canada, Inc.; Takeoff Technologies Australia Pty Ltd.; Takeoff Technologies FZE; Takeoff International Subco India Private Limited; and Takeoff International Subco, LLC.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 203 Crescent Street, Suite 203, Waltham, Massachusetts 02453.

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Credit Agreement (as defined herein) or, if not defined in the DIP Credit Agreement, in the Motion.

(1)        authorizing the Debtors to obtain postpetition financing (the "**DIP Facility**" and such loans thereunder the "**DIP Loans**") on a senior secured superpriority basis on the terms set forth in the DIP Loan Documents (as defined below), in an aggregate principal amount of up to $9,566,000 (the "**DIP Commitments**") from Woolworths Group Limited ("**Woolworths**"), Albertsons Companies, Inc. ("**Albertsons**"), Village Super Market, Inc., ShopRite of Hunterdon County, Inc., and Inserra Supermarkets, Inc. (collectively, the "**Wakefern Cooperative Lenders**") (collectively, and together with all successors and permitted assigns, the "**DIP Lenders**") for which Global Loan Agency Services (the "**DIP Collateral Agent**") will act as collateral agent  (collectively with the DIP Lenders, the "**DIP Secured Partie**s**"**);

(2)        authorizing the Debtors to execute and deliver additional documentation consistent with the terms of (or as may be required by) the Debtor-in-Possession Credit Agreement substantially in the form attached hereto as **<u>Exhibit A</u>** without exhibits or schedules (as such agreement may be amended, in accordance with its terms and this Interim Order, and including the exhibits and schedules thereto, the "**DIP Credit Agreement**"), the other DIP Loan Documents, the Interim IP Licenses (defined below), the Perpetual IP Licenses (defined below) and Customer Sublicenses (defined below), and to perform such other and further acts as may be necessary or appropriate in connection therewith, or otherwise required under the DIP Loan Documents;

(3)        authorizing the Debtors to use proceeds of the DIP Loans (the "**DIP Loan Proceeds**") as permitted in and in accordance with the DIP Loan Documents, this Interim Order, and the Approved Budget (as defined herein);

(4)      granting valid, binding, continuing, enforceable, and automatically perfected (a) first priority security interests in and liens on all of the Collateral (as defined in the DIP Credit Agreement, and referred to herein as the "**DIP Collateral**") to the DIP Collateral Agent for the benefit of the DIP Secured Parties, and (b) granting superpriority administrative expense status to the DIP Obligations (as defined below), in each case subject to the Carve Out (as defined below);

(5)      authorizing the Debtors to pay the principal, interest, fees, expenses, disbursements, and other amounts payable under the DIP Loan Documents as and when such amounts become due and payable and grant certain intellectual property licenses (in lieu of a commitment fee) without other or further notice or order;

(6)      vacating and modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the other DIP Loan Documents;

(7)      subject to entry of the Final Order, waiving the Debtors' ability to surcharge against any DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and any right of the Debtors' under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(8)      scheduling a final hearing to consider entry of the Final Order, and in connection therewith, giving and prescribing the manner of notice of the Final Hearing (as defined below) on the Motion;

(9)      waiving any applicable stay with respect to the effectiveness and enforceability of this Interim Order (including under Bankruptcy Rule 6004); and

(10)      granting the Debtors such other and further relief as is just and proper.

Upon consideration of (a) the Motion and the exhibits attached thereto, (b) the evidentiary record made at the interim hearing, which was held on [___], 2024, pursuant to Bankruptcy Rule 4001(c)(2) (the "**Interim Hearing**"), (c) the First Day Declaration, (d) the arguments and statements of counsel at the Interim Hearing, and (e) all matters brought to the Court's attention at the Interim Hearing, and the Court having found and determined that the relief sought in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors, their estates, creditors, stakeholders, and all other parties-in-interest, and essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' assets and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS AND DETERMINES:[3]**

A.     <u>Petition Date</u>.  On May 30, 2024 (the "**Petition Date**"), the Debtors filed with the Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code and are continuing to operate their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

B.     <u>Jurisdiction; Core Proceeding</u>.  This Court has jurisdiction over these Cases, the Motion, this Interim Order, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     <u>Immediate Need for Postpetition Financing</u>.  An immediate and ongoing need exists for the Debtors to obtain the DIP Loans in order to permit, among other things, the Debtors to meet

---

[3]     To the extent any findings of fact constitute conclusions of law, they are adopted as such, and vice versa.

their obligations arising during the Cases, including the administration of the Cases, so as to maximize the value of their business and assets as Debtors in possession under chapter 11 of the Bankruptcy Code. The Debtors do not have sufficient available sources of working capital to operate their business without access to the DIP Facility, and their existing liquidity is deteriorating at a rate that requires immediate access to the DIP Loan Proceeds, and warrants expedited consideration of the Motion and entry of this Interim Order. The Debtors' ability to preserve and maintain their assets, to pay employees, and to otherwise fund operations and an orderly reorganization process, is essential to the Debtors' viability and preservation of the going-concern value of their business and the value of their assets. Without access to the DIP Facility, the Debtors' estates would suffer immediate and irreparable harm.

D.      Proposed DIP Facility.  The Debtors have requested that the DIP Lenders establish the DIP Facility pursuant to which the Debtors may obtain DIP Loans and incur certain DIP Lender expenses from time to time in accordance with the DIP Loan Documents, with all DIP Loans to be secured by DIP Liens (defined below) upon the DIP Collateral as described below, and all DIP Loans and obligations of the Debtors contemplated by the DIP Loan Documents to be granted superpriority administrative expense claims, as and to the extent set forth in the DIP Loan Documents.  The DIP Lenders are willing to establish the DIP Facility upon the terms and conditions set forth in the DIP Loan Documents.

E.      No Credit Available on More Favorable Terms.  Despite diligent efforts and a sufficient marketing process, the Debtors have been unable to obtain postpetition financing on terms more favorable than those offered by the DIP Lenders under the DIP Loan Documents.  The Debtors are unable to obtain adequate unsecured credit under section 503(b)(1) of the Bankruptcy Code.  The Debtors are also unable to obtain secured credit allowable under section 364 of the

Bankruptcy Code without granting the DIP Liens and the DIP Superpriority Claims (each, as defined below) under sections 364(c) and 364(d) of the Bankruptcy Code on the terms and conditions set forth in this Interim Order and the DIP Loan Documents.

F.      Approved Budget.  The Debtors have delivered to the DIP Lenders a 14-week cash flow forecast of receipts and disbursements for the period from the Closing Date (as defined in the DIP Credit Agreement), attached to this Interim Order as **Exhibit B** (the "**Approved Budget**"), which Approved Budget is reasonably acceptable to the DIP Lenders in accordance with the DIP Loan Documents.  The DIP Secured Parties are relying upon the Approved Budget in entering into the DIP Loan Documents.

G.      Certain Conditions to DIP Facility.  The DIP Lenders' willingness to make the DIP Loans is conditioned upon, among other things, (a) the Debtors obtaining Court approval to enter into the DIP Loan Documents and to incur all of their obligations thereunder, and to confer upon the DIP Secured Parties all rights, powers, and remedies thereunder (b) the DIP Secured Parties being granted, as security for the prompt payment of the obligations under the DIP Facility and all other DIP Obligations, perfected security interests in and liens upon the DIP Collateral, and that such perfected security interests and liens have the priorities set forth herein and (c) the grant and delivery of the Interim IP Licenses, Customer Sublicenses and Specified IP (each as defined below) by the applicable Debtors to each of the DIP Lenders.

H.      Interim Hearing.  Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors have requested in the Motion that the Court hold the Interim Hearing to authorize the Debtors to enter into the DIP Loan Documents during the period (the "**Interim Period**") from the date of entry of this Interim Order through the earliest of (a) the date of the entry of the Final Order following the

final hearing on the Motion scheduled pursuant to paragraph N.24 of this Interim Order (the "**Final Hearing**") or (b) the Termination Date (as defined in the DIP Credit Agreement).

I.      <u>Service of Motion and Notice of Interim Hearing</u>.  Notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

J.      <u>Finding of Good Cause</u>.  Good cause has been shown for the entry of this Interim Order and authorization for: (a) the DIP Lenders to provide the Debtors with the DIP Loans and (b) the Debtors to accept, incur, and undertake the DIP Obligations pursuant to the DIP Loan Documents during the Interim Period.  The Debtors' need for financing of the type afforded by the DIP Loan Documents is critical.  Entry of this Interim Order will preserve the value of the assets of the Debtors' estates and is in the best interests of the Debtors, their creditors and their estates. The terms of the DIP Facility are fair and reasonable, including the interest rates, fees and expenses owed thereunder, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

K.      <u>Finding of Good Faith</u>.  Based upon the record presented at the Interim Hearing, the DIP Facility has been negotiated in good faith and at arm's length between the Debtors, on the one hand, and the DIP Secured Parties, on the other.  All of the DIP Obligations, including all DIP Loans made pursuant to the DIP Loan Documents and all other liabilities and obligations of the Debtors under this Interim Order, owing to the DIP Secured Parties shall be deemed to have been extended by the DIP Secured Parties in "good faith," as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code.  The DIP Secured Parties shall be entitled to the full protection of section 364(e)

of the Bankruptcy Code in the event that this Interim Order or any provision hereof is reversed, or modified, on appeal.

L.     <u>No Liability to Third Parties</u>.  Subject to entry of the Final Order, the Debtors stipulate and the Court finds that in making decisions to advance loans to the Debtors, in administering any DIP Loans, in accepting the Approved Budget, or in taking any other actions permitted by this Interim Order or the DIP Loan Documents in their respective capacities as DIP Lenders or DIP Collateral Agent, none of the DIP Secured Parties shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors.

M.     <u>Immediate Entry</u>.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2) and the Local Rules.  Absent the immediate grant by the Court of the interim relief sought by the Motion, the Debtors' estate will be immediately and irreparably harmed pending the Final Hearing.  The consummation of the DIP Facility in accordance with the terms of this Interim Order and the other DIP Loan Documents, is in the best interest of the Debtors' estates, and is consistent with the Debtors' exercise of their fiduciary duties. Under the circumstances, the notice given by the Debtors of the Motion and Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001(c) and the Local Rules.  No further notice of the relief sought at the Interim Hearing is necessary or required.

N.     <u>No Claims or Causes of Action.</u>  Subject to entry of the Final Order, there exist no claims or causes of action against any of the DIP Collateral Agent or the other DIP Secured Parties with respect to, in connection with, related to, or arising from the DIP Loan Documents; the DIP Facility or any MTPSA (defined below) between a Debtor and a DIP Lender, that may be asserted by the Debtors or any other person or entity.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDICATED, AND DECREED as follows:

1.    <u>Grant of Motion; Authorization of Interim Financing; Use of Proceeds</u>.

(a)    The Motion is hereby granted as and to the extent provided herein, and the Court hereby authorizes and approves the Debtors' execution and delivery of the DIP Loan Documents, and the Debtors' execution and delivery of all instruments, security agreements, assignments, pledges, mortgages, licenses, sublicenses, reaffirmations, and other documents referred to therein or reasonably requested by the DIP Secured Parties to give effect to the terms thereof and as will be drafted and executed as contemplated therein, in each case, in final form and substance consistent with this Interim Order and otherwise reasonably acceptable to the DIP Secured Parties and the Debtors (collectively, this Interim Order, the DIP Credit Agreement, the Approved Budget, and any other document delivered to any DIP Secured Party in connection with any of the foregoing, in each case, as the same may be amended, restated, or otherwise modified from time to time in accordance with the terms of this Interim Order and the DIP Credit Agreement, are referred to herein as the "**DIP Loan Documents**").

(b)    The Debtors are hereby authorized to borrow under the DIP Loan Documents and this Interim Order up to an interim aggregate principal amount of $1,954,000 during the Interim Period, subject to any conditions and limitations on availability in the DIP Loan Documents, plus all interest, fees, and other charges payable in connection with the DIP Loans as provided in the DIP Credit Agreement and the other DIP Loan Documents; to incur any and all liabilities and obligations under the DIP Loan Documents; to pay all principal, interest, fees, expenses, and other obligations provided for under the Approved Budget and the other DIP

Loan Documents, including the obligations under the DIP Loan Documents to indemnify each Indemnitee (as defined in the DIP Credit Agreement).

(c)      No DIP Secured Party shall have any obligation or responsibility to monitor the use of the DIP Loans, and each DIP Secured Party may rely upon the Debtors' representations that the amount of the DIP Loans requested at any time, and the use thereof, are in accordance with the requirements of this Interim Order, the Approved Budget, the DIP Loan Documents, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

(d)      The Debtors may obtain and use the DIP Loan Proceeds during the Interim Period only as permitted under the DIP Loan Documents.  For the avoidance of doubt, no DIP Loan Proceeds may be used to make any payment in settlement or satisfaction of any prepetition claim or administrative claim, unless such payment is (x) in compliance with the Approved Budget or (y) separately approved or authorized by the Court upon notice to the DIP Secured Parties.

2.      <u>Entry into, Execution, Delivery, and Performance of DIP Loan Documents</u>.  The Debtors are hereby authorized (a) to enter into the DIP Credit Agreement and the other DIP Loan Documents, (b) to incur and perform the DIP Obligations arising from and after the date of this Interim Order under the DIP Facility, (c) to repay amounts borrowed, together with interest, and (d) to pay all fees, costs, and expenses contemplated therein, as well as any other outstanding DIP Obligations to the DIP Secured Parties, in each case in accordance with and subject to the terms and conditions set forth in this Interim Order, the other DIP Loan Documents, and such additional documents, instruments, and agreements as may reasonably be required by the DIP Secured Parties to implement the terms or effectuate the purpose of and transactions contemplated by the DIP Loan Documents, the terms of which are incorporated by reference.  The DIP Loan Documents may be executed and delivered on behalf of the Debtors by any officer, director, or agent of the Debtors,

- 10 -

who by signing shall be deemed to represent himself or herself to be duly authorized and empowered to execute such DIP Loan Documents for and on behalf of the Debtors; the DIP Secured Parties shall be authorized to rely upon any such person's execution and delivery of any of the DIP Loan Documents as having done so with all requisite power and authority to do so; and the execution and delivery of any of the DIP Loan Documents by any such person on behalf of the Debtors shall be conclusively presumed to have been duly authorized by all necessary corporate action of the Debtors.  Upon execution and delivery thereof, each of the DIP Loan Documents shall constitute valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with its terms for all purposes during their Cases, any subsequently converted case of the Debtors under chapter 7 of the Bankruptcy Code (a "**Successor Case**"), and after the dismissal of any Case.  No obligation, payment, or transfer under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including under sections 502(d), 544, 547, 548, 549, 550 or 553 of the Bankruptcy Code or under any applicable Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act, or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.

3.     DIP Liens.  As security for the Debtors' payment and performance under the DIP Loan Documents, all principal, interest, costs, expenses, fees, and other charges at any time payable by the Debtors to the DIP Secured Parties in connection with the DIP Loan Documents, all reimbursement obligations, and all other indebtedness and obligations contemplated under any of the DIP Loan Documents (all of the foregoing being collectively called the "**DIP Obligations**"), the DIP Collateral Agent, for itself and for the benefit of the DIP Lenders, is hereby granted the following valid, binding, enforceable, non-avoidable, and automatically and properly perfected

security interests in and liens upon all of the DIP Collateral (collectively, the "**DIP Liens**") in the priorities set forth in subparagraphs (a) through (c) below, each of which shall be subject to the Carve Out:

(a)    first priority liens pursuant to section 364(c)(2) of the Bankruptcy Code on all DIP Collateral and to the extent any DIP Collateral is subject to any liens perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code ("**Permitted Senior Liens**"), senior liens, pursuant to section 364(d) of the Bankruptcy Code, on such DIP Collateral subject and subordinate only to Permitted Senior Liens;

(b)    junior liens pursuant to section 364(c)(3) of the Bankruptcy Code on all DIP Collateral that is subject to any valid and perfected liens existing on the Petition Date;

(c)    the DIP Liens shall be effective immediately upon the entry of this Interim Order and shall not at any time be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or the Debtors' estate under section 551 of the Bankruptcy Code, (B) except to the extent the DIP Loan Documents expressly allow a postpetition lien to have priority over the DIP Liens, any postpetition liens granted by the Debtors to other persons or entities or otherwise arising after the Petition Date, including any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit, commission, board, or court for any liability of the Debtors, or (C) any intercompany or affiliate liens or security interests against the Debtors; (ii) subordinated to or made *pari passu* with any other lien or security interest on the DIP Collateral under section 363 or 364 of the Bankruptcy Code; or (iii) subject to sections 510(c), 549, or 550 of the Bankruptcy Code.  In no event shall any person or entity who pays (or, through the extension of credit to the Debtors, causes to be paid) any of the DIP Obligations be subrogated, in whole or in part, to any rights, remedies, claims,

- 12 -

privileges, liens, or priorities granted to or in favor of, or conferred upon, any DIP Secured Party by the terms of any DIP Loan Documents or this Interim Order unless such person or entity contemporaneously causes payment in full of all of the DIP Obligations.

(d)    <u>Right to Challenge Competing Liens</u>.  The DIP Secured Parties shall have the right and standing to challenge the validity, priority, perfection, extent, or amount of any lien or security interest filed against the Debtors that relates to DIP Collateral that purports to be senior to any DIP Lien.

4.    <u>Superpriority Claims</u>.

(a)    <u>Allowed Claims</u>.    All DIP Obligations shall at all times constitute superpriority administrative expense claims against the Debtors (the "**DIP Superpriority Claims**") that will, in accordance with section 364(c)(1) of the Bankruptcy Code, have priority over any and all administrative expenses of and unsecured claims against the Debtors now existing or hereafter arising, of any kind or nature whatsoever, including all administrative expenses of the kind specified in, or arising or ordered under, sections 105, 326, 328, 330, 331, 364, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, and 1114 of the Bankruptcy Code (including those resulting from the conversion of any Case pursuant to section 1112 of the Bankruptcy Code), subject only to the Carve Out.  The DIP Superpriority Claims shall survive any conversion of any Case to a case under chapter 7 of the Bankruptcy Code or the dismissal of any Case.

(b)    <u>Proceeds of Avoidance Actions</u>.  Subject to entry of the Final Order, the DIP Superpriority Claims shall have recourse to all proceeds (the "**Avoidance Proceeds**") of all of the Debtors' claims and causes of action pursuant to sections 502(d), 544, 545, 547, 548, 549, 551, 553(b), 732(2), or 742(2) of the Bankruptcy Code (the "**Avoidance Actions**"), including all

of the Debtors' claims and causes of actions pursuant to section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral or postpetition transfer of DIP Loan Proceeds.

5.    <u>Repayment of DIP Obligations</u>.  The DIP Obligations shall be due and payable, and shall be paid, as and when provided in the DIP Loan Documents and as provided herein, without defense, offset, or counterclaim.  Without limiting the generality of the foregoing, in no event shall the Debtors be authorized to offset or recoup any amounts owed, or allegedly owed, by any DIP Secured Party to the Debtors or any of their respective subsidiaries or affiliates against any of the DIP Obligations without the prior written consent of the DIP Secured Parties, if any, that would be adversely affected by any such offset or recoupment, and no such consent shall be implied from any action, inaction or acquiescence by any DIP Secured Party.

6.    <u>Payments Free and Clear</u>.  All payments or proceeds remitted to the DIP Collateral Agent by or on behalf of the Debtors pursuant to the DIP Loan Documents, the provisions of this Interim Order, or any subsequent order of this Court, shall be received free and clear of any claim, charge, assessment, or other liability, including any such claim or charge arising out of or based on, directly or indirectly, section 506(c) (subject to entry of the Final Order) or the "equities of the case" exception of section 552(b) of the Bankruptcy Code (subject to entry of the Final Order).

7.    <u>DIP Lender Compensation</u>.

(a)    <u>IP Licenses</u>:  In lieu of any commitment fee, unused line fee, or similar fees, upon entry of this Order, the DIP Lenders shall receive (i) interim, worldwide, royalty free licenses with respect to the Specified IP (defined below) relevant to such DIP Lender's sites and operations for its own internal purposes, including without limitation for its locations and other future sites it develops for itself, its affiliates' and successors' property in substantially the form attached hereto as **Annex A** ( the ("**Interim IP Licenses**"), which Interim IP Licenses will automatically terminate

if the Final Order is not entered within thirty (30) days of the Petition Date, (ii) perpetual,
irrevocable, worldwide, royalty free sublicenses (the "**Customer Sublicenses**" a form of which is
attached hereto as **Annex B**) to use and sublicense the computer software programs engineered
and developed by Knapp, which are required for the operation of the operating the automated
inventory management and fulfillment equipment at each DIP Lender's sites, and (iii) all
intellectual property necessary to enable each DIP Lender to use such DIP Lender's Interim IP
License and Customer Sublicense, including (but not limited to) (A) all current versions of
software code, source code, object code, customer data, deployment pipelines, documentation,
functional design, requirements, databases, libraries, interfaces with third-parties (including
Knapp), technical architecture, technical environments (including, without limitation, production,
non-production, and lower environments), technical environment details, and any and all related
materials, documentation, data, and information (including usernames, logins, passwords, and
access keys and credentials to associated software, middleware and hardware (including routers),
and sublicenses (including from Knapp) and (B) access to the Fiix and Looker instances relevant
to that DIP Lender's sites, together with any and all related materials, documentation, data, and
information (including usernames, logins, passwords, and access keys and credentials to associated
software, middleware and hardware) (the items in this paragraph 7(a)(iii)(A)-(B) collectively
referred to as the "**Specified IP**"), including a fully operating instance suitable for and accessible
by such DIP Lender ("**Lender-Specific Specified IP**"), except to the extent that providing any
portion of the Specified IP that constitutes non-material Specified IP would violate applicable law
or result in the breach or termination of any contracts of the Debtors in existence on the Petition
Date (and not entered into in contemplation of the bankruptcy filing).

(b)     <u>Perpetual IP Licenses</u>.  Upon entry of the Final Order, (i) the term of each of the Interim IP Licenses will automatically extend in perpetuity (thereafter, the "**Perpetual IP Licenses**") and (ii) the Court hereby authorizes and approves the Debtors' execution and delivery to each of the DIP Lenders, as applicable, of the Specified IP, including the Lender-Specific Specified IP, except to the extent that providing any portion of the Specified IP that constitutes non-material Specified IP would violate applicable law or result in the breach or termination of any contracts of the Debtors in existence on the Petition Date (and not entered into in contemplation of the bankruptcy filing).

(c)     <u>MTPSA Amendment</u>. To facilitate each DIP Lender's use of the Specified IP in accordance with the rights afforded to it under its Interim IP License, Perpetual IP License and Customer Sublicense, each DIP Lender's Master Technology and Platform Services Agreement with the applicable Debtors (each an "**MTPSA**") is hereby deemed to be modified and amended in the following respects (i) all amounts that are or may become payable by each "**Customer**" (as defined in each MTPSA) to the Debtors and that have not been paid as at the date of entry of this Interim Order, including (but not limited to) all amounts payable under any statement of work or purchase order, are hereby deferred until the obligations under the DIP Facility are indefeasibly satisfied in cash or via credit bid, (ii)  in the MTPSA between Takeoff Technologies, Inc and (A) Woolworths, the operation of Sections 1.6 (*Restrictions*), 1.8(ii) (*Exclusivity*), 6.1 (*Confidential Information*) (to the extent that such provision would otherwise restrict the DIP Lender from exercising its rights under paragraph 7(b)(iii) hereof), and 11 (*Non-Solicitation*) (B) Albertsons, the operations of Sections 1.2(a) and Exhibit A (*Restrictions*), 6.1 (*Confidential Information*) (to the extent that such provision would otherwise restrict the DIP Lender from exercising its rights under paragraph 7(b)(iii) hereof), 11 (*Non-*

*Solicitation*), 15.3 (*Dispute Resolution*), and 16.6 (*Additional Restrictions*) and (C) the Wakefern Cooperative Lenders, the operation of Sections 1.5 (*Restrictions*), 6.1 (*Confidential Information*) (to the extent that such provision would otherwise restrict the DIP Lenders from exercising their rights under paragraph 7(b)(iii) hereof), and 11 (*Non-Solicitation*) (the MTPSA sections referred to in this sub-paragraph 7(b)(ii)(A)-(C) collectively, the "**Suspended Sections**") is, in each case, suspended unless and until such time as the Debtors and the applicable Customer agree in writing to lift that suspension and any right of a Debtor make a claim for breach of the Suspended Sections in respect of any act, omission or circumstance that arises during the period of suspension is hereby permanently and irrevocably waived, *provided that* the Suspended Sections shall permanently expire on the expiry or earlier termination (including as provided for by section 7(b)(iv) hereof) of the applicable MTPSA; (iii) notwithstanding any other provision of each MTPSA, each Customer shall be free to engage, negotiate, and enter into agreements with any third parties (including Knapp) as it sees fit, including in relation to the provision of e-commerce and warehouse operations management and fulfilment platform equipment and services; and (iv) the term of each MTPSA shall be deemed to be modified (A) such that each MTPSA terminates on the Maturity Date (as defined in the DIP Credit Agreement) and all payments deferred under section 6(c)(i) hereof and all payments not yet due or payable will be deemed to have been permanently and irrevocably waived by the Debtors or (B) on such other terms as may be agreed upon between the Debtors and the specific Customer.  In connection with the rights afforded to the DIP Lenders under this paragraph, the Debtors further waive any non-compete or other similar restriction imposed on any employee of the Debtors under any agreement governing such employee's employment or contracting arrangement with the Debtors.  For the avoidance of doubt, nothing in this paragraph 7 or in this Interim Order generally shall be construed as the assumption,

assignment, or rejection of an executory contract as those terms are used and defined in section 365 of the Bankruptcy Code.

8.    <u>Fees and Expenses of Estate Professionals</u>.  Subject to paragraphs 10 and 11 below, the Debtors are authorized to use proceeds of DIP Loans to pay such compensation and expense reimbursement (collectively, "**Professional Fees**") of Professional Persons (defined below), to the extent that such compensation and expense reimbursement is authorized and approved by the Court at any time.

9.    <u>Section 506(c) Claims</u>.  Subject to entry of the Final Order, except to the extent of the Carve Out, no costs or expenses of administration shall be imposed upon any DIP Secured Party or on any DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of such DIP Secured Party, and no such consent shall be implied from any action, inaction, or acquiescence by any DIP Secured Party.  Further, subject to entry of the Final Order, the Debtors waive, and shall not assert in these Cases or any Successor Cases, any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise with respect to the DIP Obligations or the DIP Liens.

10.    <u>Carve Out</u>.

(a)    Notwithstanding anything to the contrary in this Interim Order, any other DIP Loan Document, or any other order of this Court to the contrary, the rights and claims of the DIP Lenders, including the DIP Liens and DIP Superpriority Claims, shall be subject and subordinate in all respects to the payment of the Carve Out.  As used in this Interim Order, "**Carve Out**" means the following expenses: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a

- 18 -

Trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000 (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all (A) unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors (the "**Allowed Debtor Professional Fees**")) incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") and (B) unpaid fees and expenses (the "**Allowed Committee Professional Fees**" and together with the Allowed Debtor Professional Fees, collectively, the "**Allowed Professional Fees**") incurred by persons or firms retained by any statutory committees appointed in the Cases (each, a "**Committee**") pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first day following delivery by the DIP Lenders of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (these clauses (i) through (iii), the "**Pre-Carve Out Trigger Amounts**"), provided, however, that the Pre-Carve Out Trigger Amounts shall not exceed the amounts for such Professional Persons included in an Approved Budget; and (iv) Allowed Professional Fees not to exceed $150,000, incurred after the first day following delivery by the DIP Lenders of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**," and together with the Pre-Carve Out Trigger Amounts, the "**Carve Out Amount**").  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Lenders to the Debtors, their lead restructuring counsel, the United States Trustee, and counsel

to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)    Carve Out Funded Reserve.  For the period prior to the delivery of the Carve Out Trigger Notice, on a weekly basis, the Debtors shall fund from the DIP Facility or cash on hand into a segregated account (the "**Funded Reserve Account**") held by Citibank, N.A. in trust for the benefit of Professional Persons the amounts set forth in the Approved Budget for Professional Persons. The Debtors shall use funds held in the Funded Reserve Account exclusively to pay Allowed Professional Fees and other obligations included within the Carve Out in accordance with an Approved Budget as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any interim or final orders of the Bankruptcy Court; provided that when all Allowed Professional Fees provided for in an Approved Budget that have funded into the Funded Reserve Account have been paid, any unused funds remaining in the Funded Reserve Account for those periods shall revert to the DIP Collateral Agent for the benefit of the DIP Lenders.  Funds transferred to the Funded Reserve Account shall be subject to the DIP Liens and DIP Superpriority Claims granted hereunder solely to the extent of such reversionary interest; provided, that, for the avoidance of doubt, such liens and claims shall be subject in all respects to the Carve Out.  For avoidance of doubt, the Carve Out shall be limited to the Funded Reserve Account and shall not attach to or otherwise encumber the DIP Collateral or any proceeds from the sale of any DIP Collateral until such time as the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated.

(c)    Carve Out Funding.    Notwithstanding anything in the DIP Credit Agreement to the contrary, on the day on which a Carve Out Trigger Notice is validly delivered

(the "**Carve Out Trigger Notice Date**"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to first pay all DIP fees and DIP Lender expenses, then to fund to the Funded Reserve Account an amount equal to the then-unpaid amounts of the Allowed Professional Fees in an Approved Budget for the reasonably estimated fees for the period prior to the Carve Out Trigger Notice Date. All funds in the Funded Reserve Account shall be used to pay the Pre-Carve Out Trigger Amounts, but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to pay the obligations set forth in the Post-Carve Out Trigger Notice Cap, and then, to the extent the Funded Reserve Account has not been reduced to zero, to pay the DIP Collateral Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Debtors.  Further, notwithstanding anything to the contrary in the Interim Order, (i) disbursements by the Debtors from the Funded Reserve Account shall not constitute DIP Loans or increase or reduce the DIP Obligations and (ii) the failure of the Funded Reserve Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, which shall be senior to all DIP Superpriority Claims.

(d)     The failure of the Funded Reserve Account to satisfy Professional Fees in full shall not affect the priority of the Carve Out; provided that, to the extent that the Funded Reserve Account is actually funded, the Carve Out shall be reduced by such funded amount dollar-for-dollar.  In no way shall the Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Funded Reserve Account, or any of the terms of the Interim Order be construed as a cap or limitation on the amount of the Allowed Debtor Professional Fees due and payable by the Debtors or that may be allowed by the Bankruptcy Court at any time (whether by interim order, final order,

or otherwise), but rather only a cap on the amount of Allowed Professional Fees that is entitled to the priority of the Carve Out.  Any payment or reimbursement made prior to the occurrence of the Carve Out Trigger Notice Date in respect of any Allowed Professional Fees shall not reduce the Post-Carve Out Trigger Notice Cap.

(e)     None of the DIP Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Persons incurred in connection with the Cases or any Successor Cases.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Persons or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

11.     <u>DIP Proceeds Restrictions</u>.  Neither the Carve Out nor any DIP Loan Proceeds or DIP Collateral shall be used to, among other things (any of the following each a "Prohibited Purpose"): (a) object to, seek subordination of, or contest the validity, extent, perfection, priority, or enforceability of the DIP Facility or the amount due thereunder and the DIP Superpriority Claims granted thereby or the DIP Liens; (b) investigate, initiate, assert, or prosecute any claim, defense, demand, or cause of action against the DIP Collateral Agent, the DIP Lenders, or any of their respective officers, directors, employees, agents, attorneys, representatives, subsidiaries, affiliates, or shareholders, under or relating to any DIP Lender's MTPSA or the DIP Facility, including, in each case, any action, suit or other proceeding for breach of contract or tort or pursuant to sections 105, 506, 510, 544, 547, 548, 549, 550, 552, or 553 of the Bankruptcy Code, or under any other applicable law (state, federal, or foreign), or otherwise; (c) prevent, hinder, or delay, whether directly or indirectly, any DIP Secured Party's assertion or enforcement of its liens and security interests, or its efforts to realize upon any DIP Collateral or the claims authorized or

granted under the DIP Loan Documents or exercise any other rights and remedies under the DIP Loan Documents, or applicable law; (d) seek to modify any of the rights granted under this Interim Order, the Interim IP Licenses, the Perpetual IP Licenses, or the Customer Sublicenses to any DIP Secured Party; (e) assert any defense, counterclaim, or offset to this Interim Order, or any DIP Obligations; or (f) object to, contest, delay, prevent, or interfere in any way with the exercise of rights or remedies by any DIP Secured Party with respect to the Interim IP Licenses, Perpetual IP Licenses, the Specified IP, the Customer Sublicenses, or after the occurrence and during the continuance of an Event of Default (as defined in the DIP Credit Agreement) any DIP Collateral; provided, however, that the Carve Out and such DIP Loan and DIP Collateral proceeds may be used to pay the allowed fees and expenses, in an amount not to exceed $25,000 in the aggregate (the "**Investigation Budget Amount**"), incurred solely by a Committee (if appointed), in investigating (but not prosecuting or challenging) any claim, defense, demand, or cause of action against the DIP Lenders, or any of their respective officers, directors, employees, agents, attorneys, representatives, subsidiaries, affiliates, or shareholders, under or relating to any DIP Lender's MTPSA, including, in each case, any action, suit or other proceeding for breach of contract or tort or pursuant to sections 105, 506, 510, 544, 547, 548, 549, 550, 552, or 553 of the Bankruptcy Code, or under any other applicable law (state, federal, or foreign) (the "**Investigation Scope**"), or otherwise within 75 calendar days following the date of entry of the Final Order (the "**Investigation Period**"), unless otherwise extended by the Court.  If the Committee has not filed a motion seeking standing to bring an action to assert a claim or cause of action arising from or related to the Investigation Scope prior to the conclusion of the Investigation Period, all such claims and causes of action against each DIP Lender shall be deemed waived and released by the Debtors and their estates.

12.     <u>Reservation of Rights</u>.

(a)     <u>Protection from Subsequent Financing Order</u>.  Prior to the payment in full of all DIP Obligations and the termination of the DIP Commitments under the DIP Facility in accordance with the terms of the DIP Loan Documents, there shall not be entered in these Cases or in any Successor Cases any order other than with the consent of the DIP Collateral Agent, and the requisite DIP Lenders (as provided for in the DIP Loan Documents) that authorizes the obtaining of credit or the incurrence of indebtedness by the Debtors (or any trustee or examiner) that is: (i) secured by a security interest, mortgage, or other lien on all or any part of the DIP Collateral that are equal or senior to the DIP Liens or (ii) entitled to claims with payment priority that is equal or senior to the DIP Superpriority Claims; *provided, however*, that nothing herein shall prevent the entry of an order that specifically provides for, as a condition to the granting of the benefits of clauses (i) and (ii) above, (1) the payment in full of all of the DIP Obligations and (2) the termination of any DIP Commitments under the DIP Loan Documents.

(b)     <u>Rights Upon Dismissal, Conversion, or Consolidation</u>.  The dismissal, conversion, or substantive consolidation of the Cases shall not affect the rights or remedies of any DIP Secured Party under the DIP Loan Documents or this Interim Order, and all of the respective rights and remedies hereunder and thereunder of each DIP Secured Party shall remain in full force and effect as if such Cases had not been dismissed, converted, or substantively consolidated.

(c)     <u>Survival of Interim Order</u>.  This Interim Order, and any actions taken pursuant hereto, shall survive the entry of and shall not be modified, superseded, impaired, discharged, or in any way altered, without the consent of the DIP Secured Parties, by any order that may be entered: (i) confirming any plan of reorganization or liquidation in any of the Debtors' Cases; (ii) converting any of the Debtors' Cases to a case under chapter 7 of the Bankruptcy Code;

(iii) dismissing any of the Debtors' Cases or any Successor Cases; or (iv) pursuant to which the Court abstains from hearing any of the Cases or any Successor Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections granted to the DIP Secured Parties pursuant to this Interim Order or the other DIP Loan Documents, shall continue in full force and effect notwithstanding the entry of any such order, and such rights, claims and liens shall maintain their priority as provided by this Interim Order and the other DIP Loan Documents to the maximum extent permitted by law until all of the DIP Obligations are indefeasibly paid in full in accordance with the DIP Loan Documents.

(d)     <u>No Discharge</u>. None of the DIP Obligations shall be discharged by the entry of any order confirming a plan of reorganization or liquidation in these Cases unless such obligations have been indefeasibly paid in full in accordance with the DIP Loan Documents on or before the effective date of such plan, or each of the DIP Secured Parties has otherwise agreed in writing, and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived such discharge.

(e)     <u>Credit Bid Protection</u>. (i) Each DIP Secured Party shall have, subject to section 363(k) of the Bankruptcy Code, the unqualified right to credit bid up to the full amount of its *pro rata* share of the DIP Obligations and the DIP Superiority Claims and (ii) the DIP Lenders (acting unanimously) shall have, subject to section 363(k) of the Bankruptcy Code, the unqualified right to credit bid up to the full amount of the DIP Obligations and the DIP Superiority Claims, in each case without the need for further Court order authorizing the same, in connection with any sale of any of the DIP Collateral, whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise. The Debtors shall not object to or support any objection to any DIP Secured Party

credit bidding in accordance with this Interim Order and the applicable DIP Loan Documents in any sale of any DIP Collateral, whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

(f)     No Marshaling.  Subject to entry of the Final Order, in no event shall any DIP Secured Party be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to any DIP Collateral.

(g)     No Requirement to File Claim for DIP Obligations.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, no DIP Secured Party shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Loan Documents applicable thereto without the necessity of filing any such proof of claim or request for payment of administrative expenses; and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Loan Documents or of any DIP Obligations arising at any time thereunder, or prejudice or otherwise adversely affect any DIP Secured Party's rights, remedies, powers, or privileges under any of the DIP Loan Documents, this Interim Order, or applicable law.

13.     Automatic Perfection of Liens.  The DIP Liens are effective, valid, binding, enforceable, and duly perfected upon entry of this Interim Order.  None of the DIP Secured Parties shall be required to file any UCC-1 financing statement, mortgage, deed of trust, assignment, pledge, security deed, notice of lien, or any similar document or instrument in any jurisdiction or take any other action (including taking possession of any of the DIP Collateral) in order to validate

the perfection of any DIP Liens, but all of such filings and other actions are hereby authorized by the Court.  If the DIP Collateral Agent in its discretion, chooses to file or record any such mortgage, deed of trust, assignment, pledge, security deed, notice of lien, or UCC-1 financing statement, or takes any other action in any jurisdiction to evidence the perfection of any part of the DIP Liens, the Debtors and their respective officers are authorized and directed to use commercially reasonable efforts to execute, file, and record any documents or instruments as the DIP Collateral Agent, as applicable, may reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order. The DIP Collateral Agent may, in its reasonable discretion, file a certified copy of this Interim Order in any filing office in any jurisdiction in which the Debtors are organized or have or maintain any DIP Collateral or an office, and each filing office is directed to accept such certified copy of this Interim Order for filing and recording.  The DIP Collateral Agent or the DIP Lenders may require the Debtors to enter into non-U.S. security documentation with respect to such DIP Collateral located in non-U.S. jurisdictions, and the Debtors and their respective officers are authorized and directed to use commercially reasonable efforts to execute, file, and record any documents or instruments as the DIP Collateral Agent or the DIP Lenders may reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

14.     <u>Reimbursement of Fees, Costs, and Expenses of DIP Secured Parties</u>.  The Debtors shall reimburse the DIP Secured Parties for their reasonable and documented out-of-pocket fees, costs, and expenses, whether accrued on, prior to, or after the Closing Date, in connection with (a) the preparation, negotiation, execution, and administration of the DIP Loan Documents, the Interim IP Licenses, the Perpetual IP Licenses, the Customer Sublicenses and any other document

prepared in connection therewith or the consummation and administration of any transaction contemplated therein, including any amendment or waiver of the DIP Loan Documents, (b) the funding and administration of the DIP Loans, (c) the creation, perfection, or protection of the DIP Liens (including all search, filing and recording fees), (d) the enforcement or preservation of any right or remedy under any DIP Loan Document, any DIP Obligation, or with respect to the DIP Collateral, (e) the commencement, defense, conduct of, intervention in, or the taking of any other action (including preparation for and/or response to any subpoena or request for document production relating thereto) with respect to, any proceeding related to the Debtors, any DIP Loan Document or DIP Obligation, (f) the review of pleadings and other filings made with the Bankruptcy Court, (g) attendance at hearings in respect of the Cases, (h) any refinancing or restructuring of the DIP Loans in the nature of a "work-out," and (i) defending and prosecuting any actions or proceedings arising out of or relating to the DIP Obligations or any transactions related to or arising in connection with the DIP Loan Documents; *provided* that, in the case of each of the foregoing clauses (a)-(i), the payment of such fees, costs, and expenses of counsel to the DIP Secured Parties from proceeds of the DIP Facility shall be subject to the Lender Expense Cap (as defined in the DIP Credit Agreement).  The DIP Secured Parties shall deliver an invoice in summary form (which shall not be required to include time entry detail, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted for privileged or confidential information) to the counsel for the Debtors, the United States Trustee, and counsel for any Committee for any amounts to be paid from the proceeds of the DIP Facility. If no written objection is received by 12:00 p.m., prevailing Eastern Time, on the date that is ten (10) calendar days after delivery of such invoice, the Debtors shall promptly pay such fees and expenses in full.  If an objection to a DIP Secured Parties' invoice is timely received,

the undisputed portion of any such invoice will be deemed allowed, the Debtors shall promptly pay such undisputed amount and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually. The DIP Secured Parties shall not be required to comply with the United States Trustee fee guidelines or file applications or motions with, or obtain approval of, the Court for the payment of any of their fees or out-of-pocket expenses (other than with respect to disputed amounts).  For the avoidance of doubt, any fees and expenses incurred by any DIP Secured Party in excess of the Lender Expense Cap shall be added to the DIP Obligations for the applicable DIP Secured Party.  In no event shall any invoice or other statement submitted by any DIP Secured Party to the Debtors or any other interested person (or any of their respective Professional Persons) with respect to fees or expenses incurred by any professional retained by such DIP Secured Party operate to waive the attorney/client privilege, the work-product doctrine, or any other evidentiary privilege or protection recognized under applicable law.

15.    <u>Amendments and Waivers</u>.  The Debtors and the DIP Secured Parties are hereby authorized to enter into, in accordance with the terms of the applicable DIP Loan Documents and without further order of the Court, any amendments to, modifications of, or waivers with respect to any of such DIP Loan Documents (and the payment of any fees, expenses, or other amounts payable in connection therewith) on the following conditions: (a) the amendment, modification, or waiver must not constitute a material change to the terms of such DIP Loan Document; and (b) copies of the amendment, modification, or waiver must be filed and served upon counsel for any Committee and the United States Trustee, who shall have five (5) business days to file an objection to any such amendment.  Any amendment, modification, or waiver that constitutes a material change, to be effective, must be approved by the Court.  For purposes hereof, a "material change"

shall mean a change to a DIP Loan Document that operates to shorten the term of the DIP Facility or the maturity of the DIP Obligations, to increase the aggregate amount of the DIP Commitments, to increase the rate of interest other than as currently provided in or contemplated by such DIP Loan Documents, to add specific Events of Default, or to enlarge the nature and extent of remedies available to the DIP Collateral Agent following the occurrence of an Event of Default. Without limiting the generality of the foregoing, no amendment of a DIP Loan Document that postpones or extends any date or deadline therein or herein (including the expiration of the term of a DIP Facility), nor any waiver of an Event of Default, shall constitute a "material change" and any such amendment may be effectuated by the Debtors and the DIP Secured Parties without the need for further approval of the Court.

16.    <u>Events of Default; Remedies</u>.

(a)    <u>Notice of Default</u>. Upon the occurrence of an Event of Default under (and as defined in) any DIP Loan Document and during the continuance thereof: (i) the DIP Lenders may declare, on a *pro rata* basis, all or any portion of the DIP Facility to be suspended or terminated, whereupon such DIP Facility shall forthwith be suspended or terminated; (ii) the Debtors shall have no right to request any extension of credit under the DIP Facility or to use DIP Loan Proceeds or any DIP Collateral or proceeds of DIP Collateral other than towards the satisfaction of the DIP Obligations, and the Carve Out, as provided herein, and (iii) subject to the terms of the DIP Credit Agreement, the DIP Collateral Agent may in its discretion serve upon counsel for the Debtors, counsel for any Committee, and the United States Trustee a written notice (a "**Default Notice**") setting forth the Events of Default, in which event (unless the Court determines that no Event of Default exists or continues to exist, after notice and a hearing) notwithstanding Bankruptcy Rules 4001(a)(3) and 6004(h) effective five calendar days after the

Default Notice is filed (the "**Remedies Notice Period**"), the DIP Collateral Agent and the DIP

Lenders shall be deemed to have received complete relief from the automatic stay imposed by

section 362(a) of the Bankruptcy Code (and any other stay then in effect) and shall be authorized

to the extent of the rights provided in the DIP Loan Documents, without further notice to the

Debtors or any other interested party or any further order of this Court, to (A) declare all or any

portion of the unpaid principal amount of all outstanding DIP Loans, as applicable, all interest

accrued and unpaid thereon, and all other amounts owing or payable under any of the DIP Loan

Documents, as applicable, to be immediately due and payable, (B) demand payment and enforce

collection of all DIP Obligations, and (C) otherwise exercise all rights and remedies available to

them under the DIP Loan Documents, as applicable.  During the Remedies Notice Period, the

Debtors and any Committee shall be entitled to seek an emergency hearing with the Court (such

hearing, a "**Remedies Hearing**").  In any Remedies Hearing, subject to entry of the Final Order,

the Debtors shall waive their rights to and shall not be entitled to seek relief, including under

section 105 of the Bankruptcy Code, to the extent that such relief would impair or restrict the rights

and remedies of the DIP Collateral Agent as set forth in this Interim Order or in any of the other

DIP Loan Documents, as applicable, and the only issue that may be raised by the Debtors is

whether, in fact, an Event of Default has occurred.  Prior to the adjudication of the Remedies

Hearing, the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the

occurrence of an Event of Default) solely to fund essential operations in accordance with past

practice, the DIP Loan Documents, and the Approved Budget.  Upon the effectiveness of any relief

from the automatic stay granted or deemed to have been granted pursuant to this paragraph 16, the

DIP Collateral Agent may, in its discretion, take all actions and exercise all other rights and

remedies under this Interim Order, the other DIP Loan Documents and applicable law that may be

necessary or deemed appropriate to collect any of the DIP Obligations, as applicable, and otherwise enforce any of the provisions of this Interim Order. The DIP Collateral Agent's failure to exercise rights and remedies under any DIP Loan Documents, this Interim Order, or applicable law shall not constitute a waiver of any of its rights and remedies hereunder, thereunder, or otherwise, unless any such waiver is pursuant to a written instrument executed by the DIP Collateral Agent, as applicable.

(b)     <u>Rights Cumulative</u>. The rights, remedies, powers, and privileges conferred upon any DIP Secured Party pursuant to this Interim Order shall be in addition to and cumulative with those contained in the other applicable DIP Loan Documents and created under applicable law.

17.     <u>Modification of Automatic Stay</u>. The automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to the extent necessary to implement the provisions of this Interim Order and the DIP Loan Documents, thereby permitting the DIP Collateral Agent, as and to the extent provided herein, to receive proceeds of the DIP Collateral for application to the DIP Obligations, to file or record any UCC-1 financing statements, mortgages, deeds of trust, assignments, pledges, security deeds, or other instruments and documents evidencing or validating the perfection of any DIP Liens, and to enforce any DIP Liens; and as and to the extent provided herein, to receive adequate protection.

18.     <u>Effect of Appeal</u>. Consistent with section 364(e) of the Bankruptcy Code, if any or all of the provisions of this Interim Order are hereafter modified or reversed, such modification or reversal on appeal shall not affect the validity of any debt so incurred, or any liens or priorities granted by the Debtors to any DIP Secured Party, prior to the effective date of such modification

or reversal, whether or not any such entity knew of the appeal, unless the authorization and incurring of such debt, or the granting of such lien or priority, were stayed pending appeal.

19.    <u>Service of Interim Order</u>.  Promptly after the entry of this Interim Order, the Debtors shall serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court.

20.    <u>No Deemed Control; Exculpation</u>.

(a)    Subject to entry of the Final Order, in determining to make any DIP Loans under the DIP Loan Documents, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the other DIP Loan Documents, no DIP Secured Party shall be deemed to be in control of the Debtors or their operations with respect to the operation or management of such Debtors, nor shall the DIP Secured Parties (in their respective capacities as such) owe any fiduciary duty to the Debtors, their creditors, shareholders, or estate.

(b)    None of the DIP Loan Documents or any other document related to the DIP Facility shall in any way be construed or interpreted to impose, or allow the imposition upon any DIP Secured Party of, any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business or in connection with their restructuring efforts.  So long as a DIP Secured Party complies with its obligations under the applicable DIP Loan Documents and applicable law: (i) such DIP Secured Party shall not, in any way or manner, be liable or responsible for (A) the safekeeping of the DIP Collateral, (B) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (C) any diminution in the value thereof, or (D) any act or default of any licensor, licensee, carrier, servicer, bailee, custodian,

forwarding agency, or other person or entity; and (ii) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.

21.     <u>Binding Effect; Successors and Assigns</u>.  The provisions of this Interim Order shall be binding upon all parties in interest in these Cases, including the Debtors, the DIP Secured Parties, and its and their respective successors and assigns (including any chapter 11 or chapter 7 trustee hereafter appointed for the estate of the Debtors, any examiner appointed pursuant to section 1104 of the Bankruptcy Code, any Committee, or any other fiduciary appointed as a legal representative of the Debtors or with respect to any property of the estate of the Debtors), and shall inure to the benefit of the Debtors, the DIP Secured Parties, and their respective successors and assigns.  In no event shall any DIP Secured Party have any obligation to make DIP Loans to, or permit the use of the DIP Collateral by, any chapter 7 trustee, chapter 11 trustee, or similar responsible person appointed or elected for the estate of the Debtors.

22.     <u>Joint and Several</u>.   The Debtors are jointly and severally liable for the DIP Obligations and all other obligations to the DIP Secured Parties hereunder.

23.     <u>Objections Overruled</u>.  Any and all objections to the relief requested in the Motion, to the extent that such objections are to entry of this Interim Order and that have not otherwise been withdrawn, waived, or resolved by consent at or before the Interim Hearing, and all reservations of rights included therein, are hereby OVERRULED and DENIED.

24.     <u>Final Hearing</u>.  The Final Hearing shall be held on [_____] at [____] [_].m. (Prevailing Eastern Time).  If any or all of the provisions of this Interim Order are modified, vacated, or stayed by the Final Order, then any DIP Obligations incurred prior to the effective date of such modification or stay shall be governed in all respects by the provisions of this Interim Order, and the DIP Secured Parties shall be entitled to the protections afforded under section 364(e) of the

Bankruptcy Code and to all the rights, remedies, privileges, and benefits, including, the DIP Liens and DIP Superpriority Claims granted herein and pursuant to the DIP Loan Documents, with respect to all such DIP Obligations.

25. <u>Objection Deadline</u>. Any objections to entry of the Final Order shall be filed with the Court on or before [_____], 2024 at 4:00 p.m. (Prevailing Eastern Time) and concurrently served upon and actually received by (a) proposed counsel to the Debtors, Sheppard, Mullin, Richter & Hampton LLP, 321 North Clark Street, 32nd Floor Chicago, IL 60654 (Attn: Justin Bernbrock); (b) proposed local counsel to the Debtors, Young, Conaway, Stargatt & Taylor LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn.: Joseph M. Mulvihill; (c) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Jon Lipshie (Jon.Lipshie@usdoj.gov); (c) counsel to Woolworths Group, Jones Day, 555 Flower St, Los Angeles, CA 90071 (Attn: Joshua M. Mester and Kathryn Sutherland-Smith); (d) local counsel to Woolworths Group, Cross & Simon, LLC, 1105 N. Market St., Suite 901, Wilmington, DE 19801 (Attn: Christopher P. Simon); (e) counsel to Albertsons Companies, Inc., Ballard Spahr LLP, 919 N. Market Street, 11th Floor Wilmington, DE 19801-3034 (Attn: Tobey M. Daluz and Nicholas J. Brannick), (e) counsel to the Wakefern Cooperative Lenders, Epstein Becker & Green, PC, 875 Third Avenue, New York, NY 10022 (Attn: Wendy G. Marcari) and (e) counsel to any Committee appointed in these Cases. If an objecting party fails to appear at the Final Hearing and assert the basis for such objection before the Court, such objection shall be deemed to have been waived and abandoned by such objecting party.

26. <u>Conditions Precedent</u>. No DIP Lender shall have any obligation to make any DIP Loans or otherwise fulfill any obligation of such DIP Lender set forth in the DIP Loan Documents,

unless the conditions precedent to making such extensions of credit or fulfilling any such obligation under the DIP Loan Documents have been satisfied in full or waived in accordance with the DIP Loan Documents.

27. <u>Effectiveness; Enforceability</u>. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be valid, take full effect, and be enforceable immediately upon entry hereof; there shall be no stay of execution or effectiveness of this Interim Order; and any stay of the effectiveness of this Interim Order that might otherwise apply is hereby waived for cause shown.

28. <u>Inconsistencies</u>. To the extent that any provision in the other DIP Loan Documents are inconsistent with any of the provisions of this Interim Order, the provisions of this Interim Order shall govern and control.

29. <u>Headings</u>. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

**EXHIBIT A**

**DIP Credit Agreement**

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

Dated as of

May [•], 2024,

by and among

**TAKEOFF TECHNOLOGIES, INC.**

as Borrower,

**EACH PERSON LISTED AS GUARANTOR ON THE SIGNATURE PAGES HERETO,**

as Guarantors,

**[GLAS Americas, LLC]**

as the Agent,

and

**THE OTHER PERSONS PARTY HERETO,**

as the Lenders

**TABLE OF CONTENTS**

ARTICLE I        THE CREDIT ................................................................. 1

1.1      Amounts and Terms of Commitments. ................................................. 1

1.2      Evidence of Loans; Notes ............................................................... 2

1.3      Interest, Fees, and Other Amounts. ................................................... 2

1.4      Procedure for Borrowing. ............................................................... 3

1.5      Payments by the Borrower. .............................................................. 3

1.6      Optional Prepayments .................................................................... 4

1.7      Termination Date .......................................................................... 4

ARTICLE II        CONDITIONS PRECEDENT ......................................... 4

2.1      Conditions to Effectiveness of Credit Agreement ............................... 4

2.2      Conditions to Each Borrowing ........................................................ 6

ARTICLE III        REPRESENTATIONS AND WARRANTIES .................... 6

3.1      Corporate Existence and Power ...................................................... 6

3.2      Corporate Authorization; No Contravention ..................................... 7

3.3      Governmental Authorization; Consents ............................................ 7

3.4      Binding Effect ............................................................................. 7

3.5      Litigation ................................................................................... 8

3.6      Margin Regulations ...................................................................... 8

3.7      Regulated Entities ........................................................................ 8

3.8      Ownership and Possession of Property ............................................. 8

3.9      Full Disclosure ............................................................................ 8

3.10     Sanctions, Foreign Assets Control Regulations, and Anti-Money
         Laundering ................................................................................. 8

3.11     Foreign Assets Control Regulations ................................................. 9

ARTICLE IV        AFFIRMATIVE COVENANTS ..................................... 9

4.1      Notices; Other Information. ............................................................ 9

4.2      Budget and Information Requirements. ............................................ 10

4.3      Compliance with Laws; Maintenance of Existence ............................. 11

4.4      Use of Proceeds ........................................................................... 11

4.5      Further Assurances ....................................................................... 11

4.6      Bankruptcy Matters. ..................................................................... 11

4.7      Performance of MTPSA Obligations. ............................................... 12

i

**TABLE OF CONTENTS**
(continued)

| | | |
|---|---|---|
| 4.8 | Further Assurances in Respect of Specified IP. | 12 |
| 4.9 | OFAC; Anti-Money Laundering | 12 |
| 4.10 | Undertakings with respect to Collateral | 12 |
| ARTICLE V | NEGATIVE COVENANTS | 12 |
| 5.1 | Limitation on Liens | 12 |
| 5.2 | Margin Stock; Use of Proceeds | 13 |
| 5.3 | Bankruptcy Matters | 13 |
| 5.4 | General Negative Covenants | 13 |
| ARTICLE VI | SUPERPRIORITY CLAIMS, COLLATERAL, ETC. | 14 |
| 6.1 | Grant of Security | 14 |
| 6.2 | Administrative Priority | 14 |
| 6.3 | No Filings Required | 14 |
| 6.4 | No Discharge; Survival of Claims | 15 |
| 6.5 | Prohibition on Surcharge; Etc | 15 |
| 6.6 | Marshalling Obligations | 15 |
| ARTICLE VII | EVENTS OF DEFAULT | 15 |
| 7.1 | Events of Default | 15 |
| 7.2 | Remedies | 17 |
| 7.3 | Rights Not Exclusive | 18 |
| ARTICLE VIII | THE AGENT | 18 |
| 8.1 | Authorization and Action | **Error! Bookmark not defined.** |
| 8.2 | Duties of the Agents: Exculpatory Provisions. | **Error! Bookmark not defined.** |
| 8.3 | Reliance by the Agent. | **Error! Bookmark not defined.** |
| 8.4 | Delegation of Duties | **Error! Bookmark not defined.** |
| 8.5 | Resignation of the Agent | **Error! Bookmark not defined.** |
| 8.6 | Non-Reliance on the Agent and Other Lenders. | **Error! Bookmark not defined.** |
| 8.7 | Indemnification | **Error! Bookmark not defined.** |
| ARTICLE IX | MISCELLANEOUS | 18 |
| 9.1 | Amendments and Waivers. | 18 |
| 9.2 | Notices. | 19 |

## TABLE OF CONTENTS
(continued)

| | | |
|---|---|---|
| 9.3 | No Waiver; Cumulative Remedies | 20 |
| 9.4 | Costs and Expenses; Yield Protection; Indemnity; Etc. | 20 |
| 9.5 | Payments Set Aside | 22 |
| 9.6 | Assignments | 22 |
| 9.7 | Participations. | 23 |
| 9.8 | Binding Effect | 23 |
| 9.9 | Counterparts; Facsimile Signature | 23 |
| 9.10 | Severability | 23 |
| 9.11 | Captions | 24 |
| 9.12 | Independence of Provisions | 24 |
| 9.13 | Interpretation | 24 |
| 9.14 | No Third Parties Benefited | 24 |
| 9.15 | Governing Law and Jurisdiction. | 24 |
| 9.16 | Waiver of Jury Trial | 25 |
| 9.17 | Entire Agreement; Release; Survival. | 25 |
| 9.18 | Patriot Act | 25 |
| ARTICLE X | GUARANTEE | 26 |
| 10.1 | Guarantee.. | 26 |
| 10.2 | Guarantee of Payment and Performance; Continuing Guarantee. | 26 |
| 10.3 | No Limitations, Etc. | 26 |
| 10.4 | Waiver of Defenses. | 28 |
| 10.5 | Reinstatement. | 28 |
| 10.6 | Agreement To Pay; Contribution; Subrogation. | 28 |
| 10.7 | Information. | 28 |
| 10.8 | Maximum Liability.. | 28 |
| 10.9 | Acknowledgement and Consent to Bail-In of Affected Financial Institutions. | 29 |
| 10.10 | Acknowledgement Regarding Any Supported QFCs. | 29 |
| ARTICLE XI | DEFINITIONS | 30 |
| 11.1 | Defined Terms | 30 |

**TABLE OF CONTENTS**
(continued)

11.2    Other Interpretive Provisions. ............................................................... 39

11.3    Accounting Terms and Principles ........................................................ 40

11.4    Divisions ................................................................................................ 40

## SCHEDULES/EXHIBITS

Schedule 1          Term Loan Commitments

Exhibit A           Form of Borrowing Notice

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This **DEBTOR-IN-POSSESSION CREDIT AGREEMENT** (as amended, restated, replaced, supplemented, or otherwise modified from time to time, this "Agreement") is entered into as of [●], 2024, by and among **TAKEOFF TECHNOLOGIES, INC.**, a. Delaware corporation and a debtor and debtor-in-possession (the "Borrower"), **[GLAS Americas, LLC]**, as collateral agent for the Lenders (solely in such capacity, together with its successors and assigns in such capacity, the "Agent"), and the other Persons from time to time party hereto, as lenders (collectively, the "Lenders" and each a "Lender").

RECITALS

WHEREAS, on May 30, 2024 (the "Petition Date"), the Borrower, together with the guarantors listed on the signature pages hereto (collectively, the "Guarantors" and together with the Borrower, the "Debtors" or "Loan Parties") filed voluntary petitions for relief under chapter 11 (the "Chapter 11 Cases") before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, the Borrower has requested that the Lenders make available for the purposes specified in this Agreement the credit facility set forth herein; and

WHEREAS, the Lenders are willing to make available to the Borrower such credit facility on the terms and under the conditions set forth herein (i) in order to maintain business continuity of services, (ii) for reasonable and necessary amounts for incentive and retention of employees and (iii) for certain Debtor bankruptcy expenses and general corporate purposes in accordance with the Approved Budget.

NOW, THEREFORE, in consideration of the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent, and warrant as follows:

ARTICLE I
THE CREDIT

1.1    Amounts and Terms of Commitments.

(a)    Subject to the terms and conditions of this Agreement and in the DIP Order, each Lender severally and not jointly agrees to make available to the Borrower a multi-draw term loan facility in an aggregate amount not to exceed the amounts set forth opposite such Lender's name in Schedule 1 under the heading "Aggregate Term Loan Commitments" (such amount being referred to herein as such Lender's "Term Loan Commitment," and such amounts collectively, the "Term Loan Commitments"); provided that, notwithstanding anything to the contrary herein, (i) upon entry of the Interim DIP Order and during the Initial Commitment Period, Borrowing of the Term Loan Commitments shall be available to the Borrower on the Tuesday of each week in an amount not to exceed $391,000 per Borrowing (the "Interim Weekly Borrowing Amount"), with such Lender's commitment referred to as "Interim Weekly Borrowing Amount Commitment" as set forth on Schedule 1, and $1,954,000 in the aggregate and (ii) upon entry of the Final DIP Order (A) one Borrowing of the Term Loan Commitments shall be available to the Borrower in an

amount not to exceed $5,750,000 (the "<u>Final Approval Borrowing Amount</u>") with such Lender's commitment referred to as "<u>Final Approval Borrowing Amount Commitment</u>" as set forth on Schedule 1, and (B) thereafter Borrowing of the Term Loan Commitments shall be available to the Borrower on the Tuesday of each week in an amount not to exceed $207,000 per Borrowing (the "<u>Final Weekly Borrowing Amount</u>") with such Lender's commitment referred to as "<u>Final Weekly Borrowing Amount Commitment</u>" as set forth on Schedule 1, and $1,862,000 in the aggregate.

(b)    Amounts borrowed as Loans that are repaid or prepaid may not be reborrowed.

(c)    The Term Loan Commitments shall be reduced as provided in <u>Section 7.2</u> (*Remedies*) hereof.

1.2    <u>Evidence of Loans; Notes</u>. The Loans made by each Lender with a Term Loan Commitment are evidenced by this Agreement and, if requested by such Lender, a Term Note (in a form reasonably acceptable to the Lenders) payable to such Lender in an amount equal to the unpaid principal balance of the Loans held by such Lender.  Each Lender shall maintain accounts or records of each credit extension hereunder, and each assignment and assumption of a Lender's rights and obligations hereunder that is delivered to the Borrower, at the Lender's office in a register, which shall set forth the names and addresses of the Lenders, and the Term Loan Commitments of, and principal amounts (and stated interest) of the Loans owing to, the Lender pursuant to the terms hereof from time to time (the "<u>Register</u>"). The entries in the Register shall be conclusive absent manifest error, and the Borrower and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.

1.3    <u>Interest, Fees, and Other Amounts</u>.

(a)    Each Loan shall bear interest on the outstanding principal amount thereof from the date when made at a rate per annum equal to 13%; <u>provided</u> that, notwithstanding the foregoing, if such interest rate exceeds the maximum interest rate allowed by applicable law, then the interest rate shall instead be the maximum interest rate allowed by applicable law. Accrued interest on the Loans shall be payable in kind on each Interest Payment Date.  Following any increase in the principal amount of any Loans in accordance with this <u>Section 1.3(a)</u>, such Loans shall bear interest on such increased principal amount from and after each applicable Interest Payment Date.

(b)    All computations of fees, interest, and other amounts payable under this Agreement shall be made on the basis of a 365-day year and actual days elapsed.  Interest, fees, and other amounts, as applicable, shall accrue during each period during which interest or such fees are computed from the first day thereof to the last day thereof.

(c)    Automatically, without any action by the Lenders, while any Event of Default exists, the Borrower shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on the Loans from and after the date of occurrence of such Event of Default, at a rate per annum which is determined by adding 2.00% per annum to the rate then in effect for such Loans.  All such interest shall be payable in kind on each Interest Payment Date.

(d)     Once paid, the fees or any part thereof earned, due, and payable hereunder shall not be refundable under any circumstances (except as expressly provided herein, in the DIP Order or otherwise agreed). All fees earned, due, and payable hereunder shall be paid in Dollars in immediately available funds and shall be in addition to any reimbursement of the Lenders' reasonable and documented out-of-pocket expenses to the extent reimbursable hereunder.

1.4     Procedure for Borrowing.

(a)     The Borrower shall request a Borrowing by written notice delivered to each Lender a Notice of Borrowing in the form attached hereto as Exhibit A, which notice must be received prior to 12:00 p.m. (New York time) on the date that is two Business Days prior to the requested Borrowing date; provided, however, that no such Notice of Borrowing shall be required with respect to the first Interim Weekly Borrowing Amount.  Such Notice of Borrowing shall specify:

> (i)     the amount of the Borrowing;
>
> (ii)    the requested Borrowing date, which shall be a Business Day; and
>
> (iii)   the account designated by the Borrower for disbursement of funds.

(b)     Following receipt of a Notice of Borrowing and upon satisfaction of the applicable conditions set forth in Article II, each Lender shall, before 12:00 p.m. (New York time) on the requested Borrowing date (or such other time mutually agreed to by the Lenders and the Borrower), make its ratable portion of the proposed Borrowing available to the account designated by the Borrower in the applicable Notice of Borrowing, in immediately available funds in Dollars.

1.5     Payments by the Borrower.

(a)     The Borrower shall repay (x) the full amount of principal outstanding of the Loans, together with all accrued and unpaid interest thereon and all fees and expenses due and owing hereunder, on the earlier of (i) an Acceleration or (ii) the Maturity Date.

(b)     All payments made by or on behalf of a Loan Party on account of principal, interest, fees, and other amounts required hereunder shall be made without set-off, recoupment, or counterclaim of any kind, and shall, except as otherwise expressly provided herein, be made to the applicable Lender at the address for payment specified in the signature page hereof (or such other address (or account information) as the applicable Lender may from time to time specify in accordance with Section 9.2 (*Notices*), and shall be made in Dollars and in immediately available funds, no later than 12:00 p.m. (New York time) on the date due. All payments received by a Lender after 12:00 p.m. (New York time) on the date due may be deemed received on the next succeeding Business Day, and any applicable interest or fees shall continue to accrue.

(c)     If any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.

3

(d)     Each payment (excluding scheduled interest and amortization payments, which shall be paid as specified herein) made in respect of the Obligations shall be applied in the following order of priority:

(i)     first, to any fees or expenses due and owing to the Agent or the Lenders hereunder, until all such fees and expenses have been paid in full;

(ii)     second, to accrued and unpaid interest on the Loans, until all such accrued and unpaid interest has been paid in full; and

(iii)     third, to the then outstanding principal of the Loans, until all such outstanding principal has been paid in full.

1.6     Optional Prepayments. The Borrower shall not have the right to voluntarily prepay any amount of the Loans.

1.7     Termination Date. The Term Loan Commitments shall automatically be reduced to zero and terminate upon the earliest of (A) an Acceleration, (B) the Maturity Date; or (C) the termination of the Term Loan Commitments in accordance with Section 7.2(a) (*Remedies*) hereof.

ARTICLE II
CONDITIONS PRECEDENT

2.1     Conditions to Effectiveness of Credit Agreement. The effectiveness of this Agreement is subject to satisfaction or waiver by each of the Lenders of the following conditions:

(a)     Credit Agreement and Other Loan Documents. The Lenders and the Agent shall have received a counterpart of this Agreement and each other Loan Document including, without limitation the Term Notes, if applicable, executed by each Loan Party, as applicable.

(b)     Collateral Matters. (i) The Agent and the Lenders shall have received fully executed copies of each Collateral Document, (ii) the Agent shall have valid and perfected Liens on the Collateral, and (iii) each UCC-1, any other financing statement, and each document required by any Collateral Document or any applicable Requirements of Law to be filed, registered, or recorded in order to create in favor of the Agent for the benefit of the Lenders a valid and perfected Lien on the Collateral required to be delivered pursuant to each Collateral Document, shall be in proper form for filing, registration, or recording.

(c)     Approved Budget. The Lenders shall have received and approved a 14-week cash flow projection, in form and substance acceptable to all Lenders (the "Initial Approved Budget") on or prior to the Closing Date.

(d)     DIP Order. The Interim DIP Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, and shall not have been reversed, modified, amended, stayed, or vacated.

(e)     Intellectual Property. Each applicable Loan Party shall have (i) granted to the applicable Lender its Interim IP License and delivered to the applicable Lender its Specified

4

IP; <u>provided</u>, that in connection with the delivery of the Specified IP the Debtors' Chief Technology Officer or other employee with similar responsibilities (the "<u>CTO</u>") shall assist each Lender's technical representative to verify the contents and functionality, if applicable, of the Specified IP to the reasonable satisfaction of each Lender, (ii) provided access to each Lender to the "Fiix" and "Looker" instances relevant to that Lender's automated micro fulfilment center ("<u>MFC</u>") existing and future sites, together with any and all related materials, documentation, data, and information (including usernames, logins, passwords, and access keys and credentials to associated software, middleware and hardware), and (iii) transferred the Specified IP into a production instance as suitable for and accessible by such Lender.  To the extent there is any dispute between a Lender and the applicable Loan Party concerning the implementation of the concepts in the foregoing clauses (i) through (iii) of this <u>Section 2.1(e)</u> with respect to that Lender's sites, the applicable Lender's technical representative and the CTO shall cooperate in good faith to resolve the dispute to the reasonable satisfaction of the applicable Lender.

(f)    <u>Customer Sublicense</u>.  Each Loan Party shall have provided to each Lender a Customer Sublicense.

(g)    <u>Litigation</u>.  Other than the Chapter 11 Cases, there shall be no order or injunction or pending litigation that is not stayed in which there is a reasonable possibility of a decision that would have a Material Adverse Effect and no pending litigation seeking to enjoin the transactions contemplated hereby.

(h)    <u>Secretary's Certificates; Good Standing</u>.  The Agent shall have received (i) a customary secretary's certificate for each Loan Party attaching (w) such Loan Party's articles of incorporation or organization or other similar document, certified by the applicable government authority, (x) such Loan Party's bylaws or operating agreement, (y) the resolutions of such Loan Party's board of directors or other appropriate governing body approving and authorizing the execution, delivery, and performance of the Loan Documents, and (z) incumbency specimens and (ii) a good standing certificate for each Loan Party from its jurisdictions of organization, to the extent available from such jurisdiction.

(i)    <u>Other Information</u>.  (i) The Agent and the Lenders shall have received all documentation and other information about the Loan Parties that they reasonably determine is required by regulatory authorities under applicable "know your customer" and anti-money laundering laws, including the Patriot Act, and (ii) the Agent and the Lenders shall have received and be satisfied with such other information (financial or otherwise) with respect to the Loan Parties or the Chapter 11 Cases reasonably requested by the Agent or the Lenders, as applicable.

(j)    <u>Representations and Warranties</u>.  All representations and warranties by the Debtors contained herein or in any other Loan Document shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representation or warranty shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date).

(k)    <u>No Default</u>.  No Default or Event of Default shall have occurred or shall be continuing or would result after giving effect to this Agreement and the other Loan Documents.

(l)    <u>UCC and Lien Searches</u>. The Agent shall have received appropriate UCC and mortgage search results, or their local equivalents, for each Loan Party in its jurisdiction of organization and any other jurisdiction reasonably requested by the Lenders.

(m)    <u>Insurance</u>. The Agent shall have received from the Loan Parties evidence of insurance coverage in form, scope and substance reasonably satisfactory to the Agent, which such insurance coverage shall name the Agent as an additional insured.

2.2    <u>Conditions to Each Borrowing</u>. The obligation of each Lender to advance any Loan hereunder is subject to satisfaction or waiver by the Lenders of the following conditions, each as of the date of such Borrowing:

(a)    <u>Borrowing Notice</u>. Each Lender shall have received a Notice of Borrowing in accordance with <u>Section 1.4(a)</u> (*Procedure for Borrowing*).

(b)    <u>DIP Order</u>. (i) With respect to any Borrowing during the Initial Commitment Period, the Interim DIP Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, and shall not have been reversed, modified, amended, stayed, or vacated, and (ii) with respect to any Borrowing following the expiration of the Initial Commitment Period, the Final DIP Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, and shall not have been reversed, modified, amended, stayed, or vacated.

(c)    <u>Representations and Warranties</u>. All representations and warranties by the Loan Parties contained herein or in any other Loan Document shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of the date of such Borrowing, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representation or warranty shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date).

(d)    <u>No Default</u>. No Default or Event of Default shall have occurred or shall be continuing or would result after giving effect to any Loans.

(e)    <u>Perpetual IP License</u>.  With respect to the Borrowing of the Final Approval Borrowing Amount, each applicable Loan Party shall have granted to the applicable Lender its Perpetual IP License.

The request by the Borrower and acceptance by the Borrower of the proceeds of any Loan shall be deemed to constitute, as of the date thereof and the date of such Borrowing, a representation and warranty by the Borrower that the conditions in this <u>Section 2.2</u> have been satisfied.

ARTICLE III
REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Agent and each Lender that the following are, and after giving effect to the funding of any Loan will be, true, correct, and complete:

3.1    <u>Corporate Existence and Power</u>. Each Loan Party:

6

(a)      is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation, organization, or formation, as applicable;

(b)      has the power and authority and all governmental licenses, authorizations, Permits, consents, and approvals to (i) own its assets and carry on its business, except to the extent that the failure to maintain such licenses, authorizations, Permits, consents and approvals would not, in the aggregate, reasonably be expected to have a Material Adverse Effect, and (ii) subject to the entry of the DIP Order, to execute, deliver, and perform its obligations under the Loan Documents to which it is a party;

(c)      is duly qualified and licensed and in good standing, under the laws of each jurisdiction where its ownership, lease, or operation of Property or the conduct of its business requires such qualification or license, except to the extent that the failure to be so qualified, licensed and in good standing would not, in the aggregate, reasonably be expected to have a Material Adverse Effect; and

(d)      is in compliance with all Requirements of Law, except to the extent that the failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.2      <u>Corporate Authorization; No Contravention</u>. Subject to the entry of the DIP Order, the execution, delivery, and performance by the Loan Parties of this Agreement and each other Loan Document shall have been duly authorized by all necessary action, and do not and will not:

(a)      contravene the terms of any Loan Party's Organization Documents;

(b)      other than as a result of the commencement of the Chapter 11 Cases, conflict with or result in any breach or contravention of, or result in the creation of any Lien under, any document evidencing any contractual obligation to which any Loan Party is a party or any order, injunction, writ, or decree of any Governmental Authority to which any Loan Party or its Property is subject; or

(c)      violate any Requirement of Law binding on any Loan Party or its Property, except to the extent that any such violation would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.3      <u>Governmental Authorization; Consents</u>. Subject to the entry of the DIP Order, no material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document except (a) recordings and filings in connection with the Liens granted to the Agent under the Collateral Documents and (b) those obtained or made on or prior to the date hereof.

3.4      <u>Binding Effect</u>. Subject to the entry of the DIP Order, this Agreement and each other Loan Document shall constitute the legal, valid, and binding obligations of each Loan Party, enforceable against each Loan Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws

7

affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

3.5    Litigation. Except for audits conducted by taxing authorities and any related actions, suits, proceedings, claims, or disputes, or claims and disputes arising in connection with the Chapter 11 Cases, there are no actions, suits, proceedings, claims, or disputes pending, or to the best knowledge of the Loan Party, threatened or contemplated at law, in equity, in arbitration or before any Governmental Authority, against the Loan Party or any of its Properties which purport to affect or pertain to this Agreement, any other Loan Document, or any of the transactions contemplated hereby or thereby.

3.6    Margin Regulations. No Loan Party is engaged in the business of purchasing or selling Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock.

3.7    Regulated Entities. No Loan Party or any Person controlling a Loan Party, or any controlled subsidiary of a Loan Party, is (a) an "investment company" within the meaning of the Investment Company Act of 1940 or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any state public utilities code, or any other federal or state statute, rule, or regulation limiting its ability to incur indebtedness or perform its Obligations under the Loan Documents.

3.8    Ownership and Possession of Property. Each Loan Party has good and valid title to the Collateral as is necessary or used in the ordinary conduct of its business.

3.9    Full Disclosure. None of the representations or warranties made by a Loan Party in the Loan Documents as of the date such representations and warranties are made or deemed made, and none of the statements contained in each exhibit, report, statement, or certificate furnished by or on behalf of a Loan Party in connection with the Loan Documents (including the offering and disclosure materials, if any, delivered by or on behalf of a Loan Party to the Agent or the Lenders prior to the date hereof), contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered; provided that with respect to any projections, each Loan Party represents only that such projections were prepared in good faith based upon estimates, information, and assumptions believed to be reasonable.

3.10    Sanctions, Foreign Assets Control Regulations, and Anti-Money Laundering. To the extent applicable, each Loan Party and each controlled subsidiary of each Loan Party is in compliance in all material respects with all economic sanctions laws, executive orders and implementing regulations of the United States, including but not limited to those promulgated by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), as well as sanctions measures, laws, and regulations of the United Nations Security Council, the European Union or any member state thereof, and the United Kingdom, and any other relevant jurisdiction ("Sanctions"), and all applicable anti-money laundering and counter-terrorism financing laws, including the U.S. Money Laundering Control Act, the Bank Secrecy Act and all regulations issued pursuant to it, and any other similar laws to which each Loan Party and any of its controlled subsidiaries may be subject. No Loan Party or any of its controlled subsidiaries, or (to each Loan

8

Party's knowledge) any of their respective directors, officers, employees, or agents is organized, resident, or located in a country or territory that is itself the target of comprehensive or country-wide sanctions at any relevant time (currently Cuba, Iran, Syria, North Korea, and the Crimea region), or is otherwise the subject or target of any Sanctions or is owned or controlled by one or more Persons that are the subject or target of any Sanctions, including but not limited to (a) a Person designated by the U.S. government on the list of the Specially Designated Nationals and Blocked Persons (the "SDN List") with which a U.S. Person cannot deal with or otherwise engage in business transactions, (b) a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person, or (c) a Person controlled by (including by virtue of such person being a director or owning voting shares or interests), or who acts, directly or indirectly, for or on behalf of, any person or entity on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Loan Document would be prohibited under U.S. law. No part of the proceeds will be used directly or indirectly for the purpose of financing, or with respect to, any activities or business of or with any country or person that is the subject or target of Sanctions.

3.11    Foreign Assets Control Regulations. Each Loan Party and each of its controlled subsidiaries are in compliance with the Trading with the Enemy Act and each of the foreign assets control regulations of the United States Treasury Department and any other enabling legislation or executive order relating thereto. No part of the proceeds of any Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain, or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

## ARTICLE IV
## AFFIRMATIVE COVENANTS

Each Loan Party covenants and agrees that, so long as any Lender shall have any Term Loan Commitment hereunder, or any Loan shall remain unpaid, unsatisfied or outstanding:

4.1    Notices; Other Information.

(a)    The applicable Loan Party shall notify promptly the Agent and each Lender following (and in no event later than three Business Days after a Responsible Officer becomes aware thereof) the occurrence or existence of any Default or Event of Default.

(b)    Each Loan Party shall promptly forward or make available to the Agent and the Lenders any business, financial, corporate affairs and other information regarding each Loan Party, its subsidiaries, and the Collateral as the Agent or any Lender may from time to time reasonably request. For the avoidance of doubt, each Lender may share any such information, on a confidential basis, with any of such Lender's affiliates, employees, attorneys and other financial advisors, and financing sources.

(c)    The applicable Loan Party shall notify promptly the Agent and each Lender (i) following any loss, damage or destruction to the Collateral in the amount of $50,000 or more,

9

whether or not covered by insurance; and (ii) following the commencement of any dispute, litigation, investigation or proceeding involving any Loan Party.

Each notice pursuant to this Section 4.1 shall be accompanied by a written statement from a Responsible Officer of the applicable Loan Party setting forth details of the occurrence referred to hereinabove and stating what action the Loan Party has taken and/or proposes to take with respect thereto.

4.2    <u>Budget and Information Requirements</u>.

(a)    As soon as available and in any event by 5:00 p.m. beginning on the Friday following the Petition Date and every Friday thereafter, the Borrower shall deliver to the Lenders a proposed 14-week budget for approval by the Lenders (the "<u>Proposed Approved Budget</u>"). As soon as practicable the Lenders shall notify the Borrower in writing whether or not such Proposed Approved Budget has been approved unanimously by the Lenders. Upon such approval, such 14-Week Budget shall become the "<u>Approved Budget</u>"; <u>provided</u> that (i) in the absence of such approval, the Approved Budget that is then in effect shall remain in place and (ii) subject to the preceding clause (i), the Initial Approved Budget shall be the only Approved Budget. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, on and after the Closing Date, the proceeds received hereunder, all cash of the Debtors and proceeds of Collateral shall be used by the Debtors solely in accordance with the Approved Budget.

(b)    The Borrower shall provide to the Lenders on a weekly basis (commencing on the first Friday after the Closing Date), a report of (i) the Debtors' cash position and (ii) a summary reconciliation of the actual use of proceeds of any previous Borrowing as compared to the anticipated use of proceeds of such Borrowings as set forth in the Approved Budget (together with an explanation for any material variances), in each case for the week period which ended on the immediately preceding Friday.

(c)    The Loan Parties shall deliver or cause to be delivered for review and comment, as soon as commercially reasonable and in any event not less than two (2) Business Days (or as soon thereafter as is reasonably practicable under the circumstances) prior to filing, all material pleadings, motions and other documents (provided that any of the foregoing relating to this Agreement, the Loans, foreign vendors, the Debtors' software or intellectual property, or sale of any assets of the Debtors shall be deemed material) to be filed on behalf of the Debtors with the Bankruptcy Court to counsel to the Lenders and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing. The Loan Parties shall provide copies to the Lenders of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Debtors with the Bankruptcy Court, distributed by or on behalf of the Debtors to any Committee, filed with respect to the Chapter 11 Cases or filed with respect to any Loan Document. In connection with the Chapter 11 Cases, the Debtors shall provide the proper notice for (x) the motions seeking approval of the Loan Documents and the DIP Orders and (y) the hearings for the approval of the DIP Orders.

(d)    The Debtors shall provide all documents and information reasonably requested by the Lenders and reasonable access to senior management and personnel, including

but not limited to a weekly conference call between senior management of the Debtors and the Lenders.

4.3    Compliance with Laws; Maintenance of Existence. Each Loan Party (a) shall comply with all Requirements of Law of any Governmental Authority having jurisdiction over it or its business, except where the failure to comply would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, (b) shall preserve, renew, and keep in full force and effect its organizational existence, and (c) shall take all reasonable action to maintain all necessary governmental licenses, authorizations, Permits, consents, and approvals to own its assets and carry on its business.

4.4    Use of Proceeds. Subject to the terms of the DIP Order, the proceeds of the Loans shall be used solely (a) to pay reasonable fees, costs, and expenses of the Lenders up to the Lender Expense Cap and (b) to fund the operational, employee, and other costs of the Debtors, including, without limitation, payments authorized to be made under "first day" or "second day" orders, and payments related to the working capital and other general corporate purposes of the Debtors, including the payment of allowed professional fees and expenses, in each case solely as provided for in the Approved Budget. Without limiting the generality of the foregoing, no portion of the proceeds under the Loans may be utilized for the payment of professional fees and disbursements incurred in connection with any challenge against the Lenders, to the Loans, the rights of the Lenders under the Loan Documents or the perfection of the Lenders' liens, provided, however, that no more than $25,000 may be used by any official committee of unsecured creditors to investigate, but not litigate, the foregoing matters.

4.5    Further Assurances. Without any further order of the Bankruptcy Court, promptly upon request by the Agent (and the Agent shall make such request upon the direction of the Required Lenders), each Loan Party shall take such additional actions and execute such documents as the Agent or the Lenders may reasonably require from time to time in order (a) to carry out more effectively the purposes of this Agreement or any other Loan Document, (b) to subject to the Liens created by any of the Collateral Documents all of the Collateral, (c) to perfect and maintain the validity, effectiveness, and priority of any of the Collateral Documents and the Liens created thereby, and (d) to better assure, convey, grant, assign, transfer, preserve, protect, and confirm to the Agent and the Lenders the rights granted or now or hereafter intended to be granted to the Agent or the Lenders under any Loan Document.

4.6    Bankruptcy Matters.

(a)    The Debtors shall cause to occur or comply, as applicable, with each of the following (collectively, the "Milestones"):

(i)    no more than 4 days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

(ii)    no more than 5 days after the Petition Date, the Debtors shall have filed the Sale Motion;

(iii)    no later than 30 days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

11

(iv)     no later than 35 days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order;

(v)     if an Auction is required pursuant to the Bidding Procedures Order, no later the 70 days after the Petition Date, the Auction shall have occurred; and

(vi)     no later than 75 days after the Petition Date, the Bankruptcy Court shall have entered an order granting the Sale Motion.

(b)     Each Loan Party shall comply with the DIP Order in all respects.

4.7     <u>Performance of MTPSA Obligations</u>. Each Loan Party shall perform all material obligations under each MTPSA, as amended.

4.8     <u>Further Assurances in Respect of the Interim IP License, Perpetual IP License and Specified IP</u>.  Without any further order of the Bankruptcy Court, promptly upon request by any Lender, the applicable Loan Party shall take such additional actions, provide additional information, data, assistance and execute such documents as any Lender may reasonably require from time to time in order to (a) transfer the Specified IP into a production instance as suitable for and accessible by such Lender, (b) ensure that the Specified IP is fully functioning, integrated and operational at such Lender's sites in all material respects and to such Lender's reasonable satisfaction, and (c) facilitate any transition to the use of the Interim IP License, Perpetual IP License and Specified IP at a Lender's site.

4.9     <u>OFAC; Anti-Money Laundering</u>. Each Loan Party shall comply with the laws, regulations, and executive orders referred to in <u>Sections 3.10</u> (*Foreign Assets Control Regulations, and Anti-Money Laundering*) and 3.11 (*Foreign Assets Control Regulations*).

4.10     <u>Undertakings with respect to Collateral</u>. Each Loan Party shall maintain, use, and operate the Collateral in accordance with the applicable Collateral Documents (if any).

4.11     <u>Books and Records</u>.   Each Loan Party shall maintain proper books of record and account (a) in which entries that are full, true and correct in all material respects shall be made of all material financial transactions and matters involving the assets and business of the Loan Parties, as the case may be, and (b) that permit financial statements in conformity with GAAP to be derived therefrom.

ARTICLE V
NEGATIVE COVENANTS

Each Loan Party covenants and agrees that, so long as any Lender shall have any Term Loan Commitment hereunder, or any Loan shall remain unpaid, unsatisfied, or outstanding:

5.1     <u>Limitation on Liens</u>. Except as provided in the DIP Order then in effect, no Loan Party shall, directly or indirectly, make, create, incur, assume, or suffer to exist any Lien upon any of its property or assets, including the Collateral, other than Permitted Liens, without the prior written consent of the Required Lenders.

5.2     Margin Stock; Use of Proceeds. No Loan Party shall suffer or permit any of its controlled subsidiaries to, use any portion of the Loan proceeds, directly or indirectly, to purchase or carry Margin Stock or repay or otherwise refinance indebtedness of the Loan Party or others incurred to purchase or carry Margin Stock, or otherwise in any manner which is in contravention of any Requirement of Law or in violation of any Loan Document.

5.3     Bankruptcy Matters.

(a)     No Loan Party shall, directly or indirectly, seek, consent to, incur, assume, create, permit, or suffer to exist (i) any material modification or amendment or stay or vacation to the DIP Order, without the prior written consent of the Agent and the Lenders; (ii) any Bankruptcy Court order materially impacting the Loans or the Collateral in the Chapter 11 Cases that is not, in form and substance, reasonably satisfactory to the Agent and the Lenders; (iii) a claim for any administrative expense or unsecured claim which is *pari passu* with or senior to the Superpriority Claim of the Agent and the Lenders in respect of the Obligations, except for the Carve-Out; (iv) any Lien on any Collateral having a priority equal or senior to the Liens in favor of the Agent and the Lenders in respect of the Obligations (subject to the Carve-Out and Permitted Liens); or (v) any challenge to, or avoidance, recharacterization, or subordination of, the claims or Liens of any Lenders granted pursuant to or in furtherance of this Agreement and the DIP Order.

(b)     No Loan Party shall make any expenditure except of the type and for the purposes provided for in the Approved Budget.

5.4     General Negative Covenants. Each Loan Party hereby covenants and agrees that, on and after the effective date of this Agreement and until the date that the Term Loan Commitments hereunder have terminated and the principal of and interest on each of the Loans and all fees, expenses, and other amounts payable under any Loan Document (other than contingent indemnification obligations for which no claim or demand has been made) have been satisfied in full, without the prior written consent of the Required Lenders (an email from the Required Lenders' counsel being sufficient), such Loan Party will not, and will not permit any of its controlled subsidiaries to:

(a)     make a public announcement in respect of, enter into any agreement or letter of intent with respect to, attempt to consummate or support any third party's attempt to consummate any transaction or agreement that would adversely impact the Loans in any material respect;

(b)     create, assume, incur, or suffer to exist any indebtedness other than in the ordinary course of business, which does not exceed $25,000.00;

(c)     assume, assign, or reject pursuant to section 365 of the Bankruptcy Code any material contract;

(d)     increase any termination or severance entitlement whatsoever or pay any termination or severance pay to executives or other insiders of a Loan Party, or any of such Loan Party's subsidiaries;

13

(e) (i) change its name or its fiscal year or (ii) amalgamate, consolidate with or merge into, dispose of all or substantially all of its assets, or enter into any similar transaction with, any other entity;

(f) engage in any business other than the businesses engaged in by such Loan Party on the date hereof and those reasonably incidental thereto;

(g) other than of a type consistent with intercompany arrangements existing on the date hereof, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any affiliate on terms that are less favorable to the Loan Party or such subsidiary, as the case may be, than those that might be obtained at the time from Persons who are not such an affiliate;

(h) other than in connection with a Sale Motion or the DIP Facility, sell, transfer, lease, license, encumber or otherwise dispose of any material asset of a Loan Party;

(i) enter into after the date hereof or allow to exist any contractual obligations (other than this Agreement) that limit the ability of any Loan Party to create, incur, or suffer to exist Liens on the Collateral in favor of the Lenders with respect to the Loans and the Obligations hereunder;

(j) (A) divide into two or more Persons pursuant to a "plan of division" or similar method, or (B) create, or reorganize into, one or more Persons, in each case, as contemplated under the laws of any jurisdiction; or

(k) file a plan of reorganization or any related documents, including a disclosure statement and any plan supplement, that does not provide for the payment of the Obligations in full and in cash.

## ARTICLE VI
## SUPERPRIORITY CLAIMS, COLLATERAL, ETC.

6.1     <u>Grant of Security</u>.  To secure the prompt payment and performance of any and all Obligations in respect of the Loans, each Loan Party hereby pledges, assigns, and grants to the Agent, for the benefit of the Lenders, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, effective as of the date of entry of the Interim DIP Order, a valid and automatically perfected first priority Lien and security interest in the Collateral (the "<u>DIP Liens</u>"). The DIP Liens granted herein shall be junior and subordinate in all respects to, but only to, (i) the Carve-Out and (ii) any Permitted Liens.

6.2     <u>Administrative Priority</u>. Each Loan Party agrees that all Obligations hereunder shall constitute an allowed Superpriority Claim against it, pursuant to section 364(c)(1) of the Bankruptcy Code; <u>provided</u> that such Superpriority Claims shall be junior and subordinate in all respects to, but only to, the Carve-Out.

6.3     <u>No Filings Required</u>. The DIP Liens shall be deemed valid and perfected and duly recorded by entry of the DIP Order.  Neither the Agent nor the Lenders shall be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or

14

filing office or to take any other action in order to validate or perfect the Liens granted by or pursuant to the DIP Order or this Agreement.

6.4    <u>No Discharge; Survival of Claims</u>. Each Loan Party agrees that the Obligations shall not be discharged by the entry of an order confirming a plan of reorganization, liquidation or sale of all or any part of the Loan Parties' assets or business and hereby waives any such discharge, unless all Term Loan Commitments have been terminated and the Obligations (other than contingent indemnity or reimbursement Obligations for which no claim has been asserted) have been indefeasibly paid in full in cash, or otherwise satisfied pursuant to <u>Section 1.5</u> (*Payments by the Borrower*) hereof on or before the effective date of such plan or sale.

6.5    <u>Prohibition on Surcharge; Etc.</u> Subject to entry of the Final DIP Order, no Person shall be permitted to surcharge the Collateral under section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out. Until the termination of this Agreement or the dismissal of the Chapter 11 Cases, the Bankruptcy Court will retain jurisdiction over the Collateral for the purpose of enforcing this <u>Article VI</u>.

6.6    <u>Marshalling Obligations</u>. Subject to entry of the Final DIP Order, the Agent and the Lenders shall not be subject to the equitable doctrine of marshalling. The Agent and the Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and, subject to entry of the Final DIP Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Agent or the Lenders with respect to the proceeds, products, offspring or profits of any of the Collateral.

ARTICLE VII<br>EVENTS OF DEFAULT

7.1    <u>Events of Default</u>. Any of the following shall constitute an "<u>Event of Default</u>":

(a)    <u>Non-Payment</u>.  The Borrower fails to pay when and as required to be paid herein or pursuant to any Term Note, any amount of any Loan that has become due;

(b)    <u>Representation or Warranty</u>. Any representation, warranty or certification by or on behalf of a Loan Party made or deemed made herein, in any other Loan Document, or which is contained in any certificate, document, or financial or other statement by any such Person, or their respective Responsible Officers, furnished at any time under this Agreement, or in or under any other Loan Document, shall prove to have been incorrect in any material respect (without duplication of other materiality qualifiers contained therein) on or as of the date made or deemed made.

(c)    <u>Covenant Default</u>. Any Loan Party shall default in the observance or performance of any agreement contained in <u>Section 4.6</u> (*Bankruptcy Matters*) or <u>Article V</u> (*Negative Covenants*) of this Agreement.

(d)    <u>Service Default</u>. Any Loan Party shall default in the observance or performance of any agreement contained in <u>Sections 4.7</u> (*Performance of MTPSA Obligations*) or 4.8 (*Further Assurances in Respect of Specified IP*) and such default shall continue unremedied

15

for a period of five calendar days after the earlier to occur of (x) the date upon which a Responsible Officer of a Loan Party becomes aware of such default and (y) the date upon which written notice thereof is given to a Loan Party by the adversely affected Lender.

(e)    <u>Other Covenant Defaults</u>. Any Loan Party fails to perform or observe any term, covenant or agreement contained in this Agreement (other than as provided in paragraphs (a) through (d) of this <u>Section 7.1</u>) or any other Loan Document, and such default shall continue unremedied for a period of five Business Days after the earlier to occur of (x) the date upon which a Responsible Officer of a Loan Party becomes aware of such default and (y) the date upon which written notice thereof is given to a Loan Party by the Required Lenders;

(f)    <u>Bankruptcy Defaults</u>. The occurrence of any of the following in the Chapter 11 Cases:

(i)    the failure to meet any of the Milestones;

(ii)    other than in connection with the payment in full or other satisfaction or refinancing of the Obligations, the filing of any motion, taking of any action or the filing of any reorganization or liquidation plan or disclosure statement in the Chapter 11 Cases by a Loan Party (A) to obtain financing under section 364(c) or (d) of the Bankruptcy Code that is senior to or *pari passu* with the financing provided under this Agreement, (B) to grant any Lien upon or affecting any Collateral that is senior to or *pari passu* with the Liens granted under the Collateral Documents, (C) to obtain administrative expense priority that is senior to or *pari passu* with the Obligations, except as expressly permitted in the DIP Order, or (D) that is otherwise materially adverse to the rights and remedies granted to the Agent or the Lenders hereunder or under the DIP Order;

(iii)    this Agreement, any of the other Loan Documents or the DIP Order for any reason ceases to be in full force and effect or is declared to be null and void by a court of competent jurisdiction, or a Loan Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of a Loan Party or such Person) any other Person's motion to, disallow in whole or in part the Agent's or the Lenders' claims in respect of the Obligations or to challenge the validity of any portion of the Loan Documents, the Loans or the Obligations, or enforceability of the same, or which seeks to void, limit, subordinate or otherwise adversely affect any payment pursuant to the Loan Documents or the DIP Orders;

(iv)    the filing by a Loan Party of a motion or other pleading seeking entry of an order, or the Bankruptcy Court shall enter any order, revoking, reversing, staying, vacating, rescinding, or materially modifying, supplementing, or amending the DIP Order currently in effect without the unanimous prior written consent of the Lenders;

(v)    the Bankruptcy Court shall enter any order (which has not been reversed or vacated within five Business Days) (A) appointing a chapter 11 trustee under section 1104 of the Bankruptcy Code in the Chapter 11 Cases or (B) appointing an examiner with enlarged powers (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code in the Chapter 11 Cases or otherwise;

(vi)     the filing by a Loan Party or any controlled subsidiary thereof of a motion or other pleading seeking entry of an order dismissing the applicable Chapter 11 Case or converting such Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

(vii)    an order is entered dismissing the Chapter 11 Cases, or converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code;

(viii)   the entry of a final non-appealable order in the Chapter 11 Cases (A) charging any of the Collateral under section 506(c) of the Bankruptcy Code against the Agent or the Lenders; or (B) avoiding, limiting, modifying, subordinating, or recharacterizing any of the Obligations or requiring disgorgement by the Lenders of any amounts received in respect of the Obligations;

(ix)     payment by a Loan Party of prepetition debt (other than as approved by the Bankruptcy Court and as otherwise contemplated by this Agreement, the DIP Order or with the prior written consent of the Required Lenders (which may be evidenced by an email from the Required Lenders' counsel); or

(x)      any motion for any of the orders described in clauses (ii) through (ix) above shall be made by a Person other than a Loan Party, the Agent, or any Lender, and such application is not being diligently contested by the applicable Loan Party in good faith.

(g)      Collateral. Any material provision of any Collateral Document shall for any reason cease to be valid and binding on or enforceable against a Loan Party or a Loan Party shall so state in writing or shall bring an action to limit its obligations or liabilities thereunder; or any Collateral Document (together with the DIP Order) shall for any reason (other than pursuant to the terms thereof) cease to create a valid Lien on the Collateral purported to be covered thereby; or the DIP Liens shall for any reason cease to be perfected and first priority Liens, subject only to the Carve-Out and Permitted Liens.

7.2     Remedies.

(a)      Subject to Section 7.2(b) below, on the occurrence and during the continuance of an Event of Default and without any further order of the Bankruptcy Court, the Required Lenders or the Agent (at the direction of the Required Lenders) may:

(i)      Declare, on a pro rata basis, all or any portion of the Term Loan Commitments to be suspended or terminated, whereupon such Term Loan Commitments shall forthwith be suspended or terminated;

(ii)     Declare all or any portion of the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Documents to be immediately due and payable (such event being referred to herein as an "Acceleration") without presentment, demand, protest or (except as provided above) other notice of any kind, all of which are hereby expressly waived by each Loan Party; and/or

17

(iii)     Exercise all rights and remedies available under the Loan Documents, the DIP Order or applicable law, in each case, without further order of or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code.

(b)     in respect of a default arising after entry of the Final DIP Order under Section 7.1(d) (*Service Default*), the adversely affected Lender may declare its outstanding Term Loan Commitments to be suspended or terminated, whereupon such Term Loan Commitments shall forthwith be suspended or terminated.

(c)     No Loan Party shall seek to enjoin, hinder, delay or object to the Agent's or the Required Lenders' exercise of rights and remedies in accordance with this Agreement, and at any proceeding with respect to the Agent's or Required Lenders' exercise of rights and remedies, no Loan Party shall be entitled to raise any substantive objections, other than to challenge the occurrence of the relevant Event of Default.

7.3     <u>Rights Not Exclusive</u>. The rights provided for in this Agreement are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.

ARTICLE VIII
[OMITTED]


ARTICLE IX
MISCELLANEOUS

9.1     <u>Amendments and Waivers</u>.

(a)     No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by a Loan Party therefrom, shall be effective unless the same shall be in writing and signed by the Agent, the Required Lenders and the Borrower, and then such waiver shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u> that:

(i)     no waiver with respect to an Event of Default arising prior to entry of the Final DIP Order shall be effective without the consent of each Lender;

(ii)     no waiver with respect to an Event of Default arising after entry of the Final DIP Order that adversely affects a Lender and does not similarly adversely affect another Lender shall be effective without the consent of the adversely affected Lender;

(iii)     no amendment or waiver shall reduce, postpone, or forgive the amount or extend the scheduled date of maturity of any Loan or reduce the stated rate of any interest or fee payable hereunder or extend the scheduled date of any payment hereunder or increase the amount or extend the expiration date of any Lender's Term Loan Commitment or any change in the currency in which any Loan is payable, in each case

18

without the consent of each Lender directly and adversely affected thereby (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default shall not constitute an increase of the Term Loan Commitment of any Lender);

(iv)    no amendment or waiver shall amend, modify, or waive Section 2.1(e)-(f) (*Intellectual Property and Customer Sublicense*) without the consent of each Lender directly and adversely affected thereby;

(v)    no amendment or waiver shall amend, modify or waive a material provision of a Loan Document or the Approved Budget without the consent of each Lender;

(vi)    no amendment or waiver shall amend, modify or waive any provision of this Agreement that affects the Agent without the consent of the Agent;

(vii)    no amendment or waiver shall amend, modify, or waive any provision of this Section 9.1(a) (*Amendments and Waivers*) or reduce the percentage specified in the definition of "Required Lenders" or consent to the assignment or transfer by a Loan Party of any of its rights and obligations under this Agreement and the other Loan Documents, in each case without the written consent of all the Lenders; or

(viii)    no amendment or waiver shall release or subordinate the DIP Lien in whole or in part without the consent of all Lenders.

(b)    No amendment, waiver, or consent to this Agreement or any other Loan Document shall become effective prior to delivery of a copy of such amendment, waiver, or consent to the Lenders.

(c)    The parties hereto shall be permitted to amend this Agreement and the other Loan Documents without further approval or order of the Bankruptcy Court to the extent provided in the DIP Order.

9.2    Notices.

(a)    Addresses. All notices and other communications required or expressly authorized to be made by this Agreement shall be given in writing or by Electronic Transmission, unless otherwise expressly specified herein, and addressed to the address set forth on the applicable signature page hereto.

(b)    Effectiveness. All communications described in clause (a) above and all other notices, demands, requests, and other communications made in connection with this Agreement shall be effective and be deemed to have been received (i) if delivered by hand, upon personal delivery, (ii) if delivered by overnight courier service, one Business Day after delivery to such courier service, (iii) if delivered by mail, three Business Days after deposit in the mail, (iv) if by facsimile transmission, upon sender's receipt of confirmation of successful transmission, and (v) if by electronic mail, upon successful delivery.

19

(c)     Each Lender and the Agent shall notify the Borrower in writing of any changes in the address to which notices to such Lender or the Agent should be directed.

9.3     <u>No Waiver; Cumulative Remedies</u>. No failure to exercise and no delay in exercising, on the part of the Agent or any Lender, any right, remedy, power, or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. No course of dealing between a Loan Party, the Agent, or any Lender shall be effective to amend, modify, or discharge any provision of this Agreement or any of the other Loan Documents.

9.4     <u>Costs and Expenses; Yield Protection; Indemnity; Etc</u>.

(a)     Any action taken by a Loan Party under or with respect to any Loan Document, even if required under any Loan Document or at the request of the Agent or the Lenders, shall be at the expense of the Loan Party, and neither the Agent nor the Lenders shall be required under any Loan Document to reimburse the Loan Party therefor. In addition, subject to the DIP Order, but regardless of whether or not the transactions contemplated hereby shall be consummated, the Loan Parties agree to pay or reimburse the Agent and the Lenders for their reasonable and documented out-of-pocket fees, costs and expenses, whether accrued on, prior to, or after the Closing Date, which shall be part of the Obligations, in connection with:

(i)     the preparation, negotiation, and execution of the Interim DIP Order and the Final DIP Order;

(ii)     the preparation, negotiation, execution, and administration of the Loan Documents, the Interim IP Licenses, Perpetual IP Licenses, the Customer Sublicense, and any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein, including any amendment, consent, waiver, assignment, restatement, or supplement thereto;

(iii)     the funding of the Loans;

(iv)     the creation, perfection, or protection of the DIP Liens (including all search, filing, and recording fees);

(v)     internal audit reviews and field examinations;

(vi)     the enforcement or preservation of any right or remedy under any Loan Document, any Obligation, or with respect to the Collateral;

(vii)     the commencement, defense, conduct of, intervention in, or the taking of any other action (including preparation for and/or response to any subpoena or request for document production relating thereto) with respect to, any proceeding related to a Loan Party, any Loan Document, or Obligation;

(viii)     the review of pleadings and other filings made with the Bankruptcy Court;

20

(ix)    the Chapter 11 Cases, including, but not limited to, attendance at hearings in respect of the Chapter 11 Cases;

(x)    any refinancing or restructuring of the Loans in the nature of a "work-out"; and

(xi)    defending and prosecuting any actions or proceedings arising out of or relating to the Obligations or any transactions related to or arising in connection with the Loan Documents.

The Loan Parties' obligations hereunder shall not be limited by the Lender Expense Cap.

(b)    If, due to a change in law, there shall be any increase in the cost to any Lender of agreeing to make or of making, funding, or maintaining Loans, including costs in the nature of Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes), then the Borrower shall from time to time, upon demand by such Lender, pay to the Agent for the account of such Lender additional amounts sufficient to compensate such Lender for such increased cost.  A certificate as to the amount of such increased cost, submitted to the Borrower by such Lender, shall be conclusive and binding for all purposes, absent manifest error.

(c)    Each Loan Party agrees to indemnify, defend, and save and hold harmless the Agent and each Lender and each of their Related Persons (each, in its capacity as such, an "Indemnitee") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities, and expenses (including Attorney Costs) that may be incurred by or asserted or awarded against any Indemnitee, in each case arising out of or in connection with or by reason of (including in connection with any investigation, litigation, or proceeding or preparation of a defense in connection therewith) this Agreement, the other Loan Documents, the transactions contemplated hereby or thereby or the actual or proposed use of the proceeds of the Loans, except to the extent such claim, damage, loss, liability, or expense is found in a final, non-appealable judgment by a court of competent jurisdiction (or a settlement tantamount thereto) to have resulted from such Indemnitee's bad faith, gross negligence, or willful misconduct. In the case of an investigation, litigation, or other proceeding to which the indemnity applies, such indemnity shall be effective whether or not such investigation, litigation, or proceeding is brought by a Loan Party, its directors, shareholders, or creditors, whether or not any Indemnitee is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. Each Loan Party also agrees not to assert any claim against (in each case, in its capacity as such) any Agent, any Lender, or any of their respective Related Persons on any theory of liability, for special, indirect, consequential, or punitive damages arising out of or otherwise relating to this Agreement, the other Loan Documents, the transactions contemplated hereby, or thereby or the actual or proposed use of the proceeds of the Loans.

(d)    Each Loan Party acknowledges and agrees that no payments to be made by any of them are subject to any withholding or deduction for or on account of any Tax. Notwithstanding the foregoing, if any Taxes are required by applicable law to be deducted or withheld by a Loan Party from or in respect of any amount payable under any Loan Document to a Lender, (i) the applicable Loan Party shall make such deductions, (ii) the Loan Party shall timely

pay the full amount deducted to the relevant taxing authority or other authority in accordance with applicable Requirements of Law, and in the case of a payment by a Loan Party, deliver to the Agent an original or certified copy of a receipt evidencing such payment, and (iii) if such Tax is an Indemnified Tax, the amount payable by each Loan Party shall be increased as necessary so that after such deductions have been made (including such deductions applicable to additional amounts payable under this Section), such Lender receives the amount it would have received had no such deductions been made.  Each Lender shall deliver to the Borrower on or before the date on which such Person becomes a party to this Agreement and from time to time thereafter, such properly completed and executed Tax forms or other Tax documentation reasonably requested by the Borrower as will permit payments under the Loan Documents to be made without withholding or at a reduced rate of withholding or as may be required by the Borrower to comply with the requirements of any taxing authority with respect to the transactions contemplated hereby.  The Borrower will pay all Other Taxes payable in respect of any Loan Document and all payments to be made by any Loan Party under or in connection with a Loan Document will be subject to gross up for any goods and services tax, consumption tax, value added tax or any tax of a similar nature. For U.S. federal, state and local income tax purposes, the Lenders shall reasonably determine the application, if any, to the Loan and related transactions of the original issue discount and investment unit rules in Sections 1271-1275 of the Code and the Treasury regulations promulgated thereunder, and the Loan Parties shall not take any position inconsistent therewith except, and then solely to the extent, otherwise required by a final determination under applicable law.

(e)     If a Lender requests compensation for increased costs pursuant to clause (b) of this Section, each Loan Party is required to indemnify an Indemnitee pursuant to clause (c) of this Section, or a Loan Party is required to pay additional amounts to a Lender pursuant to clause (d) of this Section, then such Lender or Indemnitee shall, at the request of the Loan Party, use reasonable efforts to mitigate the effects of the event giving rise to such request or payment.

(f)     All the fees, costs, and expenses set forth in this <u>Section 9.4</u> that have accrued on or prior to the Closing Date shall be paid by the applicable Loan Party on such date (and may be netted out of Loans incurred on such date). Any amounts payable pursuant to this <u>Section 9.4</u> following the Closing Date shall be paid within three Business Days of receipt of an invoice relating thereto setting forth such expenses in reasonable detail, subject to the terms and conditions of the DIP Order.

9.5     <u>Payments Set Aside</u>. To the extent that any of the Agent or the Lenders receives a payment from a Loan Party, from the proceeds of the Collateral, from the exercise of its rights of setoff, any enforcement action or otherwise, and such payment is subsequently, in whole or in part, invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver, or any other party, then to the extent of such recovery, the Obligation or part thereof originally intended to be satisfied, and all Liens, rights, and remedies therefor, shall be revived and continued in full force and effect as if such payment had not occurred.

9.6     <u>Assignments</u>. No Loan Party may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of all of the Lenders. The rights and obligations of each Lender under this Agreement (including all or a portion of its Term Loan Commitment(s) and the Loans at the time owing to it) shall be assignable by such Lender upon prior written notice to the Borrower; <u>provided</u> that (a) unless the assignment is to an affiliate of

such Lender or an Event of Default shall have occurred and be continuing, such assignment shall not be effective without the prior written consent of the Borrower (such consent not to be unreasonably withheld or delayed); provided further that if the Borrower, within five (5) Business Days after the date of written request therefor, has not consented or notified the applicable Lender in writing that the Borrower will not consent, the Borrower shall be deemed to have consented to such assignment, (b) the parties to each assignment shall execute and deliver to the Agent an assignment and assumption agreement in such form approved by the Agent acting reasonably, and (c) if the assignee is not a current Lender, then the assignee shall deliver to the Agent all documentation and other information about such assignee that the Agent reasonably determines is required by regulatory authorities under applicable "know your customer" and anti-money laundering laws, and following the receipt by the Agent of the foregoing, it shall record the assignment in the Register.

9.7     Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Agent, sell participations to any Person in all or a portion of its Term Loan Commitments and/or the Loans at the time owing to it (and its rights and obligations under this Agreement relating thereto); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrower, the Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents, provided however that any such agreement or instrument may provide that such Lender will not, without the consent of such participant, agree to any amendments, modifications or waiver under Section 9.1 that directly and adversely affects such participant.

9.8     Binding Effect. Subject to Section 2.1 (*Conditions Precedent)* hereof, this Agreement shall become effective when it shall have been executed by each Loan Party, the Agent and each of the Lenders. Thereafter, it shall be binding upon and inure to the benefit of each Loan Party, the estate of each Loan Party, any trustee or successor in interest of each Loan Party in any Chapter 11 Case or any subsequent case commenced under chapter 7 of the Bankruptcy Code or any other bankruptcy or insolvency laws, the Agent and each Lender and, in each case, their respective successors and permitted assigns.

9.9     Counterparts; Facsimile Signature. This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart. Delivery of an executed signature page of this Agreement by facsimile transmission or Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

9.10    Severability. The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality

or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.

9.11    Captions. The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

9.12    Independence of Provisions. The parties hereto acknowledge that this Agreement and the other Loan Documents may use several different limitations, tests, or measurements to regulate the same or similar matters, and that such limitations, tests, and measurements are cumulative and must each be performed, except as expressly stated to the contrary in this Agreement.

9.13    Interpretation. This Agreement is the result of good faith negotiations among the parties hereto and has been reviewed by counsel to the Loan Parties, the Agent, and each Lender. Accordingly, this Agreement and the other Loan Documents shall not be construed against a Loan Party, the Agent, or the Lenders merely because of each Loan Party's, the Agent's, or the Lenders' involvement in the preparation of such documents and agreements. Without limiting the generality of the foregoing, each of the parties hereto has had the advice of counsel with respect to Sections 9.15 (*Governing Law and Jurisdiction*) and 9.16 (*Waiver of Jury Trial*).

9.14    No Third Parties Benefited. This Agreement is made and entered into for the sole protection and legal benefit of the Loan Parties, the Agent and the Lenders and their successors and permitted assigns, and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents. The Lenders shall not have any obligation to any Person not a party to this Agreement or the other Loan Documents.

9.15    Governing Law and Jurisdiction.

(a)    Governing Law. The laws of the State of New York shall govern all matters arising out of or in connection with this Agreement, including its validity, interpretation, construction, performance, and enforcement (including any claims sounding in contract or tort law arising out of the subject matter hereof and any determinations with respect to post-judgment interest), except to the extent that the application of the Bankruptcy Code is mandatory.

(b)    Submission to Jurisdiction. Any legal action or proceeding with respect to any Loan Document over which the Bankruptcy Court does not have, or declines to exercise, jurisdiction shall be brought exclusively in the courts of the State of New York located in the City of New York, Borough of Manhattan, or of the United States of America for the Southern District of New York, and in appellate courts from any of the foregoing, and, by execution and delivery of this Agreement, each party hereto hereby accepts for itself and in respect of its Property, generally and unconditionally, the jurisdiction of the aforesaid courts. The parties hereto hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of *forum non conveniens*, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

(c)    Service of Process. Each party hereto hereby irrevocably waives personal service of any and all legal process, summons, notices, and other documents and other service of

process of any kind and consents to such service in any suit, action, or proceeding brought in the United States of America with respect to or otherwise arising out of or in connection with any Loan Document by any means permitted by applicable Requirements of Law, including by the mailing thereof (by registered or certified mail, postage prepaid) to the address of such party specified herein (and shall be effective when such mailing shall be effective, as provided therein). Each party hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

9.16    <u>Waiver of Jury Trial</u>. EACH PARTY HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY. THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

9.17    <u>Entire Agreement; Release; Survival</u>.

(a)    THE LOAN DOCUMENTS EMBODY THE ENTIRE AGREEMENT OF THE PARTIES AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS RELATING TO THE SUBJECT MATTER HEREOF AND ANY PRIOR LETTER OF INTEREST, COMMITMENT LETTER AND SIMILAR AGREEMENTS INVOLVING THE BORROWER, THE AGENT AND ANY LENDER OR ANY OF THE AGENT'S OR THE LENDERS' AFFILIATES RELATING HERETO. IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS AGREEMENT AND ANY OTHER LOAN DOCUMENT (OTHER THAN THE DIP ORDER CURRENTLY IN EFFECT, IN WHICH CASE SUCH DIP ORDER SHALL GOVERN), THE TERMS OF THIS AGREEMENT SHALL GOVERN (UNLESS OTHERWISE EXPRESSLY STATED IN SUCH OTHER LOAN DOCUMENT OR SUCH TERMS OF SUCH OTHER LOAN DOCUMENTS ARE NECESSARY TO COMPLY WITH APPLICABLE REQUIREMENTS OF LAW, IN WHICH CASE SUCH TERMS SHALL GOVERN TO THE EXTENT NECESSARY TO COMPLY THEREWITH).

(b)    Subject to entry of the Final DIP Order, execution of this Agreement by each Loan Party constitutes a full, complete and irrevocable release of any and all claims against the Agent or any Lender (in each case, in its capacity as such) which a Loan Party may have at law or in equity in respect of all prior discussions and understandings, oral or written, relating to the subject matter of this Agreement and the other Loan Documents.

(c)    Any indemnification or other protection provided to any Indemnitee pursuant to this Agreement shall (x) survive the termination of the Term Loan Commitments and the payment in full or other satisfaction of all other Obligations and (y) inure to the benefit of any Person that at any time held such a right thereunder (as an Indemnitee or otherwise) and, thereafter, its successors and permitted assigns.

9.18    <u>Patriot Act</u>. Each Lender and the Agent that is subject to the Bank Secrecy Act hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Loan Parties, which information

includes the name and address of each Loan Party and other information that will allow such Lender or the Agent to identify the Loan Parties in accordance with the Patriot Act.

ARTICLE X
GUARANTEE

10.1    Guarantee. Each Guarantor unconditionally guarantees, jointly with the other Guarantors and severally, to the Agent for the ratable benefit of the Lenders, as a primary obligor and not merely as a surety, the due and punctual payment and performance of the Obligations. Each Guarantor further agrees that the Obligations may be extended or renewed, in whole or in part, or amended or modified, in each case, in accordance with the terms of the Loan Documents, without notice to or further assent from such Guarantor, and that such Guarantor will remain bound upon its guarantee hereunder notwithstanding any extension or renewal, or amendment or modification, of any Obligation. Each Guarantor waives promptness, presentment to, demand of payment from and protest to the Borrower or any other Loan Party of any of the Obligations, and also waives notice of acceptance of its guarantee and notice of protest for nonpayment. Capitalized terms used but not defined in this Article X shall have the meaning set forth in the Uniform Commercial Code as in effect from time to time in the State of New York.

10.2    Guarantee of Payment and Performance; Continuing Guarantee. Each Guarantor further agrees that its guarantee hereunder constitutes a guarantee of payment and performance when due (whether at the stated maturity, by acceleration or otherwise) and not merely of collection, and waives any right to require that any resort be had by the Agent or any Lender to any security held for the payment of any of the Obligations or to any balance of any deposit account or credit on the books of the Agent or any Lender in favor of any Loan Party or any other person. The obligations of each Guarantor hereunder are independent of the obligations of the Borrower or any other Guarantor, and a separate action or actions may be brought and prosecuted against each Guarantor whether or not action is brought against the Borrower or any other Guarantor and whether or not the Borrower or any other Guarantor is joined in any such action or actions. Each Guarantor agrees that its guarantee hereunder is continuing in nature and applies to all of the Obligations, whether currently existing or hereafter incurred.

10.3    No Limitations, Etc. Except for termination of a Guarantor's obligations hereunder as expressly provided for in this Agreement, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations, any impossibility in the performance of any of the Obligations or otherwise. Without limiting the generality of the foregoing, except for termination or release of a Guarantor's obligations hereunder in accordance with the terms of this Agreement, the obligations of each Guarantor hereunder, to the fullest extent permitted by applicable law, shall not be discharged or impaired or otherwise affected by, and each Guarantor hereby waives any defense to the enforcement hereof by reason of:

(a)    the failure of the Agent or any Lender to assert any claim or demand or to exercise or enforce any right or remedy under the provisions of any Loan Document or otherwise;

(b)     any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, any Loan Document or any other agreement, including with respect to any other Guarantor under this Agreement;

(c)     the failure to perfect any security interest in, the impairment of or the release of, any of the Collateral held by or on behalf of the Agent or any Lender for the Obligations;

(d)     any default, failure or delay, willful or otherwise, in the performance of the Obligations;

(e)     any other act or omission that may in any manner or to any extent vary the risk of any Guarantor or otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the payment in full in cash or immediately available funds of the Obligations);

(f)     any illegality, lack of validity or enforceability of any Obligation or any Loan Document;

(g)     any change in the corporate existence, structure or ownership of any Loan Party, or any insolvency, bankruptcy, reorganization or similar proceeding affecting any Loan Party or its assets or any resulting release or discharge of any of the Obligations;

(h)     the existence of any claim, set-off or other rights that any Guarantor may have at any time against the Borrower, the Agent, any Lender or any other person, whether in connection herewith, the other Loan Documents or any unrelated transactions;

(i)     this Agreement having been determined (on whatsoever grounds) to be invalid, non-binding or unenforceable against any other Guarantor *ab initio* or at any time after the Closing Date;

(j)     the fact that any person that, pursuant to the Loan Documents, was required to become a party hereto may not have executed or is not effectually bound by this Agreement, whether or not this fact is known to the Agent or the Lenders;

(k)     any action permitted or authorized hereunder;

(l)     any other circumstance (including any statute of limitations) or any act or omission that may in any manner or to any extent vary the risk of any Guarantor or otherwise operate as a defense to, or a legal or equitable discharge of, the Borrower or any Guarantor or any other guarantor or surety (other than the payment in full in cash or immediately available funds of the Obligations); or

(m)     any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Borrower, any other Guarantor or any other person under any Loan Document, by operation of law or otherwise. Each Guarantor expressly authorizes the Agent and the Lenders to take and hold security for the payment and performance of the Obligations, to exchange, waive or release any or all such security (with or without consideration), to enforce or apply such security and direct the order and manner of any sale thereof in their sole discretion or to release or substitute any one or more other guarantors or obligors upon or in respect of the

Obligations or take any other actions permitted by the Loan Documents, all without affecting the obligations of any Guarantor hereunder.

10.4 <u>Waiver of Defenses</u>. To the fullest extent permitted by applicable law and except for termination or release of a Guarantor's obligations hereunder in accordance with the terms of this Agreement (but without prejudice to <u>Section 10.5</u>), each Guarantor waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than, after all Term Loan Commitments have been terminated, the payment in full in cash or immediately available funds of all the Obligations (but without prejudice to <u>Section 10.5</u>). The Agent and the Lenders, at their election, may exercise any right or remedy available to them against any other Loan Party pursuant to this Agreement or the other Loan Documents, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent that after giving effect thereto all Obligations have been terminated and paid in full (but without prejudice to <u>Section 10.5</u>). To the fullest extent permitted by applicable law, each Guarantor waives any defense arising out of any such election or exercise by the Agent or any Lender even though such election or exercise operates, pursuant to applicable law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Guarantor against any other Loan Party, or any security, including, without limitation, the Collateral. To the fullest extent permitted by applicable law, each Guarantor waives any all suretyship defenses.

10.5 <u>Reinstatement</u>. Each Guarantor agrees that its guarantee hereunder shall continue to be effective or be reinstated, as the case may be, if, at any time payment, or any part thereof, of any Obligation is rescinded or must otherwise be restored by the Agent or any Lender upon the bankruptcy or reorganization (or analogous proceeding in any jurisdiction) of the Borrower or any other Loan Party or otherwise. The provisions of this <u>Section 10.5</u> shall survive the termination of this Agreement.

10.6 <u>Agreement To Pay; Contribution; Subrogation</u>. In furtherance of the foregoing and not in limitation of any other right that the Agent or any Lender has at law or in equity against any Guarantor by virtue hereof, upon the failure of any Loan Party to pay any Obligation when and as the same shall become due, whether an amortization payment, at maturity, by acceleration, after notice of prepayment or otherwise, each Guarantor hereby promises to and will forthwith pay, or cause to be paid, to the Lenders in cash or other immediately available funds the amount of such unpaid Obligation.

10.7 <u>Information</u>. Each Guarantor assumes all responsibility for being and keeping itself informed of the financial condition and assets of the Borrower and each other Loan Party and of all other circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope and extent of the risks that such Guarantor assumes and incurs hereunder, and agrees that no Lender nor the Agent will have any duty or obligation to advise such Guarantor of information known to it or any of them regarding such circumstances or risks.

10.8 <u>Maximum Liability</u>. Each Guarantor, and by its acceptance of this guarantee, the Agent and each Lender hereby confirms that it is the intention of all such persons that this guarantee and the Obligations of each Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code or any other federal, state or foreign bankruptcy,

insolvency, receivership or similar law, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act or any similar foreign, federal or state law to the extent applicable to this guarantee and the Obligations of each Guarantor hereunder. To effectuate the foregoing intention, the Agent, the Lenders and the Guarantors hereby irrevocably agree that the Obligations of Guarantor under this guarantee at any time shall be limited to the maximum amount as will result in the Obligations of such Guarantor under this guarantee not being void or voidable under applicable law, including under Section 548 of the Bankruptcy Code or any comparable provisions under any other applicable law.

10.9   <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any party hereto to any other party hereto under or in connection with the Loan Documents may be subject to Bail-In Action by the applicable Resolution Authority and acknowledges and agrees to be bound by the effect of:

(a)   the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution;

(b)   any Bail-In Action on any such liability, including (without limitation):

(i)   a reduction, in full or in part, in the principal amount, or outstanding amount due (including any accrued but unpaid interest) in respect of any such liability;

(ii)   a conversion of all, or part of, any such liability into shares or other instruments of ownership that may be issued to, or conferred on, it;

(iii)   a cancellation of any such liability; and

(iv)   a variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority; and

(c)   a variation of any term of any Loan Document to the extent necessary to give effect to any Bail-In Action in relation to any such liability.

10.10   <u>Acknowledgement Regarding Any Supported QFCs</u>.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any agreement or instrument that is a QFC (as defined below) (such support, "<u>QFC Credit Support</u>", and each such QFC, a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "<u>U.S. Special Resolution Regimes</u>") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)    In the event a Covered Entity (as defined below) that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate (as defined below) of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights (as defined below) under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a defaulting lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)    As used in this Section 10.10, the following terms have the following meanings:

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Covered Entity" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

## ARTICLE XI
## DEFINITIONS

11.1    Defined Terms. The following terms have the following meanings:

"Acceleration" has the meaning set forth in Section 7.2(a)(ii) (*Remedies*).

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"<u>Approved Budget</u>" has the meaning set forth in <u>Section 4.2</u> (*Budget and Information Requirements*).

"<u>Attorney Costs</u>" means all reasonable and documented fees and disbursements of any law firm or other external counsel acting for the Agent or any Lender hereunder and as permitted hereunder.

"<u>Auction</u>" means an auction for all or part of the Debtors' assets or business conducted in accordance with the Bidding Procedures Order.

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers.

"<u>Bail-In Legislation</u>" means, (a) with respect to any EEA Member Country which has implemented, or which at any time implements, Article 55 of Directive 2014/59/EU, establishing a framework for the recovery and resolution of credit institutions and investment firms, the relevant implementing law, regulation, rule or requirement as described in the EU Bail-In Legislation Schedule from time to time and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, 11 U.S.C. § 101, <u>et seq</u>.

"<u>Bidding Procedures Order</u>" means an order of the Bankruptcy Court in form and substance reasonably acceptable to the Lenders establishing procedures for the sale by the Debtors of their assets or business.

"<u>Borrowing</u>" means each borrowing under a Notice of Borrowing of Loan(s) by the Borrower from the Lenders pursuant to this Agreement.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday, or a day on which banks are required or authorized to close in New York City.

"<u>Carve-Out</u>" has the meaning ascribed to such term in the DIP Order then in effect.

"<u>Closing Date</u>" means the date on which the Bankruptcy Court shall have entered the Interim DIP Order and all other conditions set forth in <u>Section 2.1</u> (*Conditions Precedent*) hereof are satisfied or waived in accordance with the terms herein.

"<u>Code</u>" means the U.S. Internal Revenue Code of 1986, as amended (unless otherwise provided herein).

"<u>Collateral</u>" means, collectively, (a) all real property and all tangible and intangible personal property of each Loan Party, in each case wherever located and whether now owned or hereafter acquired, including, but not limited to, all accounts, contracts rights, chattel paper, cash, general intangibles, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments, commercial tort claims,

money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, trade names and other intellectual property, all Equity Interests (to be limited to the extent of any adverse tax consequences, as reasonably determined by the Agent and the Borrower, and limitations imposed by applicable law), all books and records relating to the foregoing, all other personal and real property of the Borrower and Guarantors, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of New York (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof)); and (b) subject to entry of the Final DIP Order, proceeds of any actions under sections 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code.

"Collateral Documents" means, collectively, this Agreement, the DIP Order, and any and all other security agreements, pledge agreements, and other similar agreements, and all amendments, restatements, modifications, or supplements thereof, or thereto, by or between a Loan Party pledging or granting a Lien on Collateral now or hereafter delivered to the Agent pursuant to or in connection with the transactions contemplated hereby, and all financing statements, mortgages, or comparable documents now or hereafter filed in accordance with the UCC or comparable law against a Loan Party in favor of the Agent, on behalf of the Lenders, as any of the foregoing may be amended, restated, and/or modified from time to time.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Customer Sublicense" means a customer sublicense granted by the applicable Loan Party to each Lender, as provided for under the Amended and Restated Master System Purchase Agreement with Knapp dated October 29, 2020 pursuant to the Interim DIP Order, the form of which is attached to the Interim DIP Order as Annex B.

"Default" means any event or circumstance that, with the passing of time or the giving of notice or both, would (if not cured or otherwise remedied during such time) become an Event of Default.

"DIP Liens" has the meaning set forth in Section 6.1 (*Grant of Security*).

"DIP Order" means the Interim DIP Order or the Final DIP Order, as applicable.

"Dollars", "dollars" and "$" each mean lawful money of the United States of America.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Electronic Transmission" means each document, instruction, authorization, file, information and any other communication transmitted, posted, or otherwise made or communicated by e-mail, facsimile, E-Fax or an electronic signature platform, or other customary electronic system.

"Equity Interest" means, with respect to a Person, all of the shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in such Person, whether voting or nonvoting, including capital stock (or other ownership or profit interests or units), preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the U.S. Securities and Exchange Commission under the Securities Exchange Act of 1934).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning set forth in Section 7.1.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Term Loan Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Term Loan Commitment or in this Agreement or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 9.4(d), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 9.4(d) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Final DIP Order" means a final order of the Bankruptcy Court in form and substance reasonably acceptable to the Agent and the Lenders entered in the Chapter 11 Cases after a final

hearing authorizing and approving on a final basis, among other things, (a) the Borrower to obtain credit and incur the Obligations, (b) the substantive terms of this Agreement and the Loan Documents, (c) the granting of the Liens on the Collateral with the priority contemplated in this Agreement, and (d) authorizing the Debtors to enter into and approving the Perpetual IP Licenses and directing the Debtors to deliver to each Lender the Specified IP, that has not been reversed, stayed, modified, or amended and as to which the time to appeal or seek leave to appeal, petition for certiorari, reargue, or seek rehearing has expired and no proceeding for certiorari, reargument, or rehearing is pending or, if an appeal, petition for certiorari, reargument, or rehearing has been sought, the order of the Bankruptcy Court has been affirmed by the highest court to which the order was appealed, from which the reargument or rehearing was sought, or certiorari has been denied and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

"<u>Governmental Authority</u>" means any nation, sovereign, or government, any state or other political subdivision thereof, any agency, authority, or instrumentality thereof and any entity or authority exercising executive, legislative, taxing, judicial, regulatory, or administrative functions of or pertaining to government, including any central bank, stock exchange, regulatory body, arbitrator, public sector entity, supra-national entity (including the European Union and the European Central Bank), and any self-regulatory organization (including the National Association of Insurance Commissioners).

"<u>Indemnified Taxes</u>" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in <u>clause (a)</u>, Other Taxes.

"<u>Initial Commitment Period</u>" means the period commencing on the date of entry of the Interim DIP Order and ending on the date of entry of the Final DIP Order.

"<u>Interest Payment Date</u>" means, as to any Loan, (a) the last day of each month to occur while such Loan is outstanding and the final maturity date of such Loan (whether by Acceleration or otherwise) and (b) the date of any repayment of principal made in respect thereof.

"<u>Interim DIP Order</u>" means an order of the Bankruptcy Court in form and substance reasonably acceptable to the Agent and the Lenders entered in the Chapter 11 Cases after an interim hearing authorizing and approving on an interim basis, among other things, (a) the Borrower to obtain credit and incur the Obligations, (b) the terms of this Agreement and the other Loan Documents on an interim basis, (c) the granting of the Liens on the Collateral with the priority contemplated in this Agreement, (d) authorizing the Debtors to enter into and approving the Interim IP Licenses and authorizing and directing the Debtors to deliver to each Lender the Specified IP, and (e) authorizing and directing the Debtors to deliver to each Lender the Customer Sublicense.

"<u>Interim IP License</u>" means, individually and collectively, as the context requires, the worldwide, royalty free license with respect to the Specified IP for the applicable Lender granted by the applicable Debtors to the applicable Lender pursuant to the Interim DIP Order, the form of which is attached to the Interim DIP Order as Annex A. Each Interim IP License will automatically terminate if the Final Order is not entered within thirty (30) days of entry of the Petition Date.

"Knapp" means KNAPP Inc.

"Lender Expense Cap" means a cap on the payment of reasonable fees, costs and expenses of the Lenders and the Agent solely from the proceeds of the Loans, in an amount equal to: (i) $365,000 for Jones Day and $30,000 for its local Delaware counsel, (ii) $40,000 for Ballard Spahr LLP, (iii) $40,000 for Epstein Becker & Green, P.C.; and (iv) $25,000 for the Agent.

"Lender-Specific Specified IP" has the meaning set forth in the definition "Specified IP."

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, fiduciary transfer for security purposes, charge, deposit arrangement, encumbrance, trust arrangement, easement, lien (statutory or otherwise), security interest or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever.

"Loan Documents" means this Agreement, the Collateral Documents, the DIP Order, the Term Notes and all other documents delivered to the Agent or the Lenders in connection with any of the foregoing.

"Loans" means, collectively, any amount borrowed under Section 1.1 (*Amounts and Terms of Commitments*).

"Margin Stock" means "margin stock" as such term is defined in Regulation T, U, or X of the Federal Reserve Board.

"Material Adverse Effect" means a material adverse change in any of (a) the condition (financial or otherwise) or business, performance, operations, or Property of any Loan Party taken as a whole; (b) the ability any Loan Party to perform its obligations under any Loan Document; (c) the validity or enforceability of any Loan Document or the rights and remedies of the Lenders under any Loan Document, (d) the validity, perfection, and priority of the DIP Liens on the Collateral to the extent required to be established and maintained by the DIP Order and the Collateral Documents in favor of the Agent for the benefit of the Lenders, or (e) the validity, functionality, and enforceability of the Interim IP Licenses, Perpetual IP Licenses, the Customer Sublicenses, or the Specified IP.

"Maturity Date" means the earliest of (a) the date that is 14 weeks after the Petition Date (unless otherwise agreed by the Lenders, acting unanimously, in writing), (b) the 30th day following the Petition Date if the Bankruptcy Court has not entered the Final Order, or (c) entry by the Bankruptcy Court of an order dismissing the Chapter 11 Cases or converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

"MTPSAs" means the Master Technology and Platform Services Agreement between each Lender and the Borrower, in each case as modified by the terms of the DIP Order.

"Notice of Borrowing" means a notice given by the Borrower to the Lenders substantially in the form of Exhibit A attached hereto, pursuant to Section 1.4 (*Procedure for Borrowing*).

"Obligations" means all Loans and other indebtedness, fees, interest, advances, expenses, debts, liabilities, obligations, covenants, and duties owing by any Loan Party to any Lender, the

Agent, or any other Person required to be indemnified, that arises under any Loan Document, whether or not for the payment of money, whether arising by reason of a Borrowing, loan, guaranty, indemnification, or in any other manner (including under the DIP Order), whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired.

"Organization Documents" means (a) the certificate or articles of incorporation, the bylaws, any certificate of determination, or instrument relating to the rights of preferred shareholders of such corporation and any shareholder rights agreement or (b) any other document setting forth the manner of election or duties of the officers, directors, managers, or other similar persons, or the designation, amount or relative rights, limitations, and preference of the Equity Interests of a Person.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56.

"Permits" means, with respect to any Person, any permit, approval, authorization, license, registration, certificate, concession, grant, franchise, variance, or permission from, and any other contractual obligations with, any Governmental Authority, in each case whether or not having the force of law and applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Permitted Liens" means:

(a)    Liens granted by the Interim DIP Order and created pursuant to the Collateral Documents to secure the Obligations;

(b)    Liens perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code;

(c)    Liens for Taxes that are not yet due and payable or that are being contested in good faith with the appropriate taxing authorities;

(d)    Liens securing indebtedness permitted by this Agreement.

"Person" means any individual, partnership, corporation (including a business trust and a public benefit corporation), joint stock company, estate, association, firm, enterprise, trust, limited liability company, unincorporated association, joint venture and any other entity or Governmental Authority.

"Perpetual IP License" means, individually and collectively, as the context requires, each Interim IP License, the term of which is automatically extended in perpetuity upon entry of the Final Order.

"Property" means any interest in any kind of property or asset, whether real, personal, or mixed, and whether tangible or intangible.

"Recipient" means (a) the Agent and (b) any Lender, as applicable.

"Related Person" means, with respect to any Person, in each case, in its capacity as such, each affiliate of such Person and each director, officer, employee, agent, trustee, representative, attorney, accountant and each insurance, environmental, legal, financial and other advisors and other consultants and agents of or to such Person or any of its affiliates.

"Required Lenders" means, at any time, Lenders having at the time 66.7% or more of the sum of the aggregate Term Loan Commitments and Loans then outstanding.

"Requirement of Law" means, with respect to any Person, the common law and any federal, state, local, foreign, multinational, or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities), and the interpretation or administration thereof by, and other determinations, directives, requirements, or requests of, any Governmental Authority, in each case whether or not having the force of law and that are applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means the chief executive officer, the president or the chief restructuring officer of the Borrower or any other officer having substantially the same authority and responsibility.

"Sale Motion" means a motion of the Debtors to approve the sale of their assets or business in form and substance reasonably acceptable to the Lenders, which for the avoidance of doubt, shall include the offer to sell certain assets in lots organized by each Lenders, which would include all Lender-Specific Specified IP, all equipment, spare parts and other materials provided under each Lender's MTPSA, and all other property, licenses, agreements and materials related to each Lender's sites.

"Specified IP" means all current versions of software code, source code, object code, customer data, deployment pipelines, documentation, functional design, requirements, databases, libraries, interfaces with third-parties (including Knapp), technical architecture, technical environments (including, without limitation, production, non-production, and lower environments),

technical environment details, and any and all related materials, documentation, data, and information (including usernames, logins, passwords, and access keys and credentials to associated software, middleware and hardware (including routers)), and sublicenses (including from Knapp) that are necessary or desirable as applicable to each Lender to enable each Lender to operate the software and system with respect to such Lender's existing and future MFC sites in the Debtors' absence, including a fully operating instance suitable for and accessible by such Lender ("Lender-Specific Specified IP"), except to the extent that providing any portion of the Specified IP that constitutes non-material Specified IP would violate applicable law or result in the breach or termination of any contracts of the Debtors in existence on the Petition Date (and not entered into in contemplation of the bankruptcy filing).

"Superpriority Claim" means an allowed claim against each Loan Party or its estate in the Chapter 11 Cases which is an administrative expense claim having priority over (a) any and all allowed administrative expenses and (b) all unsecured claims now existing or hereafter arising, including any administrative expenses of the kind specified in the Bankruptcy Code, including section 105, 326, 328, 330, 331, 364(c)(l), 365, 503, 506(c), 507, 546, 726, 1113, or 1114 of the Bankruptcy Code.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees, or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan Commitments" means each Lender's Interim Weekly Borrowing Amount Commitment, Final Approval Borrowing Amount Commitment, and Final Weekly Borrowing Amount Commitment.

"Term Note" means a promissory note of the Borrower payable to a Lender and evidencing the Obligations of the Borrower to such Lender resulting from the Loans made to the Borrower by such Lender or its predecessor(s).

"UCC" means the Uniform Commercial Code of any applicable jurisdiction and, if the applicable jurisdiction shall not have any Uniform Commercial Code, the Uniform Commercial Code as in effect from time to time in the State of New York.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"United States" and "U.S." each means the United States of America.

"Write-Down and Conversion Powers" means, (a) in relation to any Bail-In Legislation described in the EU Bail-In Legislation Schedule from time to time, the powers described as such

in relation to that Bail-In Legislation in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

11.2    Other Interpretive Provisions.

(a)    Defined Terms. Unless otherwise specified herein or therein, all terms defined in this Agreement or in any other Loan Document shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto. The meanings of defined terms shall be equally applicable to the singular and plural forms of the defined terms. Terms (including uncapitalized terms) not otherwise defined herein and that are defined in the UCC shall have the meanings therein described.

(b)    The Agreement. The words "hereof, "herein", "hereunder" and words of similar import when used in this Agreement or any other Loan Document shall refer to this Agreement or such other Loan Document as a whole and not to any particular provision of this Agreement or such other Loan Document; and subsection, section, schedule and exhibit references are to this Agreement or such other Loan Documents unless otherwise specified.

(c)    Certain Common Terms. The term "documents" includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced. The term "including" is not limiting and means "including, without limitation." The term "or" has the inclusive meaning represented by the phrase "and/or".

(d)    Performance; Time. Whenever any performance obligation hereunder or under any other Loan Document (other than a payment obligation) shall be stated to be due or required to be satisfied on a day other than a Business Day, such performance shall be made or satisfied on the next succeeding Business Day.

(e)    Contracts; Instruments. Unless otherwise expressly provided herein or in any other Loan Document, references to agreements, orders and other contractual instruments, including this Agreement and the other Loan Documents, shall be deemed to include all subsequent amendments thereto, restatements and substitutions thereof and other modifications and supplements thereto which are in effect from time to time, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document.

(f)    Laws. References to any statute or regulation may be made by using either the common or public name thereof or a specific cite reference and are to be construed as including all statutory and regulatory provisions related thereto or consolidating, amending, replacing, supplementing, or interpreting the statute or regulation.

11.3    <u>Accounting Terms and Principles</u>. All accounting determinations required to be made pursuant hereto shall, unless expressly otherwise provided herein, be made in accordance with U.S. generally accepted accounting principles.

11.4    <u>Divisions</u>. For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

*[Signature Pages Follow.]*

**Schedule 1**

**Lender Term Loan Commitments**

| Lender | Interim Weekly Borrowing Amount Commitment | Final Approval Borrowing Amount Commitment | Final Weekly Borrowing Amount Commitment | Aggregate Term Loan Commitment |
|---|---|---|---|---|
| Woolworths Group Limited | $171,000 (per week)/ $855,000 (aggregate) | $1,917,000 | $94,000 (per week) / $846,000 (aggregate) | $3,617,000 |
| Village Super Market, Inc. | $27,288.12 (per week) / $136,440.58 (aggregate) | $638,889 | $10,462.65 (per week) / $94,163.85 (aggregate) | $869,493 |
| ShopRite of Hunterdon County, Inc. | $20,095.22 (per week) / $100,476.08 (aggregate) | $638,889 | $9,891.96 (per week) / $89,027.64 (aggregate) | $828,393 |
| Inserra Supermarkets, Inc. | $31,063.77 (per week) / $155,318.83 (aggregate) | $638,889 | $11,350.39 (per week) / $102,153.51 (aggregate) | $896,361 |
| Albertsons Companies, Inc. | $141,000 (per week) / $705,000 (aggregate) | $1,917,000 | $81,000 (per week) / $729,000 (aggregate) | $3,354,000 |

**Exhibit A**

**Form of Borrowing Notice**

*[To Come]*

## **EXHIBIT B**

**Approved Budget**

**Takeoff Technologies, Inc.**
Debtor-in-Possession ("DIP") Weekly Budget
$ in 000s

| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period Beginning | 5/30/24 | 6/3/24 | 6/10/24 | 6/17/24 | 6/24/24 | 7/1/24 | 7/8/24 | 7/15/24 | 7/22/24 | 7/29/24 | 8/5/24 | 8/12/24 | 8/19/24 | 8/26/24 | |
| Period Ending | 5/31/24 | 6/7/24 | 6/14/24 | 6/21/24 | 6/28/24 | 7/5/24 | 7/12/24 | 7/19/24 | 7/26/24 | 8/2/24 | 8/9/24 | 8/16/24 | 8/23/24 | 8/30/24 | Total |
| **Beginning Domestic Operating Bank Cash** | 1,506 | 2,073 | 1,821 | 2,027 | 1,571 | 5,219 | 4,190 | 3,958 | 3,312 | 2,875 | 2,295 | 2,062 | 1,641 | 1,466 | 1,506 |
| **Total Customer Receipts** | 176 | 287 | 23 | 23 | 146 | 23 | 23 | 23 | 146 | 23 | 23 | 23 | 23 | 146 | 1,109 |
| **Employee-Related Disbursements** | | | | | | | | | | | | | | | |
| U.S. Payroll, Payroll Taxes and 401k | - | 723 | 13 | 514 | 134 | 384 | 58 | 514 | 134 | 384 | 58 | 463 | 74 | 559 | 4,011 |
| U.S. Health Insurance | - | 110 | - | - | - | 100 | - | - | - | 90 | - | - | - | - | 300 |
| Funding of India Operations | - | - | - | 299 | - | - | - | - | 299 | - | - | - | 164 | - | 762 |
| Other International Payroll & Contractors | - | 60 | 15 | - | 50 | 45 | 15 | - | 50 | 45 | 15 | - | 10 | 30 | 335 |
| Travel Program | - | - | - | - | 70 | - | - | - | 50 | - | - | - | - | 30 | 150 |
| **Total Employee-Related Disbursements** | - | 893 | 28 | 813 | 254 | 529 | 73 | 514 | 533 | 519 | 73 | 463 | 248 | 619 | 5,558 |
| **Other Operating Disbursements** | | | | | | | | | | | | | | | |
| Maintenance Hotline | - | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 32 | 416 |
| Cloud Hosting | - | - | - | - | - | 238 | - | - | - | - | 198 | - | - | - | 436 |
| Other Taxes | - | - | 138 | - | 88 | - | - | 50 | - | - | - | - | - | - | 276 |
| Other Operating Expense & COGS | - | 4 | 10 | 25 | 25 | 25 | 25 | 20 | 20 | 15 | 15 | 15 | 15 | 15 | 229 |
| **Total Other Operating Disbursements** | - | 36 | 180 | 57 | 145 | 295 | 57 | 102 | 52 | 47 | 245 | 47 | 47 | 47 | 1,357 |
| **Operating Cash Flow** | 176 | (643) | (185) | (846) | (253) | (800) | (107) | (593) | (439) | (542) | (295) | (487) | (272) | (520) | (5,806) |
| **Restructuring & Sale Process Fees** | | | | | | | | | | | | | | | |
| Chief Restructuring Officer / Financial Advisor [Huron Consulting Services, LLC] | - | - | - | - | 500 | 100 | 100 | 75 | 75 | 50 | 50 | 50 | 30 | 30 | 1,060 |
| Restructuring Counsel [Sheppard Mullin Richter & Hampton LLP] | - | - | - | - | 650 | 150 | 125 | 125 | 75 | 50 | 50 | 50 | 50 | 50 | 1,375 |
| Delaware Bankruptcy Counsel [Young Conaway Stargatt & Taylor, LLP] | - | - | - | - | 165 | 10 | 20 | 10 | 20 | 10 | 10 | 5 | 5 | 5 | 260 |
| Claims & Noticing Agent [Kroll, LLC] | - | - | - | - | 150 | 25 | 25 | 25 | 15 | 15 | 15 | 15 | 15 | 15 | 315 |
| Crisis Communications / Public Relations [C Street Advisory Group, LLC] | - | - | - | - | - | 100 | - | - | - | - | - | - | - | - | 100 |
| Investment Banker [Huron Transaction Advisory, LLC] | - | - | - | - | 100 | - | - | - | - | 100 | - | - | - | - | 200 |
| DIP Lender Counsel & Agent Fees | - | - | - | - | 525 | - | - | - | - | - | - | - | - | - | 525 |
| Unsecured Creditors Committee Counsel and/or Advisor | - | - | - | - | 150 | 50 | 25 | 25 | 20 | 20 | 20 | 20 | 10 | 10 | 350 |
| Office of the U.S. Trustee | - | - | - | - | - | - | 37 | - | - | - | - | - | - | 44 | 82 |
| **Restructuring & Sale Process Fees**[1] | - | - | - | - | 2,240 | 435 | 332 | 260 | 205 | 245 | 145 | 140 | 110 | 154 | 4,267 |
| **Net Cash Flow** | 176 | (643) | (185) | (846) | (2,493) | (1,235) | (439) | (853) | (644) | (787) | (440) | (627) | (382) | (674) | (10,073) |
| **Beginning Domestic Operating Bank Cash** | 1,506 | 2,073 | 1,821 | 2,027 | 1,571 | 5,219 | 4,190 | 3,958 | 3,312 | 2,875 | 2,295 | 2,062 | 1,641 | 1,466 | 1,506 |
| Net Cash Flow | 176 | (643) | (185) | (846) | (2,493) | (1,235) | (439) | (853) | (644) | (787) | (440) | (627) | (382) | (674) | (10,073) |
| DIP Borrowings | 391 | 391 | 391 | 391 | 6,141 | 207 | 207 | 207 | 207 | 207 | 207 | 207 | 207 | 207 | 9,566 |
| **Ending Domestic Operating Bank Cash** | 2,073 | 1,821 | 2,027 | 1,571 | 5,219 | 4,190 | 3,958 | 3,312 | 2,875 | 2,295 | 2,062 | 1,641 | 1,466 | 999 | 999 |
| JPMorgan Money Market Account | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| **Total Domestic Cash Available** | 2,083 | 1,831 | 2,037 | 1,581 | 5,229 | 4,201 | 3,968 | 3,323 | 2,886 | 2,305 | 2,072 | 1,652 | 1,477 | 1,009 | 1,009 |
| *Memo: Cumulative DIP Borrowings* | | | | | | | | | | | | | | | |
| Total DIP Borrowings | 391 | 782 | 1,172 | 1,563 | 7,704 | 7,911 | 8,118 | 8,324 | 8,531 | 8,738 | 8,945 | 9,152 | 9,359 | 9,566 | 9,566 |
| Estimated PIK Interest | - | - | - | - | - | 25 | 25 | 25 | 25 | 116 | 116 | 116 | 116 | 217 | 217 |
| **Total DIP Loan Balance** | 391 | 782 | 1,172 | 1,563 | 7,704 | 7,936 | 8,143 | 8,350 | 8,556 | 8,854 | 9,061 | 9,268 | 9,474 | 9,783 | 9,783 |

Notes:
(1) Amounts to be funded to a segregated Funded Reserve Account held in trust for the benefit of professionals.

## ANNEX A

**Interim IP Licenses**

**FILED UNDER SEAL**

## ANNEX B

**Customer Sublicenses**

**FILED UNDER SEAL**