IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| TAKEOFF TECHNOLOGIES, INC., et al.,[1] ) | |
| ) | Case No. 24-11106 (CTG) |
| ) | |
| Debtors. ) | (Jointly Administered) |
| ) | |

**DECLARATION OF MATTHEW WALKER IN SUPPORT
OF DEBTORS' OMNIBUS REPLY TO THE OBJECTIONS OF
THE UNITED STATES TRUSTEE AND THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS TO MOTION OF THE DEBTORS FOR ENTRY OF AN
ORDER APPROVING POSTPETITION FINANCING AND GRANTING RELATED RELIEF**

I, Matthew Walker, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. I am the Chief Sales and Marketing Officer of Takeoff Technologies, Inc. ("Takeoff"), the lead Debtor in the above-captioned chapter 11 cases (together with its debtor affiliates, the "Debtors").[2]

2. I submit this declaration in support of the *Debtors' Omnibus Reply to the Objections of the United States Trustee and the Official Committee of Unsecured Creditors to Motion of the Debtors for Entry of an Order Implementing Postpetition Financing and Granting Related Relief* [ECF No. 134, Exh. 1] and to describe, from a business perspective, the value of the Debtors' assets to various potential purchasers who have indicated interest in the Debtors' assets and congruently, why granting the Perpetual IP Licenses for the Specified IP pursuant to the DIP Motion does not deplete such value.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of the Debtors federal tax identification numbers, as applicable, are: Takeoff Technologies, Inc. (0552); Takeoff Technologies Canada, Inc.; Takeoff Technologies Australia Pty Ltd. (ACN 639 288 958); Takeoff Technologies FZE; Takeoff International Subco India Private Limited; and Takeoff International Subco, LLC. The location of the Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is 203 Crescent Street, Suite 203, Waltham, Massachusetts 02453.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [ECF No. 11] (the "DIP Motion").

3.     The value of the Debtors' assets to the interested market is best illustrated through a short history of the Debtors' business and the market at large. The goal of Takeoff's business plan was to create small, automated, robotic warehouses called micro-fulfillment centers ("MFCs") placed in grocery stores or near end-shoppers. To complete this objective, Takeoff created its own proprietary cloud-based software (the "Software") and partnered with third party equipment manufacturers for the hardware equipment and robotics component, which included additional perpetual third-party software (the "Third-Party Infrastructure"). Takeoff then integrated the Software with the Third-Party Infrastructure and created the MFCs, which provide end-to-end solutions for e-grocery services that cover installation, user interface, assortment, fulfillment, spoke routing, pickup/delivery, and replenishment. The existing MFCs, typically built within the footprint of grocer customers, were tailored for each customer, and were coupled with a corresponding technology and platform services agreement (the "MTPSAs") between the customer and Takeoff.

4.     Takeoff's business plan was spurred by an increasing trend toward online grocery shopping, which gained some traction prior to the COVID-19 pandemic, but ballooned as society shifted from in-person activities toward online platforms during the COVID-19 pandemic, and then maintained appeal as consumers continued to show a preference for online shopping. This permanent shift has required many grocer platforms to develop front-end solutions (usually websites and check-out functionality) that are then coupled with a third-party or on site workforce that manually functions as the back-end solution (the actual fulfillment of the order). While the MFCs are full service operations that provide both front-end and back-end robotic solutions, the Debtors believe that the Software that operates the back-end solution is the Debtors' most valuable asset because it can be adapted to function with prospective purchasers' front-end solutions or hardware, and can be transformed and adapted for use in other industries.

5.     While Takeoff's start-up business model was not able to equalize such that the revenue supported the substantial operating loss in a viable way, the Debtors believe that the Debtors' assets are incredibly valuable to the grocery industry and the ecommerce industry at large, both of which are

continuing to expand to provide efficient online services, and such value is evidenced by the interested parties who are in discussions with the Debtors' advisors, Huron Transaction Advisory LLC ("Huron") throughout the post-petition marketing and sale process.

6. Due to the nature of the business of each of the categories of potential purchasers, the Debtors believe that issuing the Perpetual IP Licenses of the Specified IP will not devalue the Debtors' assets. The Debtors believe that their assets are marketable to four different categories of potential purchasers: (a) Front-End E-Grocery Providers; (b) Hardware Automation Providers; (c) Independent Operators; and (d) Non-Grocery Vertical Operators. Each category of purchasers are represented by a subset of the interested parties who are engaged in discussions with Huron regarding a potential sale, as set forth below:

| Category | Number of Interested Parties | Total Percentage |
| --- | --- | --- |
| Front-End E-Grocery Providers | 14 | 27% |
| Hardware Automation Providers | 21 | 40% |
| Independent Operators | 11 | 21% |
| Non-Grocery Vertical Operators | 6 | 12% |

A. **Front End E-Grocery Providers**

7. The potential purchasers that are included within the category of Front-End E-Grocery Providers are generally those providers, within the grocery industry, that function to provide the front-end solutions (described above), and have the functionality in place to operate an online client interface, but lack the back-end automated solutions that the Software could provide.

8. The Front-End E-Grocery Providers have a keen interest in the Debtors' assets, particularly because obtaining the Software would allow them to expand their portfolio to an already existing customer base, and provide enhanced and efficient solutions that would give them an edge on other front-end

providers. For example, front-end grocery providers with no sophisticated back-end technology are deficient in inventory accuracy at an alarming rate, given in-store shoppers can purchase the same items that online shoppers are ordering. Back-end automated solutions, such as what the Software could provide, would remediate that.

9. Because the Front-End E-Grocery Providers operate in the grocer space, they may recognize a slight loss in the Software being licensed on a royalty-free, perpetual basis in a situation where their business plan would include operating the existing MFCs and licensing the Software to the Debtors' customers. However, given the unique and customized nature of the current MFCs, and the fact that many of the Front-End E-Grocery Providers already have a fulsome customer base (for their established front-end operation), the Debtors do not foresee the Perpetual IP Licenses of the Specified IP significantly depleting the value of the Software to Front-End E-Grocery Providers.

**B.     Hardware Automation Providers**

10. This category of potential purchasers, which encompasses the majority of interested parties, includes Hardware Automation Providers that presumably seek to break into or expand in the e-grocery industry. The grocery vertical with regard to automated fulfillment is fairly unique in terms of the functionality required to adequately and successfully support the fulfillment needs of grocery shoppers. Dynamic assortment planning, date/lot control, food safety, and inventory planning are just a few of the key requirements of a nuanced fulfillment solution where the right software supporting the hardware is critical to its success.

11. Hardware Automation Providers often work in multiple verticals through integrated Warehouse Management Systems ("WMS"), but grocery stores do not currently operate with installed WMS. Therefore, these Hardware Automation Providers have to find a software partner in order to operate in these environments. The time and money necessary to develop a software similar to the Debtors' Software is significant, which increases the value of the Software exponentially. The Hardware Automaton Providers have their own third-party infrastructure that they may seek to integrate with the

Software, which means that operating the existing MFCs and licensing out the Software to the Debtors' current customers is not a foreseeable part of their intended use of the Debtors' assets. The Debtors believe that issuing the Perpetual IP Licenses for the Specified IP would not reduce the value of the Debtors' assets for the Hardware Automation Providers.

**C.      Independent Operators**

12.     Independent Operators are massive conglomerate entities that would purchase the Debtors' assets in order to utilize the Software in-house. Because these potential purchasers would seek to transform the Software and incorporate it into their own infrastructure, the Perpetual IP Licenses of the Specified IP would have no effect on the Independent Operators' proposed use of the Debtors' Software or valuation thereof.

**D.      Non-Grocery Vertical Operators**

13.     The Non-Grocery Vertical Operators are potential purchasers that are interested in the Debtors' Software in order to take advantage of the elements of it that have solved grocery challenges, and transform it for use in other industries such as apparel, pet care, or pharmaceuticals. The Debtors believe that the Software could be ideally suited for expediting the deployment of automated solutions for a micro-fulfillment strategy to industries outside of grocery as back-end software is a critical component for any retailers' strategy in automated order fulfillment. The Debtors fully expect that the issuance of the Perpetual IP Licenses of the Specified IP would have zero consequence on the valuation of the Debtors' assets by Non-Grocery Vertical Operators who only operate in other industries, and would not be interested in providing the Software or operating MFCs for customers in the grocery industry.

## CONCLUSION

14.     The Debtors' management believes, as it has from the inception of the DIP Financing negotiation process and the marketing and sale process, that granting the Perpetual IP Licenses for the Specified IP to the DIP Lenders (a provision previously agreed to by Takeoff under certain of the MTPSAs

if they are terminated for cause) would have little-to-no impact on the interest of the various categories of potential purchasers of the Debtors' assets, as set forth above.

15. I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth herein, the foregoing is true and correct.

Executed: June 28, 2024

                                                    */s/ Matthew Walker*
                                                    Matthew Walker
                                                    Chief Sales and Marketing Officer