IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| TAKEOFF TECHNOLOGIES, INC., *et al.*,[1] | ) ) ) | Case No. 24-11106 (CTG) |
| Debtors. | ) ) ) ) | (Jointly Administered) |

**DIP LENDERS' STATEMENT IN SUPPORT OF THE
DEBTORS' MOTION TO APPROVE DEBTOR-IN-POSSESSION FINANCING**

Woolworths Group Limited ("Woolworths"), Albertsons Companies, Inc. ("Albertsons"), Inserra Supermarkets, Inc., ShopRite of Hunterdon County, Inc., Village Super Market, Inc. (collectively, "Wakefern" and together with Woolworths and Albertsons, the "DIP Lenders"), by and through each DIP Lender's undersigned counsel, submit this statement in support of (i) the Debtors' Motion to approve Debtor-in-Possession Financing [D.I. 11] (the "DIP Motion"),[2] and (ii) the Debtors' omnibus reply [D.I. 134] (the "Reply") to the *Preliminary Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [D.I. 124] (the "Committee Objection") and the *United States Trustee's Limited Objection to Motion of the Debtors for Entry of an Order Approving Postpetition Financing and Granting Related Relief* [D.I. 88] (the "UST Objection," and together with the Committee Objection, the "Objections"), and (iii) entry of the proposed *Final Order (A) Authorizing The Debtors*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of the Debtors federal tax identification numbers, as applicable, are: Takeoff Technologies, Inc. (0552); Takeoff Technologies Canada, Inc.; Takeoff Technologies Australia Pty Ltd. (ACN 639 288 958); Takeoff Technologies FZE; Takeoff International Subco India Private Limited; and Takeoff International Subco, LLC. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 203 Crescent Street, Suite 203, Waltham, Massachusetts 02453.

[2]  Capitalized terms used herein but not otherwise defined have the meaning ascribed to them in the DIP Motion.

1

*To Obtain Postpetition Financing; (B) Granting Liens And Superpriority Administrative Expense Claims; (C) Modifying the Automatic Stay and (D) Granting Related Relief* (the "<u>Proposed Final DIP Order</u>") [D.I. 138], and respectfully states as follows:

## PRELIMINARY STATEMENT

1. In May of this year, the DIP Lenders faced a harsh reality – the Debtors had a liquidity crisis and were standing on the precipice of winding down. A wind down of the Debtors, or worse yet the immediate shutdown of the Debtors, would have also shut down the DIP Lenders' grocery micro-fulfillment centers ("<u>MFCs</u>"), resulting in downstream customer disruptions and jeopardizing the substantial investment the DIP Lenders have made in those MFCs. With no prospects of outside financing, the DIP Lenders could either accept the consequences or throw the Debtors a lifeline. They chose the later. But it was critical that this lifeline provide the DIP Lenders with the ability to mitigate the very risk that they were trying to avoid – disruption in the operation of their MFCs. The DIP Lenders are retailers, not financial institutions in the business of making loans, let alone loans to distressed businesses. Thus, the only value that the DIP Lenders could obtain as compensation for making a risky loan to entities without liquid assts and on the verge of entering bankruptcy was a limited use license for the versions of source code to the Debtors' software that worked for just their MFCs to avoid the risk of interrupting their business operations if the Debtors failed to continue as a going concern in their restructuring efforts.

2. The Official Committee of Unsecured Creditors (the "<u>Committee</u>") objects to the DIP Motion arguing, among other things, that the Debtors' bankruptcy cases are being run solely for the DIP Lenders' benefit and the license rights and contract modifications transfer the Debtors' most valuable rights to the DIP Lenders for free. This is not the case and this argument fundamentally misunderstands the Debtors' business and the scope of the licenses proposed as part of the DIP Facility as explained below. Instead, the DIP Facility provides the estates with liquidity to pursue the estates' best option for a going concern or value maximizing sale for the benefit of all stakeholders

without impairing the Debtors' core assets. In return, the Debtors are providing limited rights to use intellectually property specific to each DIP Lender's MFCs. The terms of the amended DIP Facility are fair, reasonable, and a sound exercise of the Debtors' business judgment and should be approved.

**I.      The IP License and Specified IP are a Subset of the Debtors' Assets Without Any Independent Value**

3.      The Committee argues that the DIP Lenders are receiving a valuable asset in the form of the Specified IP, which they will be entitled to use under the IP Licenses. The Committee goes too far to suggest that the IP License and sharing of source code renders the Debtors' assets worthless for anyone but the DIP Lenders.[3] The facts are that both the IP License and the Specified IP are limited. The IP License is limited to use for each DIP Lender's respective internal purposes and does not permit commercialization of the software for sale to third parties. Also, the definition of Specified IP is narrowed to what is "necessary or desirable as applicable to each Lender *to enable each Lender to operate the software and system with respect to such Lender's existing and future MFC sites in the Debtors' absence*."[4] Specified IP does not include all of the Debtors' source code – rather just the parts that are required to only operate at a specific DIP Lender's MFCs,. A good portion of the source code being obtained is specific to the integration with each specific DIP Lender's own unique ecommerce system environment, and is simply not usable by any other business. Accordingly, the DIP Lenders will not be competing with any purchaser of assets and will not have the rights to or the full code necessary for the software to function on any MFC site other than their own.

4.      In addition, the form of Specified IP that the DIP Lenders have received is not functional and has no immediate value. The Debtors provided the DIP Lenders with over 81,000 code files across 23 different technologies and coding languages that are stored in over 300 separate repositories. These files need to be put together in a specific sequence before the Takeoff Software

---

[3]     Committee Obj. at ¶ 1.
[4]     DIP Credit Agreement §11.1 (emphasis added).

3

can be used by each DIP Lender in its own specific business. Once the code is properly assembled, which is a labor intensive process anticipated to take many weeks due to the lack of existing automated pipelines or even instructions as to the manual steps required to do so, the DIP Lenders will still not be able to read the code unless the Debtors and DIP Lenders develop stand-alone infrastructure in the form of individual Google Cloud instances that are configured to be able to read the combination of codes and technologies described above. Finally, before the DIP Lenders can make use of the code, the Debtors need to separate the data they hold in relation to each DIP Lender and deliver that data into each DIP Lender's newly formed Google Cloud instance and then transition the operation of each DIP Lender's MFCs from the Takeoff-hosted instance to their own, newly-established separate instances, which requires a careful testing and validation process to avoid disruption. Contrary to the Committee's suggestion that on entry of the Proposed Final Order that the DIP Lenders will have "already received *everything* they want and need," the Debtors will have only provided the raw ingredients for the software that the DIP Lenders currently use but without a recipe for assembling it or the mixing bowl.

5. While the Debtors and DIP Lenders are working diligently to resolve these threshold issues, the work is complex, novel and must be completed under the challenging time and resourcing constraints resulting from these chapter 11 cases. If any of these critical gating items are not performed, the Specified IP and corresponding IP Licenses will be worthless and the DIP Lenders will have provided value to the estates in the form of DIP Financing without the benefit of the consideration that formed the foundation of the financing.

6. Assuming the DIP Lenders and Debtors are able to resolve the threshold issues prior to completion of the chapter 11 cases, the work required of the DIP Lenders to make use of the IP Licenses and Specified IP will not end there. Each DIP Lender will be required to invest, on an ongoing basis, in developing systems, processes and teams to monitor and maintain the software, including updates as third parties such as Google (the host of the Google Cloud instances) push

4

through their own updates. The time and expense associated with these ongoing workstreams further demonstrates the lack of value associated with the Specified IP and Interim Licenses that have been provided to the DIP Lenders.

7. At the end of the day, the most that the DIP Lenders will have achieved with the IP License and successful development of a single tenancy operational instance of the software is independence from the Debtors or any purchaser of the Debtors' assets. To address this reality, the DIP Lenders have agreed to deem 20% of the DIP Obligations satisfied on the satisfaction of the "Operational Production Instance Milestone" – the date when the Debtors deliver a single tenancy instance for a DIP Lender's specific MFC sites that is functional with a live MFC site. When that occurs for all three DIP Lenders, more than $2 million of the DIP Facility will be deemed satisfied without payment in cash – an amount that far exceeds the Debtors' estimated value of the IP Licenses.

## II. The DIP Financing Will Contribute to the Debtors' Sale Efforts

8. While the Committee claims that the DIP Lenders will "take the Debtors' most valuable and unencumbered asset and render it worthless for anyone but the DIP Lenders,"[5] the DIP Lenders are actually doing the opposite. The IP Licenses are non-exclusive and not for commercialization and therefore do not preclude third parties from acquiring their own rights to use the Debtors' software and underlying source code.

9. In connection with the delivery of the Specified IP, it is necessary for the Debtors and DIP Lenders to create automated scripts and programs. They are also consolidating five independent code pipelines into one, which will streamline how the code can be accessed, amended and maintained. These enhancements have broad and value maximizing potential future applications by the Debtors and any future purchaser of the Takeoff technology or business. For example, the

---

[5] Committee Obj. at ¶ 1. The Committee's suggestion that merely by possessing the source code the DIP Lenders are diminishing its value by risking that the DIP Lenders' will improperly share that source code with third parties. Committee Obj. at ¶ 17. The DIP Lenders will be restricted from doing so under the confidentiality restrictions in the IP Licenses. Amended IP License at §7.1.

automated scripts can be used in lieu of the Debtors' existing manual processes for onboarding new customers, enhancing disaster recovery capabilities and rolling-out improvements and software updates in the future. The repeatable and scalable nature of these newly developed processes will enhance the value of the Takeoff Software by reducing the time, labor and cost associated with the performance of these essential functions. As part of this process, the Debtors are also creating documented artifacts (i.e. manuals) concerning how substantially all aspects of the Debtors' software works. These manuals will be a valuable resource for the Debtors (or a future purchaser) in understanding, maintaining, updating, and improving the Takeoff Software as well as in training employees and customers in all aspects of the technology and reduce the risk of business interruption if employees with critical knowledge leave. There is no assurance that the Debtors would have taken these steps in connection with the sale process without the requirements of the DIP Facility.

10. While the Committee suggests that creditors would fare better in a chapter 7 liquidation,[6] the sale of the Debtors' code in a liquidation scenario would be extremely value destructive without the workforce necessary to support that transition and the enhancements being funded and enabled by the DIP Lenders and without the resources necessary to provide continuous access to the Debtors' software on its current Google Cloud Platform. The DIP Financing gives the Debtors their best opportunity to retain their workforce and resources necessary to preserve their prospects of delivering a functioning software product or business to a prospective purchaser, maximizing value for the estates.

---

[6] Committee Obj. at ¶ 7. It is unclear whether the Committee seriously believes that a chapter 7 process would yield better recoveries for unsecured creditors, as it concurrently claims that the timeline for the chapter 11 sale process should be extended. *Id.* at ¶¶ 42-44. Moreover, as illustrated above, a substantial portion of the value to the DIP Lenders in providing the DIP Financing is the continuity of the Debtors' operations through the Specified IP transition process. Conversion destroys that value and with it much of the value of the Debtors and their assets.

### III. The MTPSA Amendments Do Not Devalue the Estates

11. The Committee also objects to the amendments of the DIP Lenders' MTPSAs. Its most critical objections are that the amendments allow the DIP Lenders to "(i) reverse engineer, decompile, disassemble, or otherwise attempt to discovery the source code, object code, or underlying structure, ideas, or algorithms of the Debtors' platform and software, and (ii) solicit the Debtors' employees, including software engineers."[7] Both of these concerns are unfounded.

12. First, the risk of reverse engineering and having unfettered use of the totality of the Debtors' source code is mitigated through the terms of the IP License. The IP License will effectively substitute for the protections in the MTPSA and limit the DIP Lenders' ability to do use the source code outside the boundaries and agreements of the IP License. Section 3 of the IP License contains the necessary restrictions to protect against the risks identified by the Committee.

13. Second, it was not the intention of the DIP Lenders to solicit the Debtors' tech engineers required for continuing operations. Rather, the DIP Lenders sought to protect those employees whose only function was to serve a single customer (such as on-site technicians) rather than the Debtors' overall operations and who were at risk of not having future employment with the Debtors, or those employees who were identified by Takeoff as not having a continuing role as the bankruptcy process unfolds.

14. The Committee also contends that the amendments to length of the terms of the MTPSAs so that they terminate at maturity of the DIP Facility removes value from the estate. The problem with this argument is that it presupposes that the MTPSAs will be assignable to a purchaser. There have been ongoing defaults under the MTPSAs that may not be curable. Certain of the MTPSAs have expired by their terms and therefore are not executory contracts. Moreover, given the nature of the MTPSAs, the DIP Lender's consent may be required under applicable non-bankruptcy

---

[7] Committee Obj. at ¶ 3.

law. It is not certain that cure and assignment would have been possible even if the MTPSAs had not been amended.

      For the reasons set forth above, the DIP Lenders support the approval of the DIP Motion, entry of the Proposed Final DIP Order and request that the Court overrule the Objections.

Dated: June 28, 2024
Wilmington, Delaware

| | |
|---|---|
| */s/ Nicholas J. Brannick* | */s/ Kevin S. Mann* |
| Tobey M. Daluz (DE No.3939) | Christopher P. Simon (No. 3697) |
| Nicholas J. Brannick (DE No. 5721) | Kevin S. Mann (No. 4576) |
| BALLARD SPAHR LLP | CROSS & SIMON LLC |
| 919 N. Market Street, 11th Floor | 1105 N. Market Street, Suite 901 Wilmington, DE 19801 |
| Wilmington, Delaware 19801-3034 | Telephone: (302) 777-4200 |
| Telephone: (302) 252-4465 | csimon@crosslaw.com |
| Facsimile: (302) 252-4466 | kmann@crosslaw.com |
| E-mail: daluzt@ballardspahr.com | |
| brannickn@ballardspahr.com | -and- |
| | |
| *Counsel to Albertsons Companies, Inc.* | Joshua M. Mester (*Admitted Pro Hac Vice*) |
| | Kathryn Sutherland-Smith |
| | JONES DAY |
| | 555 South Flower Street  Fiftieth Floor |
| | Los Angeles, CA  90071 |
| | Telephone: (213) 489-3939 |
| | jmester@jonesday.com |
| | ksutherlandsmith@jonesday.com |
| | |
| | *Counsel to Woolworths Group Limited* |

*/s/ Michael Busenkell*
Michael Busenkell (DE 3933)
GELLERT SEITZ BUSENKELL & BROWN, LLC
1201 N. Orange St., Ste. 300
Wilmington, DE 19801
Telephone: (302) 425-5812
mbusenkell@gsbblaw.com


-and-

Wendy G. Marcari (*Admitted Pro Hac Vice*)
Epstein Becker & Green, P.C.
875 Third Avenue
New York, NY 10022
Telephone: (212) 351-4500
WMarcari@ebglaw.com

*Counsel to Village Super Market, Inc.,
ShopRite of Hunterdon County, Inc., and
Inserra Supermarkets, Inc.*