**UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE**

CRAIG T. GOLDBLATT
JUDGE

824 N. MARKET STREET
WILMINGTON, DELAWARE
(302) 252-3832



July 5, 2024

**VIA CM/ECF**

Re:   *In re Takeoff Technologies, Inc.*, No. 24-11106

Dear Counsel:

The debtor and the Official Committee of Unsecured Creditors have submitted competing forms of order providing for continued interim authority for the debtor to borrow under a debtor-in-possession loan being offered to it by its largest customers. There are two principal differences between the proposed forms of order.

*First*, the different forms of order use different language to set forth the carve-out provided to the Committee for fees incurred prior to final approval of a DIP loan. The difference in language does not relate to the amount of the carve out, but instead addresses a potential ambiguity in the existing interim order about whether DIP proceeds may be used to fund professional fees prior to final approval of the DIP. The Court's language is intended to adopt neither side's position about the meaning of the

prior interim order, but instead preserves all parties' rights with respect to the meaning of that language.

The *second* change is that the Committee has proposed language that would limit the scope of the license to use the debtor's intellectual property during the interim period. The Court will adopt the debtor's language in this regard.

This letter is intended to set forth the Court's reasoning for entering the order in the form it has adopted. The debtor is directed to apprise all parties in interest, through a filing made on the Court's docket, whether the lenders have agreed to interim funding under the terms set out in the Court's order.

* * *

This is an unusual chapter 11 case. As the first-day declaration explains, the debtors developed technology used to create "micro-fulfillment centers" within large grocery retailers. To oversimplify, the debtors' robots and software would stock and deliver groceries within a fulfillment center, thus reducing the size of the real estate footprint required by the grocer to provide its customers with access to its inventory.[1]

To again oversimplify, the difficulty presented is that the business has not obtained the scale necessary to achieve profitability. As a result, the debtors have suffered tremendous operating losses (approximately $60 million a year in 2022 and 2023). The company was unable to find the financing necessary to continue its operations. At the same time, the debtors' technology is quite valuable to several of

---

[1] First Day Declaration, D.I. 12.

its existing customers. They have substantial investments in micro-fulfillment centers located in their stores that depend on the debtors' technology.

The debtors therefore agreed to enter into a DIP-financing agreement under which three of those customers would provide post-petition financing. The catch, however, is that upon closing of the DIP loan, the lenders would obtain a perpetual license to the debtors' intellectual property. While this overview omits many of the details, the basic point of the transaction is to provide the lenders with both the legal rights and the technical ability to continue to operate their fulfillment centers once the DIP loan closes, without further obligations to the debtors or to any potential third-party buyer of the debtors' assets.

The Court granted interim approval of the DIP loan after the parties agreed that the lenders would not obtain *permanent* rights to any of the debtor's assets unless and until the DIP loan was approved on a final basis. The Court appreciates that the substance of what is happening is that the existing customers may well be propping up the debtor by funding its operations for just long enough for them to acquire the legal rights and practical ability to run their fulfillment centers on their own. That may or may not turn out to be the highest and best use of the debtor's assets. The Court was persuaded that the lenders should be permitted, during the interim period, to take action to prepare for the possibility that they will ultimately acquire the rights to the debtor's intellectual property and achieve a smooth transition. The condition is that whatever legal rights or source code that the customers obtain in the interim period must be returned to the debtors in the event

that they do not obtain those rights in the end.  The notion is that the parties can take preparatory steps designed to provide for a smooth transition in the event that the customers end up with the rights to the intellectual property so long as doing so does not entail having value leak out of the bankruptcy estate in the meantime.

When the Committee was formed, it objected to final approval of the DIP loan, as did the Office of the United States Trustee.  It argued that the DIP loan was a disguised motion to approve the sale of the debtor's most valuable asset.  Such a sale, the Committee argued, would only be appropriate after a traditional auction and sale process designed to ensure that the estate was achieving the highest and best price.  The Committee also moved to convert the cases to ones under chapter 7.

At the outset of the hearing on final approval of the DIP loan, the Court explained that it generally agreed with the Committee's position on the propriety of conveying a perpetual license to the debtors' intellectual property upon final approval of the DIP loan.  The basic rule of thumb is that a DIP lender seeking to obtain a debtor's assets must permit a process through which the proposed transaction is appropriately market tested.  Buyers in bankruptcy obtain important protections.  But the reason the law provides those benefits to the buyer is because the sale follows a process that respects the rights of other parties.  The law is designed to ensure that the price obtained is in fact the highest and best price available, after the assets are sufficiently marketed.  While there may be certain circumstances in which a bankruptcy court might approve a private sale or establish a highly abbreviated sales process, nothing in the record before the Court in this case supported doing so.

To be sure, nothing set forth above means that the result of the process needs to be that every constituency finds its eventual recovery acceptable. The value of the debtor's assets and the company's existing capital structure are what they are. The Court's concern is with sufficiency of process, not with tilting the playing field in favor of achieving any ultimate economic result for the benefit of any particular constituency.

The Court concluded that it would be open to the possibility of permitting the conveyance of the intellectual property in advance of a sale process if that were done with the support of the Committee. But absent such consent, the debtor would need to retain its intellectual property pending the result of an appropriate court-supervised sales process.

The parties then negotiated for several days without reaching an agreement. The debtors, however, explained that they were prepared to proceed as the Court proposed, with a DIP loan that did not include a conveyance of intellectual property, and a regular bankruptcy sales process with respect to its assets. The Committee objected to that, arguing that the debtor filed for bankruptcy without material secured debt, and that the process proposed would layer the secured DIP loan ahead of them without material benefit to unsecured creditors.

The Court has accordingly set a hearing both on final approval of the DIP loan and on the Committee's motion to convert for July 11. The present dispute relates to the terms of the second interim DIP order that provides financing to the estate between now and then.

The terms of the order the Court is entering is intended, to the greatest extent possible, to preserve the status quo between now and then, while providing the Committee with a carve-out, as agreed between the parties, to fund the costs it incurs in this second interim period.

Finally, the Court notes that it is aware of the Committee's motion *in limine* based on the debtor's alleged failure to provide appropriate discovery on its motion to dismiss. To the extent the lenders agree to provide interim financing under the terms of this Court's order such that the hearing will proceed on July 11, without prejudging that dispute in any way, the Court strongly encourages all parties to devote appropriate energy, even on the highly compressed schedule the Court has set, to providing appropriate discovery so that the hearing may be conducted in a manner that respects the procedural rights of all parties in interest.

Sincerely,

Craig T. Goldblatt
United States Bankruptcy Judge