## **Exhibit 1**

APA

**CONFIDENTIAL**

**ASSET PURCHASE AGREEMENT**

between

**WOOLWORTHS GROUP LIMITED**

and

**TAKEOFF TECHNOLOGIES, INC.**

**Dated as of August 13, 2024**

**THIS AGREEMENT IS SUBJECT TO REVISION BY THE SELLER AND THE BUYER AND MUST BE KEPT CONFIDENTIAL.**

# TABLE OF CONTENTS

PAGE

ARTICLE 1 DEFINITIONS .................................................................................................. 1

SECTION 1.01    Definitions...................................................................... 1
SECTION 1.02    Construction .................................................................. 12

ARTICLE 2 PURCHASE AND SALE ................................................................................ 13

SECTION 2.01    Purchase and Sale ......................................................... 13
SECTION 2.02    Assumed Liabilities. ..................................................... 16
SECTION 2.03    Excluded Assets ............................................................ 17
SECTION 2.04    Excluded Liabilities ...................................................... 18
SECTION 2.05    Assignment of Contracts and Rights.............................. 19
SECTION 2.06    Purchase Price ............................................................... 22
SECTION 2.07    Purchase Price Allocation .............................................. 22
SECTION 2.08    Closing .......................................................................... 23
SECTION 2.09    Withholding .................................................................. 24

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE SELLER ....................... 25

SECTION 3.01    Organization and Qualification...................................... 25
SECTION 3.02    Authorization; Execution and Delivery; Enforceability ...... 25
SECTION 3.03    Tax Matters. ................................................................. 26
SECTION 3.04    Noncontravention; Consents and Approvals ................... 26
SECTION 3.05    Title to and Sufficiency of Purchased Assets ................. 26
SECTION 3.06    Litigation ...................................................................... 26
SECTION 3.07    Permits; Compliance with Laws .................................... 27
SECTION 3.08    Material Contracts......................................................... 27
SECTION 3.09    Intellectual Property...................................................... 28
SECTION 3.10    Real Property ................................................................ 30
SECTION 3.11    Brokers ......................................................................... 30

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER ................................. 31

SECTION 4.01    Corporate Existence and Power ..................................... 31
SECTION 4.02    Authorization; Execution and Delivery; Enforceability ...... 31
SECTION 4.03    Noncontravention; Consents and Approvals ................... 31
SECTION 4.04    Adequate Assurance...................................................... 31
SECTION 4.05    Litigation ...................................................................... 32
SECTION 4.06    Brokers......................................................................... 32
SECTION 4.07    "AS IS" Sale ................................................................. 32

ARTICLE 5 COVENANTS OF THE SELLER ..................................................................... 33

SECTION 5.01    Conduct of the Business................................................. 33

SECTION 5.02        Access to Information ................................................................ 34
SECTION 5.03        Supplements to Schedules......................................................... 34

ARTICLE 6 COVENANTS OF BUYER .............................................................................. 35

SECTION 6.01        Preservation of and Access to Books and Records ...................... 35
SECTION 6.02        Insurance Matters ...................................................................... 35
SECTION 6.03        Availability of Funds ................................................................. 36

ARTICLE 7 COVENANTS OF BUYER AND THE SELLER ................................................. 36

SECTION 7.01        Confidentiality .......................................................................... 36
SECTION 7.02        Further Assurances..................................................................... 36
SECTION 7.03        Certain Efforts .......................................................................... 36
SECTION 7.04        Public Announcements ............................................................... 37
SECTION 7.05        Employee Matters ...................................................................... 37
SECTION 7.07        Misallocated Assets ................................................................... 38
SECTION 7.08        Payments from Third Parties after Closing................................. 39
SECTION 7.09        Bulk Transfer Laws.................................................................... 39
SECTION 7.10        Bankruptcy Court Approval. ...................................................... 39
SECTION 7.11        No Successor Liability ............................................................... 41
SECTION 7.12        Communications with Customers and Suppliers ......................... 42
SECTION 7.13        Investigation.............................................................................. 42
SECTION 7.14        Releases..................................................................................... 42

ARTICLE 8 CONDITIONS TO CLOSING............................................................................ 42

SECTION 8.01        Conditions to Obligations of Buyer and the Seller ...................... 42
SECTION 8.02        Conditions to Obligation of Buyer.............................................. 43
SECTION 8.03        Conditions to Obligation of the Seller ........................................ 43

ARTICLE 9 SURVIVAL ................................................................................................... 44

SECTION 9.01        Survival ..................................................................................... 44

ARTICLE 10 TERMINATION ............................................................................................ 44

SECTION 10.01      Grounds for Termination ............................................................ 44
SECTION 10.02      Effect of Termination................................................................. 46
SECTION 10.03      Costs and Expenses.................................................................... 46

ARTICLE 11 MISCELLANEOUS ....................................................................................... 46

SECTION 11.01      Notices ...................................................................................... 46
SECTION 11.02      Amendments and Waivers .......................................................... 47
SECTION 11.03      Successors, Assigns and Designees ............................................ 47
SECTION 11.04      Governing Law .......................................................................... 48
SECTION 11.05      Jurisdiction................................................................................ 48

SECTION 11.06   WAIVER OF JURY TRIAL.......................................................... 48
SECTION 11.07   Counterparts; Third-Party Beneficiaries ...................................... 49
SECTION 11.08   Specific Performance ................................................................... 49
SECTION 11.09   Entire Agreement ......................................................................... 49
SECTION 11.10   No Strict Construction ................................................................. 49
SECTION 11.11   Severability .................................................................................. 50
SECTION 11.12   Disclosure Schedules ................................................................... 50
SECTION 11.13   No Recourse.................................................................................. 50

## ASSET PURCHASE AGREEMENT

THIS **ASSET PURCHASE AGREEMENT**, dated as of August 8, 2024 (this "**Agreement**"), is made and entered into by and among Woolworths Group Limited (the "**Buyer**"), and Takeoff Technologies, Inc., a Delaware corporation (the "**Seller**"). Buyer and the Seller are sometimes referred to collectively herein as the "**Parties**" and individually as a "**Party**." Capitalized terms used herein and not otherwise defined herein have the meanings set forth in Article 1.

## W I T N E S S E T H :

**WHEREAS**, on May 30, 2024 (the "**Petition Date**"), the Seller, as debtor and debtor in possession, together with its affiliated debtors and debtors in possession (collectively, the "**Debtors**"), sought relief under Chapter 11 of Title 11, §§ 101-1330 of the United States Code (as amended, the "**Bankruptcy Code**") by filing cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

**WHEREAS**, upon the terms and subject to the conditions set forth in this Agreement and the entry of the Sale Order, the Parties desire to enter into this Agreement, pursuant to which the Seller shall sell, assign, transfer, and convey to Buyer or its designee, and Buyer or its designee shall purchase and acquire from the Seller, all of the Seller's right, title and interest in and to the Purchased Assets, and Buyer or its designee shall assume all of the Assumed Liabilities, and the Parties intend to effectuate the transactions contemplated by this Agreement, upon the terms and conditions hereinafter set forth in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, Sections 105, 363, and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to entry of the Sale Order; and

**WHEREAS**, Seller's ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

## ARTICLE 1

## DEFINITIONS

SECTION 1.01    *Definitions*.  The following terms, as used herein, have the following meanings:

"**Affiliate**" means, with respect to any Person, another Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, where "control" means the possession, directly or indirectly, of the power to direct

the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise. For the avoidance of doubt, ownership of more than fifty percent (50%) of the voting securities shall be deemed to be "control" for purposes of this definition.

"**Approved Budget**" has the meaning set forth in the Final DIP Order.

"**Assumed Liabilities**" has the meaning set forth in Section 2.02 of this Agreement.

"**Auction**" means an auction or auctions, if any, for the sale of the Seller's assets conducted pursuant to the terms and conditions of the Bid Procedures Order.

"**Bankruptcy and Equity Exception**" means any Laws relating to bankruptcy, and subject, as to enforceability, to the effect of general principles of equity.

"**Bid Procedures Order**" means the *Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other Than Assumed Liabilities and Permitted Encumbrances, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Lease, (II) Approving Certain Bidding Procedures and Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, (III) Authorizing the Debtors to Enter Into the Stalking Horse Purchase Agreement, and (IV) Granting Related Relief* [Docket No. 225] entered by the Bankruptcy Court on July 12, 2024.

"**Business**" means the business conducted by the Seller of providing end-to-end solutions using the Seller's proprietary cloud-based software and third-party equipment for the interface, assortment, fulfillment, spoke routing, pickup, delivery and replenishment of micro fulfilment centers for large grocery customers.

"**Business Day**" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Law to close.

"**Cash and Cash Equivalents**" means all of the Seller's cash, checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

"**Claim**" or "**Claims**" means a "claim" as defined in Section 101 of the Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 2.08 of this Agreement.

"**Closing Date**" means the date of the Closing.

"**Closing Date Cash**" means the Cash and Cash Equivalents of the Seller immediately prior to Closing, but excluding the Funded Fee Reserve.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collective Bargaining Agreement**" means any Contract that the Seller has entered into with any union, works council or collective bargaining agent with respect to terms and conditions of employment of its employees, not including any agreements covering non-U.S. employees which are applicable on an industry-wide basis to employees and which are not individually negotiated by the Seller.

"**Committee**" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases.

"**Contract**" means any contract, agreement, license, sublicense, Lease, sales order, purchase order, instrument, undertaking or legally binding commitment.

"**Cure Costs**" means, with respect to any Purchased Contract, the Liabilities that, except as otherwise agreed between the Purchased Contract counterparty and the Seller, must be paid or otherwise satisfied to cure all monetary defaults under such Purchased Contract to the extent required by Section 365(b) of the Bankruptcy Code in connection with the assignment and assumption of such Purchased Contract.

"**Cut-Off Date**" means the earlier of (a) the occurrence of the effective date of a plan of reorganization or liquidation for the Debtors, and (b) conversion of the Chapter 11 Cases to chapter 7.

"**DIP Credit Agreement**" means that certain Amended and Restated Debtor-In-Possession Credit Agreement dated as of July 16, 2024 (as amended and restated from time to time), and as agreed to by and among the Debtors, the Administrative Agent (as defined therein) and the lenders thereto (the "**DIP Lenders**").

"**DIP Facility**" means the senior secured superpriority debtor-in-possession financing facility, as further described in the DIP Credit Agreement and approved by the Bankruptcy Court pursuant to the Final DIP Order.

"**DIP Obligations**" has the meaning ascribed to "Obligations" under the DIP Credit Agreement.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by the Seller to Buyer on the date hereof.

"**Employee**" means an employee of the Seller, including those on disability or a leave of absence, whether paid or unpaid.

"**Encumbrance**" means any "interest" as that term is used in section 363(f) of the Bankruptcy Code, any Claim, hypothecation, mortgage, lien (statutory or otherwise), mechanic's workmen's, repairmen's, materialmen's, warehousemen's, carrier's and other similar statutory or inchoate lien, pledge, security interest, equitable interest, charge, easement, purchase option, put, call, pledge, deed of trust, right of first refusal or offer, pre-emptive right, covenant running with the land, right of way, option, claim, license, title defect or other survey defect and other similar

3

impositions, imperfections or restrictions on transfer or use or other encumbrance or restriction of any kind.

"**Environmental, Health and Safety Requirements**" means all applicable Laws concerning or relating to worker/occupational health and safety, or pollution, protection or preservation of the environment, including those relating to the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, transfer, storage, disposal, distribution, importing, labeling, testing, processing, discharge, release, threatened release, control or other action or failure to act involving cleanup of any hazardous materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, noise or radiation.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**Excluded Claims**" has the meaning ascribed to "Excluded Assets" in the DIP Credit Agreement.

"**Excluded Cure Costs**" means Cure Costs consisting of amounts due under any Purchased Contract for postpetition goods or services the payment of which is included in and contemplated by an Approved Budget.

"**Final DIP Order**" means the *Final Order (A) Authorizing The Debtors To Obtain Postpetition Financing; (B) Granting Liens and Superpriority Administrative Expense Claims; (C) Modifying The Automatic Stay and (D) Granting Related Relief* [Docket No. 224] entered by the Bankruptcy Court on July 12, 2024.

"**Final Order**" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented in writing to by Buyer) and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such Proceeding or Order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"**Fundamental Representations**" means Section 3.01 (*Organization and Qualification*), Section 3.02 (*Authorization, Execution and Delivery; Enforceability*) and Section 3.11 (*Brokers*).

"**Funded Fee Reserve**" has the meaning set forth in the Final DIP Order.

"**GAAP**" means generally accepted accounting principles in the United States, consistently applied.

"**Governmental Authority**" means any (a) multinational, tribal, federal, state, municipal, local or other governmental entity or authority or public department, central bank, court, commission, commissioner, tribunal, board, bureau, agency or instrumentality, domestic or foreign, (b) subdivision or authority of any of the foregoing, or (c) regulatory, legislative, judicial, arbitral or administrative authority.

"**Indebtedness**" of any Person means, without duplication, (a) the principal of and premium (if any) in respect of (i) indebtedness of such Person for borrowed money, (ii) other indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, or (iii) any obligations in respect of letters of credit, surety bonds or bank guarantees, in each case to the extent funds have been drawn or are payable thereunder, (b) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable for goods and services and other accrued current liabilities arising in the Ordinary Course), (c) all obligations of such Person under leases required to be capitalized in accordance with GAAP (other than any liabilities pursuant to leases which would not have been required to be capitalized under GAAP prior to the implementation of ASC 842), (d) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction, (e) all obligations of the type references in clauses (a) through (d) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guaranties of such obligations, (f) any interest or other amounts owed with respect to the indebtedness referred to above and any termination fee, prepayment premiums or fees related thereto and (g) all obligations of the type referred to in clauses (a) through (e) of other Persons secured by any Encumbrance on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"**Intellectual Property**" means any and all intellectual property of every kind, whether protected or arising under the Laws of the United States or any other jurisdiction, including all intellectual or industrial property rights in any of the following: (a) all trademarks and service marks (registered or unregistered), and all registrations, renewals and applications therefor, and all brand names, product names, trade dress, logos, protectable distinguishing guises and indicia, slogans and other similar designations of source or origin and, in each case, all worldwide rights, title and interest associated with the foregoing, whether registered or not, in any form including abbreviation, derivation, variation, diffusion or otherwise, whether stylized or not stylized, and for all purposes and for all goods, products and services (collectively, "**Trademarks**"), (b) methods, techniques, ideas, know-how, research and development, technical data, molds, prototypes, models and designs, programs, materials, specifications, processes, inventions (patentable or unpatentable), unique ornamental designs of an article of manufacture, patents and patent applications (including all reissuances, continuations, continuations-in-part, divisions, revisions, extensions and reexaminations thereof), and other similar materials and improvements thereto, and

all tangible embodiments of the foregoing (collectively, "**Patents**"), (c) all copyrights (registered or unregistered), including applications and registrations thereof, published and unpublished works of authorship, including audiovisual works, collective works, computer programs and software including source code, object code, operating systems, and specifications functional design, requirements, databases, libraries, interfaces with third-parties, technical architecture, technical environments (including, without limitation, production, non-production, and lower environments), technical environment details, and any and all related materials, documentation, data, and information (including usernames, logins, passwords, and access keys and credentials to associated software, middleware and hardware (including routers)), documentation, compilations, databases, derivative works, literary works, maskworks, websites, and sound recordings (collectively, "**Copyrights**"), (d) all trade secrets, confidential or proprietary business information, such as algorithms, business data bases, data analytics, know-how, techniques, concepts, methods, processes, specifications, product designs, blue prints, surveys, customer reviews, customer/vendor lists, customer contact information, email lists, data bases, data compilations and collections, data, sales plans, formulae, reports, and other proprietary or confidential information and know-how (collectively, "**Trade Secrets**"), (e) all rights of publicity, (f) all moral and other non-economic rights of authors, inventors, however denominated, (g) all other intellectual property and proprietary rights including domain names and web pages, and (h) all rights to sue and recover damages for past, present and future infringement, misappropriation, dilution or other violation of any of the foregoing.

"**Knowledge of the Seller**" means the actual knowledge of the individuals set forth on Section 1.01 of the Disclosure Schedules, after reasonable inquiry.

"**Law**" means any federal, state, provincial, local and foreign law (including common law), treaty, statute, ordinance, code, directive, decree, Order, rule or regulation of or by any Governmental Authority.

"**Lease**" means any lease, together with any other subleases and similar agreements under which the Seller leases, uses or occupies, or has the right to use or occupy, any real property or personal property (including any furniture, fixtures, equipment and other tangible personal property).

"**Leased Real Property**" means any real property leased, subleased or which the Seller has the right to use or occupy, pursuant to a Lease.

"**Liability**" means any and all debts, liabilities, Losses, commitments or obligations of any kind, whether pecuniary or not, fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including, whether arising out of any Contract or tort based on negligence or strict liability) and whether or not the same would be required to be reflected in financial statements or disclosed in the notes thereto.

"**Losses**" means any and all losses, claims, complaints, charges, examinations, suits, actions, proceedings, hearings, mediations, enforcement actions, findings, demands,

investigations, damages, liabilities, Taxes, awards, penalties, fines, fees, costs and reasonable and documented out-of-pocket expenses (including reasonable fees and expenses of counsel).

"**Material Adverse Effect**" means any change, effect, event, circumstance, occurrence or state of facts that, individually or in the aggregate, has had, or would reasonably be expected to have, a material adverse effect on the (i) Purchased Assets or the Assumed Liabilities, taken as a whole or (ii) the ability of Seller to consummate the transactions contemplated hereby; provided, however, that in no event shall any change, effect, event, circumstance, occurrence or state of facts that results from or arises out of the following be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Material Adverse Effect: (a) general changes or developments in global or national political, economic, business, monetary, financial or capital or credit market conditions or trends; (b) general political, regulatory, legislative, economic, business, monetary, financial or capital or credit market conditions or trends (including interest rates); (c) geopolitical conditions or any outbreak or escalation of hostilities, acts of terrorism (including any internet or "cyber" attack or hacking) or war, civil unrest, regional, national or international emergency, or any acts of God or similar force majeure events, including any potential or actual government shutdown, lapse in appropriations or funding hiatus (or similar event); (d) general conditions in the industries in which the Seller generally conducts business (or any changes therein); (e) the mere failure of the financial or operating performance of the Seller or its business to meet any projections, forecasts, budgets or estimates for any period (it being understood that the underlying cause of such failure to meet such projections, forecasts, budgets, estimates or predictions may be taken into account in determining whether a Material Adverse Effect has occurred); (f) changes in Laws; (g) changes in GAAP or other accounting regulations or principles, in each case, after the date hereof; (h) the negotiation, execution, announcement, pendency, performance or consummation of this Agreement or the transactions contemplated hereby, including, in each case to the extent attributable to the foregoing, the impact thereof on the relationships, contractual or otherwise, of the Seller with employees, suppliers, customers, partners, vendors or any other third Person; (i) any global or national health concern, epidemic, disease outbreak or pandemic (including the COVID-19 pandemic and any mutations thereof); (j) any Law issued by a Governmental Authority requiring business closures, quarantine or sheltering-in-place or similar restrictions; (k) the commencement or pendency of the Chapter 11 Cases, including (i) the Auction, (ii) any objections filed in the Chapter 11 Cases to this Agreement or any of the transactions contemplated hereby, the assumption or rejection of any Purchased Contract otherwise in compliance with this Agreement, (iii) any Order of the Bankruptcy Court or any actions or omissions of the Seller required to be taken (or not taken) to comply therewith (provided this clause (k) and clause (n) below do not apply in the context of the representations and warranties explicitly addressing the execution, delivery or performance of this Agreement or the terms hereof or the consummation of the transactions contemplated hereby, or any condition to Closing as it relates to such representations and warranties); (l) the taking of any action expressly required or permitted to be taken, or the refraining from taking any action expressly prohibited from being taken, in each case as required by this Agreement; (m) arising from any action taken or refrained from being taken, in each case to which Buyer has expressly approved, consented to or requested in writing following the date hereof; and (n) any Transaction Litigation; provided, further, that in the case of clause (a), (b), (c), (d), (f), (g), (i) or (j), to the extent that the effects of any such change, effect, event, circumstance, occurrence or state of facts has a disproportionately

7

adverse impact on the Purchased Assets or the Assumed Liabilities, taken as a whole, relative to other similarly situated businesses in the industries in which the Seller operates, then such matter, event, change, development, occurrence, circumstance or effect may be taken into account in determining whether there has been, or would reasonably be expected to be, a Material Adverse Effect.

"**MTPSA**" means a Master Technology and Platform Services Agreement between the Seller and Buyer and any related agreement related thereto, including any statement of work.

"**Order**" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, precept, directive, consent, approval, award, decree or similar determination or finding entered, issued, made or rendered by any Governmental Authority.

"**Open Source License**" means any and all (i) licenses or agreements for software or materials that allow for non-exclusive use, distribution or modification without a license fee, or (ii) any other license that requires the distribution of source code in connection with the distribution of Open Source Materials, that, in each case of (i) and (ii), require modifications or derivative works be distributed under such Open Source License, or that prohibits one from charging a fee or otherwise seeking compensation in connection with sublicensing, displaying or distributing such Open Source Material and (iii) the Creative Commons License, open database license, the Mozilla Public License, the GNU General Public License, GNU Lesser General Public License, Common Public License, Apache License, BSD License, or MIT License and all other licenses identified by the Open Source Initiative as "open source licenses".

"**Open Source Material**" means any software or other materials that are distributed as "free software" or "open source software" or are otherwise generally distributed publicly (in source code form in the case of open source software) under terms of an Open Source License.

"**Ordinary Course**" means the ordinary and usual course of the Business.

"**Original Contract & Cure Schedule**" means the *Notice of Assumption of Lease/Executory Contract Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Sale* [Docket No. 237] filed by Seller in the Chapter 11 Case on July 17, 2024.

"**Permits**" means any franchises, permits, licenses, consents, certificates, clearances, approvals, exceptions, variances, permissions, filings, publications, declarations, notices, waivers, and authorizations, including environmental permits, of or with any Governmental Authority held, used or made by the Seller in connection with the Purchased Assets or the Assumed Liabilities.

"**Permitted Encumbrances**" means the following Encumbrances: (a) statutory Encumbrances for current Taxes, assessments or other governmental charges or levies that are not yet due or payable or that are being contested in good faith by appropriate Proceedings and for which adequate reserves have been established; (b) Encumbrances incurred or deposits made in the Ordinary Course and on a basis consistent with past practice in connection with workers' compensation, unemployment insurance or other types of social security; (c) Encumbrances that

will be released at the Closing with no Liability to Buyer or its Affiliates; (d) outbound Intellectual Property licenses, covenants not to sue and similar rights or licenses that are subject to Section 365(n) of the Bankruptcy Code solely to the extent disclosed on Section 3.08(iv) of the Disclosure Schedules; (e) any other Encumbrance or title exceptions as Buyer expressly approves in writing.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or group or Governmental Authority.

"**Personal Data**" means information relating to or reasonably capable of being associated with an identified or identifiable person, device, or household, including name, street address, date of birth, telephone number, email address, photograph, identification number issued by a Governmental Authority, credit card number, bank information, customer or account number, online identifier, device identifier, IP address, browsing history, search history, or other website, application, or online activity or usage data, location data, biometric data, medical or health information, or any other information that is considered "personally identifiable information," "personal information," or "personal data" under applicable Law, and all data associated with any of the foregoing that are or could reasonably be used to develop a profile or record of the activities of a natural Person across multiple websites or online services, to predict or infer the preferences, interests, or other characteristics of a natural Person, or to target advertisements or other content or products or services to a natural Person.

"**Personally Identifiable Information**" has the meaning ascribed to it in section 101(41A) of the Bankruptcy Code.

"**Privacy Requirements**" means all applicable Laws, industry requirements, and Contracts concerning the privacy, security, or Processing of Personal Data, including as applicable, data breach notification Laws, consumer protection Laws, Laws concerning requirements for website and mobile application privacy policies and practices, Social Security number protection Laws, data security Laws, and Laws concerning email, text message, or telephone communications.

"**Proceeding**" means any claim, action, charge, suit, litigation, arbitration or similar legal proceeding by or before any Governmental Authority.

"**Process or Processing**" means any access, collection, use, processing, storage, sharing, distribution, transfer, disclosure, security, destruction, or disposal of any personal, sensitive, or confidential information or data (whether in electronic or any other form or medium).

"**Purchased Contracts**" has the meaning set forth in Section 2.01(a) of this Agreement.

"**Purchased Intellectual Property**" has the meaning set forth in Section 2.01(d) of this Agreement.

"**Registered Intellectual Property**" means the applications, registrations, and filings for Purchased Intellectual Property that have been registered, filed, certified, or otherwise perfected or recorded or are the subject of a pending application for such, with or by any Governmental Authority or the Internet domain name registrar, by or on behalf of or in the name of the Seller.

"**Sale Order**" means an Order by the Bankruptcy Court, in form and substance reasonably acceptable to Buyer and the Seller, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, among other things, (a) approving this Agreement, (b) authorizing the sale of the Purchased Assets to Buyer (or its designee) pursuant to the terms and conditions set forth herein, free and clear of any and all Encumbrances (other than Permitted Encumbrances) of any kind or nature whatsoever, whether at law or in equity, including free and clear of any rights or claims based on theories of transferee or successor liability under any appliable Law, whether arising before or after the commencement of the Chapter 11 Cases, (c) authorizing the assumption by, and assignment to, Buyer (or its designee) of the Purchased Contracts and the Assumed Liabilities pursuant to section 365 of the Bankruptcy Code, (d) authorizing the other transactions contemplated by this Agreement, (e) that contains findings of fact and conclusions of law that Buyer has acted in "good faith" within the meaning of, and is entitled to the protections of, section 363(m) of the Bankruptcy Code, and that this Agreement was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length bargaining positions, and (f) ordering that this Agreement and the transactions contemplated under this Agreement may, subject to the terms set forth herein, be specifically enforced against and binding upon, and not subject to rejection or avoidance by Seller or its estate or any chapter 7 or chapter 11 trustee of Seller or other representative of is estate.

"**Seller Plan**" means each (a) "employee benefit plan" as defined in Section 3(3) of ERISA, whether or not subject to ERISA, (b) end of service or severance, termination protection, retirement, pension, profit sharing, deferred compensation, phantom, equity or equity-based, health or welfare, employment, independent contractor, vacation, change in control, transaction, retention, bonus or other incentive, fringe benefit, paid time off or similar plan, agreement, arrangement, program or policy, or (c) other plan, Contract, policy or arrangement providing compensation or benefits, in each case whether or not written, in the case of clauses (a)-(c), that is sponsored, maintained, administered, contributed to or entered into by the Seller for the benefit of any of its current or former Service Providers, or for which the Seller has any direct or indirect liability.

"**Seller Privacy and Data Security Policies**" means all of Seller's past or present, internal or public-facing policies, notices, representations, commitments, and statements concerning the privacy, security, or Processing of Personal Data, including any (i) written information security policies and policies; and (ii) obligations applicable to Seller as a result of any certification relating to privacy or the Processing of Personal Data.

"**Seller Products**" means all products and services that are or have been in the past year, provided, marketed, distributed, sold, leased, loaned or licensed by or on behalf of the Seller in connection with the Business.

"**Seller Software**" means all versions of the software (including past versions, current versions, and versions under development) that embody or practice any Intellectual Property owned or purported to be owned by Seller and is used in the operation, design, development, product, distribution, testing, provision, maintenance or support of any Seller Product.

"**Seller Software Documentation**" means all manuals, guides, instructions, version or release notes, logic diagrams, flowcharts, algorithms, specifications, file structures, coding sheets, user manuals, reference manuals, written utility programs, or other materials held or used by Seller to develop, deploy, utilize, update, and maintain the Seller Software or any Seller Products.

"**Seller Source Code**" means any software source code authored by or on behalf of Seller, and any software source of any Seller Software.

"**Service Provider**" means a director, officer, executive, employee or individual independent contractor.

"**Subsidiary**" means, with respect to any Person, another Person in which such Person beneficially owns, directly or indirectly, capital stock or other equity securities representing at least fifty percent (50%) of the outstanding voting stock or other equity interests.

"**Tax**" means all federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, real property gains, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, special assessment, personal property, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding tax, profits, lease, service, recording, documentary, filing, permit or authorization, gains, import, export, intangibles, or any other taxes, fees, assessments or charges in the nature of a tax including any interest, penalties or additions to tax or additional amounts in respect of the foregoing.

"**Tax Return**" means any report, return, election, extension or similar document (including declarations, disclaimers, notices, disclosures, estimates, claims (including claims for refunds), real property transfer tax returns, information returns, schedules or any related or supporting information) filed or required to be filed with respect to Taxes with any Governmental Authority or other Person in connection with the determination, assessment or collection of any Tax or the administration of any Laws or administrative requirements relating to any Tax, including any information return, claim for refund, amended return or declaration of estimated Taxes.

"**Transaction Document**" means this Agreement, the Assignment and Assumption Agreements, the Bills of Sale, the Assignment of Patents, the Assignment of Trademarks, the Assignment of Domain Names and any other agreements, instruments or documents entered into pursuant to, or as contemplated by, this Agreement.

"**Transaction Litigation**" means any Proceeding commenced or threatened in writing against a Party or any of its Subsidiaries or Affiliates or otherwise relating to, involving or affecting such Party or any of its Subsidiaries or Affiliates, in each case in connection with, arising from or otherwise relating to or regarding the transactions contemplated by this Agreement.

"**Transfer Taxes**" means any sales, use, direct or indirect real property transfer, value added, property transfer, documentary, stamp, registration, conveyance, recording or similar non-income Tax (including, for certainty, goods and services tax, harmonized sales tax and land transfer tax) and any recording costs or fees, however styled or designated, or other amounts in the nature

of transfer Taxes payable in connection with the sale or transfer of the Purchased Assets contemplated by this Agreement.

SECTION 1.02    *Construction*.  In construing this Agreement, including the Exhibits and Schedules hereto, the following principles shall be followed: (a) the terms "herein," "hereof," "hereby," "hereunder" and other similar terms refer to this Agreement as a whole and not only to the particular Article, Section or other subdivision in which any such terms may be employed unless otherwise specified; (b) except as otherwise set forth herein, references to Articles, Sections, Disclosure Schedules, Schedules and Exhibits refer to the Articles, Sections, Disclosure Schedules, Schedules and Exhibits of this Agreement, which are incorporated in and made a part of this Agreement; (c) a reference to any Person shall include such Person's successors and permitted assigns; (d) the word "includes" and "including" and their syntactical variants mean "includes, but is not limited to" and "including" and corresponding syntactical variant expressions; (e) a defined term has its defined meaning throughout this Agreement, regardless of whether it appears before or after the place in this Agreement where it is defined, including in any Schedule; (f) the word "dollar" and the symbol "$" refer to the lawful currency of the United States of America; (g) unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa; (h) the words "to the extent" shall mean "the degree by which" and not "if"; (i) the word "will" will be construed to have the same meaning and effect as the word "shall," and the words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive; (j) where a word is defined herein, references to the singular will include references to the plural and vice versa; (k) all references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless Business Days are expressly specified; (l) any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived; (m) any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance; (n) references to "written" or "in writing" include in electronic form; (o) the headings contained in this Agreement and the other Transaction Documents are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement and the other Transaction Documents; (p) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day; (q) the use of "[Docket No. ___]" refers to filings on the jointly-administered docket of the Chapter 11 Cases; (r) the word "or" shall not be exclusive; and (s) unless the context otherwise requires, the words "include", "includes" and "including" (or similar terms) are deemed to be followed by the words "without limitation".

ARTICLE 2

PURCHASE AND SALE

SECTION 2.01    *Purchase and Sale*.  Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement and the Sale Order, on the Closing Date, the Seller shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered to Buyer (or its designee), and Buyer (or its designee) shall purchase, acquire and accept from the Seller, free and clear of all Encumbrances (other than Permitted Encumbrances), all of the Seller's right, title and interest in the properties, interests, rights and other assets set forth in this Section 2.01 of the Seller as of the Closing of every kind and nature, whether tangible or intangible (including goodwill), real, personal or mixed, known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any such properties, rights, interests, and other assets acquired by the Seller after the date hereof and prior to the Closing in accordance with <u>Section 5.01</u> (collectively, the "**Purchased Assets**"); <u>provided that</u>, the Purchased Assets shall not include any Excluded Assets that, notwithstanding the foregoing provisions of this <u>Section 2.01</u> to the contrary, will remain, as applicable, the assets, properties, interests and rights of the Seller.  To the extent that any Purchased Assets (or assets, properties and rights that would be Purchased Assets if held by Seller) are owned, leased, used or held for use by an Affiliate of the Seller then, in either case, the Seller shall cause such Affiliate to transfer all such assets, properties and rights either to (i) a Seller (for further transfer to the Buyer or its designee on the Closing Date) or (ii) the Buyer (or its designee) directly prior to or contemporaneously with Closing.  The Purchased Assets shall comprise all of the following properties, rights, interests and other assets of the Seller (other than any Excluded Assets):

(a)      subject to <u>Section 2.05</u>, all Contracts and Leases identified on Schedule 2.01(a) (collectively, the "**Purchased Contracts**");

(b)      all tangible assets, including machinery, equipment, computers, laptops (and associated accessories), maintenance tool kits, information management systems (including software and hardware related thereto), supplies and other tangible personal property owned by the Seller, including any such personal property located at any Leased Real Property and any such property on order to be delivered to the Seller (the "**Purchased Tangible Assets**"), <u>provided that</u>, Buyer shall have the right to amend the definition of Purchased Tangible Assets to exclude any items or categories of items to be acquired pursuant to this Agreement by providing notice (or multiple notices) in writing to the Seller up to five (5) Business Days prior to Closing.  On the Closing Date, all Purchased Tangible Assets shall be delivered to the Buyer (or its designee), unless Buyer provides prior notice in writing that any or all Purchased Tangible Assets are to be held by Seller until such time as the Buyer provides further notice in writing demanding delivery, which such notice shall be given no later than 60 days following the Closing Date (unless otherwise agreed in writing between the Buyer and Seller), <u>provided further</u> that title to the Purchased Tangible Assets shall pass to Buyer upon Closing and thereafter Buyer shall be responsible for all Liabilities in connection with or otherwise related to such Purchased Tangible Assets (other than Liabilities arising from fraud, negligence or misconduct of the Seller or its Affiliates, or any of

13

their respective directors, agents, officers, members, partners, shareholders, designees, managers, advisors or representatives);

(c)       all warranties, indemnities or guaranties from any Person with respect to any Purchased Asset, including any item of real property, personal property or equipment;

(d)       all Intellectual Property that is owned or claimed, in whole or in part, by the Seller or any of the Seller's Affiliates, or in which the Seller or any of the Seller's Affiliates have any interest or right, whether registered or unregistered, wherever located (the "**Purchased Intellectual Property**"), including without limitation:

(i)       the Patent and Copyright registrations and applications for registration set forth in Section 2.01(d)(i) of the Disclosure Schedules, including all rights to sue for past, present, and future infringement, misappropriation, or violation thereof;

(ii)       the Trademarks set forth in Section 2.01(d)(ii) of the Disclosure Schedules, and goodwill associated therewith, including the historical trademark files;

(iii)       the internet domain name registrations, web addresses, web pages, websites and related content, and social media accounts set forth in Section 2.01(d)(iii) of the Disclosure Schedules;

(iv)       all rights of publicity and all similar rights, including all commercial merchandising rights, owned or controlled by the Seller and either (A) derived from, based upon, inherent, in or attaching to the Purchased Intellectual Property or (B) used or held for use by the Seller in the conduct of the Business, in each case, to the extent permitted to be assigned by the Seller under any Contract or applicable Law;

(v)       solely with respect to customers of the Buyer, all customer data and information derived from customer purchase files and branded loyalty promotion programs and other similar information related to customer purchases, including personal information (such as name, address, telephone number, e-mail address, website, and any other database information) and customer purchase history at a transaction level (including dollar amounts, dates, and items purchased, but excluding from the foregoing any credit card numbers or related customer payment source, social security numbers, or other information prohibited by Law);

(vi)       the right to enforce and to represent to third parties that Buyer (or its designee) is the successor to all rights with respect to the Purchased Intellectual Property;

(vii)       all originals and copies of all files and assignment documentation pertaining to existence, validity, availability, registrability, infringement, enforcement or ownership of any of the Purchased Intellectual Property and documentation of the development, conception or reduction to practice thereof, in each case, under the Seller's possession or control; provided that the Seller shall be entitled to retain copies thereof for legal record-keeping purposes;

(viii)    all Seller Software, Seller Products, Seller Source Code and Seller Software Documentation all tangible embodiments of the foregoing;

(ix)    all other Intellectual Property owned or purported to be owned by the Seller and all embodiments of such Intellectual Property, in which the Seller has any interest or right;

(e)    subject to section 363(b)(1)(A) of the Bankruptcy Code, all rights to the websites, domain names, telephone and e-mail addresses used by the Seller, as well as rights to receive mail and other communications addressed to the Seller relating to the Purchased Assets (including mail and communications from customers, vendors, suppliers, distributors and agents);

(f)    all rights of the Seller under non-disclosure or confidentiality, invention assignment, work made for hire, non-compete, or non-solicitation agreements with current or former Service Providers of the Seller to the extent in place to protect the Purchased Assets;

(g)    all Permits set forth on <u>Section 2.01(g)</u> of the Disclosure Schedules;

(h)    all deposits, credits, prepaid expenses, deferred charges, advance payments, refunds, rights of set-off, rights of recovery, security deposits, prepaid items and duties related to the Purchased Assets (including the Purchased Contracts), except for a claim of set-off against any DIP Lender in connection with any MTPSA between Seller and such DIP Lender;

(i)    all accounts receivable, notes, negotiable instruments and chattel paper owned or held by the Seller, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto, and other amounts receivable from Buyer or any of its Affiliates to Seller before the Closing, whether or not in the Ordinary Course, including any amounts under the MTPSA with Buyer;

(j)    other than Excluded Claims or in respect of Excluded Assets, all rights of the Seller against any Person (including (i) customers, suppliers, vendors, lessors, lessees, licensees, licensors of the Seller and (ii) Buyer, its Affiliates, or any of their respective directors, agents, officers, members, partners, shareholders, designees, managers, advisors or representatives), howsoever arising, including under or related to any Purchased Contract (including all receivables, claims and causes of action thereunder), other Purchased Asset (including any use, ownership, possession, operation, sale or lease thereof), Assumed Liability, the DIP Facility, the Chapter 11 Cases, the negotiation and entry into this Agreement, the operation or conduct of the Business, including Proceedings, Claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refunds or Tax attributes), rights of set off, rights of recovery, rights of subrogation, rights of recoupment, rights under or with respect to express or implied guarantees, warranties, representations, covenants, indemnities, exculpation, advancement, reimbursement of expenses or contract renewal rights and other similar rights, in each case, whether direct or derivative, known or unknown, liquidated or unliquidated, contingent or otherwise;

(k)     all goodwill related to the Purchased Assets (including the goodwill associated with the Trademarks and other Intellectual Property included in the Purchased Assets); and

(l)     other than the Excluded Records, all of the Seller's current or historical written files, documents, instruments, papers, books, reports, records, tapes, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, ledgers, journals, title policies, customer lists, supplier lists, vendor lists, price lists, mailing lists, invoices, shipping records, standard forms of documents, regulatory filings, operating data and plans, Seller Source Code, documented artifacts and manuals pertaining to Seller Source Code, Seller Products and Seller Software, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, *etc.*), user documentation (installation guides, user manuals, training materials, release notes, working papers, *etc.*), marketing documentation (catalogs, sales brochures, flyers, pamphlets, web pages, *etc.*), consulting materials, opinions and other documents commissioned by or on behalf of the Seller, development, quality control, quality assurance, regulatory, pharmacovigilance records and other regulatory documents, all personnel and employment records for the Employees and Service Providers of the Seller, and other books and records of the Seller and any rights thereto owned by the Seller, in each case whether stored in hard copy form or on electronic, magnetic, optical or other media.

SECTION 2.02   *Assumed Liabilities.*  Upon the terms and subject to the conditions of this Agreement, Buyer agrees, effective at the time of the Closing, that it shall (or shall cause its designee to) assume and pay, perform and discharge the following Liabilities, and only such Liabilities, of the Seller (the "**Assumed Liabilities**"):

(a)     all Liabilities relating to or arising out of the ownership or operation of the Purchased Assets by Buyer (or its designee) solely for periods following the Closing;

(b)     all Cure Costs, other than Excluded Cure Costs, to the extent they have not been paid on or before the Closing;

(c)     the Liabilities assumed by Buyer (or its designee) pursuant to <u>Section 7.05</u> and <u>Section 2.06</u>;

(d)     all Liabilities of the Seller relating to or arising out of the Purchased Contracts arising solely following the Closing and (other than Cure Costs) not to the extent relating to or arising out of any breach or default thereof or other activities prior to the Closing; and

(e)     solely in connection with any Purchased Contract or other Purchased Asset and to the extent agreed in writing with the Seller, all (i) open purchase orders, (ii) Liabilities arising under drafts or checks outstanding at Closing, (iii) accrued royalties and (iv) all Liabilities arising from rebates, returns, recalls, chargebacks, coupons, discounts, failure to supply claims and similar obligations, but in each case, to the extent (and solely to the extent) (A) incurred in the Ordinary Course and otherwise in compliance with the terms and conditions of this Agreement (including <u>Section 5.01</u>) and (B) not arising under or otherwise relating to any Excluded Asset.

SECTION 2.03    *Excluded Assets*.  Notwithstanding any provision in this Agreement to the contrary, the Seller shall not be deemed to sell, transfer, assign, convey or deliver, and the Seller will retain all right, title and interest to, in and under the following assets, properties, interests and rights of the Seller and its Affiliates (whether owned, licensed, leased or otherwise) (the "**Excluded Assets**"):

(a)    the organizational documents, corporate records and minute books, in each case to the extent solely pertaining to the organization, existence or capitalization of the Seller;

(b)    any (i) materials to the extent containing information about any Employee, disclosure of which would violate applicable Law, (ii) all documents that the Seller is required by Law to retain, and (iii) all attorney-client privilege and attorney work-product protection of the Seller or associated with its business other than attorney-client privilege and attorney work-product pertaining to the Purchased Assets and the Assumed Liabilities and that is unrelated to this Agreement or the Contemplated Transactions and (such documents described in clauses (i), (ii) and (iii), collectively, the "**Excluded Records**");

(c)    subject to Section 2.05, any Contract that is not a Purchased Contract (collectively, the "**Excluded Contracts**");

(d)    all rights, claims or causes of action that accrue or will accrue to the Seller or any of its Subsidiaries pursuant to this Agreement or any of the other Transaction Documents;

(e)    all Tax refunds and Tax attributes of Seller;

(f)    all Personally Identifiable Information other than with respect to customers of the Buyer and its Affiliates;

(g)    all shares of capital stock or other equity interests of the Seller or any of its Subsidiaries;

(h)    all bank accounts of the Seller or any of its Subsidiaries;

(i)    all funding arrangements, assets, trusts, insurance policies and administrative service Contracts, or portions thereof, that are in place to fund or service the Seller Plans;

(j)    all Cash and Cash Equivalents, including the Funded Fee Reserve;

(k)    all proceeds received from the sale or liquidation of any other Excluded Assets;

(l)    subject to Section 6.02, all insurance policies (including, for the avoidance of doubt, all current and prior director and officer insurance policies) and binders, and all rights and benefits of any nature of the Seller with respect thereto (including any claims arising under such policies and all credits, premium refunds, proceeds, causes of action or rights thereunder);

(m)    the Excluded Claims;

(n)    any deposits, escrows, surety bonds or other financial assurances and any cash or cash equivalents securing any surety bonds or financial assurances, in each case, to the extent solely relating to the Excluded Assets or the Excluded Liabilities;

(o)    all tangible assets other than the Purchased Tangible Assets;

(p)    any Leased Real Property;

(q)    all other accounts receivable, notes, negotiable instruments and chattel paper owned or held by the Seller, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto, and other amounts receivable from any Person before the Closing, whether or not in the Ordinary Course, other than those transferred pursuant to Section 2.01(i); and

(r)    all other assets that are related to or used in connection with the Business and that are owned by the Seller as of the Closing that are not Purchased Assets.

SECTION 2.04    *Excluded Liabilities*.  Notwithstanding any provision in this Agreement to the contrary, neither Buyer nor its designee shall assume, be required to pay, perform or discharge, or be liable hereunder for any Liabilities of the Seller, of whatever nature, whether presently in existence or arising hereafter, whether or not related to the Business or the Purchased Assets, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, matured or unmatured, direct or indirect, and however arising, whether existing prior to or on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities, and the Seller shall retain and be responsible for all other Liabilities of the Seller (other than the Assumed Liabilities), including the following (collectively, the "**Excluded Liabilities**"):

(a)    all Liabilities arising under any Excluded Contract or in relation to any Excluded Asset;

(b)    all Liabilities arising out of or relating to the Seller Plans, including all equity incentive plans and grants thereunder;

(c)    all Liabilities for accounts and trade payables incurred or accrued prior to the Petition Date;

(d)    all Liabilities arising under Section 503(b)(9) of the Bankruptcy Code and other priority claim;

(e)    all Liabilities owed by any of the Debtors to any other Debtors or Debtor's Affiliate;

(f)    except to the extent of any Liabilities expressly assumed pursuant to Section 2.02(d) or Section 2.02(e), all Liabilities of the Seller for Indebtedness;

(g)    all Liabilities in respect of any current or former Employee or Service Provider, including but not limited to, payroll (including salary, wages and commissions), bonuses, vacation,

18

sick leave, parental leave, long service leave, workers' compensation claims, severance, unemployment benefits or liabilities otherwise arising under a termination agreement;

(h)    all Liabilities arising out of, relating to or with respect to any Seller Plan, if any;

(i)    all Liabilities arising in connection with any violation of any applicable Law (by the Seller) relating to the period prior to the Closing;

(j)    all Liabilities of the Seller arising under or pursuant to any Environmental, Health and Safety Requirements, including with respect to any real property owned, operated, leased or otherwise used by the Seller, whether or not used in the Ordinary Course, including any Liabilities for noncompliance with any Environmental, Health and Safety Requirements (including the release of hazardous substances), in each case only to the extent arising as a result of any act, omission, or circumstances taking place prior to the Closing, whether known or unknown as of the Closing;

(k)    all Liabilities arising out of, relating to or with respect to any Order or Proceeding involving, against or affecting any Purchased Asset, the Business, the Seller or any assets or properties of the Seller (i) commenced, filed, initiated or threatened as of the Closing or (ii) relating to facts, events or circumstances arising or occurring prior to the Closing;

(l)    all Losses and claims for product liability or under warranties associated with the Business, Seller Product or Purchased Assets or otherwise (whether known or unknown, and whether recorded or reported), relating to facts, events or circumstances arising or occurring before the Closing (including with respect to products manufactured and sold by Sellers prior to the Closing);

(m)    all claims against Seller asserted in any litigation, arbitration or any other proceeding before any court or tribunal;

(n)    all Liabilities for Excluded Cure Costs; and

(o)    all Liabilities for Taxes (i) relating to or arising out of the ownership or operation of the Business or the Purchased Assets prior to the Closing or (ii) of Seller or any Affiliate of Seller or relating to the Excluded Assets; and

(p)    all other Liabilities of the Seller that are not expressly included as Assumed Liabilities.

SECTION 2.05    *Assignment of Contracts and Rights*.

(a)    In connection with the assumption and assignment to Buyer (or its designee) of the Purchased Contracts, Buyer (or its designee) shall pay all of the Cure Costs (other than Excluded Cure Costs) as determined by the Bankruptcy Court if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that result from such defaults under the Purchased Contracts.  From the date hereof until the date which is five (5) days prior to the Closing Date, promptly following any changes to the information set forth on the Original Contract & Cure

Schedule (including any new Contracts to which any Seller becomes a party and any change in the Cure Cost of any Contract), or as reasonably requested by Buyer, Seller shall provide Buyer with a schedule that updates and corrects such information (as such schedule may be amended, supplemented or otherwise modified from time to time prior to the Closing Date in accordance with the terms of this Agreement, the "**Contract & Cure Update Schedule**").  Seller shall verify all Cure Costs for each Purchased Contract and shall, in consultation with and subject to the consent of Buyer, use commercially reasonable efforts to establish proper Cure Costs for each Purchased Contract prior to the Closing Date.  At any time but in any event no later than three (3) days prior to the Closing Date, Buyer may, by written notice to the Seller, and following good faith consultation with the Seller, add or eliminate any Contract (including any Lease) as a Purchased Contract.  Automatically upon the elimination of any Contract as a Purchased Contract, such Contract will constitute an Excluded Asset and will not be assigned to Buyer (or its designee), and no Liabilities arising thereunder or relating thereto shall be assumed by Buyer (or its designee).  Automatically, upon the addition of any Contract as a Purchased Contract in accordance with this Section 2.05(a) such Contract will constitute a Purchased Asset and will be assigned to Buyer (or its designee) under, and in accordance with the terms of, this Agreement at Closing (and, if applicable, will cease to constitute an Excluded Asset).  The Parties acknowledge and agree that (unless otherwise agreed by the Parties) there will be no reduction in, or increase to, the Purchase Price as a result of any addition or elimination of any Contract as a Purchased Contract; provided, however, that any such addition or elimination may increase or decrease (as applicable) the extent of the Assumed Liabilities, Purchased Assets or Excluded Contracts.  If, following the Closing, it is discovered that a Contract that should have been listed on the Original Contract & Cure Schedule or any Contract & Cure Update Schedule was not so listed, Seller shall, to the extent Seller is still a debtors-in-possession in the Chapter 11 Cases, promptly following the discovery thereof, notify Buyer in writing of any such Contract and Seller's good faith estimate of the amount of Cure Costs applicable to each such Contract (and if no Cure Cost is estimated to be applicable with respect to any such Contract, the amount of such Cure Cost shall be designated for such Contract as "$0.00"), and upon Buyer's request, take all actions reasonably required to assume and assign to Buyer (or its designee) such Contract, provided that Buyer (or its designee) shall pay the applicable Cure Cost (if any).

(b)     The Seller shall use commercially reasonable efforts to take all actions required to assign the Purchased Contracts to Buyer (or its designee), including taking all actions reasonably required to facilitate any negotiations with the counterparties to such Purchased Contracts and to obtain an Order containing a finding that the proposed assumption and assignment of the Purchased Contracts to Buyer (or its designee) satisfies all requirements of Section 365 of the Bankruptcy Code.

(c)     Except with respect to Purchased Contracts assigned pursuant to Section 365 of the Bankruptcy Code, this Agreement shall not constitute an agreement to contribute, transfer, assign or deliver any Purchased Asset or any claim, right or benefit arising thereunder or resulting therefrom if an attempted contribution, transfer, assignment, or delivery thereof without the consent of a third party or Governmental Authority (each, a "**Transfer Consent**") would conflict with, violate, constitute a breach or default under any related Contract or violate any applicable Law or in any way otherwise adversely affect the rights of Buyer or the Seller thereunder.  If such Transfer Consent is not obtained or such assignment is not attainable pursuant to Section 365 of

the Bankruptcy Code, to the extent permitted and subject to any approval of the Bankruptcy Court that may be required, the Seller and Buyer will reasonably cooperate in a mutually agreeable arrangement under which Buyer (or its designee) would obtain the claims, rights or benefits and assume the obligations thereunder in accordance with this Agreement without any further additional consideration; provided, however, that subject to Buyer (or its designee) receiving the claims, rights or benefits of, or under, the applicable Purchased Asset under any such arrangement, from and after the Closing, Buyer (or its designee) shall be responsible for, and shall promptly pay and perform all payment and other obligations under such Purchased Asset (all of which shall constitute, and shall be deemed to be, Assumed Liabilities hereunder) to the same extent as if such Purchased Asset had been assigned or transferred at the Closing.  For the avoidance of doubt, the failure to obtain any Transfer Consent with respect to any Purchased Asset shall not delay the Closing; provided that, from and after the Closing, the Seller and Buyer shall use commercially reasonable efforts to obtain such Transfer Consent with respect to such Purchased Asset. Notwithstanding the foregoing, the Seller's obligations under this Section 2.05(c) shall not restrict or limit their ability to wind-down or otherwise liquidate their estates, in each case, after the Closing, including by confirming and consummating a Chapter 11 plan of liquidation, or limit their ability to close the Chapter 11 Cases, after the Closing; provided that, if the Transfer Consent in respect of a Purchased Asset has not been obtained by the Cut-Off Date, then following written notice by Buyer prior to the Cut-Off Date, and with the prior written consent of Seller, Seller shall use its commercially reasonable efforts to ensure that Buyer shall continue to have the benefit of this Section 2.05(c) following the Cut-Off Date.  Upon obtaining any such Transfer Consent with respect to the applicable Purchased Asset after the Closing, such Purchased Asset shall promptly be transferred and assigned to Buyer (or its designee) in accordance with the terms of this Agreement, the Sale Order, and the Bankruptcy Code without any further additional consideration. Buyer may request, in its reasonable business judgment, certain modifications and amendments to any Contract as a condition to such Contract being designated as a Purchased Contract, and the Seller shall use its commercially reasonable efforts to obtain such modifications or amendments.

(d)    At Closing, pursuant to the Sale Order and the Assignment and Assumption Agreements, and in accordance with Section 2.08 below, the Seller shall assign or cause to be assigned to Buyer (or its designee) (the consideration for which is included in the Purchase Price) each of the Purchased Contracts that is capable of being assigned.

(e)    If any Contract requires the payment of Cure Costs in order to be assumed pursuant to Section 365 of the Bankruptcy Code, and such Cure Costs are undetermined on the Closing Date because a non-Seller counterparty to such Contract has objected to the amount of the Cure Cost set forth on the Original Contract & Cure Schedule for such Contract and such objection will not be resolved prior to the Closing Date (each such Contract, a "**Disputed Amount Contract**"), then the Seller shall provide Buyer, not less than three (3) days prior to the Closing Date, with a schedule that lists each such Disputed Amount Contract and the amount of Cure Costs that has been proposed by each such non-Seller counterparty; provided that the Seller shall agree to the amount of any Cure Costs proposed by a non-Seller counterparty for any Contract irrevocably designated by Buyer in writing as a Purchased Contract if instructed to do so by Buyer.  If the Seller, with the consent of Buyer, and the non-Seller counterparty with respect to any Disputed Amount Contract, are unable to agree on Cure Costs for a Disputed Amount Contract within five (5) Business Days following the Closing Date, solely upon Buyer's written request, the Seller shall, at the expense of

Buyer, seek to have the amount of Cure Costs related to such Disputed Amount Contract determined by the Bankruptcy Court. Upon final determination of such Cure Costs by the Bankruptcy Court or by mutual agreement of the Buyer, Seller and the non-Seller counterparty, Buyer may elect to (i) re-designate such Purchased Contract as an Excluded Contract (ii) designate a Contract as a Purchased Contract to be assigned to Buyer (or its designee) under, and in accordance with the terms of, this Agreement (and, if applicable, such Contract shall will cease to constitute an Excluded Asset) or (iii) take no further action with respect to such Disputed Amount Contract. If, following such election, the Disputed Amount Contract is or becomes a Purchased Contract, (x) the Seller shall promptly take such steps as are reasonably necessary, including, if applicable and reasonably practicable, promptly on delivery of no less than five (5) Business Days' notice to the non-Seller counterparty to such Contract, to cause such Contract to be assumed by the Seller and assigned to Buyer (or its designee), including by executing and delivering to Buyer (or its designee) an Assignment and Assumption Agreement with respect to such Purchased Contract, and (y) Buyer (or its designee) shall pay the Cure Costs with respect to such Purchased Contract either (i) concurrently with the Seller's assumption and assignment thereof to Buyer (or its designee) or (ii) as agreed in writing by Buyer (or its designee) and the applicable counterparty to such Purchased Contract, and execute and deliver to the Seller an Assignment and Assumption Agreement with respect to such Purchased Contract.

SECTION 2.06    *Purchase Price*. On the terms and subject to the conditions contained herein, the aggregate consideration for the Purchased Assets (the "**Purchase Price**") shall consist of (i) a credit bid of all of Buyer's DIP Obligations consisting of principal and interest pursuant to section 363(k) of the Bankruptcy Code (the "**Credit Bid Component**"), (ii) the assumption by the Buyer (or its designee) of the Assumed Liabilities, including payment of the Cure Costs (the "**Assumption Component**") and (iii) cash in an amount equal to the difference between $2.5 million and the Closing Date Cash, but which shall not exceed $700,000 in the aggregate (the "**Cash Component**" and collectively with the Credit Bid Component, and the Assumption Component the "**Closing Date Payment**"); provided, however, that Buyer reserves the right, in its sole discretion, to increase the Purchase Price (including any component thereof), subject to the Bid Procedures Order and applicable Law. The Credit Bid Component shall be paid by means of discharging the Seller of the DIP Obligations owed to the Buyer that comprise the Credit Bid Component, and Seller shall be deemed to be discharged, from the obligation to repay such amounts under the DIP Credit Agreement as of the Closing Date.

SECTION 2.07    *Purchase Price Allocation*. Within ninety (90) days following the Closing Date, the Buyer shall deliver to Seller a schedule allocating the Purchase Price (and any adjustments thereto as determined for U.S. federal income Tax purposes) among the Purchased Assets (the "**Allocation Schedule**"). The Allocation Schedule shall be prepared in accordance with Section 1060 of the Code and the Treasury regulations promulgated thereunder. The Allocation Schedule as prepared by Buyer shall be final and binding on the Parties, unless Seller notifies the Buyer in writing that Seller objects to one or more items reflected in the Allocation Schedule within twenty (20) Business Days after delivery of the Allocation Schedule to Seller, which written notice of objection shall set forth in reasonable detail Seller's basis for such objection and Seller's proposed modification to the Allocation Schedule. In the event of any such objection, Buyer, on the one hand, and the Seller, on the other hand, shall negotiate in good faith to resolve such disputed items set forth in Buyer's written notice of objection. If Buyer and Seller are able to resolve all

such disputed items within twenty (20) days after delivery of Seller's written notice of objection to Buyer, then the Parties will revise the Allocation Schedule to reflect such resolution and the Allocation Schedule (as so revised) shall be final and binding on the Parties; provided, however, if Buyer and the Seller are unable to resolve all such disputed items regarding the Allocation Schedule (including, for the avoidance of doubt, the determination of the purchase price for applicable Tax purposes) within such 20-day period, the Seller and Buyer shall submit the disputed items on the next Business Day to a mutually agreed independent internationally recognized accounting firm (the "**Accounting Firm**") (which may in turn select an appraiser if needed) whose review shall be limited to whether a disputed item has been prepared in accordance with the applicable Law and whose resolution of such disputed items shall be final and binding on all Parties. The Parties shall direct the Accounting Firm to resolve any such disputed items within thirty (30) days after it receives the submission and the Allocation Schedule (as so revised to reflect the resolution of the Accounting Firm) shall be final and binding on the Parties. The costs, fees and expenses of the Accounting Firm shall be borne equally by Buyer, on the one hand, and the Seller, on the other hand. If the Purchase Price is adjusted pursuant to this Agreement, the final Allocation Schedule shall be correspondingly adjusted as appropriate and the Parties shall cooperate in making any such adjustments. The Parties shall report all Taxes and file all Tax Returns, including Form 8594 (*Asset Acquisition Statement Under Section 1060*), in a manner consistent with the final Allocation Schedule and shall not take any position inconsistent therewith (including upon examination of any Tax Return, in any Tax refund claim, in any Tax Proceeding, or otherwise) unless, in each case and then only to the extent, otherwise required by applicable Law.

SECTION 2.08   *Closing*. The closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder (the "**Closing**") shall take place via the exchange of documents by mail or electronic delivery services as soon as possible following entry of the Sale Order, but in no event later than five (5) Business Days after satisfaction of the conditions set forth in Article 8 (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver (to the extent permitted hereunder) of such conditions), or at such other time or place as Buyer and the Seller may agree in writing. At the Closing:

(a)      The Seller shall deliver, or cause to be delivered, to Buyer (or its designee):

(i)      an assignment and assumption agreement, in a form and substance reasonably acceptable to the Seller and Buyer  (the "**Assignment and Assumption Agreements**"), duly executed by the Seller;

(ii)      a bill of sale, in a form and substance reasonably acceptable to the Seller and Buyer  (the "**Bills of Sale**"), duly executed by the Seller;

(iii)      (A) one or more instruments of assignment of the Patents in form and substance reasonably acceptable to the Seller and Buyer  (the "**Assignment of Patents**"), (B) one or more instruments of assignment of Trademarks in a form and substance reasonably acceptable to the Seller and Buyer  (the "**Assignment of Trademarks**"), (C) one or more instruments of assignment of the Copyrights in form and substance reasonably acceptable to the Seller and Buyer  (the "**Assignment of Copyrights**"), and (D) one or

more instruments of assignments of the domain names owed by the Seller in a form and substance reasonably acceptable to the Seller and Buyer  ("**Assignment of Domain Names**"), in each case, duly executed by the Seller;

(iv)    a certificate, dated as of the Closing Date, executed by a duly authorized officer of the Seller certifying that the conditions set forth in <u>Section 8.02(a)</u> and <u>Section 8.02(b)</u> have been satisfied;

(v)    an IRS Form W-9 of the Seller; duly executed by the Seller; and

(vi)    such other deeds, bills of sale, assignments, share transfer forms and other good and sufficient instruments of conveyance and assignment, each in form reasonably satisfactory to Buyer and the Seller, as Buyer deems reasonably necessary to vest in, and transfer to, Buyer (or its designee) all right, title and interest in, to and under the Purchased Assets.

(b)    Buyer shall deliver, or cause to be delivered, to the Seller or to such other Person(s) as may be entitled to payment therefrom (for the satisfaction and discharge of the Cure Costs), as applicable:

(i)    the Closing Date Payment *plus*, if applicable, any amounts contemplated to be paid to the Seller by <u>Section 2.06</u>, by wire transfer of immediately available funds, to the bank account(s) designated in writing by the Seller at least five (5) Business Days prior to the Closing Date;

(ii)    the Assignment and Assumption Agreements, duly executed by Buyer (or its designee);

(iii)    the Bills of Sale, duly executed by Buyer (or its designee);

(iv)    the Assignment of Patents, the Assignment of Trademarks the Assignment of Copyrights and the Assignment of Domain Names, in each case, duly executed by Buyer (or its designee);

(v)    a certificate, dated as of the Closing Date, executed by a duly authorized officer of Buyer certifying that the conditions set forth in <u>Section 8.03(a)</u> and <u>Section 8.03(b)</u> have been satisfied; and

(vi)    such other deeds, bills of sale, assignments, share transfer forms and other good and sufficient instruments of conveyance and assumption and transfer, in form reasonably satisfactory to Buyer and the Seller, as the Seller may reasonably request to transfer and assign the Purchased Assets and Assumed Liabilities to Buyer (or its designee).

SECTION 2.09    *Withholding*.  Buyer shall be entitled to deduct and withhold (or cause to be deducted and withheld) from the consideration otherwise payable pursuant to this Agreement to any Person such amounts as Buyer is required to deduct and withhold under the Code, or any

Tax Law, with respect to the making of such payment.  In the event that Buyer determines that any such deduction or withholding is required, Buyer shall, at least three (3) Business Days prior to the Closing Date, notify the Seller of such determination and, in the event the Seller informs Buyer that the Seller believes such deduction or withholding is inapplicable, Buyer shall consider in good faith any forms, certifications or other documentation provided by Seller to Buyer prior to the Closing intended to eliminate or reduce any such withholding obligation; provided, however, that Buyer shall have no obligation to provide any such notice to Seller with respect to withholding (a) arising as a result of the Seller's failure to provide the documentation described in Section 2.08(a)(v) on or prior to the Closing, or (b) that relates to compensation, benefits and other terms of employment. To the extent that amounts are withheld, such withheld amounts shall be (i) timely remitted to the applicable Governmental Authority in accordance with applicable Law and (ii) treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as set forth in the Disclosure Schedules, the Seller hereby represents and warrants to Buyer as follows:

SECTION 3.01    *Organization and Qualification*.  The Seller is duly organized, validly existing and in good standing (where applicable) under the Laws of its jurisdiction of incorporation and, subject to the provisions of the Bankruptcy Code, has requisite power and authority to own, lease and operate its properties and conduct its business (including the Business) as currently conducted.  The Seller is duly qualified to do business and is in good standing (where applicable) in each foreign jurisdiction where such qualification is required for the ownership or operation of the Purchased Assets, except for failures to be so qualified or to be in such good standing as would not, individually or in the aggregate, be material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole.

SECTION 3.02    *Authorization; Execution and Delivery; Enforceability*.  The execution, delivery and performance of this Agreement and each Transaction Document to which the Seller is a party and the consummation of the transactions contemplated hereby and thereby have been, or prior to the Closing will be, duly authorized by all necessary corporate or other action on the part of the Seller.  The Seller has all necessary power and authority to execute and deliver this Agreement and each other Transaction Document to which such Seller is a party and to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder.  Subject to entry of the Sale Order and any other Order necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents, this Agreement has been, and at or prior to the Closing, each Transaction Document to which the Seller is a party will be, duly and validly executed and delivered by the Seller and, assuming due authorization, execution and delivery by the other Parties and the entry of the Sale Order, this Agreement constitutes, and each other Transaction Document (when duly and validly executed and delivered) will constitute, the legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, subject to the Bankruptcy and Equity Exception.

SECTION 3.03    *Tax Matters.*  All Tax Returns required to be filed with respect to the Business or the Purchased Assets have been duly and timely filed and all such Tax Returns are true, correct and complete in all material respects.  All Taxes required to be paid with respect to the Business or the Purchased Assets have been duly and timely paid, including all Taxes required to be collected, deducted or withheld and remitted to a Governmental Authority in connection with amounts paid or owing to any employee, independent contractor, creditor, supplier, vendor or other Person.  There are no Encumbrances for Taxes on any of the Purchased Assets, other than statutory Encumbrances for property Taxes that are not yet due and payable.  No extension or waiver of a statute of limitations relating to Taxes is in effect with respect to the Business or the Purchased Assets.  There are no audits, examinations, claims or other actions or Proceedings ongoing or pending relating to Taxes with respect to the Business or the Purchased Assets and no such audits, examinations, claims or other actions or Proceedings have been threatened in writing.  No claim has been made by a Governmental Authority in a jurisdiction where Seller does not file Tax Returns with respect to the Business or the Purchased Assets asserting that Seller or any Affiliate of Seller is or may be required to file Tax Returns with or is otherwise subject to taxation by such jurisdiction or a Governmental Authority thereof.

SECTION 3.04    *Noncontravention; Consents and Approvals.*  Neither the execution and delivery by the Seller of this Agreement and each other Transaction Document to which the Seller is a party, nor the consummation of the transactions contemplated hereunder or thereunder, will, subject to entry of the Sale Order, (i) conflict with or result in a breach of the organizational documents of the Seller, (ii) violate any Law or Order to which the Seller, or its assets or properties, or any of the Purchased Assets is subject, or (iii) conflict with, result in a breach of, constitute a default (with or without notice or lapse of time, or both) under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify or cancel or require any notice under, or result in the creation of any Encumbrance (other than Permitted Encumbrances) on, any Material Contract, after giving effect to the Sale Order and any applicable Order of the Bankruptcy Court authorizing the assignment and assumption of any such Material Contract hereunder, except, in the case of clause (ii) or (iii), for such conflicts, breaches, defaults, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to be material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole.

SECTION 3.05    *Title to and Sufficiency of Purchased Assets.*  The Seller has good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances) and, at the Closing, subject to the Sale Order and obtaining any Transfer Consent, the Seller will transfer, convey and assign good and valid title to, or valid leasehold interests in, the Purchased Assets free and clear of all Encumbrances (other than Permitted Encumbrances).  The Purchased Assets, collectively with the Excluded Assets, constitute all of the material assets, properties and rights held for use by Seller or necessary to operate and conduct the Business in the Ordinary Course before the Closing.  No other Person (other than Seller) owns any assets that are material to operate the Business in substantially the same manner as conducted by Seller before Closing, except for personal property leased by Seller and the Excluded Assets.

SECTION 3.06    *Litigation.*  Except as set forth on Section 3.06 of the Disclosure Schedules, there are no Proceedings pending, or, to the Knowledge of the Seller, threatened against

the Seller, the Purchased Assets or the Assumed Liabilities, or any Order outstanding, which, in each case, would adversely affect the ability of the Seller to enter into this Agreement or to consummate the transactions contemplated hereby or otherwise would, individually or in the aggregate, reasonably be expected to be material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole.

SECTION 3.07 *Permits; Compliance with Laws*.

(a)     The Seller is in possession of all Permits necessary for the Seller to own, lease and use the Purchased Assets as currently owned, leased or used and to carry on and operate the Business as currently conducted, except where the failure to possess such Permit, individually or in the aggregate, has not had, and would not reasonably be expected to be material to the Business. the Purchased Assets or the Assumed Liabilities, taken as a whole.  Section 3.07(a) of the Disclosure Schedule is a true, correct and complete list of all material Permits used by the Seller with respect to the Business, Purchased Assets and the Assumed Liabilities.  To the Knowledge of the Seller, there is no fact or circumstance relating to the Permits that would cause a Governmental Authority to deny or refrain from issuing any Permit Approval.

(b)     Except as set forth in Section 3.07(b) of the Disclosure Schedules, (i) all material Permits held by the Seller are valid and in full force and effect, except where such failure to be valid or in full force and effect would not reasonably be expected to be, individually or in the aggregate, material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole, and (ii) the Seller is, and in the last three (3) years has been, in compliance with the terms of all material Permits except where the failure to comply with the terms of such material Permit would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole, and there are no Proceedings pending or, to the Knowledge of the Seller, threatened that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any material Permits, except as would not reasonably be expected to be, individually or in the aggregate, material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole.

(c)     Except as set forth on Section 3.06(b) of the Disclosure Schedules, the Seller is, in all material respects, in compliance with applicable Laws with respect to the Purchased Assets and the Assumed Liabilities.  The Seller has not received any written notice or, to Seller's Knowledge, oral notice from any Governmental Authority relating to actual violations or alleged violations of, failure to comply with or defaults under, any Law, Order or Permit, in each case, with respect to the Purchased Assets and the Assumed Liabilities.

SECTION 3.08 *Material Contracts*.  (a) The Original Contract & Cure Schedule, as supplemented by Section 3.08 of the Disclosure Schedules, sets forth a true, correct and complete list of all material contracts of the Seller and its Affiliates as of the date hereof (the "**Material Contracts**"), including but not limited to:

(i)     any partnership, joint venture, strategic alliance or similar Contract involving a sharing of profits, losses, costs or liabilities with any other Person requiring payments by the Seller, in the aggregate, in excess of $100,000 in a fiscal year;

(ii)     any Contract relating to the Indebtedness of the Seller in excess of $100,000, other than (A) Indebtedness that will be fully discharged under the Bankruptcy Code or (B) the DIP Credit Agreement;

(iii)     any Lease with respect to the Leased Real Property;

(iv)     any Contract to which the Seller or any of Seller's Affiliates is a party (A) pursuant to which the Seller or a Seller Affiliate is granted a right to use any third party Intellectual Property that is material to the Business, taken as a whole, other than non-exclusive licenses for commercially available, off-the-shelf software, (B) pursuant to which the Seller or a Seller Affiliate grants a third party the right to use any Purchased Intellectual Property that is material to the Business, taken as a whole, other than (i) any non-exclusive licenses granted by the Seller to any end user of the Seller's products or services which is entered into in the Ordinary Course on Seller's standard terms and conditions which have been disclosed to Buyer, or (ii) any non-exclusive license that is merely incidental to the transaction contemplated in such license, such as a marketing agreement which contains an incidental trademark license to use the Seller's Trademarks in the scope of providing such services or (C) covering the settlement of any claims related to any Intellectual Property; and

(v)     any Contract that is a Collective Bargaining Agreement.

(b)     With respect to each Material Contract, (i) such Material Contract is in full force and effect and constitutes the legal, valid and binding of the Seller and, to the Knowledge of the Seller, the counterparty thereto, enforceable against the Seller and, to the Knowledge of the Seller, the counterparty thereto in accordance with its terms and conditions, subject to the Bankruptcy and Equity Exception and (ii) neither the Seller nor, to the Knowledge of the Seller, the counterparty thereto is in material breach or default thereof that would permit or give rise to a right of termination, modification or acceleration thereunder, and (iii) neither the Seller nor, to the Knowledge of the Seller, any counterparty thereto, has commenced any Proceeding against any other party to such Contract or given or received any written notice of any breach or default under such Contract that has not been withdrawn or dismissed, except, in the cases of clauses (ii) and (iii), for breaches or defaults (A) caused by or resulting from the Chapter 11 Cases or (B) which are not, and would not reasonably be expected to be, individually or in the aggregate, material to the Business taken as a whole.

(c)     Except as set forth on Section 3.08 of the Disclosure Schedules, the transactions contemplated by this Agreement do not require any notice to or consent of any third party.

SECTION 3.09     *Intellectual Property.*

(a)     Section 3.09(a) of the Disclosure Schedules contains a complete and accurate list of all Registered Intellectual Property, including for each item of Registered Intellectual Property, where applicable, the relevant registration number, application number, registered owner, filing date or registration date.  To the Knowledge of the Seller, with respect to each item of Registered Intellectual Property, all necessary registration, maintenance and renewal fees have been paid, and

all necessary documents and certificates have been filed, in each case to or with the relevant patent, copyright, trademark, domain registrars or other authorities in the United States or foreign jurisdictions, as may be required for the purposes of registering and/or maintaining such Registered Intellectual Property.  To the Knowledge of the Seller, there are no materials, facts or circumstances, including any information, materials, facts or circumstances that would render any Registered Intellectual Property invalid or unenforceable, or would materially affect any pending application for any Registered Intellectual Property.  There are no pending oppositions, invalidation or cancellation proceedings against the Seller or any Seller Affiliate involving such Registered Intellectual Property and, to the Knowledge of the Seller, there are no facts or circumstances that would support such proceedings.

(b)      The Seller exclusively owns all right, title and interest in and to the Purchased Intellectual Property.  To the Knowledge of the Seller, the Purchased Intellectual Property is valid, subsisting, and enforceable.

(c)      To the Knowledge of the Seller, no Person is infringing or misappropriating any Purchased Intellectual Property.  There is no pending dispute, including any pending Proceeding and, to the Knowledge of the Seller, there is no threatened Claim against the Seller, challenging the ownership, validity or enforceability of any such Purchased Intellectual Property.  The Seller has not received service of process or been charged in writing as a defendant, in the twelve (12) month period prior to the date of this Agreement, in any Proceeding that alleges that any of the Purchased Intellectual Property infringes any Intellectual Property right of any Person.  To the Knowledge of the Seller, none of the Seller Products, Seller Software, Seller Software Documentation, or Seller Source Code infringes, violates or misappropriates, and has not infringed, violated or misappropriated in the three (3) year period prior to the date of this Agreement, any Intellectual Property right of any Person.

(d)      The Seller has taken commercially reasonable security measures to protect the secrecy, confidentiality and value of all Trade Secrets and confidential information included in the Purchased Intellectual Property.

(e)      Neither the Seller Software nor the Seller Products contains any (i) bug, defect or error (including any bug, defect or error relating to or resulting from the display, manipulation, processing, storage, transmission or use of date data) that materially and adversely affects the use, functionality or performance of such Seller Software and Seller Products or any product or system containing or authorized or intended to be used in conjunction with such Seller Software or Seller Product; or (ii) "back door," "drop dead device," "time bomb," "Trojan horse," "virus" or "worm" (as such terms are commonly understood in the software industry) or any other code designed or intended to have, any of the following functions: (X) disrupting, disabling, harming or otherwise materially impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed; or (Y) damaging or destroying any data or file without the user's consent.

(f)      No Seller Software or Seller Product is subject to, and no Seller Software or Product contains, is linked with, derived from, is distributed with, or is being or was developed using, Open Source Material that is licensed under any Open Source License that: (i) imposes a requirement or

condition that Seller grant a license under, or refrain from asserting any one or more of its Patent rights or that any Seller Software or part thereof (except for the applicable, unmodified third party Open Source Material itself): (A) be disclosed or distributed in source code form; (B) be licensed for the purpose of making modifications or derivative works; or (C) be redistributable at no charge; or (ii) otherwise imposes any other limitation, restriction or condition, including any requirements to advertise, on the right or ability of Seller to use or distribute any Seller Software or Seller Product or part thereof (except for the applicable, unmodified third party Open Source Material itself or any requirements to include attributions).

(g)     Seller complies and at all times in the past three year period has complied, in all material respects, with Seller Privacy and Data Security Policies and, in all material respects with Privacy Requirements. To the extent required by Privacy Requirements or Seller Privacy and Data Security Policies, (A) Personal Data is Processed by Seller and any third parties processing Personal Information on its behalf in an encrypted manner and (B) Personal Data is securely deleted or destroyed by the Seller and any third parties processing Personal Data on its behalf.  The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby, including the transfer to Buyer (or its designee) of all Personal Data in the possession or control of Seller in connection with the Business, do not and will not: (A) conflict with or result in a violation or breach of any Privacy Requirements or Seller Privacy and Data Security Policies (as currently existing or as existing at any time during which any Personal Data was collected or Processed by or for Seller in the conduct of the Business); or (B) require the consent of or notice to any Person concerning such Person's Personal Data.

(h)     All current and former Employees and Service Providers of the Seller have entered into a Proprietary Information and Inventions Agreement ("**PIIA**") on substantially identical standard terms that, in each case, effectuate a present assignment of all such current or former Employee or Service Provider's intellectual property rights created, conceived of, or reduced to practice in the course of Seller's employment of such current or former Employee or engagement of such Service Provider, as appropriate, and all such PIIAs have been provided to the Buyer.

SECTION 3.10     *Real Property*.

(a)     The Seller does not own, and has never owned, any real property.  The Seller is not a party to any agreement or option to purchase any real property or material interest therein.

(b)     Section 3.10(b) of the Disclosure Schedules sets forth a true, correct and complete list of all Leased Real Property.  The Seller has valid leasehold or sublease interest relating to the Leased Real Property, free and clear of all Encumbrances (other than Permitted Encumbrances). To the Knowledge of the Seller, except as set forth on Section 3.10(b) of the Disclosure Schedules, none of the Leased Real Property is subject to any sublease or grant to any Person of any right to the use, occupancy or enjoyment of the Leased Real Property (or any portion thereof) that would materially impair the use of the Leased Real Property in the operation of the Business.

SECTION 3.11     *Brokers*.     Except as set forth in Section 3.11 of the Disclosure Schedules, no broker, finder, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in

connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Seller or any of its Subsidiaries or their respective Affiliates.

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Seller as follows:

SECTION 4.01    *Corporate Existence and Power*.  Buyer is an entity duly formed, validly existing and in good standing under the laws of Australia and has all power and authority to carry on its business as presently conducted.

SECTION 4.02    *Authorization; Execution and Delivery; Enforceability*.  The execution, delivery and performance of this Agreement and each Transaction Document to which Buyer is a party and the consummation of the transactions contemplated hereby and thereby have been, or prior to the Closing will be, duly authorized by all necessary corporate or other action on the part of Buyer.  Buyer has all necessary power and authority to execute and deliver this Agreement and each other Transaction Documents to which Buyer is a party and to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder.  Subject to entry of the Sale Order and any other Order necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents, this Agreement has been, and at or prior to the Closing, each Transaction Document to which the Seller is a party will be, duly and validly executed and delivered by Buyer and, assuming due authorization, execution and delivery by the other Parties and the entry of the Sale Order, this Agreement constitutes, and each other Transaction Document (when duly and validly executed and delivered) will constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject to the Bankruptcy and Equity Exception.

SECTION 4.03    *Noncontravention; Consents and Approvals*.  Neither the execution and delivery by Buyer of this Agreement and each other Transaction Document to which Buyer is a party, nor the consummation of the transactions contemplated hereunder or thereunder, will, subject to entry of the Sale Order, (i) conflict with or result in a breach of the organizational documents of Buyer, (ii) violate any Law or Order to which Buyer or its assets and properties may be subject, (iii) conflict with, result in a breach of, constitute a default (with or without notice or lapse of time, or both) under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify or cancel or require any notice under, or result in the creation of any Encumbrance (other than Permitted Encumbrances) on, any Contract to which Buyer is a party or by which Buyer or its assets and properties is bound, except, in the case of clause (ii) or (iii), for such conflicts, breaches, defaults, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to have a material effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

SECTION 4.04    *Adequate Assurance*.  Buyer has the ability to demonstrate to the Bankruptcy Court adequate assurance of future performance under the Purchased Contracts, and

31

shall provide financial information reasonably available to Buyer and testimony that is required by the Bankruptcy Court to demonstrate Buyer's ability to assume, or to take an assignment of, the Purchased Contracts; provided, however, that any such financial information and related testimony and exhibits, other than information that is otherwise publicly available or is ordinarily provided by Buyer to potential contracting parties, shall be distributed subject to appropriate confidentiality arrangements and shall be filed or otherwise introduced in the Bankruptcy Court only under seal.

SECTION 4.05    *Litigation*.  There are no Proceedings to which Buyer is a party pending, or, to the knowledge of Buyer, threatened against Buyer that would affect in any material respect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

SECTION 4.06    *Brokers*.  No broker, finder, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Buyer.

SECTION 4.07    *"AS IS" Sale*BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE 3 ABOVE, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS AND ASSUMED LIABILITIES INCLUDING EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS AND ASSUMED LIABILITIES, THE PHYSICAL CONDITION OF ANY PERSONAL PROPERTY COMPRISING A PART OF THE PURCHASED ASSETS AND ASSUMED LIABILITIES OR WHICH IS THE SUBJECT OF ANY OTHER LEASE OR OTHER CONTRACT TO BE ASSUMED BY BUYER (OR ITS DESIGNEE) AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OR IMPROVEMENTS THAT ARE THE SUBJECT OF ANY REAL PROPERTY LEASE TO BE ASSUMED BY BUYER (OR ITS DESIGNEE) AT THE CLOSING, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF PROPERTY, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS, ASSUMED LIABILITIES OR ANY PORTION THEREOF.  WITHOUT IN ANY WAY LIMITING THE FOREGOING, THE SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS.    SUBJECT TO THE REPRESENTATIONS SET FORTH IN THIS ARTICLE 4, BUYER (OR ITS DESIGNEE) WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS." FURTHERMORE BUYER HEREBY EXPRESSLY ACKNOWLEDGES THAT THE ASSUMPTION AND ASSIGNMENT OF THE PURCHASED ASSETS WILL BE CONSUMMATED IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT NOTWITHSTANDING ANY AND ALL OUTSTANDING DEFAULTS AND

OTHER CLAIMS FOR FAILURES TO COMPLY WITH THE PROVISIONS OF SUCH CONTRACTS, CERTAIN OF WHICH DEFAULTS OR CLAIMS MAY NOT BE SUBJECT TO CURE OR WAIVER.

ARTICLE 5

COVENANTS OF THE SELLER

SECTION 5.01     *Conduct of the Business.*

(a)     Except (x) as consented to by Buyer in writing (which consent shall not be unreasonably withheld, conditioned or delayed), (y) as required or approved by the Bankruptcy Code or any Orders entered by the Bankruptcy Court in the Chapter 11 Cases prior to the date of this Agreement or (z) as set forth on Section 5.01(b) of the Disclosure Schedules, from the date hereof until the Closing Date (or the earlier valid termination of this Agreement pursuant to Article 10), the Seller shall (i) use commercially reasonable efforts to conduct the Business in the Ordinary Course and maintain in all material respects the goodwill associated with the Purchased Assets and the Seller's business relationships with employees, customers, suppliers, vendors, clients, contractors and other Persons in connection with the Purchased Assets (ii) use commercially reasonable efforts to comply in all material respects with all Laws applicable to the Seller and the Business, (iii) keep in full force and effect current insurance policies, (iv) maintain the multi-tenant Google Cloud Platform instance in good working order, and (v) maintain and preserve the Specified IP (as defined in the DIP Credit Agreement), together with all assets, data, source code, pipelines and other information returned by the DIP Lenders to the Seller pursuant to the Final DIP Order (as defined in the DIP Credit Agreement).

(b)     Except as otherwise contemplated by Section 5.01(a), as required by applicable Law or as set forth on Section 5.01(b) of the Disclosure Schedules, without the prior written consent or express prior written direction of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), from the date hereof until the Closing Date (or the earlier valid termination of this Agreement pursuant to Article 10), the Seller shall not:

(i)     fail to maintain the properties and assets included in the Purchased Assets in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear, if applicable;

(ii)     fail to defend and protect the properties and assets included in the Purchased Assets from infringement or usurpation;

(iii)     amend, modify, or terminate any Purchased Contract or enter into any new Contract in respect of the Purchased Assets;

(iv)     subject to available funding under the DIP Facility, fail to perform all of the obligations arising after the Petition Date under all Purchased Contracts;

(v)     fail to maintain the books and records of the Seller in accordance with past practice;

(vi)     fail to comply in all material respects with all Laws applicable to the ownership and use of the Purchased Assets;

(vii)     concede, settle, pay, discharge or satisfy any legal proceedings that would constitute a Purchased Asset or Assumed Liability;

(viii)     (A) sell, transfer, assign, abandon or cancel any Purchased Intellectual Property, (B) intentionally let lapse or fail to renew, continue to prosecute, protect or defend, or otherwise dispose of, any Purchased Intellectual Property (other than expiration of registered Purchased Intellectual Property at the end of its statutory period) or (C) enter into any Contract regarding the license, sublicense, agreement or permission to use any Purchased Intellectual Property that is material to the Business, other than non-exclusive license agreements in the Ordinary Course of Business; or

(ix)     agree or commit to do any of the foregoing.

(c)     Notwithstanding the foregoing, nothing contained in this Agreement is intended to give Buyer, directly or indirectly, the right to control the Seller's operations prior to the Closing Date.

SECTION 5.02     *Access to Information*.  From the date hereof until the Closing Date (or the earlier termination of this Agreement pursuant to Article 10), Buyer and its representatives shall be entitled to have such reasonable access to and make such reasonable investigation and examination of the books and records, properties, assets, operations and personnel of the Seller relating (and solely to the extent relating) to the Purchased Assets and the Assumed Liabilities as Buyer may reasonably request.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and in a manner not to unreasonably interfere with the Business.  The Seller shall use commercially reasonable efforts to cause its representatives to cooperate with Buyer and its representatives in connection with such investigations and examinations.  Notwithstanding the foregoing, the Seller shall not be required to afford such access to the extent that the Seller reasonably believes that doing so would: (A) result in the loss of attorney-client privilege or (B) violate any applicable Law or the terms of any Contract in effect as of the date hereof, provided that in the case of each of subclauses (A) and (B), the Seller shall use its commercially reasonable efforts to allow for such access or disclosure in a manner that does not result in a loss of attorney-client privilege or a violation of applicable Law or such Contract. Any information provided pursuant to this Section 5.02 shall be subject to the confidentiality provisions of the MTPSA.

SECTION 5.03     *Supplements to Schedules*.  Subject to Section 10.01(g), from time to time up to the entry of the Sale Order, the Seller shall promptly supplement or amend the Disclosure Schedules that it has delivered with respect to any matter first existing or occurring following the date hereof that (a) if existing or occurring at or prior to the date hereof, would have been required to be set forth or described in the Disclosure Schedules, or (b) is necessary to correct any information in the Disclosure Schedules that has been rendered inaccurate thereby; provided, in each case, that the disclosure provided in any such supplemented or amended schedule shall in no

way be effective for purposes of the conditions set forth in Article 8 or to cure any breach of representation or warranty that otherwise may have existed hereunder by reason of such matter.

ARTICLE 6

COVENANTS OF BUYER

SECTION 6.01    *Preservation of and Access to Books and Records*.  Until the earlier of (i) the completion of the wind-down of the Seller and (ii) a period of six (6) months following the Closing Date (collectively, the "**Wind Down Period**"), Buyer shall (or shall cause its designee) to provide to the Seller and its Affiliates and representatives (after reasonable advance notice and during regular business hours) reasonable access to, including the right to make copies of, all books and records included in and otherwise related to the Purchased Assets, to the extent reasonably necessary to permit the Seller to (a) facilitate the wind down of the Chapter 11 Cases and consummate a Chapter 11 plan of liquidation, and (b) determine any matter relating to their respective rights and obligations hereunder or to any Proceeding (for example, for purposes of any Tax or accounting audit or any claim or litigation matter) or otherwise related to the Excluded Assets or Excluded Liabilities, for periods prior to the Closing and shall preserve such books and records until the latest of (w) such period as shall be consistent with Buyer's records retention policy in effect from time to time, (x) the retention period required by applicable Law, (y) the conclusion of the Wind Down Period and (z) in the case of books and records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes provided that, Buyer shall not be required to afford such access to the extent that Buyer reasonably believes doing so would (A) result in the loss of attorney-client privilege, (B) violate any applicable Law or Privacy Requirements, or (C) disclose any confidential information or Trade Secrets of the Buyer.  Such access shall include access to any information in electronic form to the extent reasonably available.

SECTION 6.02    *Insurance Matters*.  From and after the Closing, the Purchased Assets, the Assumed Liabilities and the operations and assets and Liabilities in respect thereof, shall cease to be insured by any insurance policies or self-insurance programs maintained by the Seller or any of its Affiliates, and neither Buyer nor its Affiliates shall have any access, right, title or interest to or in any such insurance policies or self-insurance programs (including to all claims and rights to make claims and all rights to proceeds) to cover the Purchased Assets, the Assumed Liabilities or the operations or assets or Liabilities in respect thereof; provided, however, that Buyer (or its designee) shall have the right to make claims and shall have the right to any proceeds with respect to the Purchased Assets or the Assumed Liabilities under any insurance policy for occurrence-based claims pertaining to, arising out of and inuring to the benefit of the Seller for all periods prior to the Closing, and the Seller shall use commercially reasonable efforts to seek the maximum recovery or allow Buyer (or its designee) to seek recovery (including by executing or delivering any document, agreement, instrument or other information as Buyer (or its designee) may reasonably request to seek such recovery) under such insurance policy, in each case, at Buyer's sole cost and expense (including, if and to the extent unpaid and otherwise payable as a result of such recovery, any deductibles, self-insured retentions or other out-of-pocket expenses required to be paid by the Seller or to the insurer in connection therewith), and the Seller shall cooperate with Buyer (or its designee's) reasonable requests if Buyer (or its designee) seeks recovery, with respect to such matters and shall remit (or, at Buyer's request, direct any such insurer to pay directly to Buyer or

its designee) any insurance proceeds actually obtained therefrom (net of the Seller's reasonable and documented out-of-pocket costs and expenses of seeking such recovery, to the extent not otherwise paid or reimbursed by Buyer) to Buyer (or its designee).  Notwithstanding the foregoing, the Seller's obligations under this Section 6.02 shall not restrict or limit its ability to wind-down or otherwise liquidate their estates, in each case, after the Closing, including by confirming and consummating a Chapter 11 plan, or limit their ability to close the Chapter 11 Cases after the Closing.  The Seller's obligations under this Section 6.02 shall terminate upon the Cut-Off Date.

SECTION 6.03    *Availability of Funds*.  Buyer confirms that it will have sufficient funds at the Closing to pay (a) the cash components of the Purchase Price and (b) any other costs, fees and expenses which may be required to be paid by or on behalf of Buyer under this Agreement and the other Transaction Documents.

ARTICLE 7

COVENANTS OF BUYER AND THE SELLER

SECTION 7.01    *Confidentiality*.

(a)    The Seller acknowledges that from and after the Closing, all non-public information relating to the Purchased Assets and the Assumed Liabilities will be valuable and proprietary to Buyer and its Affiliates.  The Seller agrees that, from and after the Closing, unless disclosure is requested or required under applicable Law, the Seller will not, and the Seller will cause its representatives not to, disclose to any Person any confidential information regarding the Purchased Assets or the Assumed Liabilities; provided that (x) confidential information shall not include information that becomes generally available to the public other than through any action by the Seller or its Affiliates in violation this Section 7.01(a) and (y) confidential information may be used by the Seller solely to the extent necessary to defend any claims against the Seller; provided that in the case of clause (y), the Seller shall (i) disclose only that portion of such information which the Seller is advised by its counsel is legally required to be disclosed, (ii) other than in connection with any claims involving Buyer or its Affiliates, cooperate with Buyer (at its expense) to obtain a protective order or other confidential treatment with respect to such information and (iii) other than in connection with any claims involving Buyer or its Affiliates, provide Buyer with a reasonable opportunity to review and comment on such disclosure.

SECTION 7.02    *Further Assurances*.  At and after the Closing, and without further consideration therefor, each of the Seller and Buyer shall execute and deliver such further instruments and certificates (including deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances) and use commercially reasonable efforts to take, or cause to be taken, all actions, and do or cause to be done all things as may be reasonably necessary, to effectuate the purposes and intent of and consummate the transactions contemplated by this Agreement and the other Transaction Documents.

SECTION 7.03    *Certain Efforts*.  Buyer and the Seller shall, and shall cause their respective Affiliates to, use their commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Law to consummate

and make effective the transactions contemplated by this Agreement, including (i) preparing and filing all forms, registrations and notifications to or with any Governmental Authority required to be filed to consummate the transactions contemplated by this Agreement, (ii) using reasonable best efforts to satisfy the conditions to the obligations of the Parties to consummate the transactions contemplated by this Agreement, (iii) using reasonable best efforts to obtain (and to cooperate with each other in obtaining) any consent, authorization, expiration or termination of a waiting period, permit, order or approval of, waiver or any exemption by, any Governmental Authority or any counterparty to any Contract, and (iv) defending, contesting and resolving any lawsuits or other Proceedings, whether judicial or administrative, and whether brought by any Governmental Authority or any private party, challenging this Agreement or the consummation of the transactions contemplated by this Agreement, and initiating litigation or other Proceedings against any such Governmental Authority or private party in connection therewith.

SECTION 7.04    *Public Announcements*.  On and after the date hereof and through the Closing Date, the Parties shall reasonably consult with each other before issuing any press release or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and neither Party shall, except as may be required to comply with applicable Law or by the Bankruptcy Code or any Orders entered by the Bankruptcy Court in the Chapter 11 Cases, issue any press release or make any public statement prior to obtaining, with respect to the Seller, Buyer, and with respect to Buyer, the Seller's, prior written consent (which consent, in each case, shall not be unreasonably withheld, conditioned or delayed).

SECTION 7.05    *Employee Matters*.

(a)    At least five (5) Business Days prior to the Closing, Buyer (or its designee, as applicable) shall make an offer of employment, to commence as of the Closing, to certain Employees and Service Providers who are employed immediately prior to Closing, which shall provide (i) base salary or wage rate and target bonus opportunity (total compensation) at least comparable in the aggregate to the total compensation provided to such employee as of the date hereof; and (ii) health and welfare benefits comparable to the benefits provided to such employee as of the date hereof (each such Employee or Service Provider, an "**Offered Person**").  Each Offered Person who receives and accepts such an offer of employment with Buyer (or its designee) is referred to herein as a "**Transferred Person**", and Buyer (or its designee) shall employ each Transferred Person in accordance with such accepted offer as of the Closing.

(b)    If any Offered Person requires a work permit or employment pass or other legal or regulatory approval for his or her employment with Buyer, its Affiliates (including any designee), Seller shall, and shall cause its controlled Affiliates to, use commercially reasonable efforts to transfer any such permit, pass or other approval to Buyer (or its designee), to the extent permitted by applicable Law and to cooperate with Buyer or its Affiliates (including its designee) with respect to any ongoing approval process.  Notwithstanding the foregoing, to the extent permitted by applicable Law, in the event an applicable work permit, pass or other approval for an Offered Person is not in place with Buyer, its Affiliates (including any designee) as of the Closing, where the Buyer determines in its sole discretion that it is necessary, the parties shall reasonably cooperate to provide for the services of such Offered Person to be made available exclusively to Buyer, its Affiliates (including any designee) for up to 180 days (or such lesser period in which such Offered

37

Person is permitted to work, or greater period as agreed by the Buyer, Seller and Offered Person) through an employee secondment, services or similar arrangement under which Buyer, its Affiliates (or any designee) shall be responsible for all Liabilities in connection with or otherwise related to such individual's employment for such service period until the applicable work permit can be obtained, including (a) all compensation and benefits (including reimbursement for any expenses incurred by such Offered Person and direct and indirect costs associated with providing such compensation and benefits), (b) all applicable fees, Taxes, social or national insurance contributions, unemployment insurance and other amounts owed to any Governmental Authority or other third party in respect of such Offered Person, and (c) all Liabilities related to actions or omissions of such Offered Person; provided, however, that Buyer shall, and shall cause its Affiliates (including any designee) to, continue to use their reasonable best efforts to obtain the applicable work permit, pass or other approval.  Notwithstanding the generality of the foregoing, Buyer (or its designee) assume the immigration rights and Liabilities of the Seller with respect to the Offered Persons, and shall be the successor-in-interest to the Seller's immigration petitions with respect to the Transferred Persons.

(c)    No provision in this Section 7.05 or otherwise in this Agreement, whether express or implied, shall (i) create any third-party beneficiary or other rights in any employee or former employee of the Seller or any of their subsidiaries or Affiliates (including any beneficiary or dependent thereof), any other participant in any Seller Plan or any other Person; (ii) create any rights to continued employment with the Seller, Buyer or any of its subsidiaries, designees or Affiliates or in any way limit the ability of the Seller, Buyer or any of their respective subsidiaries, designees or Affiliates to terminate the employment of any individual at any time and for any reason; or (iii) constitute or be deemed to constitute an amendment to any Seller Plan or any other employee benefit plan, program, policy, agreement or arrangement sponsored or maintained by the Seller, Buyer or any of its subsidiaries or Affiliates.

. All Transfer Taxes required to be paid under applicable Law in connection with the transfer of the Purchased Assets to Buyer (or its designee) pursuant to this Agreement will be timely paid by Buyer (or its designee).  To the extent the Seller is required by applicable Law to pay any such Transfer Taxes, Buyer shall indemnify the Seller against and reimburse the Seller in full for the amount of such Transfer Taxes within 10 Business Days after Seller's prior written demand therefor.  Buyer shall timely file all Tax Returns related to any such Transfer Taxes required to be filed under applicable Law, and the Seller shall cooperate as and to the extent reasonably requested by Buyer in connection with preparing and filing any such Tax Returns, including joining in the execution of such Tax Returns to the extent required by applicable Law or obtaining any exemption from or reduction in any such Transfer Taxes.

SECTION 7.07    *Misallocated Assets*.  If, following the Closing, Buyer (or its designee) or its Affiliates own or hold any Excluded Asset (including by having an Excluded Asset located at any Leased Real Property that is or will be owned or leased by Buyer (or its designee) or any of its Affiliates), Buyer shall transfer, or shall cause its Affiliate to transfer, at no cost to the Seller, such Excluded Asset as soon as practicable to the Seller.  If, following the Closing, the Seller or any of its Affiliates own any Purchased Asset, the Seller shall transfer, or shall cause its Affiliates to transfer, such Purchased Asset as soon as practicable to Buyer or an Affiliate designated by Buyer.

SECTION 7.08   *Payments from Third Parties after Closing*.  In the event that the Seller receives any payment from a third party (other than Buyer, its designee, or any of its Affiliates) after the Closing Date pursuant to any of the Purchased Contracts (or with respect to the operation by Buyer of the business of the Seller or any Purchased Asset during the post-Closing period) and to the extent such payment is not made in connection with an Excluded Asset or an Excluded Liability, the Seller shall forward such payment, as promptly as practicable but in any event within thirty (30) days after such receipt, to Buyer (or other entity nominated by Buyer in writing to the Seller) and notify such third party to remit all future payments (in each case, to the extent such payment is in respect of any post-Closing period with respect to the business of the Seller and is not in respect of an Excluded Asset or an Excluded Liability) pursuant to the Purchased Contracts to Buyer (or such other entity).  Notwithstanding anything to the contrary in this Agreement, in the event that Buyer, any of its Affiliates (including any designee) receives any payment from a third party after the Closing on account of, or in connection with, any Excluded Asset, Buyer shall forward such payment, as promptly as practicable but in any event within thirty (30) days after such receipt, to the Seller (or other entity nominated by the Seller in writing to Buyer) and notify such third party to remit all future payments on account of or in connection with the Excluded Assets to the Seller (or such other entity as the Seller may designate).

SECTION 7.09   *Bulk Transfer Laws*.  The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any security interests in the Purchased Assets, including any liens or claims arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.  In furtherance of the foregoing, each Party hereby waives compliance by the Parties with "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

SECTION 7.10   *Bankruptcy Court Approval*.  The Seller and Buyer shall cooperate to obtain the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as reasonably practicable, including furnishing affidavits, non-confidential financial information, or other documents or information for filing with the Bankruptcy Court and making such advisors of the Seller and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing adequate assurances of performance by Buyer as required under Section 365 of the Bankruptcy Code, and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and that no cause exists to prevent Buyer from credit bidding under Section 363(k) of the Bankruptcy Code. The Seller and Buyer acknowledge that in order to obtain such approval the Seller must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets and that such demonstration shall include serving notice of the transactions contemplated by this Agreement to creditors and interested parties as ordered by the Bankruptcy Court.

(a)      Each of the Seller and Buyer shall appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and keep the other Party reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other Party with copies of notices or other communications received by

such Party from the Bankruptcy Court or any third party or any Governmental Authority with respect to the transactions contemplated by this Agreement.

(b)     Subject to entry of the Sale Order and consummation of the Closing, Buyer (or its designee) shall, promptly following the Closing Date, pay the undisputed Cure Costs (other than Excluded Cure Costs) and cure any and all other defaults and breaches under the Purchased Contracts in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement.

(c)     The Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by the Seller of this Agreement, (B) the sale of the Purchased Assets to Buyer (or its designee) on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances) and (C) the performance by the Seller of its obligations under this Agreement, (ii) authorize and empower the Seller to assume and assign to Buyer (or its designee) the Purchased Contracts, (iii) find that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, (iv) find that Buyer is not a successor to the Seller and grant Buyer the protections of Section 363(m) of the Bankruptcy Code, (v) find that Buyer (and its designee) shall have no Liability or responsibility for any Liability or other obligation of the Seller arising under or related to the Purchased Assets other than as expressly set forth in this Agreement or as required under applicable nonbankruptcy Law, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (vi) find that Buyer has provided adequate assurance (as that term is used in Section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Purchased Contracts and (vii) find that Buyer (and its designee) shall have no Liability for any Excluded Liability.  Without limiting the Seller's obligation to take all such actions as are reasonably necessary to obtain Bankruptcy Court approval of the Sale Order, Buyer agrees that it will promptly take reasonable actions to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.  Nothing in this Agreement shall require Buyer, the Seller or its Affiliates to give testimony to or submit any pleading, affidavit or information to the Bankruptcy Court or any Person that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or their respective stakeholders.

(d)     The Seller acknowledges and agrees, and the Sale Order shall provide that, except as otherwise provided in Section 2.03, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances of, against or created by the Seller or its bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Purchased Assets, with such Liabilities and Encumbrances attaching to the proceeds paid for the Purchased Assets with the same enforceability and priority as existed immediately prior to the sale of the Purchased Assets. On the Closing Date, the Purchased Assets shall be transferred to Buyer free and clear of all

obligations, Liabilities and Encumbrances, other than Permitted Encumbrances and the Assumed Liabilities to the fullest extent permitted by Section 363 of the Bankruptcy Code.

(e)    In the event the entry of the Bid Procedures Order, the Sale Order or any other Orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bid Procedures Order, the Sale Order or other such Order), the Seller shall use commercially reasonable efforts to defend such appeal.  The Seller shall comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure or (ii) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

(f)    Notwithstanding anything contained herein to the contrary, following the deadline for the making of bids set forth in the Bid Procedures Order and during the pendency of the Chapter 11 Cases, the Seller shall not reject or transfer any Excluded Contract without first obtaining Buyer prior written consent.  In the event that any of the Parties discovers a Contract related to the business of the Seller and its Subsidiaries, the Purchased Assets or the Assumed Liabilities (whether prior to, on or following the Closing) and such Contract (i) was not set forth on Section 2.01(a) to this Agreement, (ii) is a Contract which Buyer wishes to assume the rights and obligations of and (iii) has not been rejected by the Seller (with Buyer's prior written consent in compliance with the immediately preceding sentence), Buyer and the Seller shall execute, acknowledge and deliver such other instruments and take such further actions as are reasonably practicable for Buyer to assume the rights and obligations under such Contract as of the Closing (or, if applicable, as soon as reasonably practicable following the Closing), otherwise in accordance with Section 2.05.  For the avoidance of doubt, Buyer acknowledges that certain Contracts may have been rejected by the Seller in the Chapter 11 Cases before the Seller's entry into this Agreement, and such action shall not be a breach of this Agreement.

SECTION 7.11    *No Successor Liability*.  The Parties intend that, to the fullest extent permitted by applicable Law (including under Section 363 of the Bankruptcy Code), upon the Closing, neither Buyer (nor its designee) shall be deemed to: (a) be the successor of the Seller, (b) have, de facto or otherwise, merged with or into the Seller, (c) be a mere continuation or substantial continuation of the Seller or the enterprise(s) of the Seller or (d) be liable or have any Liability for any acts or omissions of the Seller in the conduct of the Business or arising under or related to the Purchased Assets other than as expressly set forth and agreed in this Agreement.  Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, the Parties intend that Buyer shall have no Liability for any Encumbrance (other than the Assumed Liabilities and Permitted Encumbrances on the Purchased Assets) against the Seller or any of the Seller's predecessors or Affiliates, and neither Buyer nor its designee shall have any successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or in connection with the transactions contemplated to occur on the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the business of the Seller, the Purchased Assets or any Liability of the Seller arising prior to, or relating to any period occurring prior to, the Closing Date. The Parties agree that the Sale Order shall contain provisions substantially in the form set forth in this Section 7.11.

SECTION 7.12   *Communications with Customers and Suppliers*.  Prior to the Closing, the Parties shall reasonably cooperate with each other in coordinating their communications with any material contractual counterparty of the Seller in relation to this Agreement and the transactions contemplated hereby.

SECTION 7.13   *Investigation*.  Buyer acknowledges that it has conducted its own independent investigation and analysis of the business, operations, assets, liabilities, results of operations, condition (financial or otherwise) and prospects of the Business and the Purchased Assets, and that Buyer and its representatives have received access to certain of the books and records, facilities, equipment, Contracts and other assets of the Business (including the Purchased Assets) for such purpose.  Buyer acknowledges and agrees that, except for the representations and warranties contained in Article 3 and any certificate delivered pursuant to Section 8.02(c), neither the Seller nor any of its Affiliates makes or has made any representation or warranty, either express or implied, or other statements or information concerning the Business or the Purchased Assets in connection with the transactions contemplated by this Agreement.  Notwithstanding the foregoing, nothing in this Section 7.13 shall limit or alter the rights of Buyer under any other agreement with the Seller, including the DIP Credit Agreement and the DIP Facility.

SECTION 7.14   *Releases.*  Effective as of the Closing the Seller hereby irrevocably, knowingly, and voluntarily releases, discharges, and forever waives and relinquishes all claims, demands, Liabilities, losses, debts, costs, fees, expenses, penalties, actions, covenants, suits, judgments, damages, defenses, affirmative defenses, setoffs, counterclaims, actions, obligations, and causes of action of whatever kind, character or nature, whether known or unknown, suspected or unsuspected, in contract, contingent or absolute, matured or unmatured, liquidated or unliquidated, direct or indirect, at Law or in equity, derivative or otherwise, which the Seller has, may have, or may assert now or in the future against Buyer arising out of, based upon, or resulting from any Contract, transaction, event, circumstance, action, failure to act, occurrence, or omission of any sort or type, whether known or unknown, and which occurred, existed, was taken, permitted or begun prior to the Closing or otherwise*,* except for claims arising out of this Agreement.

## ARTICLE 8

## CONDITIONS TO CLOSING

SECTION 8.01   *Conditions to Obligations of Buyer and the Seller*.  The obligations of each of Buyer and the Seller to consummate the Closing are subject to the satisfaction or valid waiver at or prior to the Closing of the following conditions:

(a)   no provision of any applicable Law and no judgment, injunction or Order shall then be in effect prohibiting or making illegal the consummation of the Closing; and

(b)   the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a Final Order.

SECTION 8.02    *Conditions to Obligation of Buyer*.   The obligation of Buyer to consummate the Closing is subject to the satisfaction (or valid waiver) at or prior to the Closing of the following further conditions:

(a)    (i) the representations and warranties of the Seller in this Agreement (other than the Fundamental Representations) shall be true and correct on the date hereof and on and as of the Closing, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date), except where the failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality," "material adverse effect," "Material Adverse Effect" or similar qualifiers contained therein), has not had or would not reasonably be expected to have a Material Adverse Effect and (ii) the Fundamental Representations shall be true and correct in all respects (other than *de minimis* inaccuracies) on the date hereof and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date);

(b)    the covenants and agreements that the Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects;

(c)    the Seller shall have delivered, or cause to be delivered, to Buyer each item set forth in Section 2.08(a);

(d)    no less than seventy percent (70%) of the Offered Persons shall have accepted an offer of employment by Buyer (or its designee) and shall have become Transferred Persons;

(e)    if requested in writing by Buyer prior to the Closing, the Seller shall have delivered to the Buyer a report commissioned on or after August 8, 2024 by the Seller from Black Duck Software with respect to a review of the Source Code contained in or distributed with software included in the Purchased Assets, which report shall be at Buyer's sole cost and expense; and

(f)    the Seller shall remove and purge from its multi-tenant platform any Personally Identifiable Information, other than Personally Identifiable Information pertaining to customers of the Buyer or its Affiliates and otherwise ensure that the Purchased Assets do not include such information.

SECTION 8.03    *Conditions to Obligation of the Seller*.   The obligation of the Seller to consummate the Closing is subject to the satisfaction (or valid waiver) at or prior to the Closing of the following further conditions:

(a)    the representations and warranties of Buyer in this Agreement shall be true and correct on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct (without giving effect to any limitation as to "materiality," "material adverse effect" or similar qualifiers contained therein) in

all respects as of such earlier date, except where such failures to be true and correct would not materially impair or prevent Buyer's ability to consummate the transactions contemplated by this Agreement;

(b)     the covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects; and

(c)     Buyer shall have delivered, or cause to be delivered, to the Seller each item set forth in Section 2.08(b).

ARTICLE 9

SURVIVAL

SECTION 9.01     *Survival*.   The Parties, expressly intending to modify any applicable statute of limitations, agree that (a)(i) the representations and warranties in this Agreement and in any certificate delivered pursuant hereto and (ii) the covenants in this Agreement only requiring performance prior to the Closing shall, in each case, terminate and be of no further force and effect effective as of the Closing and shall not survive the Closing for any purpose, and thereafter there shall be no Liability on the part of, nor shall any claim be made by or on behalf of, any Party or any Party's Affiliates in respect thereof and (b) the covenants in this Agreement that contemplate performance at or after the Closing or expressly by their terms survive the Closing shall survive the Closing in accordance with their respective terms (the "**Surviving Post-Closing Covenants**") until the earlier of (i) full performance of such covenant in accordance with its terms and (ii) three (3) years following the Closing Date.  Except with respect to the Surviving Post-Closing Covenants, no other remedy shall be asserted or sought by Buyer, and Buyer shall cause its Affiliates not to assert or seek any other remedy, against the Seller or any of its Affiliates under any contract, misrepresentation, tort, strict liability, or statutory or regulatory Law or theory or otherwise, all such remedies being hereby knowingly and expressly waived and relinquished to the fullest extent permitted under applicable Law. Buyer and the Seller acknowledge and agree, on their own behalf and on behalf of their Affiliates that the agreements contained in this Section 9.01 are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this Section 9.01, none of the Parties would enter into this Agreement.

ARTICLE 10

TERMINATION

SECTION 10.01   *Grounds for Termination*.   This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written agreement of the Seller and Buyer;

(b)     by either the Seller or Buyer, if the Closing shall not have been consummated on or before August 31, 2024 (the "**End Date**"); provided, however, the Seller and Buyer may, by

mutual written agreement, extend the End Date for a maximum of sixty (60) days following the End Date (a "**Renewal Period**") and such date, as so extended, shall be deemed the End Date, *provided* that any such extension shall also require the consent of the Committee;

(c)    by the Seller, if the Seller is not then in material breach of its obligations under this Agreement and Buyer breaches or fails to perform any of its representations, warranties, covenants or agreements contained in this Agreement and such breach or failure to perform (i) would prevent the satisfaction of a condition set forth in <u>Section 8.01</u> or <u>Section 8.03</u>, (ii) cannot be, or has not been, cured within ten (10) days following delivery of written notice to Buyer of such breach or failure to perform and (iii) has not been waived by the Seller;

(d)    by Buyer, if Buyer is not then in material breach of its obligations under this Agreement and the Seller breaches or fails to perform any of its representations, warranties, covenants or agreements contained in this Agreement and such breach or failure to perform (i) would prevent the satisfaction of a condition set forth in <u>Section 8.01</u> or <u>Section 8.02</u>, (ii) cannot be, or has not been, cured within ten (10) days following delivery of written notice to the Seller of such breach or failure to perform and (iii) has not been waived by Buyer;

(e)    by either Buyer or the Seller, (i) if the Bankruptcy Court enters an Order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the cases commenced by the Seller under Chapter 11 of the Bankruptcy Code and comprising part of the Chapter 11 Cases, (ii) if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Seller is appointed in the Chapter 11 Cases or (iii) an Order or dismissal, conversion or appointment is entered with respect to the Chapter 11 Cases for any reason and not reversed or vacated within fourteen (14) days after entry thereof;

(f)    by Buyer or the Seller, if any Governmental Authority issues any Order permanently enjoining or otherwise permanently prohibiting the transactions contemplated by this Agreement and such Order shall have become final and non-appealable; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 10.01(f)</u> shall not be available to a Party that failed to use its reasonable best efforts to contest, resolve or lift such Order; <u>provided</u>, <u>further</u>, that the right to terminate this Agreement under this <u>Section 10.01(f)</u> shall not be available to any Party if such Order was primarily caused by (i) such Party's material breach of any provision of this Agreement or (ii) such Party's failure to comply in any material respect with its obligations hereunder;

(g)    by Buyer if, pursuant to Section 5.03, Seller amends or supplements the Disclosure Schedules (or any part thereof) in a manner that, in the reasonable opinion of the Buyer, has or would have a Material Adverse Effect on the Buyer, the Business, the Purchased Assets, the Assumed Liabilities or the transactions set forth in this Agreement.

(h)    if the DIP Facility is accelerated or matures and the Required Lenders or the Agent (each as defined in the DIP Credit Agreement) exercise remedies provided thereunder; or

(i)    by either Buyer or the Seller, if an Order of the Bankruptcy Court is entered denying approval of the Sale Order.

The Party desiring to terminate this Agreement pursuant to this Section 10.01 (other than pursuant to Section 10.01(a)) shall give written notice of such termination to the other Party in accordance with Section 11.01. For the avoidance of doubt, each condition permitting termination of this Agreement set forth in this Section 10.01 shall be considered separate and distinct from each other such condition and, if more than one termination condition set forth in this Section 10.01 is applicable, the Party exercising any such termination right shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

SECTION 10.02  *Effect of Termination*.  If this Agreement is terminated as permitted by Section 10.01, (i) this Agreement shall become null and void and of no further force and except, except for the provisions of this Section 10.02, Section 10.03 and Article 11 (other than Section 11.08), which shall survive such termination of this Agreement and (ii) no Party (nor any stockholder, director, officer, employee, agent, consultant or representative of any such Party) shall thereafter have any Liability hereunder; provided that nothing in this Section 10.02 shall be deemed to release any Party from any Liability (x) for any willful and material breach of this Agreement occurring prior to its termination and (y) that may otherwise be provided in, or contemplated by, the provisions of Section 7.01.

SECTION 10.03  *Costs and Expenses*.  Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated by this Agreement are consummated, all costs and expenses incurred in connection with this Agreement shall be paid by the Party incurring such cost or expense.

ARTICLE 11

MISCELLANEOUS

SECTION 11.01  *Notices*.  All notices, requests and other communications to any Party hereunder shall be in writing and shall be delivered to the addresses set forth below (or pursuant to such other address(es) as may be designated in writing by the Party to receive such notice):

if to Buyer:

> 1 Woolworths Way
> Bella Vista NSW 2153
> Attention: Chris Mills and Jade Droguett
> Email:   cjmills@woolworths.com.au;   jdroguett@woolworths.com.au;   and legalnotices@woolworths.com.au

with a copy, which shall not constitute notice, to:

> Jones Day
> 555 S. Flower St., 50th Floor
> Los Angeles, CA  90071
> Attention:  Joshua M. Mester and Kathryn Sutherland-Smith
> Email:  jmester@jonesday.com; ksutherlandsmith@jonesday.com

46

if to the Seller, to:

> Takeoff Technologies, Inc.
> 203 Crescent St.
> Waltham, MA  02453
> Attention: Heather Carroll
> Email: Heather.Carroll@takeoff.com

with a copy, which shall not constitute notice, to:

> Sheppard Mullin Richter & Hampton, LLP
> 321 North Clark Street, 32nd Floor
> Chicago, IL 60654
> Attention: Justin R. Bernbrock, P.C.; Daniel Belzer; and Robert B. McLellarn
> Email:    JBernbrock@sheppardmullin.com;    DBelzer@sheppardmullin.com;
> RMcLellarn@sheppardmullin.com

All such notices, requests and other communications shall be deemed received (a) if delivered prior to 5:00 p.m. New York time on a day which is a Business Day, then on such date of delivery if delivered personally, or, if by email, upon written confirmation of delivery by email (which may be electronic), and if delivered after 5:00 p.m. New York time (whether personally or by email) then on the next succeeding Business Day, (b) on the first (1st) Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier or (c) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.

SECTION 11.02  *Amendments and Waivers*.

(a)    Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by Buyer and the Seller or, in the case of a waiver, by the Party against whom the waiver is to be effective. For clarity, Bankruptcy Court approval shall not be required for any amendment to this Agreement, except in the case of a material amendment.  The Committee shall be provided with prior written notice of any amendment to this Agreement.

(b)    No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law.

SECTION 11.03  *Successors, Assigns and Designees*.  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns; provided that Seller may not assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of Buyer.  Buyer may

assign, delegate or otherwise transfer, in whole or in part, this Agreement and any of its rights and obligations hereunder to one or more designees or Affiliates without the prior written consent of the Seller, and any reference to Buyer in this Agreement shall also be deemed a reference to its designees or Affiliates, except where in the context of this Agreement such use would not be appropriate; <u>provided that</u> no such assignment will relieve the Buyer of any of its obligations under this Agreement.  Any attempted assignment in violation of this <u>Section 11.03</u> shall be null and void, *ab initio*.

SECTION 11.04  *Governing Law*.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware, without regard to the conflicts of law rules of such State.

SECTION 11.05  *Jurisdiction*.  The Parties agree that, during the period from the date hereof until the date on which the Chapter 11 Cases are closed or dismissed (the "**Bankruptcy Period**"), any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court.  The Parties further agree that, following the Bankruptcy Period, any Proceeding with respect to this Agreement or the transactions contemplated hereby shall be brought against any of the Parties exclusively in either the United States District Court for the District of Delaware or any state court of the State of Delaware located in such district, and each of the Parties hereby irrevocably consents to the jurisdiction of such court and the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such Proceeding (including any Proceeding) and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding (including any Proceeding) in such courts or that any such Proceeding (including any Proceeding) which is brought in such courts has been brought in an inconvenient forum.  Process in any such Proceeding (including any Proceeding) may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court, the United States District Court for the District of Delaware or any state court of the State of Delaware.  Without limiting the foregoing, each Party agrees that service of process on such Party in the manner as provided in <u>Section 11.01</u> for notices shall be deemed effective service of process on such Party.

SECTION 11.06  *WAIVER OF JURY TRIAL*.  TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HEREBY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSES OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT OR THE SUBJECT MATTER HEREOF OR THEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE.  ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 11.06</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

SECTION 11.07 *Counterparts; Third-Party Beneficiaries*.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  This Agreement shall become effective when each Party shall have received a counterpart hereof signed by the other Party.  No other provision of this Agreement is intended to confer upon any Person other than the Parties any rights, benefits, Proceedings or remedies hereunder.  Delivery of a .pdf version (or other electronic means) of one or more signatures to this Agreement shall be deemed adequate delivery for purposes of this Agreement.

SECTION 11.08 *Specific Performance*.  It is understood and agreed by the Parties that money damages (even if available) would not be a sufficient remedy for any breach of this Agreement by the Seller or Buyer and as a consequence thereof, after the Bankruptcy Court's entry of the Sale Order, the Seller and Buyer shall each be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach or threatened breach in addition to any other remedy to which such Party may be entitled in Law or in equity, including an Order of the Bankruptcy Court or other court of competent jurisdiction requiring Buyer or the Seller, as may be applicable, to comply promptly with any of their obligations hereunder.  Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that the other Party has an adequate remedy at Law or that any award of specific performance is not an appropriate remedy for any reason at Law or in equity.  Any Party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with such Order.

SECTION 11.09 *Entire Agreement*.  This Agreement and the other Transaction Documents (together with the Schedules and Exhibits hereto and thereto) constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the Parties with respect to such subject matter.  No Party to this Agreement shall be liable or bound to any other Party in any manner by any representations, warranties, covenants or agreements relating to such subject matter except as specifically set forth herein and therein.  In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

SECTION 11.10 *No Strict Construction*.  Buyer and the Seller participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer and the Seller and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

SECTION 11.11  *Severability*.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transaction contemplated hereby be consummated as originally contemplated to the fullest extent possible.

SECTION 11.12  *Disclosure Schedules*.  The representations and warranties of the Seller set forth in this Agreement are made and given subject to the disclosures in the Disclosure Schedules.  Except where expressly stated in the Disclosure Schedules, inclusion of information in the Disclosure Schedules will not be construed as an admission that such information is material to the business, operations of condition (financial or otherwise) of the Seller or its business, in whole or in part, or as an admission of Liability or obligation of the Seller to any Person.  The sections of the Disclosure Schedules have been organized for purposes of convenience in numbered sections corresponding to the sections in this Agreement; provided, however, that any disclosure in any section of the Disclosure Schedules will apply to and will be deemed to be disclosed with respect to any other representation and warranty, so long as the applicability of such disclosure is reasonably apparent on its face to a reader previously unfamiliar with the matter in question that such disclosure is applicable to (without reference to any additional information, investigation or documentation).  It is understood and agreed that the specification of any dollar amount in the representations and warranties or covenants contained in this Agreement or the inclusion of any specific item in the Disclosure Schedules is not intended to imply that such amounts or higher or lower amounts, or the items so included or other items, are or are not material, and no Party or other Person shall use the fact of the setting of such amounts or the fact of the inclusion of any such item in the Disclosure Schedules in any dispute or controversy as to whether any obligation, item or matter not described in this Agreement or included in the Disclosure Schedules is or is not material for purposes of this Agreement.  Nothing in this Agreement (including the Disclosure Schedules) shall be deemed an admission by either Party or any of its Affiliates, in any Proceedings, that such Party or any such Affiliate, or any third party, is or is not in breach or violation of, or in default in, the performance or observance of any term or provisions of any Contract or Law. The Disclosure Schedules and the information and disclosures contained therein are intended only to modify the representations or warranties of the Seller contained in this Agreement.  Where the terms of a contract or document have been summarized or described in the Disclosure Schedules, such summary or description does not purport to be a complete statement of the material terms of such contract or document, and all such summaries and descriptions are qualified in their entirety by reference to the contract or document being summarized or described to the extent such contract or other document has been made available to Buyer prior to the date hereof.

SECTION 11.13  *No Recourse*.  Notwithstanding anything in this Agreement or in any other Transaction Document, the Parties hereby acknowledge and agree that, except to the extent a Person is a named party to this Agreement, no Person, including any current, former or future director, officer, employee, incorporator, member, manager, director, partner, investor, shareholder, agent, representative, or Affiliate of any, shall have any liability to the other Party, and each Party

shall have no recourse against, any Person other than the other Party in connection with any liability, claim or cause of action arising out of, or in relation to, this Agreement, any other Transaction Document or the transactions contemplated hereby and thereby, whether pursuant to any attempt to pierce the corporate veil, any claims for fraud, negligence or misconduct or any other claims otherwise available or asserted at law or in equity.

(Signature Pages Follow)

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

<u>**SELLER**</u>

**TAKEOFF TECHNOLOGIES, INC.**

By:_____
Name:
Title:

**<u>BUYER</u>**

**WOOLWORTHS GROUP LIMITED**

By: _____
Name:
Title:

**Schedule 2.01(a)**

**Purchased Contracts**

1. Google Cloud Reseller Contract, dated December 20, 2021, by and between DoiT International USA, Inc. and Takeoff Technologies Inc. as amended from time to time (with such further amendments as are acceptable to the Buyer and DoiT)

2. DoiT International Contract, dated October 6, 2023, by and between DoiT International USA, Inc. and Takeoff Technologies Inc. as amended from time to time (with such further amendments as are acceptable to the Buyer and DoiT)

3. Order form for Quote # Q-794108, dated February 20, 2024, between JAMF Software, LLC and Takeoff Technologies Inc.

4. Global Master Services Agreement, dated May 15, 2020, by and between ADP International Services B.V. and Takeoff Technologies Inc., as supplemented by that certain Annualized Client Proposed Pricing Agreement, dated April 21, 2023.

5. Ordering Document between dated February 10, 2022, by and between Oracle America Inc. and Takeoff Technologies, Inc.

6. Purchase Order PO-370 dated May 31, 2024, by and between Peak Technologies LLC and Takeoff Technologies, Inc.

7. Purchase Order PO-371 dated May 31, 2024, by and between Peak Technologies LLC and Takeoff Technologies Inc.

8. Master Subscription Agreement with Zendesk

9. Service Order for Service Order Reference No: 10212022-01 dated October 21, 2022 by and between FireHydrant Enterprise and Takeoff Technologies, Inc.

10. Subscription Agreement with JetBrains Americas Inc.

11. Order Form for Quote Q-736686 dated November 17, 2023 by and between Okta, Inc. and Takeoff Technologies, Inc.

12. Subscription Agreement with OpsGenie

13. Order Form Primary Quote Q-118370 dated January 31, 2023, by and between Slack Technologies, LLC and Takeoff Technologies, Inc.

14. Subscription Agreement with 1Password

15. Subscription Agreement with Atlassian Software.

16. Subscription Agreement with Idera, Inc. (Gurock Software GmbH) software.

17. Subscription Agreement with Rockwell Automation.

18. Subscription Agreement with Microsoft.

19. Subscription Agreement with Github.com.

20. Subscription Agreement with Lucid Software, Inc.

21. Subscription Agreement with PC Connection Sales Corp.

22. Subscription Agreement with ThousandEyes.

23. Subscription Agreement with Postman.

24. Subscription Agreement with Adobe.

25. Subscription Agreement with Metabase.

26. Subscription Agreement with Cloudbakers, LLC.

27. Purchase Agreement, dated March 7, 2018, by and between Bar Code Direct, Inc. and Takeoff Technologies, Inc.

28. Subscription Agreement with Elasticsearch

29. Master Subscription Agreement by and between Fiix Inc. and Takeoff Technologies, Inc.

30. Order Form number OF0000043165 dated September 7, 2023 by and between RealtimeBoard Inc., dba Miro and Takeoff Technologies, Inc.

31. Technology and Platform Services Agreement dated as of September 27, 2023 by and between Takeoff Technologies, Inc., and Woolworths Group Limited and all associated statements of work.

32. Intellectual Property License and Services Agreement dated 6 June 2024 by and between Takeoff Technologies, Inc., and Woolworths Group Limited.

33. Intellectual Property Sublicense Agreement dated 6 June 2024 by and between Takeoff Technologies, Inc., and Woolworths Group Limited.