IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TAKEOFF TECHNOLOGIES, INC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-11106 (CTG)<br><br>(Jointly Administered) |

**RENEWED MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER CONVERTING THE DEBTORS' CHAPTER 11 CASES TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its undersigned counsel, Eversheds Sutherland (US) LLP and Ashby & Geddes, P.A., hereby submits to this Court its emergency motion (the "Motion") requesting that the Court enter an order converting the Debtors' Chapter 11 Cases (as defined below) to cases under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") and, as grounds therefor, respectfully represents as follows:

**PRELIMINARY STATEMENT[2]**

1. Just over three months ago, the Committee moved to convert the Debtors' chapter 11 cases (the "Chapter 11 Cases") to cases under chapter 7 of the Bankruptcy Code [D.I. 147] (the "First Conversion Motion") based on the belief, which was ultimately proven through the course of these cases, that the Debtors' reorganization strategy would strip value from the estates for the sole benefit of certain of the Debtors' favored customers, to the detriment of all other creditors. The Committee withdrew the First Conversion Motion after reaching what it believed was a

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, as applicable, are: Takeoff Technologies, Inc. (0552); Takeoff Technologies Canada, Inc.; Takeoff Technologies Australia Pty Ltd. (ACN 639 288 958); Takeoff Technologies FZE; Takeoff International Subco India Private Limited.; and Takeoff International Subco, LLC. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 203 Crescent Street, Suite 203, Waltham, Massachusetts 02453.

[2] Capitalized terms used but not otherwise defined in the Preliminary Statement shall have the meanings ascribed to them herein.

51720454.19

comprehensive settlement that could preserve meaningful value for general unsecured claimants and other parties in interest.

2. After learning that the financial representations and covenants upon which that settlement was premised were false, the Committee finds itself right back where it started (directionally, but unfortunately not economically)—convinced that a liquidation of the Debtors' estates in chapter 7 is the only way to prevent further hemorrhaging of value from the Debtors' estates and preserve what little of the Debtors' value remains for the benefit of creditors.

3. From the outset of the Chapter 11 Cases, the Debtors have pursued a reorganization strategy that prioritized the interests of its top customers, who also served as DIP Lenders, at the expense of all other creditors. As a cornerstone of this strategy, the Debtors initially sought Court approval of a DIP Financing facility that not only encumbered the previously unencumbered Estate assets with a $10 million secured DIP loan but also handed the Estates' most valuable assets to the DIP Lenders without adequate consideration. The terms of the Original DIP Financing so egregiously stripped the Estates of their key assets that, after the Committee objected, the Court denied final approval of the Original DIP Financing from the bench before the Debtors could even commence their case in support of it. The Debtors later proposed amended DIP Financing terms that, though improved, continued to undermine unsecured creditors' interests in favor of the DIP Lenders.

4. Eventually the Debtors, the Committee, and the DIP Lenders reached an eleventh-hour settlement intended to preserve enough value for Estate creditors to marginally warrant the Debtors' continued Chapter 11 Cases. That settlement, however, was negotiated based on incomplete and inaccurate information. The Committee has recently discovered that the budget upon which the settlement was premised inexplicably omitted ***over $732,000*** of pre-closing expenses—all or most of which were fully known to and anticipated by the Debtors when the settlement was negotiated.

2

51720454.19

5. If this weren't bad enough, the Debtors' post-closing "winddown" costs—which were advertised at the time of settlement as minimal and largely consisting of budgeted and capped professional fees—have turned into a massive expenditure estimated at over $1 million. Nearly $600,000 of those winddown costs *were not disclosed* in settlement negotiations. Just the **undisclosed** portion of the Debtors' pre-Closing and winddown costs, together, will claim **over $1.3 million**[3]— ***i.e., more than half of the $2.5 million of unencumbered cash set aside under the settlement***.

6. The months spent in chapter 11 have only damaged, not enhanced, the value of the Debtors' Estates. The Debtors' assets were sold to one of the DIP Lenders for a mere $4,387,764.67—less than half the total DIP Financing authorized to bridge to the sale! This left the Estates with significant unpaid secured DIP Financing obligations[4]—obligations that the Estates should never have incurred and could have avoided had the cases been properly filed under chapter 7, or converted at the outset.

7. Additional time in chapter 11 will not enhance the value of Estate assets or provide for a more effective winddown of the Estates. To date, the Debtors have been wholly ineffective stewards in this regard. Not only have the Debtors prioritized the DIP Lenders' interests at the expense of all other parties, the Debtors also have proven unable (or unwilling) to manage the costs of continuing the Chapter 11 Cases. For example, the Debtors did not adequately plan for the termination of non-essential employees on the closing date of the sale, resulting in the incurrence of ***hundreds of thousands of dollars*** in unnecessary Estate expenses by continuing to employ those

---

[3] Specifically, the undisclosed but known or easily predictable pre-closing and winddown costs total $1,332,521, and consist of employee costs ($249,200), operating expenses ($483,521), and winddown costs ($599,800) that the Debtors could have anticipated at the time of the settlement. This amount *does not* include employee retention bonuses ($309,000) and priority tax claims ($21,000), of which the Committee was made aware during settlement negotiations, or operating expenses that the Debtors could not have anticipated during settlement negotiations ($79,479). When all disclosed and undisclosed pre-Closing and winddown expenses are added together, they total $1,742,000.

[4] The other DIP Lenders recently sent a letter to Debtors' counsel declaring an event of default under the DIP Financing, and demanding payment of all remaining DIP Financing obligations and turnover of post-Closing cash as alleged cash collateral. *See* Letter from DIP Lenders (W. Marcari and N. Brannick, counsel) to Debtors (J. Bernbrock, counsel, and B. Anderson, Deputy CRO) (Sept. 30, 2024), attached hereto as **Exhibit H**.

3

individuals for nearly a week after closing. As an additional example, the Debtors omitted $341,000 of pre-closing recurring monthly charges to a cloud services vendor (DoiT) from their budget, on which the Committee relied when negotiating the settlement, despite the Debtors' obvious awareness of this obligation.

8. The information the Debtors provided to the Committee (and the Court) has repeatedly been incomplete, at best, and inaccurate or misleading, at worst, hindering the Committee's ability to make informed strategic decisions. If the Debtors had disclosed to the Committee an accurate picture of their anticipated pre-closing and winddown financial obligations, the Committee would have continued to push for conversion months ago and preserved significant value for creditors. Given the Debtors' many missteps and oversteps in these Chapter 11 Cases, Estate creditors would be best served by installing a chapter 7 trustee to steer the remaining liquidation and make what it can out of this colossal mess.

9. At this point, there is nothing to be gained by the Debtors remaining in chapter 11, other than additional fees and administrative expense claims. Conversion to chapter 7, however, offers various advantages, including the opportunity for a fiduciary to analyze claims against the Estates[5] and the Estates' potential causes of action, and seek remedies (where appropriate) for the benefit of creditors. As such, the Committee requests that the Court grant this Motion to convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code so the Debtors' remaining assets may be liquidated for the benefit of creditors with as little overhead as possible.[6]

---

[5] Such claims include, for example, Knapp's alleged administrative claim and the DIP Lenders' demand for turnover of post-Closing cash as alleged cash collateral, both discussed herein.

[6] In fact, the remaining DIP Lenders have communicated to the Debtors and the Committee that they also desire the Chapter 11 Cases to be converted. *See* email exchange between J. Bernbrock, Debtors' counsel, W. Marcari and N. Brannick, counsel to the remaining DIP Lenders, and T. Meyers, counsel to the Committee, *et al.* (Sep. 27, 2024), attached hereto as **Exhibit I**.

**JURISDICTION**

10. The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Committee confirms its consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

11. Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12. The statutory basis for the relief requested herein is section 1112(b) of the Bankruptcy Code.

**RELIEF REQUESTED**

13. By this Motion, the Committee requests entry of an order, substantially in the form attached hereto as Exhibit A, converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code pursuant to section 1112(b) of the Bankruptcy Code.

**BACKGROUND**

**A.     General Case Background**

14. On May 30, 2024 (the "Petition Date"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code. Additional information about the Debtors' Chapter 11 Cases is set forth in the *Declaration of Brett M. Anderson in Support of Chapter 11 Petitions, the DIP Motion, and First Day Pleadings* [D.I. 12] (the "First Day Declaration") filed on the Petition Date.

15. On June 12, 2024, pursuant to section 1102 of the Bankruptcy Code, the United States Trustee for Region 3 (the "U.S. Trustee") appointed the Committee [D.I. 64]. On June 13, 2024, the Committee selected Kilpatrick Townsend & Stockton LLP ("Kilpatrick") and Ashby & Geddes, P.A. as its proposed counsel. On June 17, 2024, the Committee selected Dundon Advisers, LLC as its proposed financial advisor. Following the undersigned Committee counsel's change in law firm from Kilpatrick to Eversheds Sutherland (US) LLP ("Eversheds Sutherland"), the Committee selected Eversheds Sutherland as its proposed counsel in place of Kilpatrick. The Court entered orders approving the Committee's retention of each of its professionals [D.I. 250, 252, 251, 391].

**B.    Background Regarding the Debtors' DIP Financing and Asset Sale**

16. On the Petition Date, the Debtors filed a motion seeking entry of interim and final orders that, among other things, authorize the Debtors' proposed postpetition debtor-in-possession financing, funded by the Debtors' three largest customers as lenders (collectively, the "DIP Lenders"),[7] pursuant to that certain DIP credit agreement attached thereto (the "Original DIP Financing"). *See Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [D.I. 11] (the "Original DIP Motion"). On the Petition Date, the Debtors did not have any prepetition secured debt.

---

[7] The DIP Lenders are, collectively, Woolworths Group Limited ("Woolworths"); Albertsons Companies, Inc.; Inserra Supermarkets, Inc.; ShopRite of Hunterdon County, Inc.; and Village Super Market, Inc.

6

51720454.19

17. The Original DIP Financing would have allowed the DIP Lenders to plunder all foreseeable value from the Debtors' estates (the "Estates"), leaving little to nothing of value for the Debtors to sell for the benefit of creditors. The Original DIP Financing would have authorized the DIP Lenders to, among other things, (i) obtain a perpetual, royalty-free license to use the Debtors' intellectual property;[8] (ii) terminate their customer contracts with the Debtors upon a default under the Original DIP Financing; (iii) retain and not pay millions of dollars in prepetition obligations, and millions more in postpetition obligations, owed under their customer contracts at the maturity of the proposed Original DIP Financing; (iv) poach any and all of the Debtors' employees; and (v) reverse-engineer the Debtors' proprietary technology. *See, e.g.*, *Preliminary Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [D.I. 124], ¶ 20 (describing such provisions). Moreover, the Original DIP Financing would have allowed the DIP Lenders to indefinitely "suspend" critical terms of their prepetition contract *without even disclosing to the Court the terms they sought to suspend*.

18. The Court entered an order approving the Original DIP Financing on an interim basis, but not before rejecting the immediate transfer of the Debtors' intellectual property rights as part of that interim relief package. *See Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (B) Granting Liens and Superpriority Administrative Expense Claims; (C) Modifying the Automatic Stay; (D) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001(c) and (E) Granting Related Relief* [D.I. 55].

---

[8] The Debtors granted these terms though they performed no valuation of the perpetual IP licenses and the underlying IP, and provided no financial or legal justification for the grant of the license to the DIP Lenders.

19. On the last business day before the hearing to approve the Original DIP Motion on a final basis, the Debtors filed a 196-page reply (including exhibits) in support of the Original DIP Motion, including, for the first time, a proposed final order in which the Debtors had <u>buried new terms</u> that made the proposed DIP Financing dramatically worse (which one would not have thought possible). *See* D.I. 134-1, Ex. E at 13 and Schedule 1. Specifically, the Debtors: (i) added new operational "milestones" (creating three new significant default possibilities) requiring the Debtors to take actions in furtherance of the free transfer of its intellectual property to the DIP Lenders; and (ii) reduced the availability of the financing as set forth in the Original DIP Motion (such that only 50% of what was supposed to be available upon entry of a final DIP order would now be available and the remaining amount would only be available later on in stages if the operational "milestones" were met).

20. Following objections by both the U.S. Trustee [D.I. 88] and the Committee [D.I. 124], however, the Court refused to approve the Original DIP Motion on a final basis before the Debtors even initiated their case in favor of it at the July 11, 2024 hearing.

21. After the Debtors' Original DIP Financing was rejected by the Court, the Debtors proposed amended DIP financing terms (the "<u>Amended DIP Financing</u>" and, together with the Original DIP Financing, the "<u>DIP Financing</u>"). *See Debtors' Supplement to Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [D.I. 197] (together with the Original DIP Motion, the "<u>Revised DIP Motion</u>").

22. The Amended DIP Financing was also value-destructive to the Estates, however. It still provided for (i) improper asset transfers (*e.g.*, granting the DIP Lenders sublicenses to the Debtors' technology licensed from KNAPP, Inc. ("<u>Knapp</u>")), (ii) continued deferral of prepetition

8

51720454.19

and postpetition amounts owed by the DIP Lenders, (iii) default provisions tied to breaches of the prepetition contracts between the Debtors and the DIP Lenders, and (iv) new operational covenants designed to protect the DIP Lenders' ability to ultimately obtain the Debtors' technology.  Even if the DIP Financing did *not* include these overreaching provisions, however, it still would have destroyed the value of the Estates merely by imposing nearly $10 million in new and unnecessary secured debt obligations.  The Committee filed a supplemental objection in opposition to the Revised DIP Motion.  *Supplemental Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [D.I. 211].

23. Concurrently, the Debtors were pursuing a section 363 sale process through the Chapter 11 Cases.  On June 6, 2024, the Debtors filed a motion seeking certain sale-related relief, including approval of procedures to sell substantially all of their assets through the Chapter 11 Cases [D.I. 62] (the "Bid Procedures Motion").  On June 25, 2024, the Committee timely filed an objection to entry of an order approving the Debtors' proposed bidding procedures [D.I. 123] (the "Bid Procedures Objection").

24. To avoid the disastrous, value-stripping impact of the Debtors' proposed DIP Facility and the consequently grim prospects for obtaining meaningful value from a hopeless sale process, the Committee filed its First Motion to Convert on June 30, 2024, seeking to convert the Chapter 11 Cases to chapter 7 cases.

C. **Background Regarding the Global Settlement**

25. After midnight on the day of the July 11, 2024 hearing to consider approval of the DIP Financing on a final basis, and the Committee's objections thereto, the Debtors, Committee and DIP Lenders managed to reach a settlement (the "Global Settlement") resolving (i) the

Committee's objections to the DIP Financing and the Bid Procedures Objection, as well as objections to certain other relief requested by the Debtors; and (ii) the Committee's First Motion to Convert.

26. Under the Global Settlement, the DIP Lenders agreed to (i) release all DIP liens on up to $1.8 million of Estate cash anticipated to be available at Closing and (ii) contribute an additional $700,000 in cash to the Debtors' Estates, or such lesser amount as needed to create a combined $2.5 million in unencumbered cash when combined with the $1.8 million described in (i). This $2.5 million in unencumbered cash would be available to (a) satisfy any administrative and priority claims and (b) fund what was advertised as a minimally expensive winddown consisting of work by the Debtors' professionals under a capped and pre-funded budget, with all remaining funds going into a trust for the benefit of general unsecured creditors. Debtors' counsel described the Global Settlement on the record at the July 11, 2024 hearing, explaining that the "headline concept [of the Global Settlement] is $2.5 million in the estates for general unsecured creditors and not for payment of presale fees and expenses or other costs of the case. It is truly intended to go to unsecured creditors and to winddown the estates at that point." *See* Ex. D, July 11, 2024 Hr'g Tr., 8:1-5; *see also id.* at 5:17-9:15 (further describing the settlement).

27. The Global Settlement was premised upon, and negotiated in reliance on, the Debtors' budget (the "July 11 Budget") estimating all Estate obligations expected to arise prior to the closing of the Debtors' asset sale (the "Closing"), a copy of which was presented to the Committee the evening of July 10th and updated the afternoon of July 11th to reflect the timing of the Committee's carve out funding. A copy of the updated July 11 Budget that was presented to the Committee after the July 11th hearing to obtain final sign off by the Committee is attached hereto as **Exhibit B**. In connection with negotiating the Global Settlement, the Debtors identified the following potential post-Closing payments to be made from the anticipated $2.5 million of unencumbered cash:

51720454.19

(i) retention bonuses for any employees not hired by the buyer, which were estimated at approximately $200,000;[9] (ii) priority tax claims, which the Debtors' financial advisor estimated would be minimal; (iii) the Committee's professional fees, if any, that exceeded the budget under the DIP Financing;[10] and (iv) winddown costs associated with confirming a plan, which were represented to the Committee to be minimal.

28. Despite its promising start, it is now clear that the Global Settlement is untenable because it was premised on a July 11 Budget that was completely inaccurate. The July 11 Budget failed to account for **approximately $732,700 of pre-Closing expenses**, and the Debtors failed to disclose or anticipate **nearly $600,000 of newly-projected winddown costs—thus totaling over $1.3 million in undisclosed costs** that were (or should have been) known to the Debtors when the settlement was negotiated. *Compare* Table of Unbudgeted Pre-Close and Winddown Estate Obligations prepared by Dundon Advisers LLC (the "Unbudgeted Pre-Close and Winddown Estate Obligations"), attached hereto as Ex. C, *with* July 11 Budget, Ex. B. The Debtors' omissions from the July 11 Budget, which the Committee relied upon in good faith when negotiating the Global Settlement, include the following:

   a. **approximately $483,500 of pre-Closing operating expenses that the Debtors knew about but did not disclose**, including, for example, $341,000 for two months of hosting charges owed to the Debtors' primary cloud storage provider, DoiT International USA, Inc. ("DoiT"), which were *recurring* monthly charges;[11]

---

[9] Though this amount ultimately came out higher (approximately $309,000) because the buyer did not hire all anticipated employees, the Committee does not take issue with this increase because it was made aware of that risk during settlement negotiations.

[10] The Debtors agreed to cap their professional fees at the amount allowed under the carveout.

[11] On August 28, 2024, without any consultation with the Committee (troubling in and of itself), the Debtors filed a stipulation with DoiT and Woolworths (the buyer), under certification of counsel, confirming the amount required to cure their contract with DoiT and the value of DoiT's postpetition charges that would constitute an administrative

51720454.19

    b. **$249,200 of employee-related obligations incurred through the Closing date,** August 30, 2024, but paid in arrears after Closing, including $111,100 of U.S. payroll obligations, $80,100 for 401(k) obligations, and $58,000 for international employee obligations; and

    c. **approximately $600,000 of post-Closing winddown costs that were not identified during Global Settlement negotiations and are excessive**, including approximately $128,000 in fees for three independent directors (whose post-Closing roles appear to be duplicative), and $471,800 in employee-related costs (exclusive of the $309,000 in prepetition retention bonuses that the Committee was warned about).

29. Though the Committee was warned that the Estates could incur certain categories of expenses over the amounts identified in the July 11 Budget, those known financial risks that the Committee accepted *do not account* for the more than $1.3 million in *unidentified* Estate expenses. Moreover, those accepted financial risks account for a comparatively small portion of the total pre-Closing and winddown expenses that, when including both identified and unidentified amounts, have risen to approximately $1.74 million. Though the Committee, and apparently Debtors' counsel,[12] understood that all Estate obligations were accounted for in the July 11 Budget, clearly that was not the case.

30. It is unclear to the Committee at what time the Debtors realized that the July 11

---

expense claim [D.I. 357; order entered at D.I. 358]. When Committee's counsel asked Debtors' counsel about this stipulation, Debtors' counsel responded, "Woolworths is paying for it!" *See* email from Justin Bernbrock, Debtors' counsel, to Todd Meyers, Committee's counsel (Aug. 28, 2024, 11:11:24 PM), attached hereto as **Exhibit F**. This, of course, was untrue.

[12] Mr. Bernbrock, Debtors' counsel, wrote to Mr. Meyers, Committee counsel, "my understanding was that everything was in the budget, which is a totally reasonable assumption." *See* text messages from J. Bernbrock, Debtors' counsel, to T. Meyers, Committee counsel (Sep. 4, 2024), attached hereto as **Exhibit G**. Mr. Meyers responded, "You directly told me yesterday that there was cash beyond [$]2 ½ million to pay Amazon [for DoiT expense] and that it wasn't coming out of our pocket. How is that not misinformation[?]" Mr. Bernbrock then reiterated, "I told you that I believed everything in the budget was accounted for in reaching the $2.5m amount."

Budget was inaccurate. Debtors' counsel repeatedly affirmed the Committee's understanding of the Global Settlement without hinting at the unbudgeted $732,700 of additional pre-closing costs that would have torpedoed the deal. *See, e.g.*, August 14, 2024 Hr'g Tr., 8:5-9 (Debtors' counsel, Mr. Bernbrock describing "the $2.5 million that has been reserved for general unsecured creditor recovery"), attached hereto as Ex. E (hereinafter, "<u>Sale Hearing Transcript</u>"). Based on the information provided by the Debtors, Committee's counsel reiterated its understanding at the August 14th sale hearing to approve the Debtors' asset sale to Woolworths:

> We had always suspected that this was going to be a credit bid. It was kind of worse in that it was only a partial credit bid and we'll have to deal with the fact that there are, you know, that not all of the DIP obligations were bid, but **the fundamental deal that was cut is still sacrosanct in that as long as the debtors' cash comes in where it was expected, which I believe right now it's tracking, you know, favorably**, that, plus the top-off amount, if it's needed, **would leave $2 and a half million for administrative and priority claims, which we are hoping and expect to be relatively minimal and then funding for a distribution to unsecured creditors**.

Ex. E, Sale Hearing Tr., 13:1-12 (T. Meyers) (emphasis added). Debtors' counsel did not correct this understanding at the hearing. *See id.* At 15:11-13 (stating Debtors have nothing further to add).

31. Since the Closing, the Committee has come to understand through conversations with the Debtors' financial advisor that, after accounting for the additional $732,700 in unbudgeted pre-Closing Estate expenses and the massive winddown costs, only about $800,000 to $1,000,000[13] will be available to fund, collectively, a plan process, a liquidating trust, and any distributions to creditors. Already, the DIP Lenders and creditors holding administrative expense claims are clamoring for prompt payment from these limited Estate assets, even before a full examination of the liabilities can be undertaken.[14] In light of the severely diminished Estate assets and the opposition to

---

[13] This amount will depend on whether certain post-Closing receipts are (i) encumbered by the DIP Lenders' liens and (ii) unavailable to satisfy expenses (which the Committee disputes).

[14] The Committee has requested that the Debtors withhold payment on the Knapp claim at this time while the Committee explores whether Knapp's claim is even owed by the Estates and, if owed, entitled to administrative

13

a plan by both the Committee and the remaining DIP Lenders, the Committee has concluded that a chapter 7 liquidation of the Estates would be able to provide more value to creditors than continuation of the Chapter 11 Cases.

## BASIS FOR RELIEF

32. Section 1112(b) of the Bankruptcy Code ("Section 1112(b)") provides:

> Except as provided in paragraph (2)[15] and subsection (c) [which is not relevant here] …, the court *shall* convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1) (emphasis added).

33. Section 1112(b) calls for a two-step analysis. *First*, the Court must determine whether there is "cause" to convert or dismiss the Chapter 11 Cases. *Second*, if cause exists, the Court must choose between conversion and dismissal based on "the best interest of creditors and the estate." *See In re Am. Cap. Equip., LLC*, 688 F.3d 145, 161 (3d Cir. 2012) (citing § 1112(b)(1); *In re SGL Carbon Corp.*, 200 F.3d 154, 159 n.8 (3d Cir. 1999)).

34. Absent unusual circumstances, "[section 1112(b)] makes conversion *mandatory* once a court finds . . . any of the elements of 'cause.' . . . *The Court does not have discretion.*" *In re Rsrvs. Resort, Spa & Country Club LLC*, No. 12-13316(KG), 2013 WL 3523289, at *2 (Bankr. D. Del. July 12, 2013) (emphasis added); *accord In re Midwest Properties of Shawano, LLC*, 442 B.R. 278, 283 (Bankr. D. Del. 2010) (noting that the BAPCPA amendments to Section 1112(b) "limit the

---

expense status. Knapp has filed a motion seeking payment of its claim and, absurdly, sanctions against the Committee for opposing immediate payment [D.I. 421]. In addition, the DIP Lenders have demanded turnover of post-closing cash receipts that the Committee believes should instead be used to satisfy pre-closing (and possibly winddown) expenses. *See* Ex. H (Letter from the DIP Lenders to the Debtors).

[15] Section 1112(b)(2) states that the "court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate," and certain other findings are established as set forth therein. 11 U.S.C. § 1112(b)(2).

Court's discretion to refuse to dismiss or convert a chapter 11 case upon a finding of cause").

A.   **"Cause" for Conversion Exists Here Based on Section 1112(b)(4)(A) of the Bankruptcy Code.**

35.   Section 1112(b)(4)(A) expressly provides that "cause" for conversion *per se* exists where there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). This provision requires a showing of two prongs: (i) either a substantial or continuing loss to the Estates or diminution of the Estates; and (ii) no reasonable likelihood of rehabilitation.

i.   **The Debtors' Estates Will Lose Value if They Remain in Chapter 11.**

36.   The first prong may be satisfied by "demonstrating that the debtor suffered or has continued to experience a negative cash flow or declining asset values following the order for relief." *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1988) ("All that need be found is that the estate is suffering some diminution in value."); 7 COLLIER ON BANKRUPTCY, ¶ 1112.04[6][a] (Alan N. Resnik & Henry J. Sommer eds., 16th ed. 2014) (hereinafter, "7 Collier") ("[Section 1112(b)(4)(A)] tests whether, after the commencement of the case, the debtor has suffered or continued to experience . . . declining asset values."). Where a debtor's loss is "sufficiently large given the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate and interest of creditors, the loss is substantial" within the meaning of Section 1112(b)(4)(A). *In re TMT Procurement Corp.*, 534 B.R. 912, 918 (Bankr. S.D. Tex. 2015) (citing 7 Collier at ¶ 1112.04[6][a][i]).

37.   Here, every additional moment that the Debtors wallow in chapter 11 costs the Estate more professional fees and administrative expenses that eat into creditors' (now measly) potential recoveries. The Debtors have shown they are unable to even *predict* the expenses that

15

51720454.19

will be incurred through the chapter 11 winddown process, much less plan ahead to limit them.[16] Further, the Debtors' actions thus far suggest a chapter 11 strategy that will continue to undermine the interests of unsecured creditors in favor of the interests of the DIP Lenders, the Debtors' professionals, and the Debtors' insiders. *See, e.g.*, *Combined Disclosure Statement and Joint Chapter 11 Plan of Takeoff Technologies, Inc. and its Debtor* Affiliates [D.I. 416], §§ 1.84, 1.85, 14.1(c) (providing for releases of, among others, the Debtors and their insiders). The Estates have only lost value from the chapter 11 process, including by incurring millions of dollars of new secured debt. There is no reason to expect a reversal of that trend.

### ii. The Debtors Do Not Have a Reasonable Likelihood of Rehabilitation in Chapter 11.

38. The second prong for establishing "cause" under section 1112(b)(4)(A)—the absence of a reasonable likelihood of rehabilitation—is also met here. "Rehabilitation" is not simply a question of whether a debtor can confirm a plan, but whether "the debtor's business prospects justify continuance of the reorganization effort." *TMT Procurement Corp.*, 534 B.R. at 920 (quoting *In re LG Motors, Inc.*, 422 B.R. 110, 116 (Bankr. N.D. Ill. 2009)). In other words, it refers to a "debtor's ability to restore the viability of its business." *Loop Corp. v. United States Tr.*, 379 F.3d 511, 516 (8th Cir. 2004) (citing *In re Gonic Realty Trust*, 909 F.2d 624, 626 (1st Cir. 1990)).

39. To remain in chapter 11, "[t]here must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" *In re Brown*, 951 F.2d 564, 572 (3rd Cir. 1991) (quoting *United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 376 (1988)). As the

---

[16] For example, the Debtors continue to employ three independent directors, claiming all three directors are needed despite the sale of the business. As a further example, the Debtors failed to properly manage their expenses to maximize the $700,000 "top off" amount the DIP Lenders had agreed to pay into the Estates under the Global Settlement to reach $2.5 million of unencumbered cash. Had the Debtors exercised the foresight to pay certain accrued pre-Closing expenses before the Closing, they could have received the full $700,000 payment from the DIP Lenders. Instead, the Debtors sought only $659,000 as the "top off" payment from the DIP Lenders.

51720454.19

Third Circuit Court of Appeals has emphasized, "[h]owever honest in its efforts the debtor may be, and however sincere its motives, the District Court is not bound to clog its docket with visionary or impracticable schemes for resuscitation." *Id.* (quoting *Tenn. Publishing Co. v. American Nat'l Bank*, 299 U.S. 18, 22 (1936)).

40. Here, the Debtors have no feasible reorganization prospects. The Debtors no longer have a business to reorganize—they have already sold the majority of their assets to Woolworths, one of the DIP Lenders.

41. Further, there is nothing to be gained from a chapter 11 plan process at this point, which would only cause the Estates to incur more professional fees. Instead, a "Chapter 7 bankruptcy can be accomplished more efficiently, thus halting the mounting liabilities against the estate[s]." *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 163 (3d Cir. 2012) (upholding bankruptcy court's conversion of debtor's chapter 11 case to chapter 7).

42. The only remaining steps in these cases are to liquidate the Estates, including the pursuit of causes of action, which could just as easily, and more efficiently, be handled by a chapter 7 trustee. Indeed, parties in interest would benefit from a truly independent chapter 7 trustee taking over these cases, given the favor shown to the DIP Lenders and insiders to date. A chapter 7 trustee could (i) assess pending claims and requests for payment; (ii) liquidate the remaining Estate assets, including potential causes of action against insiders and other parties in interest; and (iii) equitably distribute proceeds to creditors in accordance with the Bankruptcy Code, creating more favorable outcomes for most creditors. Thus, liquidation offers the best chance for creditors to extract any value from the Estates' few remaining assets, which is the only remaining goal of the Chapter 11 Cases.

**B.  No Unusual Circumstances Exist Here to Prevent Conversion of These Cases.**

43. Although the moving party has the burden to show "cause" by a preponderance of

51720454.19

the evidence, once "cause" has been established, the burden of proof shifts to the party opposing conversion to demonstrate "unusual circumstances" establishing that conversion is not in the best interests of the Debtors' creditors and bankruptcy estates. *Midwest Properties of Shawano*, 442 B.R. at 283 (initial burden is on the movant to show cause); Section 1112(b)(2). The term, "'[u]nusual circumstances,' contemplates conditions that are not common in chapter 11 cases." *LG Motors*, 422 B.R. at 116 (citations omitted).

44. No conditions or circumstances have been identified in these Chapter 11 Cases that could render "cause" overcome and conversion inappropriate. Further, no factors have been identified that would prove conversion is *not* in the best interests of the Estates or creditors. Any opposing parties cannot sustain their burden to overcome the "cause" shown to convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. On the contrary, the recent discovery of over $1.3 million in previously unbudgeted and undisclosed Estate expenses reinforces the need for immediate conversion before any more expenses accrue and payments are made.

C.    **The Court Should Convert These Cases, Rather than Dismiss Them.**

45. After the Court has made the threshold determination that "cause" exists here, the Court must decide whether conversion or dismissal "is in the best interest of creditors and the estate." 11 U.S.C. § 1112(b); *see also Matter of NuGelt, Inc.*, 142 B.R. 661, 669 (Bankr. D. Del. 1992). The Court's determination is "discretionary, based on the facts of each case." *NuGelt, Inc.*, 142 B.R. at 669 (citing *In re Winslow*, 123 B.R. 641, 631 (D. Colo. 1991); *In re Sullivan*, 108 B.R. 555, 557 (W.D. Pa. 1989)).

46. Here, the creditors and the Estates are best served by conversion to chapter 7, rather than dismissal. Chapter 7 cases, unlike dismissal, offer a lower-cost avenue to monetize the Debtors' remaining assets *and* will provide for the disbursement of the liquidated value among creditors in a fair and equitable manner pursuant to the priority scheme of the Bankruptcy Code. Further, under

chapter 7, an independent trustee will be free to investigate potential claims and causes of action against insiders and others, as well as the circumstances surrounding the Global Settlement, and seek remedies if appropriate.

47. As such, "cause" exists to convert the Chapter 11 Cases to chapter 7 cases, and conversion is in the best interests of creditors and other parties in interest.

## NOTICE

48. Notice of the Motion will be provided to (i) the Debtors, (ii) the DIP Lenders, (iii) the U.S. Trustee, and (iv) all parties entitled to notice under Bankruptcy Rule 2002 and Local Rule 2002-1(b). No prior request for the relief requested herein has been made by the Committee to this or any other court.

## CONCLUSION

49. For the reasons set forth above, and pursuant to section 1112(b) of the Bankruptcy Code, the Committee submits that the Chapter 11 Cases should be converted to cases under chapter 7 of the Bankruptcy Code.

*[Remainder of Page Intentionally Blank]*

WHEREFORE, the Committee respectfully requests the entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, pursuant to section 1112(b) of the Bankruptcy Code, (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code and (ii) granting such other relief as is just and proper.

Dated:  October 10, 2024                                         **ASHBY & GEDDES, P.A.**

<u>*/s/ Ricardo Palacio*</u>
Ricardo Palacio (DE Bar No. 3765)
Gregory A. Taylor (DE Bar No. 4008)
Destiny A. Kosloske (AL Bar No. 2983W00U)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19899-1150
Telephone: (302) 654-1888
Facsimile: (302) 654-2067
Email: RPalacio@ashbygeddes.com
Email: GTaylor@ashbygeddes.com
Email: DKosloske@ashbygeddes.com

-and-

**EVERSHEDS SUTHERLAND (US) LLP**
Todd C. Meyers (admitted *pro hac vice*)
Danielle Barav-Johnson (admitted *pro hac vice*)
999 Peachtree Street NE, Suite 2300
Atlanta, GA 30309
Telephone: (404) 853-8000
Email: ToddMeyers@Eversheds-Sutherland.com
          DahniBarav-Johnson@Eversheds-
             Sutherland.com

*Counsel to the Official Committee of Unsecured Creditors*