**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| TAKEOFF TECHNOLOGIES, INC., *et al.*,[1] | Case No. 24-11106 (CTG) (Jointly Administered) |
| Debtors. | **Hearing Date:  Oct. 23, 2024, at 3:30 p.m. (ET)** **Objection Deadline:  Oct. 16, 2024, at 4:00 p.m. (ET)** **(extended for U.S. Trustee by agreement)** **RE: D.I. No. 417** |

**UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE COMBINED DISCLOSURE STATEMENT AND PLAN ON AN INTERIM BASIS FOR SOLICITATION PURPOSES ONLY; (II) ESTABLISHING SOLICITATION AND TABULATION PROCEDURES; (III) APPROVING THE FORM OF BALLOT AND SOLICITATION MATERIALS; (IV) ESTABLISHING THE VOTING RECORD DATE; (V) FIXING THE DATE, TIME, AND PLACE FOR THE COMBINED HEARING AND THE DEADLINE FOR FILING OBJECTIONS THERETO; (VI) ESTABLISHING BAR DATE FOR FILING REQUESTS FOR ALLOWANCE OF INITIAL ADMINISTRATIVE CLAIMS; AND (VII) GRANTING RELATED RELIEF**

Andrew R. Vara, the United States Trustee for Region 3 ("U.S. Trustee"), through his counsel, files this objection (the "Objection") to *Debtors' Motion for Entry of an Order (I) Approving the Combined Disclosure Statement and Plan on an Interim Basis for Solicitation Purposes Only; (II) Establishing Solicitation and Tabulation Procedures; (III) Approving the Form of Ballot and Solicitation Materials; (IV) Establishing the Voting Record Date; (V) Fixing the Date, Time, and Place for the Combined Hearing and the Deadline for Filing Objections Thereto; (VI) Establishing Bar Date for Filing Requests for Allowance of Initial Administrative Claims; and (VII) Granting Related Relief* ("Disclosure Statement Motion") filed at D.I. 417, and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of the Debtors federal tax identification numbers, as applicable, are: Takeoff Technologies, Inc. (0552); Takeoff Technologies Canada, Inc.; Takeoff Technologies Australia Pty Ltd. (ACN 639 288 958); Takeoff Technologies FZE; Takeoff International Subco India Private Limited; and Takeoff International Subco, LLC. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is 203 Crescent Street, Suite 203, Waltham, Massachusetts 02453.

in support of his Objection states:

## PRELIMINARY STATEMENT

1.     First, the Debtors' proposed Disclosure Statement[2] should not be approved because it fails to provide adequate information.  In the Disclosure Statement, the Debtors do not provide a liquidation analysis, nor do the Debtors identify the Debtor-owners of estate assets and the value of those assets.  Moreover, although Related Parties (i) will be stripped of certain claims against non-debtors through the third-party release provisions and (ii) are proposed to receive releases under the Plan, the Debtors fail to define which entities are included in that term.  Further, the Debtors do not provide any information regarding the nature and/or value of claims that they propose to release under the Plan.

2.     Second, the Debtors cannot provide adequate notice of the Plan's provisions affecting the rights of Related Parties because the Debtors do not define who these parties are and, by extension, cannot solicit the consent of all Related Parties to a third-party release even if they wanted to—and they do not, in fact, plan on soliciting any such consent from Related Parties.[3]

3.     Third, the Disclosure Statement should not be approved because the  non-consensual third-party releases render the proposed Plan unconfirmable.  The Plan extinguishes a broad range of direct claims against non-debtor parties held by other non-debtor parties without their affirmative consent, including claims held by: (i) all parties in the lone voting class that cast a vote in favor of the Plan, (ii) all parties who vote to reject the Plan and who do not "opt out" of the third-party releases; and (iii) the seventeen (17) categories of Related Parties.

---

[2]   All capitalized terms not defined herein have the definitions set forth in the Combined Disclosure Statement and Joint Chapter 11 Plan, as applicable.

[3]   The proposed Class 3 Ballot does not contain the definition of Related Parties, which is critical to understanding the scope of the Plan's Third-Party Release provision.

4.      As the discussion below demonstrates, neither the Disclosure Statement nor the Debtors' proposed solicitation procedures should be approved, and the Disclosure Statement Motion should be denied.[4]

## JURISDICTION AND STANDING

5.      Under (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2)(A), this Court has jurisdiction to hear and determine this Objection.

6.      Pursuant to 28 U.S.C. § 586, the U. S. Trustee is charged with the administrative oversight of cases commenced pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). This duty is part of the U. S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U. S. Trustee as a "watchdog").

7.      Pursuant to 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee has the duty to monitor plans and disclosure statements filed in Chapter 11 cases and to comment on such plans and disclosure statements.

8.      The U.S. Trustee has standing to be heard on the Disclosure Statement and the Disclosure Statement Motion pursuant to 11 U.S.C. § 307. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that the U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere

---

[4]  In addition to the points raised in this Objection, the U.S. Trustee's counsel has provided additional comments to Debtors' counsel to the Disclosure Statement, the form of order approving the Disclosure Statement, the solicitation procedures and related notices which counsel expects will be resolved by agreement.  To the extent such comments are not resolved, the U.S. Trustee reserves the right to supplement this Objection or to assert additional objections at the hearing on the Motion.

pecuniary interest).

## **BACKGROUND**

9.      On May 30, 2024, the above-captioned cases were commenced by the filing of voluntary petitions in this Court.

10.     On June 12, 2024, the U.S. Trustee appointed an official committee of unsecured creditors [D.I. 61]. On July 2, 2024, the U.S. Trustee filed an *Amended Notice of Appointment of Committee of Unsecured Creditors* [D.I. 165].

11.     On September 27, 2024, the Debtors filed the Disclosure Statement Motion [D.I. 417], which seeks interim approval of (i) the Combined Disclosure Statement and Joint Chapter 11 Plan [D.I. 416] and (ii) certain procedures concerning the solicitation of votes on the Joint Plan.

### *The Solicitation Procedures*

12.     The Disclosure Statement Motion requests approval of the form of ballot for use in soliciting votes from Class 3A, 3B, 3C, 3D, 3E, and 3F, the general unsecured creditors of the six Debtors.   Disclosure Stmt. Mot. Ex. 1 (Form Class 3 Ballot).   The proposed ballot confirms, consistent with the Plan (discussed below), that (i) creditors voting in favor of the Plan will be deemed to agree to the Third-Party Release (defined below) and (ii) creditors voting to reject the Plan must "opt out" of providing the Third-Party Release in accordance with the Plan's terms.

### *Relevant Plan Provisions*

13.     The third-party release provision in the Plan (the "Third-Party Release[s]") states in relevant part:

> **Consensual Party Releases by Certain Parties.** As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany

transactions between or among the Debtors, the Chapter 11 Cases, the historical relationship between the Debtors and the DIP Lenders, the Sale, any other matters addressed in the Global Settlement, and the formulation, preparation, dissemination, negotiation, or filing of the Final DIP Order, the Sale, the Global Settlement, the Disclosure Statement, the Plan, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Final DIP Order, the Sale, the Global Settlement, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations, or any document, instrument, or agreement (including those set forth in the Final DIP Order and the Sale Order) executed to implement the Plan.

Plan Art. 14.1(c).

14.    The Plan provides the following with respect to the release of claims by the Debtors

(the "Debtor Release[s]"):

**Releases by the Debtors.** Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, each of the Debtors, on their own behalf and as a representative of their respective Estates, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or Contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, their respective Assets, the Estates, the Chapter 11 Cases, any of the Debtors' in- or out-of-court restructuring efforts, or the combined Plan and Disclosure Statement, that may be asserted by or on behalf of any of the Debtors or their respective Estates, against any of the Released Parties.

Plan Art. 14.1(b).

15.    In the Plan, the "Releasing Parties" are defined as follows:

"*Releasing Parties*" shall mean, in their capacities as such: (a) the Committee and its members, (b) all Holders of General Unsecured Claims who either (i) vote to

accept the Plan; or (ii) vote to reject the Plan, but do not "opt out" of the releases set forth in Article XIV(c) of the Plan, (c) the DIP Lenders, and (d) with respect to each of the foregoing, their Related Parties, *provided, however,* that Releasing Parties shall exclude any of the foregoing parties that makes a Release Opt-Out Election, unless otherwise ordered by the Bankruptcy Court.

Plan Art. 1.87

16.     The "Released Parties" under the Plan

mean, in their capacities as such, (a) the Debtors and the Estates, (b) the Committee and its members, (c) the DIP Lenders, and (d) with respect to each of the foregoing, their Related Parties, provided, however, that Released Parties shall exclude any of the foregoing parties that makes a Release Opt-Out Election, unless otherwise ordered by the Bankruptcy Court.

Plan Art. 1.85

17.     The Plan term "Related Party" means:

in their capacities as such, an Entity's officers and directors, and the agents, attorneys, advisors, employees, professionals, shareholders, partners (general or limited), Affiliates, members, managers, equity holders, trustees, executors, predecessors in interest, or successors or assigns of any such Entity.

Plan Art. 1.84.

18.     The term "Release Opt-Out Election" is defined in the Plan as:

the timely election to "opt out" of being a Releasing Party by (a) submitting a Ballot by the Voting Deadline that (i) does not vote to accept the Plan and (ii) selecting the option set forth on the Ballot to not grant the releases set forth in Section 14.1(c) of this Plan, or (b) Filing a written objection to the releases set forth in Section 14.1(c) of this Plan by the objection deadline established by the Solicitation Procedures Order, unless otherwise ordered by the Bankruptcy Court.

Plan Art. 1.86.

19.     Additionally, the Plan contains an injunction enforcing, *inter alia*, the release provisions:

**Non-Discharge of the Debtors; Injunction**.  In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors. Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors. As such, no Entity holding a Claim against the Debtors may receive any payment from,

or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Entity under the Plan. All parties are precluded from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Interest, from:

(1) commencing or continuing in any manner any action or other proceeding of any kind against any of the Estates, the Plan Administrator, their successors and assigns, and any of their assets and properties;

(2) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Estate, the Plan Administrator, their successors and assigns, and any of their assets and properties;

(3) creating, perfecting or enforcing any encumbrance of any kind against any Estate, the Plan Administrator, their successors and assigns, and any of their assets and properties;

(4) asserting any right of setoff or subrogation of any kind against any obligation due from any Estate, the Plan Administrator or their successors and assigns, or against any of their assets and properties, except to the extent a right to setoff or subrogation is asserted with respect to a timely filed proof of Claim; or

(5) commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Interest or Cause of Action released under Article XIV of the Plan.

Any Entity injured by any willful violation of such injunction may seek actual damages and, in appropriate circumstances, may seek punitive damages from the willful violator.

Plan Art. 14.1(d).

## **ARGUMENT**

**I.    The Disclosure Statement Does Not Contain Adequate Information.**

20.     Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "adequate information" describing a confirmable plan.  11 U.S.C. § 1125; *see In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007).   The Bankruptcy Code defines "adequate

information" as:

> [i]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, *that would enable such a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan* . . . .

11 U.S.C. § 1125(a)(1) (emphasis added); *see Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999).

21.     The disclosure statement requirement of section 1125 of the Bankruptcy Code is "crucial to the effective functioning of the federal bankruptcy system[;] . . . the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (citing *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.*), 848 F.2d 414 (3d Cir. 1988)).

22.     The "adequate information" requirement is designed to help creditors in their negotiations with debtors over the plan. *See Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94 (3d Cir. 1988). Section 1129(a)(2) conditions confirmation upon compliance with applicable Code provisions. The disclosure requirement of section 1125 is one of those provisions. *See* 11 U.S.C. 1129(a)(2); *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000).

23.     To be approved, a disclosure statement must include sufficient information to apprise creditors of the risks and financial consequences of the proposed plan. *See In re Duratech Indus.*, 241 B.R. 291, 298 (Bankr. E.D.N.Y.), *aff'd*, 241 B.R. 283 (E.D.N.Y. 1999) (the purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of whether to approve or reject the debtor's plan); *In re McLean Indus.*, 87 B.R.

830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan").

24.     Section 1125 of the Bankruptcy Code is geared towards more disclosure rather than less.  *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990).  The "adequate information" requirement merely establishes a floor, and not a ceiling for disclosure to voting creditors.  *See In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006) (citing *Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, at 100 (3d Cir. 1988).

25.     "Adequate information" under section 1125 is "determined by the facts and circumstances of each case."  *See Oneida*, 848 F.2d at 417 (citing H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)).

26.     A disclosure statement must inform the average creditor what it is going to get and when, and what contingencies there are that might intervene.  *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).  Although the adequacy of the disclosure is determined on a case-by-case basis, the disclosure must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy Code] alternatives . . . ."  *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

27.     Here, the Disclosure Statement does not include certain information that is necessary to creditors deciding how to vote on the Plan:

   a.   The Disclosure Statement does not include a liquidation analysis, which creditors need to determine whether they will receive more under the Plan than in a hypothetical chapter 7 liquidation.

b.  The Disclosure Statement does not identify the Debtor-owners of estate assets and the value of those assets.  The cases are not substantively consolidated, so creditors of each Debtor should be informed as to which assets will satisfy their claims.

28.  The Disclosure Statement also fails to provide certain information relating to releases:

a.  The Disclosure Statement does not identify the innumerable Related Parties from whom Third-Party Releases are being extracted without their consent and/or, in most cases, knowledge.  As noted above, the Related Parties consist of at least seventeen (17) categories of parties related to each of the Released Parties, with some categories as broad and ill-defined as "agents," "advisors," "managers," "members", and "professionals."

b.  The Disclosure Statement does not identify all parties who will be the *recipients* of Third-Party Releases or Debtor releases, because the definition of "Released Parties" also includes the same broad seventeen (17) categories of Related Parties for each Released Party.

c.  Moreover, in connection with the Debtor Release, the disclosure statement does not adequately disclose: (a) why the Debtors will be releasing the Released Parties; (b) the nature and value of the claims the Debtors are releasing (e.g., are there any potential claims against current/former insiders, and are any claims subject to liens held by the Debtors' secured creditors); or (c) what (if anything) the Debtors are receiving as consideration for such releases.

29.  Because the Disclosure Statement fails to provide adequate information as to the above-referenced items, it should not be approved by the Court.

II.     **The Proposed Solicitation Procedures Do Not Provide Notice to Numerous Persons That Their Claims Against Non-Debtors Will Be Released Under the Plan.**

30.     The Plan and Disclosure Statement include a recitation of the Third-Party Release, and the Plan includes the relevant definitions.  However, the Debtors do not propose to serve the Solicitation Package, the Confirmation Hearing Notice, or any other document on the numerous Related Parties that would notify them that the Plan will strip them of their right to pursue their direct claims against a large number of non-debtor entities.  Moreover, it likely would be impossible for the Debtors to arrange to provide such notice, because the identity of many of the Related Parties—such as their "agents"—cannot be known by the Debtors.

31.     In *Folger Adam Security, Inc. v. DeMatteis/MacGregor*, 209 F.3d 252 (3d Cir. 2000), the Third Circuit ruled that "[d]ue process requires 'notice reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Id.* at 265 (citations omitted).

32.     The Debtors' proposed solicitation procedures will not provide notice to the Related Parties that is "reasonably calculated, under all the circumstances, to apprize [them] of the pendency of the action and afford them an opportunity to present their objections" to having Third-Party Releases extracted from them.  *Id.*  In fact, most, if not all, of the Related Parties will receive no notice at all, because they are not themselves creditors or interest holders of the Debtors. Therefore, the Disclosure Statement Motion must be denied unless the Plan is modified so that no Related Parties are deemed to give releases to non-debtors.  *See In re Boy Scouts of America and Delaware BSA, LLC*, Case No. 20-10343 (LSS), 2022 WL 3030138, at * 128 (Bankr. D. Del. July 29, 2022) (Court was unable to find that the twenty-two (22) categories of  "Related Releasing Parties" received notice, and because Court had concluded that "a request for opt-out consent must

be grounded in adequate notice, it is inconsistent to permit releases from persons who do not receive notice by virtue of creditor (or shareholder) status."); *see also Patterson v. Mahwah Bergen Ret. Grp., Inc.*, No. 3:21CV167 (DJN), 2022 WL 135398, at *7 (E.D. Va. Jan. 13, 2022) (in vacating the Bankruptcy Court's order confirming the plan, the District Court noted that "[t]he Bankruptcy Court did not order that any notice or opt-out forms be sent to all of the Releasing Parties, including the current and former employees, consultants, accountants or attorneys of Debtors, their affiliates, lenders, creditors or interest holders.").

**III.    The Disclosure Statement Should Not Be Approved Because the Plan Is Not Confirmable.**

33.    The Plan is unconfirmable for two separate and independent reasons. *First*, the Plan proposes non-consensual Third-Party Releases that are not authorized under the Bankruptcy Code. *Second*, the Releases do not have exceptions for fraud, willful misconduct or gross negligence as to Debtor parties and estate fiduciaries, thus providing them exculpation by another name beyond what this Circuit allows.

**A.    *The Plan Proposes Unauthorized, Non-Consensual Third-Party Releases***

34.    If a plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied.  *See In re Quigley Co.,* 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) (citing *In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003)); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y.) *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992); *In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990)).

35.    Non-consensual third-party releases are not authorized under the Bankruptcy Code. *Harrington v. Purdue Pharma L.P.*, 603 U.S. __, 144 S. Ct. 2071, 2082-88 (2024).

36.    Contract principles govern whether a release is consensual. *See Smallhold, Inc.*, No. 14-10267, 2024 WL 4296938, at *11 (Bankr. D. Del. Sept. 25, 2024); *In re SunEdison, Inc.,* 576

B.R. 453, 458 (Bankr. S.D.N.Y. 2017). That is because a third-party release is essentially a settlement between a non-debtor claimant and another non-debtor.

37.     Whether parties have reached an agreement — including an agreement not to sue — is governed by state law. The only exception is if there is federal law that preempts applicable state contract law. *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)).

38.     No federal law applies to the question of whether the non-debtor Releasing Parties have agreed to release the non-debtor Released Parties. The Bankruptcy Code does not apply to agreements between non-debtors. And no Code provision authorizes courts, as part of an order confirming a chapter 11 plan, to "deem" a non-debtor to have consented to an agreement to release claims against other non-debtors where consent would not exist under state law. Nor does 11 U.S.C. § 105(a) confer any power to override state law. Rather, section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue*, 144 S. Ct. at 2082 n.2 (quotation marks omitted). Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Thus, the state-law definition of consent is not diluted or transformed by the Code.

39.     Indeed, even as to a debtor, it is well settled that whether parties have entered a valid settlement agreement is governed by state law. *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A.*

*(In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law."); *see also Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) ("[T]he basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law.") (quotation marks omitted); *Butner v. United States*, 440 U.S. 48 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

40.     Because the Bankruptcy Code does not govern relationships between claim holders and non-debtor third-parties, state contract principles are the source of authority when considering whether a release is consensual. *See, e.g.*, *Patterson v. Mahwah Bergen Ret. Grp., Inc.,* 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, No. 24-10267, 2024 WL 4296938, at *11 (Bankr. D. Del. Sept. 25, 2024) (requiring "some sort of affirmative expression of consent that would be sufficient as a matter of contract law"); *In re SunEdison, Inc.,* 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506 (Bankr. D.N.J. 1997) (holding that a third-party release "is no different from any other settlement or contract"); *id*. at 507 (holding that "the validity of the release … hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original).  As one court recently held, because "nothing in the bankruptcy

code contemplates (much less authorizes it)' … any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *In re Tonawanda Coke Corp.*, No. BK 18-12156 CLB, 2024 WL 4024385, at *2 (Bankr. W.D.N.Y. Aug. 27, 2024) (quoting *Purdue*, 144 S. Ct. at 2086). Accordingly, "any such consensual agreement would be governed by state law." *Id.*

41.     Here, the Debtors do not meet the state-law burden of establishing that the Releasing Parties will expressly consent to release their property rights or to have that release memorialized in the Plan.

42.     The "general rule of contracts is that silence cannot manifest consent." *Patterson,* 636 B.R. at 686. "Acceptance by silence is exceptional. Ordinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

43.     "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance. Even in those cases the contract may be unenforceable under the Statute of Frauds." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

44.     Thus, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981); *see Patterson*, 636 B.R. at 686 (discussing how contract law does not support consent by failure to opt out). Further, "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." RESTATEMENT (SECOND) OF CONTRACTS § 69, cmt. c (1981); *see Reichert v. Rapid*

*Invs., Inc.*, 56 F.4th 1220, 1227-28 (9th Cir. 2022) ("[E]ven though the offer states that silence will

be taken as consent, silence on the part of the offeree cannot turn the offer into an agreement, as

the offerer cannot prescribe conditions so as to turn silence into acceptance.") (quotation marks

omitted).

45.     Using Delaware common law as a point of reference, silence does not equal consent

except under limited circumstances not applicable here. *See, e.g., Hornberger Mgmt. Co. v. Haws

& Tingle Gen. Contractors, Inc.*, 768 A.2d 983, 991 (Del. Super. Ct. 2000) (quoting RESTATEMENT

(SECOND) OF CONTRACTS § 69 (1981)). Delaware follows the "mirror image" rule, requiring the

acceptance to be identical to the offer. *See Urban Green Techs., LLC v. Sustainable Strategies

2050 LLC*, No. N136-12-115, 2017 WL 527565, at *3 (Del. Super. Ct. Feb. 8, 2017); *see also

Patterson*, 636 B.R. at 686 (contract law does not support consent by failure to opt out).

46.     Applicable state contract law cannot be disregarded on a default theory, applied by

some courts, that creditors who remain silent forfeit their rights against non-debtors because they

received notice of the non-debtor release, just as they would forfeit their right to object to a plan if

they failed timely to do so. *See, e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097,

2023 WL 2655592 (Bankr. D. Del. Mar. 27, 2023), *abrogated by In re Smallhold, Inc.*, 2024 WL

4296938, at *8-*11. As explained by this Court in *Smallhold*, the Supreme Court's *Purdue*

decision undermined the fundamental premise of such a theory — that a bankruptcy proceeding

legally could lead to the destruction of creditors' rights against non-debtors, so they had best pay

attention lest they risk losing those rights. *In re Smallhold, Inc.*, 2024 WL 4296938, at *1-*2; *see

also id*. at *10 ("The possibility that a plan might be confirmed that provided a nonconsensual

release was sufficient to impose on the creditor the duty to speak up if it objected to what the debtor

was proposing."). Under the default theory, because pre-*Purdue* a chapter 11 plan (under certain

circumstances, under certain circuit-level decisions) could permissibly include nonconsensual, non-debtor releases, non-debtor releases were no different from any other plan provision to which creditors had to object or risk forfeiture of their rights. *See id*. at *10. A failure to opt out under the default theory is not truly consent, but rather "an administrative shortcut to relieve those creditors of the burden of having to file a formal plan objection." *See id*. at *2; *see also id*. at *9 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default.").

47.    But entering relief against a party who defaulted by not responding is, "[u]nder established principles" permissible "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff in litigation." *Id*. at *2; *see also id*. at *13 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so. [After *Purdue*], that is no longer the case in the context of a third-party release."). After *Purdue*, however, it is now clear in all circuits that imposition of a non-debtor release is not available relief through a debtor's chapter 11 plan. *See id*. at *2 ("After *Purdue Pharma*, a third-party release is no longer an ordinary plan provision that can properly be entered by 'default' in the absence of an objection."); *see also id*. at *10. Thus, *Smallhold* held that "it is no longer appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *Id*. at *10.

48.    The *Smallhold* court provided an illustration that makes obvious why notice-plus-failure-to-opt-out is not consent:

> Consider, for example, a plan of reorganization that provided that each creditor who failed to check an "opt out" box on a ballot was required to make a $100 contribution to the college education fund for the children of the CEO of the debtor.  Just as in the case of Party

> A's letter to Party B, no court would find that in these circumstances,
> a creditor that never returned a ballot could properly be subject to a
> legally enforceable obligation to make the $100 contribution.

*Id*. at *2 (footnote omitted). Cases that impose a non-debtor release based merely on the failure to opt out fail to "provide[] any limiting principle that would distinguish the third-party release from the college education fund plan. And after *Purdue Pharma*, there is none." *Id*. Thus, "ordinary contract principles" apply to determine whether there is consent to a non-debtor release. *Id*. at *3.

49.     Just like it is legal error to define consent in a manner inconsistent with state law, it is error to presume it exists. As discussed above, consent arises when two sets of parties affirmatively assent to something. *See* 1 VOSS ON DELAWARE CONTRACT LAW § 2.05 (citing *Loveman v. The NuSmile, Inc.*, C.A. No. 08C-08-223 MJB, memo. op. at *7 (Del. Super. Ct. Mar. 31, 2009) (Brady, J.)). A party seeking to include non-debtor releases in a bankruptcy plan must show that they are consensual. To do so, state law requires that mutually agreeing third parties must come forward, state their consent affirmatively, and ask the court to memorialize their consent in a plan. Nothing in the Code authorizes bankruptcy courts to extinguish claims by inferring consent outside the bounds of state law.

50.     But an affirmative agreement — something more than the failure to opt out — is required to support a consensual third-party release. *See In re Smallhold, Inc.*, 2024 WL 4296938, at *3 ("[A] creditor cannot be deemed to consent to a third-party release without some affirmative expression of the creditor's consent."); *see also id*. at *8; *In re Tonawanda Coke Corp.,* 2024 WL 4024385, at *2; *Patterson*, 636 B.R. at 686. Failing to "opt out" of an offer is not a manifestation of consent unless one of the exceptions to the rule that silence is not consent applies, such as conduct by the offeree that manifests an intention that silence means acceptance or taking the offered benefits. For example, the *Patterson* court, in applying black-letter contract principles to opt-out releases in a chapter 11 plan, found that contract law does not support consent by failure

to opt-out. *Patterson*, 636 B.R. at 686. "Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent." *Id.* at 688. Because the Plan forces third-party releases on these parties without their affirmative consent, the releases are non-consensual and cannot be approved under *Purdue*.

51.     The Ninth Circuit's decision in *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-18 (3d Cir. 2017), illustrates the point.  In *Norcia*, a consumer bought a Samsung phone from a Verizon Wireless store and signed the Verizon Wireless Customer Agreement. *Norcia*, 845 F.3d at 1282. Among the contents of the phone's box was a Samsung "Product Safety & Warranty Information" brochure that contained an arbitration provision, which "stated that purchasers could opt out of the arbitration agreement by providing notice to Samsung within 30 calendar days of purchase, either through email or by calling a toll-free telephone number." *Id*. It also stated that opting out would not affect the warranty coverage. *See id*. The customer did not take any steps to opt out. *See id*. When the customer later sued Samsung, Samsung argued that the arbitration provision applied. *See id*. at 1282-83.

52.     As an initial matter, the *Norcia* court rejected the argument that the customer agreed to the arbitration provision by signing his contract with Verizon: "The Customer Agreement is an agreement between Verizon Wireless and its customer. Samsung is not a signatory." 845 F.3d at 1290. That is even more true in the context of a chapter 11 plan. Not only are the non-debtor Released Parties not signatories to it, a chapter 11 plan is a creature of the Bankruptcy Code specifically for determining how the debtor will pay its creditors, not for resolving claims between non-debtors. As the Ninth Circuit has explained, "[w]hen a bankruptcy court discharges the debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors. … [T]he payment

which effects a discharge is not consideration for any promise by the creditors, much less for one

to release non-party obligators." *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1085 (9th Cir. 2020)

(quotation marks omitted).

53.     The Ninth Circuit in *Norcia* further held that the customer's failure to opt out did

not constitute consent to arbitrate. Unsurprisingly — because there was no applicable federal law

— the court applied the "general rule," applicable under California law, that "silence or inaction

does not constitute acceptance of an offer." 845 F.3d at 1284 (quotation marks omitted); *accord*

*Southern Cal. Acoustics Co. v. C.V. Holder, Inc.*, 456 P.2d 975, 978 (Cal. 1969). The customer did

not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would

show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration

agreement." *Norcia*, 845 F.3d at 1285 (quotation marks omitted). This was true, even though the

customer *did* take action to accept the offered contract from Verizon Wireless. "Samsung's offer

to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person

to whom it is made or sent makes no reply, even though the offer states that silence will be taken

as consent, unless an exception to this general rule applies." *Id.* at 1286 (quotation marks and

citation omitted).

54.     The Ninth Circuit explained that exceptions to this rule exist when the offeree has

a duty to respond or when the offeree retains the offered benefits but held neither exception

applied. *See Norcia*, 845 F.3d at 1284-85. There was no state law imposing a duty on the customer

to act in response to the offer, the parties did not have a prior course of dealing that might impose

such a duty, and the customer did not retain any benefits by failing to act given that the warranty

applied whether or not he opted out of the arbitration provision. *See id*. at 1286.

55.     Here, too, the debtors' creditors have not signed an agreement to release the non-debtor releasees. Nor may consent be inferred from their silence because they have no duty to respond to the offer of a non-debtor release and they have not retained any benefits offered in exchange for it.

56.     The Debtors propose that the Third-Party Releases in the Plan, which benefit numerous non-debtors that are Released Parties, bind: (a) all parties who vote to accept the Plan; (b) those who vote to reject the Plan, unless they check an opt-out box on the returned ballot; and (c) as discussed in Argument section II, *supra*, the numerous Related Parties of the foregoing. There is also a catch-all provision providing that the release will not apply to any party who elects to opt out of the releases or timely objects to the releases, but this provision does not appear to apply to those who vote in favor, as the ballot provides that such entities are not entitled to opt out of the release.  Plan Art. 1.86 (definition of "Release Opt-Out Election").

57.     *First*, the Debtors propose that the non-debtor releases in the Plan bind all parties who vote to accept the Plan.  Because the Plan forces non-debtor releases on these parties without their affirmative consent, the releases are non-consensual and cannot be approved under *Purdue*.

58.     The Plan's conflation of voting for the Plan with acceptance of the Third-Party Release is inconsistent with state law.  Voting for a plan does not reflect the unambiguous assent necessary to find consent to a release.  *See, e.g., In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) ("[A] consensual release cannot be based solely on a vote in favor of a plan."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (holding that, because consensual releases are premised on the party's agreement to the release, "it is not enough for a creditor to abstain from voting for a plan, or even to simply vote 'yes' as to a plan").

59.    Voting on a chapter 11 plan is governed by the Bankruptcy Code, and voter support only reflects approval of the plan's treatment of the voters' claims *against the debtor*.  Because impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan, *see* 11 U.S.C. § 1126(a), merely exercising that right does not manifest consent to release claims against non-debtors.  People voting on the chapter 11 plan have not "manifest[ed] [an] intention that silence may operate as acceptance" of an offer to release claims against non-debtors. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.  Nor are they "silently tak[ing] offered benefits" from the released non-debtors, such that consent may be inferred.  *Id.*  And because the plan's distributions are not contingent on agreeing to the non-debtor release, one cannot infer consent from the acceptance of those distributions. *See Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017) (holding customer did not retain any benefits such that a failure to opt out of arbitration indicated consent when the warranty applied regardless of the failure to opt out). Further, acceptance of a "benefit" — distributions under the plan — that the offeror had no right to refuse the offeree does not manifest acceptance of the offer. *See Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 223 (5th Cir. 2005) ("In the absence of any evidence that Strong had the right to exclude CFS from the property in question or that CFS accepted any service or thing of value from Strong, no reasonable jury could conclude that CFS's failure to remove its pipeline upon Strong's demand constituted consent to a contract.").

60.    As explained in *Arrowmill*, a voluntary release arises only "because the *creditor agrees*" to it. 211 B.R. at 507 (emphasis in original).  Because "a creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings," "it is not enough for a creditor . . . to simply vote 'yes' as to a plan." *Id*. (quotation marks omitted); *accord Congoleum Corp.*, 362 B.R. at 194; *In re Digital Impact, Inc*., 223 B.R. 1,

14 (Bankr. N.D. Okla. 1998).  Rather, a creditor must "unambiguously manifest[] assent to the release of the nondebtor from liability on its debt." *Arrowmill*, 211 B.R. at 507.

61.     Further, a plan is presented as a package deal—a person votes yes or no on the entire plan, not particular aspects of it—and a person should not be compelled to accept a non-debtor release as a condition of receiving the benefits of a plan.  That is not true consent.  For those who believe the plan is the best way to maximize the return of their money from the debtor, requiring them to vote "no" on the Plan—thus raising the possibility that the Plan may not be able to be confirmed and they thus cannot receive the economic benefit under the Plan—to reject the nondebtor release would be penalizing them for exercising their right to vote in favor of the Plan. That an offeree is penalized unless an "offer" is accepted "preclude[es] an inference of assent." *Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1230-31 (9th Cir. 2022).

62.     In addition, the Bankruptcy Code guarantees that a creditor may not be required to accept in a chapter 11 plan less than it would receive in a chapter 7 liquidation. *See* 11 U.S.C. § 1129(a)(7)(A). But a chapter 7 liquidation could not require a release of non-debtors as a condition of receiving a distribution (because it does not involve a plan).  Requiring a non-debtor release as a condition of receiving a distribution under a chapter 11 plan, absent the individual creditor's consent, is thus inconsistent with Bankruptcy Code section 1129(a)(7)(A).

63.     Hence, voting for a plan does not reflect actual and knowing consent, particularly in the context of "an immensely complicated plan" where "it would be difficult for any layperson to comprehend all of its details." *In re Congoleum Corp.*, 362 B.R. at 194.

64.     *Second*, the plan imposes non-debtor releases on those who vote to reject the Plan, unless they check an opt-out box on the returned ballot. But it is even more obvious that those who vote to reject a plan are not consenting merely through silence by failing to opt out of the nondebtor

release.  *See In re Chassix Holdings, Inc.*, 533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015). Not only is there no "mutual agreement" as to the Plan, much less the Third-Party Release, the creditor has actually expressly stated its rejection of the Plan.  As the court in *Chassix* said, "a creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. ***The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.***" *Id.* (emphasis added).

65.     Whether or not a creditor votes to accept or reject the Plan, such creditors may not have understood the solicitation package and may not have possessed the time or financial resources to engage counsel, never imagining that their rights against non-debtors could be extinguished through the bankruptcy of these Debtors. "[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Norcia*, 845 F.3d at 1285 (quotation marks omitted).

66.     This Court correctly held in *Smallhold* that "ordinary contract principles" apply to determine whether there is consent to a non-debtor release. *In re Smallhold, Inc.*, 2024 WL 4296938, at *3. However, the U.S. Trustee respectfully submits that, in finding that voting to reject a plan without opting out constitutes "an affirmative step" necessary to infer consent (*id.* at *14), the Court erred by failing to consider whether any of the exceptions to the state-law rule that silence is not consent apply in this context.[5]  They do not.  As discussed above, merely voting for a plan

---

[5] The Ninth and Second Circuit cases cited by this Court in *Smallhold* do not support the conclusion that the act of voting on a chapter 11 plan while remaining silent regarding the non-debtor release constitutes consent.  *Smallhold*, 2024 WL 4296938, at *14 n.60 (citing *Berman v. Freedom Financial Network*, 30 F.4th 849, 856 (9th Cir. 2022); *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 75 (2d Cir. 2017)). Those cases emphasize the importance of notice as a prerequisite to consent and explain the requirements for when

is not an expression of consent to a non-debtor release.  Voting against a plan plus a failure to opt out is still nothing more than silence with respect to the offer to release claims against non-debtors.

67.     Thus, while voting on a plan is an affirmative act, it is not a "*manifestation of intention* that silence may operate as acceptance" of an offer to release claims against non-debtors. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) (emphasis added). Creditors have no affirmative obligation to act on a plan, either to vote or to opt out. *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *In re SunEdison, Inc.*, 576 B.R. at 460–61 (holding creditors have no duty to speak regarding a plan that would allow a court to infer consent from silence). And as in *Norcia*, creditors have no state law duty to respond to an offer to release non-debtors such that their silence can be understood as consent, nor have they any prior course of dealing with the released non-debtors that would impose such a duty. Rather, voting on a chapter 11 plan is governed by the Bankruptcy Code, and even a favorable vote reflects only approval of the plan's treatment of the voters' claims *against the debtor*. State law affords no basis to conclude that consent to release *third-party* claims can properly be inferred from nothing more than a mere failure to check an opt-out box on a ballot rejecting the proposed treatment of its claims against the *debtor*.

68.     Notably, the proposed form of ballot does not contain any language advising creditors that, if they vote to reject and elect to opt out of the release, they are not jeopardizing

---

someone can be deemed on "inquiry notice" of terms they did not read.  *See Berman*, 30 F.4th at 856; *Meyer*, 868 F.3d at 75.  But whether there is sufficient notice is a distinct question from whether there has been a manifestation of an intent to accept an offer.  *See, e.g., Meyer*, 868 F.3d at 74 ("[A]n offeree, *regardless of apparent manifestation of his consent*, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious.") (internal quotation marks omitted; emphasis added); RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) ("The mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak.").

their entitlement to a distribution from the Debtors' estates under the Plan.  Discl. Stmt. Mot. Ex.

1 (Form of Class 3 Ballot).

69.     This Court (and other courts) have raised the issue of whether opt outs could

constitute consent because, under Federal Rule of Civil Procedure 23, a court-approved class

action settlement may bind class members who do not opt out of the class action.  They cannot.

The analogy to class-action procedure is inapt.

70.     First, Rule 23 of course does not apply by its own terms here.  This is not a federal

class action settlement between the non-debtor releasees and non-debtor releasors.  Nor is there

any provision in the Code that would authorize treatment of creditors' claims against non-debtors

as a class action.  Accordingly, federal class action law does not apply and cannot preempt state

contract law, which (as discussed above) requires affirmative consent.

71.     Second, the "opt out" procedure of Rule 23(b)(3) cannot properly be transplanted

by a court to other legal contexts, absent statutory authority to do so.  Class actions are

fundamentally different.  Class actions are congressionally created and entail procedural

protections that do not exist in bankruptcy with respect to claims between non-debtors.[6]  "[P]eople

who fail to respond to class action notices are bound because that is the legal consequence that the

Rule specifies, and not on the theory that their inaction is the equivalent of an affirmative joinder

in an action." *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015).  By contrast,

in the context of non-debtor releases imposed via a chapter 11 plan, "[t]here is no rule that specifies

an 'opt out' mechanism or a 'deemed consent' mechanism."  *Id.*

---

[6] Further, "in the class action context there is a public policy that favors the consolidation of similar cases and that justifies the imposition of a rule that binds class members who have not affirmatively opted out." *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015).  By contrast, in the context of non-debtor releases imposed via a chapter 11 plan, there is no "general 'public policy' in favor of making third party releases applicable to as many creditors as possible."  *Id.*

72.     Indeed, as the court found in *Patterson*, "the comparison to class action litigation highlights the impropriety of finding releases consensual based merely on a failure to opt out" because in class actions, unlike chapter 11 plan confirmations, "courts must ensure that the class action complies with the unique requirements of Rule 23 of the Federal Rules of Civil Procedure." 636 B.R. at 686.

73.     Federal class actions may proceed only after a court certifies that the class meets a series of rigorous procedural requirements designed to ensure the appropriateness and fairness of class-wide litigation.   For any class to be certified, Rule 23(a) requires a court to find: (1) commonality ("questions of law or fact common to the class"); (2) typicality (named parties' claims or defenses "are typical . . . of the class"); and (3) adequacy of representation (representatives "will fairly and adequately protect the interests of the class").   *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (quoting Fed. R. Civ. P. 23); *see id.* at 621 (noting that these standards protect against the variability of equitable justice).

74.     Once those threshold showings are made, Rule 23(b) then requires that one of three further predicates satisfied.   Speaking generally, Rule 23(b)(1) authorizes class treatment where "individual adjudications would be impossible or unworkable," while Rule 23(b)(2) authorizes class actions where "the relief sought must perforce affect the entire class at once."   *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011).   Rule 23(b)(3), in turn, authorizes class treatment only where a court finds both that "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."   Fed. R. Civ. P. 23(b)(3).   (Notably, it is only class actions under Rule 23(b)(3)—and not those under

Rule 23(b)(1) and 23(b)(2)—that permit class members to opt out. *See Wal-Mart Stores*, 564 U.S. at 362 (explaining that "unlike (b)(1) and (b)(2) classes, the (b)(3) class is not mandatory").)

75.     Congressionally approved class action procedures also entail additional procedural safeguards.  A class must be specifically defined to identify the class members and the class claims. Fed. R. Civ. P. 23(c)(1)(B).   Moreover, the court must appoint class counsel that can best "represent the interests of the class."  Fed. R. Civ. P. 23(g).  In other words, the Federal Rules of Civil Procedure set objective procedural protections before a class can be certified and potential members bound.

76.     Further, "any class settlement that would bind absent class members requires court approval."  *Patterson*, 636 B.R. at 686 (citing Fed. R. Civ. P. 23(e)).  And approval may only be granted if, after a hearing, the court finds the settlement is "'fair, reasonable, and adequate' taking into account whether '(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate; and (D) the proposal treats class members equitably relative to each other.'"  *Id.* at 687 (quoting Fed. R. Civ. P. 23(e)(2)).  "The inquiry appropriate under Rule 23(e) . . . protects unnamed class members from unjust or unfair settlements affecting their rights." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

77.     "None of these protections exist in the context of a non-debtor release in a bankruptcy action."  *Patterson*, 636 B.R. at 686.  "[N]o party litigates on behalf of the absent releasing party."  *Id.*; *see also In re Smallhold, Inc.*, No. 14-10267, 2024 WL 4296938, at *12 n.53 (Sept. 25, 2024) ("[I]n the class action context, a class is only certified after a court makes a factual finding that the named representative is an appropriate representative of the unnamed class members. In the plan context, there is no named plaintiff, found by the court to be an adequate

representative, whose actions may presumptively bind others."). And "[n]o party with a typical claim has a duty to ensure that he fairly and adequately represents the best interests of the absent releasing party." *Patterson*, 636 B.R. at 686. "Moreover, the absent releasing party does not enjoy counsel that will represent his best interests in his stead."[7] *Id.*

78.    Finally, in a class action, members that fail to opt out have claims litigated on their behalf, and they may receive whatever proceeds are won in that litigation. Under a chapter 11 plan with non-debtor releases, although the releasing creditors may receive a distribution under the plan for their claims against a debtor, they lose their claims against the released non-debtors and any corresponding compensation forever if they (1) are unaware of the release and (2) fail to take affirmative action to opt out or object. Indeed, if a mere failure to opt out constitutes consent to a non-debtor release in bankruptcy, "then no court carries an obligation to ensure the fairness, reasonableness and adequacy of the relief afforded the absent releasing parties." *Patterson*, 636 B.R. at 687.

79.    Notably, state law also provides class-action procedures, with similar procedural protections to federal class actions, in which unnamed class members are bound by a court-approved class settlement unless they opt out. *See, e.g.,* Del. Super. Ct. R. Civ. P. 23. But outside of that class-action context, ordinary contract principles apply as discussed above, and a person cannot force a contract on someone else by deeming silence, such as a failure to "opt out," to be consent, except in narrow circumstances inapplicable here. ¶¶ 41-45, *supra*.

---

[7] Although the official committee of unsecured creditors owes a fiduciary duty to the creditor body as a whole, it does not owe a duty to any individual creditor or any specific group of creditors, and the diverse body of creditors to whom it owes duties often has conflicting interests. *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 717, 722 (Bankr. S.D.N.Y. 1992) (fiduciary duty of individual members of an official committee "extends to the class as a whole, not to its individual members"). Further, the committee's duties relate only to claims against the debtor, not claims against non-debtors.

80.     In sum, there will be no affirmative consent to Third-Party Releases given by the numerous persons and entities on whom such releases will be imposed.  Such releases are therefore non-consensual.

81.     This Court also may not approve the injunction enforcing the release by parties in interest against non-debtors because *Purdue* clearly stands for the proposition that non-consensual third-party releases and injunctions are not permitted by the Bankruptcy Code. *See Purdue*, 144 S.Ct. at 2088. As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context: asbestos-related bankruptcies, and these cases are not asbestos-related. *See Purdue*, 144 S. Ct. at 2085 (citing 11 U.S.C. § 524(e)). Even if non-debtor releases are consensual, there is no Code provision that authorizes chapter 11 plans or confirmation orders to include injunctions to enforce them. Further, such an injunction is not warranted by the traditional factors that support injunctive relief because, if the release is truly consensual, there is no threatened litigation and no need for an injunction to prevent "immediate and irreparable harm" to either the estates or the released parties. A consensual release may serve as an affirmative defense in any ensuing, post-effective date litigation between the third party releasees and releasors, but there is no reason for this Court to be involved with the post-effective date enforcement of those releases. Moreover, this injunction essentially precludes any party deemed to consent to this release from raising any issue with respect to the effectiveness or enforceability of the release (such as mistake or lack of capacity) under applicable non-bankruptcy law.

**B.      *The Plan is Not Confirmable Because the Releases Do Not Have Exceptions for Fraud, Willful Misconduct or Gross Negligence as to Debtor Parties or Estate Fiduciaries***

82.     The Plan is not confirmable as drafted because the Third-Party Release and the Debtor Release do not make an exception for actual fraud, willful misconduct, or gross negligence.

This is objectionable for several reasons. First, the Debtors are included in the definition of "Released Parties," and therefore will be receiving releases under the Third-Party Release provision. Under the Bankruptcy Code, even if the Debtors were entitled to a discharge, the Bankruptcy Code bars them from being discharged for claims of fraud and willful misconduct. *See* 11 U.S.C. § 523(a)(2, 4, 6).

83.     The releases to be given by the Debtors under the Debtor Release also fail to include any exception for actual fraud, willful misconduct, or gross negligence. Through this release, and the "Related Parties" clause in the definition of Released Parties, the Debtors are releasing, among others, all of their employees.

84.     The Debtors have the burden to establish how their release of claims in favor of the Released Parties, including but not limited to claims for known and unknown fraud, willful misconduct, and gross negligence of their employees and the other Released Parties, meet the requirements of *In re Zenith Electronics Corp.,* 241 B.R. 92, 110 (Bankr. D. Del. 1999) and *In re Master Mortgage Inv. Fund, Inc.,* 168 B.R. 930, 937-38 (Bankr. W. D. Mo. 1994). In *Zenith,* the bankruptcy court noted that a plan, notwithstanding section 524(e), may provide for releases by the debtor of claims against third parties under certain limited circumstances. The bankruptcy court in *Zenith* adopted a five-part test enunciated in *Master Mortgage Investment Fund, Inc.,* 168 B.R. 930 (Bankr. W.D. Mo. 1994) to determine whether a release by a debtor of a third party as part of a plan is permissible. These factors are:

(1) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;
(2) substantial contribution by the non-debtor of assets to the reorganization;
(3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;

(4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes 'overwhelmingly' votes to accept the plan; and

(5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.

*Zenith,* 241 B.R. at 111. The *Master Mortgage/Zenith* factors must be separately applied to each of the entities.   Absent such a showing, and appropriate findings by the Court, the plan is unconfirmable.

85.     In addition, both the Third-Party Release and the Debtor Release benefit certain fiduciaries of the estate, such as the Debtors' directors and officers, and professionals retained by the Debtors in these cases.   Under Circuit precedent, any exculpation of fiduciaries must carve out claims of fraud, intentional misconduct and gross negligence, which the Exculpation provision in the Debtors' Plan does.  *See In re PWS Holding Corp.,* 228 F.3d 224, 246 (3d Cir. 2000).  However, because the Third-Party Release and the Debtor Release do not have carve-outs for fraud, intentional misconduct and gross negligence, these estate fiduciaries are getting through the release provisions of the Plan what they are not entitled to receive by way of exculpation.   As recognized by this Court in *Washington Mutual,* released parties who are fiduciaries of the estate are receiving exculpations, and therefore the releases are "unnecessary, duplicative and ***exceed the limits of what they are entitled to receive***" under the exculpations.   *In re Washington Mut., Inc.*, 442 B.R. 314, 350 (Bankr. D. Del. 2011) (emphasis added).

### B.  Plan Impermissibly Deemed to Be a Settlement

86.     Article 14.3 of the Plan provides:

**Comprehensive Settlement of Claims and Controversies**. Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, Distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including all claims arising prior to the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, by or against

any Released Party, or holders of Claims, arising out of, relating to or in connection with the business or affairs of or transactions with the Debtors, as well as the compromises and arrangements provided for in the Global Settlement. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, creditors and other parties in interest, and are fair, equitable and within the range of reasonableness. The provisions of the Plan, including its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.

Plan Art. 14.3.

87.    Section 1123(b)(3)(A) of the Bankruptcy Code allows a plan proponent to "provide for [] the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A) (emphasis added).

88.    Section 1123(b)(3) only allows a debtor to settle claims it has against others; it does not allow a debtor to settle claims that creditors and interest holders may have against it, which is what Plan § 6.9 seeks to do. *See Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 489, 496 (B.A.P. 9th Cir. 2003) ("The only reference in [section 1123(b)] to adjustments of claims is the authorization for a plan to provide for 'the settlement or adjustment of any claim or interest belonging to the debtor or to the estate.' . . . It is significant that there is no parallel authorization regarding claims against the estate.") (quoting section 1123(b)(3)(A)) (internal citation omitted).

89.    The resolution of claims against the Debtors is governed by sections 1129 and 1141.

90.    A plan may incorporate one or more negotiated settlements, but a plan is not itself a settlement. Sending a plan to impaired creditors for a vote is not equivalent to parties negotiating a settlement among themselves. A "settlement" is "an agreement ending a dispute or lawsuit." BLACK'S LAW DICTIONARY (10th ed. 2014). An "agreement" is "a mutual understanding between

two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons." *Id.*

91.     Approval of settlements is governed by Federal Rule of Bankruptcy Procedure 9019, which provides that, "[o]n motion by the trustee [or chapter 11 debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement."  But, because a "settlement" requires an agreement between the settling parties, Rule 9019 governs only parties that have entered into an express settlement agreement; it is not a blanket provision allowing general "settlements" to be unilaterally imposed upon broad swaths of claimants that have no formal agreement with any party to "settle" their claims.

92.     The decision whether to approve a settlement under Rule 9019 is left to the sound discretion of the bankruptcy court, which "must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'" *Washington Mut.*, 442 B.R. at 338 (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).   In contrast, chapter 11 plans are subject to the requirements of Bankruptcy Code sections 1123 and 1129.  What may be permissible under a negotiated settlement agreement that is considered "fair, reasonable, and in the best interest of the estate" outside of the plan context is different from what may be permissible under a plan.

93.     Here, Article 14.3 of the Plan purports to treat the Plan itself as if it were a Rule 9019 "settlement."  Further, it appears Article 14.3 is not limited to settling claims belonging to the Debtor or the estate.  Thus, Article 14.3 exceeds the scope of what can be settled under section 1123(b)(3)(A).  Unless Article 14.3 is narrowed so that (i) it pertains only to claims the Debtors are settling against others and (ii) the Plan itself is not a settlement, the Plan does not comply with section 1123(b)(3)(A) and does not satisfy section 1129(a)(1).

## CONCLUSION

94.     For the reasons set forth above, the Disclosure Statement should not be approved, and the Disclosure Statement Motion should be denied.

## RESERVATION OF RIGHTS

95.     The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights, remedies and obligations to, *inter alia*, complement, supplement, augment, alter and/or modify this Objection, file an appropriate Motion and/or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.  The U.S. Trustee also reserves all rights with respect to plan confirmation issues until the relevant objection deadline.

**WHEREFORE**, the U.S. Trustee requests that this Court enter an order (i) denying approval of the Disclosure Statement and the Disclosure Statement Motion and (ii) granting such other relief that the Court deems just and proper.

Dated: October 16, 2024
      Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGION 3**

By:  /s/ *Jonathan W. Lipshie*
      Jonathan W. Lipshie
      Trial Attorney
      United States Department of Justice
      Office of the United States Trustee
      J. Caleb Boggs Federal Building
      844 King Street, Suite 2207, Lockbox 35
      Wilmington, Delaware 19801
      Phone: (202) 567-1124
      Fax:    (302) 573-6497
      Email: jon.lipshie@usdoj.gov